1  SCOTT+SCOTT LLP
   ARTHUR L. SHINGLER III (181719)
2  MARY K. BLASY (211262)
   HAL D. CUNNINGHAM (243048)
3  600 B Street, Suite 1500
   San Diego, CA  92101
4  Telephone:  619/233-4565
   619/233-0508 (fax)
5  ashingler@scott-scott.com
   mblasy@scott-scott.com
6     – and –
   DAVID R. SCOTT (CT16080)
7  P.O. Box 192
   108 Norwich Avenue
8  Colchester, CT  06415
   Telephone:  860/537-3818
9  860/537-4432 (fax)
   drscott@scott-scott.com
10
   *Lead Counsel for Lead Plaintiffs*
11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15 | IN RE BARE ESCENTUALS, INC.          | Master File No. C-09-03268-PJH
   | SECURITIES LITIGATION                |
16 |                                      | <u>CLASS ACTION</u>
17 | _____ |
                                          | CONSOLIDATED COMPLAINT FOR
18 | This Document Relates To:            | VIOLATIONS OF THE FEDERAL
                                          | SECURITIES LAWS
19 | All Actions                          |
                                          | <u>DEMAND FOR JURY TRIAL</u>
20 | _____ |

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

# <u>TABLE OF CONTENTS</u>

2   NATURE OF THE ACTION.................................................................................................1

3   SUMMARY OF THE ACTION ..........................................................................................1

4   JURISDICTION AND VENUE...........................................................................................15

5   PARTIES...............................................................................................................................16

6   THE FALSE AND DEFECTIVE IPO REGISTRATION STATEMENT AND
        PROSPECTUS................................................................................................................32
7

8   THE FALSE AND DEFECTIVE MARCH 2007 OFFERING REGISTRATION
        STATEMENT AND PROSPECTUS ............................................................................37

9   THE FALSE AND DEFECTIVE JUNE 2007 OFFERING REGISTRATION STATEMENT
        AND PROSPECTUS......................................................................................................41
10

    BACKGROUND TO THE EXCHANGE ACT CLASS PERIOD ALLEGATIONS ........46
11

    BARE ESCENTUALS PRIVATE EQUITY SPONSORS "KEPT COMING BACK TO THE
12      TROUGH" VIA REPEATED PUBLIC STOCK OFFERINGS OF STOCK .........54

13  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ..........55

14  THE TRUTH BEGINS TO BE REVEALED ....................................................................74

15  POST CLASS PERIOD DISCLOSURES..........................................................................88

16  LOSS CAUSATION/ECONOMIC LOSS AS TO THE EXCHANGE ACT CLAIMS ONLY..........91

17  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        DOCTRINE ...................................................................................................................94
18

    NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ............................95
19

    CLASS ACTION ALLEGATIONS....................................................................................96
20

    COUNT I..............................................................................................................................98
21

    COUNT II.............................................................................................................................99
22

    COUNT III...........................................................................................................................100
23

    COUNT IV...........................................................................................................................101
24

    COUNT V.............................................................................................................................102
25

    COUNT VI...........................................................................................................................102
26

    PRAYER FOR RELIEF .....................................................................................................103
27

    JURY DEMAND..................................................................................................................104
28
    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 1 -

Lead Plaintiffs, the Westmoreland County Retirement System and Vincent J. Takas (collectively, "Plaintiffs" or "Lead Plaintiffs"), allege the following based upon the investigation by plaintiffs' counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bare Escentuals, Inc. ("Bare Escentuals" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action against Bare Escentuals, certain of its current and former directors and executives, and its investment bankers (collectively, "Defendants") for violations of the Securities Act of 1933 (the "Securities Act") and violations of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs bring the Securities Act claims on behalf of themselves and all other purchasers of Bare Escentuals' common stock issued pursuant and/or traceable to the false and misleading Registration Statements and Prospectuses filed with the SEC by Bare Escentuals in connection with the Company's September 28, 2006 initial public offering of 18.4 million shares at $22 per share for proceeds of $404.8 million (the "IPO"),and the Company's March 14, 2007 follow-on offering of 13.8 million shares at $34.50 per share for proceeds of $476.1 million (the "March 2007 Offering").  The Securities Act claims involve solely ***strict liability*** and ***negligence*** claims.  ***All fraud allegations are expressly disclaimed as to Plaintiffs' Securities Act claims.***  Separately, Lead Plaintiffs bring the Exchange Act claims on behalf of themselves and all other purchasers of Bare Escentuals' common stock between September 28, 2006 and October 31, 2008 (the "Class Period") and who were damaged thereby.

## SUMMARY OF THE ACTION

2.      Defendant Bare Escentuals describes itself as "one of the leading prestige cosmetic companies in the United States and an innovator in mineral-based cosmetics."  The Company

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 1 -

1  develops, markets and sells branded cosmetics and skin care products primarily under its

2  bareMinerals, RareMinerals, Buxom and md formulations brands worldwide, utilizing what it

3  characterizes as a "distinctive marketing strategy and a multi-channel distribution model utilizing

4  traditional retail distribution channels consisting of premium wholesale, including Sephora, Ulta and

5  selected department stores; company-owned boutiques; and spas and salons; as well as direct to

6  consumer distribution channels consisting of home shopping television on QVC; infomercials; and

7  online shopping."

8      3.     The Bare Escentuals brand dates back to the opening of its first boutique in 1976, and

9  its products have been marketed through the QVC home shopping network since 1997.  But sales

10  never really took off until the introduction of Bare Escentuals' infomercials in 2001.  The longer

11  infomercials were 28 minutes long and featured demonstrations by Bare Escentuals' Chief Executive

12  Officer Leslie Blodgett ("Blodgett") applying the Company's powder-based foundation and related

13  cosmetics.  The Company also employed a shorter 60-120 second format that was being broadcast

14  more than 500 times a week at the time of the IPO.

15      4.     By 2002, consumers worldwide had flocked to try the cosmetic "phenomenon"

16  known as "bare mineral powder makeup."  Women around the world viewed firsthand the cosmetic

17  television infomercial evolution, beginning the mineral makeup boom and increasing Bare

18  Escentuals' sales ten-fold from annual sales of $25 million in 2001 to over $250 million in 2005.  In

19  the months leading up to the Company's November 2006 IPO, the Company's sales rose to more

20  than $394.5 million in FY06.

21      5.     Bare Escentuals obtained this exponential 2001 - 2006 sales growth by distinguishing

22  itself from other cosmetic companies in two distinctive ways.  First, Bare Escentuals was a first-

23  mover in the mineral powder makeup phenomenon that peaked in 2008 – by which time almost all

24  worldwide cosmetic companies, including Estée Lauder, M.A.C. Cosmetics, and L'Oréal Cosmetics,

25  had introduced their own versions of mineral-based makeup.  Rather than traditional glycerin-based

26  cosmetics, Bare Escentuals claimed its mineral-based cosmetics were 100% natural and, thus, better

27  for the skin.  This "back to basics" health mantra that supported the Company's sales in boutiques in

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 2 -

1   the health-conscious San Francisco Bay Area in the 90's was also well-received across the country

2   through the advent of the Company's infomercials.

3       6.    But the Bare Escentuals story was really never about the product, ***it was more about***

4   ***brand development and sales***.  The investors who bought more than $1.17+ billion of Bare

5   Escentuals stock in the three registered stock offerings the Company and its underwriters conducted

6   between November 2006 and June 2007 and during the Class Period that followed, did not buy into a

7   product line, but into a purportedly well-greased sales machine.[1]  In fact, Bare Escentuals does not

8   now and never has manufactured ***anything***.  Bare Escentuals does not now and never has owned ***a***

9   ***single patent*** on any of its products or methods of production. There are zero barriers to entry in this

10   market.  The minerals and powders that compose its cosmetics cost next to nothing and Bare

11   Escentuals buys the brushes and other application supplies it packages with its cosmetics in China.

12   As a result, for instance, if a particular Christmas kit does not sell as expected, the Company simply

13   breaks down those kits and re-packages their contents as a Mother's Day kit, a "Getting Started Kit"

14   or some other packaged offering.  Indeed, after reviewing an initial draft of the Company's proposed

15   original IPO Registration Statement/Prospectus, the SEC specifically admonished that the Company

16   "clarify that third parties develop and manufacture your products" in an amended registration

17   statement.

18       7.    Thus, it is truly the second distinction which forms the real basis for the phenomenal

19   run-up in Bare Escentuals' pre-IPO sales – ***and, as fate would have it, the Company's Achilles***

20   ***tendon***.  In reality, as evidenced in the Company's IPO statement and its agreement with QVC

21   attached thereto, during the Company's 2001-2006 uber-sales growth years, its sales channels were

22   very tightly controlled and that control permitted Bare Escentuals to limit most of its sales to

23   prepackaged "kits" containing any variety of products Bare Escentuals selected and assembled (not

24   all of which customers necessarily wanted).  It also permitted Bare Escentuals to charge premium

25

26   [1]     In addition to the IPO and the March 2007 Offering, on June 14, 2007, the Company

27   conducted another follow-on offering of 8 million shares priced at $36.50 per share for proceeds of $292 million (hereinafter, the "June 2007 Offering").

28   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 3 -

1  prices for cosmetics far in excess of market prices because, at the time, it was the only company

2  meaningfully selling mineral-based makeup.

3       8.    As the IPO Registration Statement/Prospectus explained, in December 1998, the

4  Company entered into an agreement with QVC, Inc. under which it granted QVC "***the exclusive***

5  ***right to promote, advertise, market, sell and distribute*** [its] products in all distribution channels ***in***

6  ***the United States*** other than…company-owned boutiques and ***prestige*** retail channels."  The QVC

7  agreement defined "prestige retail channels" as "traditional department stores and specialty stores,

8  specialty boutiques and beauty salons," but explicitly "exclude[d] ***all other retail channels of***

9  ***distribution, including discount stores, drug stores, warehouse stores, superstores and retail outlet***

10  ***stores***."

11       9.    In September 2006, Bare Escentuals and QVC entered into a letter agreement

12  amending their prior agreement and giving the Company "the right to enter into additional

13  distribution channels."  Under the amended letter agreement, Bare Escentuals could "promote,

14  advertise, market and sell [its] products on [its] websites, advertising, catalogs, direct mail

15  promotions and telephone numbers listed in [its] websites, catalogs and direct mail promotions, so

16  long as [it paid] QVC a specified royalty on net sales…in these channels."  The amended letter

17  agreement still "prohibit[ed] [Bare Escentuals] from selling products through retail channels not

18  considered 'prestige,' ***such as discount stores, warehouse stores and superstores***…."  Pursuant to

19  the amended letter agreement, the Company "granted QVC the exclusive right to promote, advertise,

20  market and sell [its] products in Japan, Germany and the United Kingdom, subject to [its] rights to

21  promote, advertise, market and sell [its] products in the same distribution channels available to [the

22  Company] in the United States."  According to the IPO Registration Statement/Prospectus, all of the

23  QVC agreements contained penalty provisions and the September 2006 amended QVC agreement

24  attached to the IPO Registration Statement/Prospectus contained Bare Escentuals' express

25  representation that it was then in compliance with the terms of the agreement.

26       10.    Thus, like the investors who bought Bare Escentuals stock in the three stock offerings

27  at the start of the Class Period, and those who would continue buying its stock in the after-market

28

1   throughout the Class Period, QVC understood that the Bare Escentuals success story was not about

2   owning or manufacturing the products *but about controlling and owning the sales channels*.

3   Indeed, until June 2004, QVC itself owned a significant financial stake in Bare Escentuals, having

4   accepted hundreds of millions of dollars worth of stock and warrants in connection with its

5   consignment-type wholesale agreements with Bare Escentuals.  However, in preparation for the

6   Company's IPO, as part of an omnibus restructuring in June 2004, QVC cashed in its stake in Bare

7   Escentuals and Bare Escentuals' executives turned to private equity sponsors to provide the bridge

8   financing to their IPO.

9          11.     However, in reality, at the time of its IPO in September 2006, Bare Escentuals was

10  not in compliance with the spirit, much less the word, of its QVC exclusivity agreement.  In fact,

11  though Bare Escentuals repeatedly touted in the IPO Registration Statement/Prospectus and

12  thereafter that its sales model and its "multi-channel distribution strategy provide[d] for greater

13  consumer diversity, reach and convenience *while reinforcing the authenticity and premium image*

14  *of [the Company's] brands*," Defendants concealed, *at the time of the IPO,* that Bare Escentuals

15  product the Company itself had put into the chain of commerce through distributors was being

16  prepared for resale at big box discounters Costco and Target for the 2006 Christmas season.

17  Defendants also knew at some point before the Fall of 2007 that their products were being sold on

18  Target's website and by early Spring 2008 that Target was displaying Bare Escentuals' products in

19  its sales circular.

20         12.     Indeed, Bare Escentuals filed litigation in federal court in January 2007 against

21  Costco.  The Company characterized that litigation as involving "*100,000 high-end cosmetic kits*

22  *that Costco purchased from a third party for millions of dollars*," repackaged and was selling in

23  December 2006 at substantial discounts to the prices Bare Escentuals, QVC and its other "prestige"

24  wholesalers were charging.  Defendants explicitly averred in that action that *"Bare Escentuals ha[d]*

25  *invested substantial time and money in developing, marketing, and selling its products, and in its*

26  *reputation and goodwill*," and that "*Costco's unauthorized actions have resulted or will result in*

27  *harm to Bare Escentuals' sales, brand name, market reputation, and goodwill.*"

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 5 -

1       13.    Moreover, Bare Escentuals' former Director of Production during the

2   February/March 2007 to February/March 2008 time period (who was responsible for coordinating

3   the production of Bare Escentuals' make-up products across all sales channels with the Sourcing,

4   Planning and Sales Departments), specifically described to plaintiffs' counsels' investigators that

5   they recalled working on fulfilling a large special order that suddenly came in in October 2007.  This

6   Director of Production believed this order ended up, partially or totally, on Target's shelves.

7   Further, the Company's former Director of Production specifically recalled working on fulfilling that

8   particular order because it was so large and because it was being filled toward the end of the quarter.

9   This former Director of Production also recalled being under the impression that Bare Escentuals

10  was trying to fulfill its sales goals for that particular quarter at the time the order was being filled,

11  and that Production was working on specific kits designed just for this individual customer.

12      14.    Yet, Defendants concealed their knowledge of these big box discounter sales –

13  including the aforementioned litigation – from the investing public until the Company's outside

14  auditors mandated disclosure in connection with its preparation of the Company's 2007 annual

15  financial report in February 2008.  And even then, during the Company's earnings conference held

16  February 28, 2008, Defendants attempted to falsely assure the investment community that the

17  "unauthorized" Target and Costco sales would be stopped.  As would be revealed, however, Bare

18  Escentuals, owned no patents on its products and had no legally enforceable right to stop big box

19  discounters from selling its product so long as they legally procured the product.  ***Indeed, though it***

20  ***appears Bare Escentuals was eventually able to cut off Costco's supplier, Target continues selling***

21  ***Bare Escentuals on its website to this day.***

22      15.    The Target and Costco sales would dramatically dilute Bare Escentuals' pricing

23  power though, forcing the Company to succumb to pricing pressures and eventually forcing the

24  Company to disclose it was reducing the price of certain starter kits from $60 to as low as $15 at the

25  end of the Class Period on October 31, 2008.  In fact, Bare Escentuals' Lead Business Manager for

26  much of Southern California during the March 2007 - June 2008 time period recalled hearing from

27  customers throughout the duration of his tenure as Lead Business Manager that Bare Escentuals

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 6 -

1   products were available in Target and Costco stores and he was instructed by the corporate office to

2   honor Target and Costco prices if he received inquiries from customers.  He recalled receiving

3   approximately five such inquiries per month from all of his stores.  One such product he recalled was

4   a complexion enhancer kit Bare Escentuals sold for $49.99 but the big box discounter was selling for

5   approximately $39.99 – *a 25% price discount*.

6        16.    The Target and Costco sales also jeopardized the Company's relations with its

7   "prestige" wholesalers who neither wanted to compete with Costco and Target on price point nor to

8   be perceived as selling cosmetics readily available to the masses.  Indeed, in retaliation, Sephora and

9   other wholesalers would dramatically slash their orders and the Company's sales declined

10  dramatically during 2007.  By the end of the Class Period on October 31, 2008, the Company would

11  be forced to disclose that the inventory it held at these retailers, essentially under consignment

12  contracts, was extremely bloated and far exceeded sales demand.  The resulting decline in sales to

13  the Company's prestige wholesalers would significantly diminish sales for several quarters and some

14  wholesalers are still engaged in further "destocking" efforts.

15       17.    According to the former Bare Escentuals Director of Retail Boutiques from

16  September 2005 to September 2007, the issue of sales at Target and Costco was common knowledge

17  at Bare Escentuals during 1Q 07 and 2Q 07 and the issue was raised regularly at the meetings of the

18  Company's Directors of Finance, Wholesale Distribution, Inventory Control, Production and Human

19  Resources, and other departments at Bare Escentuals.  According to the former Director of Retail

20  Boutiques, approximately 30 executives attended these monthly meetings which were typically

21  conducted by Chief Financial Officer Myles McCormick ("McCormick"), and sometimes President

22  Diane Miles ("Miles").  According to this former Director of Retail Boutiques, the concern

23  expressed among sales Directors was that these types of sales would "cut into the brand name cache

24  and could anger wholesalers, especially Sephora," which "would not put up with" Costco and Target

25  selling the same "Getting Started" kits these prestige wholesalers were selling.  According to the

26  former Director of Retail Boutiques, during the executive's tenure at Bare Escentuals, the Sephora

27  account was worth approximately $180 million annually and Bare Escentuals' executives did not

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     - 7 -

1  want to jeopardize that relationship.  According to the former Director of Retail Boutiques,

2  McCormick assured sales Directors that the Company "was looking into" the situation.  Meanwhile,

3  however, Bare Escentuals' executives authorized certain prestige wholesalers to honor the Target

4  and Costco prices if customers complained, including Macy's and Nordstrom.

5  18.  The Target and Costco sales would also ring a death-knell to the most lucrative aspect

6  of Bare Escentuals' already fragile infomercial and QVC sales model.  Unbeknownst to investors –

7  because Defendants actively concealed this fact too – a significant portion of Bare Escentuals' stellar

8  2001-2006 direct-to-consumer sales growth was dependent upon Bare Escentuals' ability to

9  unwittingly sign up customers for "club" sales programs whereby their credit cards were later

10  automatically billed for multiple shipments beyond their initial orders without the customers'

11  consent.  Despite only having agreed to purchase an innocuous "starter kit," two to three months

12  after the initial product was delivered, they would be shipped – and their credit cards again billed for

13  – additional small but costly shipments.  Such automatically recurring credit card transactions are

14  notoriously easy to start but nearly impossible to stop.  As a result, the Company's Customer Service

15  and Accounts Receivable departments were receiving hundreds of complaints and refund demands.

16  According to some customers, though, the response was yet another shipment.  A former Bare

17  Escentuals Assistant Controller who served in that capacity between May 2007 and October 2008

18  and oversaw all of the Company's revenue channels specifically recalled that ongoing customer

19  complaints about the automatic shipments was a recurring theme and she recalled a discussion about

20  terminating the "club" sales practice.  A former Accounts Receivable Manager who reported to that

21  former Assistant Controller during the February 2008 - August 2008 time period confirmed A/R

22  received multiple daily complaints from customers who received shipments they did not order.

23  19.  Meanwhile, Bare Escentuals, which "recognize[d these] sales when merchandise

24  [was] shipped from a warehouse directly to…infomercial customers and online shopping customer,"

25  collected and reported millions of dollars in unearned revenues.  While Bare Escentuals was able to

26  capture, obtain and report several years worth of phenomenal premium sales employing this guise

27  leading up to its September 2006 IPO, not only would the repeat sales these tactics generated grow

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 8 -

1   lean in the period following the IPO and the follow-on offerings, the Company would be forced to

2   refund previously-recognized sales and many would-be direct-to-consumer sales customers became

3   brick-and-mortar shoppers instead.  *In fact, in the two years following the Company's IPO, the*

4   *Company's  so-called direct-to-consumer sales plummeted  from $179 million in FY 2006,*

5   *representing 45.6% of all sales, to $170 million in FY 2008, representing just 30.6% all sales.*

6        20.    Concomitantly, Defendants' aggressive drive to haphazardly open hundreds of what

7   they would later refer to as "brick-and-mortar" sales channels during the Class Period was also

8   cannibalizing sales from the Company's other distribution channels, including its own boutiques,

9   infomercial sales, QVC and even "prestige" wholesalers.  According to the "Growth Strategy"

10  published in the Company's IPO Registration Statement/Prospectus, Defendants stated they planned

11  to "[f]urther penetrate each of [their] multiple distribution channels" as follows:

12  •   *Wholesale.   We intend to continue to increase net sales through key*
        *premium wholesale accounts, such as Sephora and Ulta, home shopping*
13      *television, and spas and salons*. Within Sephora and Ulta, we will seek to
        improve our in-store product positioning and collaborative marketing efforts.
14      In addition, we expect our premium wholesale sales will grow as Sephora
        and Ulta open new stores. *We also may explore additional opportunities to*
15      *sell our products in premium department stores.*

16  •   *Retail.   We intend to expand our base of company-owned boutiques and to*
        *grow our infomercial sales. We believe substantial opportunity exists to*
17      *open additional domestic boutiques*. As of July 2, 2006, we operated 30
        boutiques and reported average annual net sales of approximately $1,400 per
18      square foot for the fiscal year ended January 1, 2006. We intend to continue
        growing our infomercial sales by increasing and improving the effectiveness
19      of our media spending.

20       21.    Instead, by December 31, 2008, the rampant expansion effort to chase sales at all

21  costs had resulted in Bare Escentuals opening over 750 so-called "brick and mortar" sales channels –

22  *though absolutely no effort was made internally to coordinate the multiple competing sales spots*

23  *that were popping up* – including multiple competing sales outlets in single shopping malls.

24  According to the Company's 2008 annual financial report, "[a]s of December 28, 2008, [Bare

25  Escentuals's] products were distributed in a total of approximately 795 North American premium

26  wholesale locations, which include Ulta, Sephora, Nordstrom, Macy's, Sephora in JCPenney,

27  Bloomingdales and Shoppers Drug Mart in Canada."  As a result, the Company's own boutiques

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 9 -

1  were competing with not only Target and Costco but with multiple other retail locations within a

2  single mall.

3       22.    Any of these defects in the Company's sales model could, on its own, throw sales

4  projections off wildly.  Collectively, they rendered Bare Escentuals Class Period sales projections,

5  and stock valuations based on those projections (both internal and external), utterly meaningless.

6  Indeed, just as the SEC had presciently admonished the Company to fully disclose in its IPO

7  Registration Statement/Prospectus just how much it relied upon third parties to develop and

8  manufacture its products, the hundreds of millions of dollars the Company had  recently paid to its

9  private equity sponsors and executives in dividends just prior to the IPO,  and that its so-called "risk

10 disclosures" should not – **in fact could not** – remain in the boilerplate fashion in which they were

11 initially submitted to the SEC, in an August 24, 2006 letter to Bare Escentuals CEO Leslie Blodgett,

12 the SEC explicitly demanded that Defendants explain how the purported "value" of Bare Escentuals'

13 stock had almost instantaneously increased **400%** from the $5.42 the Company's economists had

14 valued it at to $22 in the months leading up to the IPO.  In its Comment Letter critiquing the

15 Company's initial draft of the IPO Registration Statement/Prospectus, the SEC stated:

16         ***It is unclear how your common stock value could have significantly increased in***
        ***very short time periods.*** Please provide a reconciliation between the common stock
17         values listed below. The reconciliation should show the estimated impact of each
        significant factor contributing to the difference in values. ***For example, the***
18         ***reconciliation should show how much of the increase in value was related to actual***
        ***results exceeding forecasts***. Please address the following significant increases:
19

20         • The fair value per share increased ***45% from $5.42 at December 20, 2005 to $7.88***
        ***at January 6, 2006***;

21         • The fair value per share increased ***60% from $7.88 at March 31, 2006 to $12.64 at***
        ***April 2, 2006***;
22

23         • The fair value per share increased ***59% from $12.64 at June 6, 2006 to $20.15 at***
        ***June 7, 2006***; and

24         • The fair value per share was ***$13.30*** at July 20, 2006. ***The estimated IPO range per***
        ***share of $22.00 to $26.00 results in an increase in value of 65% to 95% in an***
25         ***approximate one to two month period***.

26      23.    Rather than justifying this dramatic increase with indications of real stock ***value***, *i.e.*

27 by showing, for instance, as the SEC suggested, that "***the increase in value was related to actual***

28 CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 10 -

1  *results exceeding forecasts*," Defendants, however, simply restated the Company's interim financial

2  reports for January 2006 - June 2006 in the final IPO Registration Statement/Prospectus "to reflect

3  adjustments relating to the estimated fair value per share of the Company's common stock."

4       24.    Meanwhile, the Company's insiders cashed in. As described in relevant part in an

5  October 2006 exposé by *Business Week* entitled "***Gluttons At The Gate - Private equity are using***

6  ***slick new tricks to gorge on corporate assets.  A story of excess***":

7      The case of San-Francisco's Bare Escentuals Inc. (BARE) shows how reliant firms

8  have become on public stock investors. In 2005 the cosmetics maker took on $412
million in debt, mostly to pay its owners, Boston's Berkshire Partners and San

9  Francisco's JH Partners, a total of $309 million in dividends and "transaction fees" in
two installments eight months apart. ***The payments were a stretch for a company***

10  ***that earned only $24 million in 2005. In September, 2005, Standard & Poor's***
***revised its outlook for the company to "negative" from "stable," citing its "very***
***aggressive financial policy."***

11

12  ***Yet Bare Escentuals' owners, who bought the company in June, 2004, kept coming***
***back to the trough.*** In June, 2006, despite S&P's decision in May to lower the

13  company's credit rating from to B to B- and the company's soaring debt-payoff
costs, Bare Escentuals began to borrow again to pay its owners even larger amounts:

14  a $340 million dividend, $218,00 in management fees, and $1.8 million in stock for
arranging the dividend.

15

16  

17

18

19

20  On Sept. 29, investors picked up the tab through an IPO. Most of the money raised
was used to repay debt, ***except for $1.8 million that went to the owners "as***

21  ***consideration for the termination of our management agreements with them."*** Bare
Escentuals and its owners declined to comment on the payments. For now, the

22  company is doing well both by its public investors and its owners. Its stock has
jumped 44% since the IPO.

23  [Emphasis added.]

24

25       25.    Indeed, beginning in June 2004, the Company's two private equity sponsors began a

26  series of "recapitalizations" in which affiliates of Berkshire Partners LLC, the Boston-based private

27  investment firm ("Berkshire Partners"), JH Partners, LLC, a San Francisco-based private equity firm

28  ("JH Partners") (collectively, the "Private Equity Sponsors"), and certain members of the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 11 -

1   Company's management acquired a majority controlling interest in Bare Escentuals.  ***QVC cashed***
2   ***out of its stake in Bare Escentuals in the same transaction.***  On June 10, 2004, Bare Escentuals
3   entered into management agreements with Berkshire Partners and JH Partners.  Immediately
4   following the June 2004 recapitalization, Berkshire Partners would control 46.8% of the Company's
5   stock and appoint two directors to the Company's Board, including Bare Escentuals' Chairman of
6   the Board, Ross M. Jones ("Jones"), and JH Partners would control another 31.6% of Bare
7   Escentuals' stock and appoint two members of the Bare Escentuals Board.

8   　　　　26.　　As identified in the *Business Week* exposé, while the Company's sales revenues were
9   flying high, beginning in February 2005, the Company undertook another series of
10  "recapitalizations" whereby it took on debt and used significant cash to pay hundreds of millions of
11  dollars in dividends to its Private Equity Sponsors and its executives.  Finally, in September 2006,
12  the Company completed its IPO in order to repay the outstanding indebtedness and to buy out the
13  management agreements with Berkshire Partners and JH Partners.  ***In connection with its review of***
14  ***the Company's initial IPO Registration Statement/Prospectus, the SEC would expressly admonish***
15  ***Bare Escentuals to "disclose that Berkshire Partners, JH Partners, and members of senior***
16  ***management were the primary beneficiaries of the dividends paid and quantify the amount paid to***
17  ***each."***

18  　　　　27.　　In March 2007, Bare Escentuals, Berkshire Partners, JH Partners, certain of the
19  Company's senior executives and several other "Selling Stockholders" went back to the capital
20  markets "trough" again.  Bare Escentuals issued and offered another 575,000 shares, receiving $19.8
21  million in gross proceeds, and the other Selling Stockholders, including Bare Escentuals' CEO
22  Blodgett, sold an additional 13.225 million previously-issued shares, receiving $456+ million in
23  gross proceeds.

24  　　　　28.　　Once again, in June 2007, Bare Escentuals, Berkshire Partners, JH Partners, certain of
25  the Company's senior executives and several other "Selling Stockholders" went back to the capital
26  markets again.  Bare Escentuals offered another 100,000 shares, receiving $3.6 million in gross

27

28

1   proceeds, and the other Selling Stockholders, including Blodgett, sold an additional 7.9 million

2   previously-issued shares, receiving $288+ million in gross proceeds.

3        29.   Meanwhile, Defendants issued a series of false and misleading statements concerning

4   Bare Escentuals' sales practices and business model.  As a result, the Company's stock traded up to

5   $28 in its first day of trading following its IPO, over 27% higher than the IPO price of $22 per share.

6   The Company's stock price continued pulsating on Defendants' positive, but false, statements,

7   *trading as high as $44 per share in June 2007*, and permitting Bare Escentuals to issue and sell

8   over 18 million shares in its September 2006 IPO, for $404.8 million in proceeds, and the

9   Company's Private Equity Sponsors and executives to unload over 21.3 million shares of Bare

10  Escentuals stock into the unsuspecting public market, receiving over $700 million in proceeds in the

11  March and June 2006 follow-on offerings.  Overnight, insiders Berkshire Partners, JH Partners and

12  other Company insiders, including Blodgett, received handsome premiums on their investment in

13  Bare Escentuals to the detriment of the investing public who purchased at prices inflated by

14  Defendants' misstatements and material omissions.

15       30.   As Defendants would later admit, the Registration Statement/Prospectuses issued by

16  Defendants in connection with the IPO, the March 2007 Offering and the June 2007 Offering were

17  false when filed with and declared effective by the SEC.  Defendants have now admitted that the

18  Registration Statement/Prospectuses were false and misleading in that they misrepresented and/or

19  failed to disclose, among other things, that:  (i) the Company's "premium" product image was being

20  diluted by sales through discounters like Costco and Target; (ii) the Company's efforts to revitalize

21  its infomercial sales and to cross-sell were failing; and (iii) the Company's ability to continue

22  garnering the premium "club" deal sales revenues from its direct-to-consumer infomercial and QVC

23  sales program was diminishing as consumers refused to permit unwanted additional shipments to be

24  billed to their credit cards – simply making their purchases through shopping mall "prestige"

25  vendors – or, for the very cost conscious, at Target or Costco.

26       31.   Plaintiffs and the other members of the Class have suffered hundreds of millions of

27  dollars in damages as a result of their purchase of Bare Escentuals' common stock in the IPO, the

28
    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 13 -

1    March 2007 and the June 2007 Offerings, and during the Class Period following those offerings.  As

2    consumers rejected the Company's "club" sales program and automatic reordering/rebilling

3    processes *en masse*, the Company's direct-to-consumer infomercial and QVC sales plummeted.  The

4    Company also saw the sudden departure of its President, its Chief Marketing Officer and the

5    resignation of its President of Retail upon revelation that he had committed résumé fraud.  The

6    market would also learn that Bare Escentuals' goods were being offered at mass discounters Target

7    and Costco throughout the Class Period, and that despite management's statements that these

8    "millions of dollars" in sales were "unauthorized" by Bare Escentuals and that it was aggressively

9    taking action to stop them, the sales were lawful and there was little if anything management could

10   do to stop them from cannibalizing Bare Escentuals' "premium" sales mantra.  Finally, on October

11   31, 2008, management announced that the Company would be forced to slash prices and cut its

12   financial guidance going forward and during late 2008, with the Company completely revamping its

13   marketing campaign, including offering lower priced starter kits (at $15-$30, rather than $60).  The

14   Company also disclosed that its inventory levels rose 55% in FY 08, while revenues rose just 2%,

15   which would provide a substantial drain on future cash flows as wholesalers (and the Company)

16   worked down excessive inventory levels.  Throughout 2009, the Company's sales have been ravaged

17   by "de-stocking" efforts at its premium wholesalers, resulting in Bare Escentuals reporting an 11.5%

18   revenue *decline* for 1Q 2009.  As the truth about Bare Escentuals and its financial operations reached

19   the market, the price of the Company's common stock plummeted to as low as $4.20 per share in

20   intraday trading on October 31, 2008, almost *80%* below the IPO price and *more than 87%* below

21   the March 2007 Offering and June 2007 Offering prices.

22          32.    The Class Period stock price inflation was due to Company-specific misstatements as

23   the S&P 500 Index fell only approximately *30%* during this period and the stock of cosmetics

24   industry leader Estée Lauder Companies Inc. [EL] fell *less than 15%* and Proctor & Gamble Inc.

25   [PG] *did not decline at all*, while Bare Escentuals fell almost *90%* during the Class Period.

26   Moreover, these other stocks were relatively flat during the earlier period of significant incline in

27   Bare Escentuals' stock price:

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



**JURISDICTION AND VENUE**

19    33.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the

20   Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o and §§10(b), 20(a) and 20Aof the Exchange Act,

21   15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

22   §240.10b-5.

23    34.    Jurisdiction is conferred by §22 of the Securities Act, §27 of the Exchange Act and 28

24   U.S.C. §1331 and venue is proper in this District pursuant to §22 of the Securities Act, §27 of the

25   Exchange Act, 28 U.S.C. §1391(b) and 28 U.S.C. §1331.

26    35.    The violations of law complained of herein occurred in substantial part in this

27   District, including the preparation and dissemination of materially false and misleading statements

28   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 15 -

1   and the omission of material information complained of herein.  Bare Escentuals maintains its

2   principal place of business in San Francisco, California, where many of the underwriter Defendants

3   maintain significant presences as well.  In connection with the acts alleged in this complaint,

4   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

5   including, but not limited to, the mails, interstate telephone communications and the facilities of the

6   national securities markets.

7   **PARTIES**

8   36.   (a)   Lead Plaintiff Westmoreland County Retirement System purchased the

9   common stock of Bare Escentuals at artificially inflated prices during the Class Period and

10  purchased Bare Escentuals shares pursuant and traceable to the IPO and March 2007 Offering

11  Registration Statement/Prospectus and has suffered damages as a result thereof, as identified on the

12  Certification filed with its Complaint in this consolidated action on September 14, 2009, at Dkt. No.

13  10-5.

14  (b)   Lead Plaintiff Vincent J. Takas purchased the common stock of Bare Escentuals at

15  artificially inflated prices during the Class Period and purchased Bare Escentuals shares pursuant and

16  traceable to the IPO Registration Statement and has suffered damages as a result thereof, as

17  identified on his revised Certification filed herewith.

18  37.   Defendant Bare Escentuals, headquartered in San Francisco, California, develops,

19  markets, and sells cosmetics, and skin care and body care products under bareMinerals,

20  RareMinerals, Buxom, and md formulations brands.  During the Class Period, Bare Escentuals stock

21  traded on the NASDAQ in a highly efficient market, trading millions, if not tens of millions, of

22  shares every day.  Bare Escentuals was followed by several stock analysts and was constantly in

23  communication with the markets and investors in quarterly conference calls and frequent

24  presentations to investor and analyst conferences.  Bare Escentuals also filed periodic public reports

25  with the SEC, and regularly issued press releases to the financial press.  Financial information about

26  Bare Escentuals was widely distributed.

27

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 16 -

38.     Defendant Blodgett has served as the Chief Executive Officer and a Director of Bare Escentuals since 1995.  Blodgett signed the false and misleading IPO, March 2007 and June 2007 Offering Registration Statement/Prospectuses and certified each of the false and misleading Class Period financial statements filed with the SEC pursuant to the Sarbanes-Oxley Act of 2002. Accordingly, Blodgett is liable under both the Exchange Act and the Securities Act.  Blodgett was intimately knowledgeable about all aspects of Bare Escentuals' business operations as she had access to daily reports regarding sales through all channels, accounts receivable, inventory and demand. Blodgett  was also intimately involved in the preparation of Bare Escentuals' financial statements and guidance, including the amounts of inventory, the performance of various sales channels, what disclosures would be made, and the functioning of Bare Escentuals' internal financial, accounting and disclosure controls.  McCormick was also fully aware of the sales of Bare Escentuals' products at Costco and Target, even making public statements regarding the issue.   She reviewed and approved all of Bare Escentuals' Class Period SEC filings and its Sarbanes-Oxley certificates. During the Class Period, Blodgett sold 1,720,169 shares of her Bare Escentuals stock for ***$58+ million*** in insider trading proceeds. ***These sales were completed during two short trading windows.*** On March 19, 2007, Blodgett sold 1,220,169 shares representing approximately 19% of her total share holdings and on June 19, 2007, she sold another 500,000 shares representing approximately 10% of her remaining share holdings.  As the following chart demonstrates, these sales were unusual in timing and amount as they were timed to take full advantage of the Class Period stock price inflation:

1
2
3
4
5
6
7
8
9
10
11
12



13    39.    Defendant Myles B. McCormick ("McCormick") served as Executive Vice President,

14  Chief Financial Officer of Bare Escentuals since December 2004, and as Chief Operations Officer of

15  Bare Escentuals since March 2006, through and including his resignation as the Company's Chief

16  Accounting Officer on December 8, 2008.  McCormick signed the false and misleading IPO, March

17  2007 and June 2007 Offering Registration Statement/Prospectuses and certified each of the false and

18  misleading Class Period financial statements filed with the SEC pursuant to the Sarbanes-Oxley Act

19  of 2002.  Accordingly, McCormick is liable under both the Exchange Act and the Securities Act.

20  McCormick was intimately knowledgeable about all aspects of Bare Escentuals' business operations

21  as he had access to daily reports regarding sales through all channels, accounts receivable, inventory

22  and demand.  McCormick  was also intimately involved in the preparation of Bare Escentuals'

23  financial statements and guidance, including the amounts of inventory, the performance of various

24  sales channels, what disclosures would be made, and the functioning of Bare Escentuals' internal

25  financial, accounting and disclosure controls.  McCormick was also fully aware of the sales of Bare

26  Escentuals' products at Costco and Target.  He reviewed and approved all of Bare Escentuals' Class

27  Period SEC filings and its Sarbanes-Oxley certificates.  During the Class Period, McCormick sold

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 18 -

20,072 shares of his Bare Escentuals stock for **$700+ thousand** in insider trading proceeds.  On

March 19, 2007, McCormick sold 20,072 shares representing approximately 14% of his total share

holdings.  As the following chart demonstrates, this sale was unusual in timing and amount and

timed to take full advantage of the Class Period inflation in Bare Escentuals' stock price:



**McCORMICK, MYLES B.**
Monthly Insider Sales Dollar Volume
September 28, 2006 to October 30, 2008

Class Period: 9/28/2006 - 10/30/08
Shares Sold: 20,072
Total Proceeds: $717,975

40.      Defendant Diane M. Miles ("Miles") served as President of Wholesale and

International Sales at Bare Escentuals from May 2006 to November 26, 2007 when she suddenly

resigned.  Miles presented at the Company's Q3 06, Q4 06, Q1 07 and Q2 07 earnings conferences

and is liable under the Exchange Act.  Miles was intimately knowledgeable about all aspects of Bare

Escentuals' business operations as she had access to daily reports regarding sales through all

channels, accounts receivable, inventory and demand.  Miles  was also intimately involved in the

preparation of Bare Escentuals' financial statements and guidance, including the amounts of

inventory, the performance of various sales channels, what disclosures would be made, and the

functioning of Bare Escentuals' internal financial, accounting and disclosure controls.  Miles was

also fully knowledgeable concerning the sales of Bare Escentuals' products at Costco and Target.

41.     Defendant Jones has served as a Director and Chairman of the Board of Bare Escentuals since June and July of 2004, respectively.  Jones is also a managing director of Berkshire Partners which he joined in 1993.  Jones became a managing director of Berkshire Partners LLC in 2000 and is or has been a director of several of Berkshire Partners LLC's consumer, retailing, manufacturing, and business services companies including Carter's, Inc., a public company, and the private companies N.E.W. Customer Service Companies, Inc., Waterworks, Inc., AVW-TelAv Inc., Sterling Collision Centers, Inc., and Thomas Built Buses, Inc., now a division of the public company Daimler Chrysler, AG.  Jones signed the false and misleading IPO, March 2007 and June 2007 Offering Registration Statement/Prospectuses and each of the false and misleading 10-Ks filed with the SEC during the Class Period and is liable under both the Exchange Act and the Securities Act. Jones was intimately knowledgeable about all aspects of Bare Escentuals' business operations as he had access to regular reports regarding sales through all channels, accounts receivable, inventory and demand.  Jones  was also intimately involved in the preparation of Bare Escentuals' financial statements and guidance, including the amounts of inventory, the performance of various sales channels, what disclosures would be made, and the functioning of Bare Escentuals' internal financial, accounting and disclosure controls.  Jones was also fully aware of the sales of Bare Escentuals' products at Costco and Target during the Class Period.  During the Class Period, Jones (through Berkshire Partners) sold 10,193,445 shares of Bare Escentuals stock for *$347+ million* in insider trading proceeds.  *These trades were completed during two short trading windows.*  On March 19, 2007, Berkshire Partners sold 6,315,116 shares representing approximately 82% of its total share holdings and on June 19, 2007, Berkshire Partners sold another 3,878,329 shares representing approximately 77% of its remaining share holdings.   As the following chart demonstrates, these sales were unusual in timing and amount and timed to take full advantage of the Class Period inflation in Bare Escentuals' stock price:

1
2
3
4
5
6
7
8
9
10
11
12
13



**JONES, ROSS M.**
Monthly Insider Sales Dollar Volume
September 28, 2006 to October 30, 2008

Class Period: 9/28/2006 - 10/30/08
Fifth Berkshire Assoc. LLC
Shares Sold: 10,193,445
Total Proceeds: $347,316,110

14    42.        Defendant Bradley M. Bloom ("Bloom") has served as a Director of the Board of
15 Bare Escentuals since June 2004.  Bloom is also a managing director of Berkshire Partners, which he
16 co-founded in 1986.  He has been a director of several of Berkshire Partners' consumer and retailing
17 companies including Carter's, Inc., a public company, and the private companies Acosta, Inc.,
18 Gordon Brothers Group, Sterling, Inc., America's Best Contacts and Eyeglasses, L.P., and Miami
19 Cruiseline Services Holdings I.B.V. Bloom signed the false and misleading IPO, March 2007 and
20 June 2007 Offering Registration Statement/Prospectuses and each of the false and misleading 10-Ks
21 filed with the SEC during the Class Period and is liable under both the Exchange Act and the
22 Securities Act.  Bloom was intimately knowledgeable about all aspects of Bare Escentuals' business
23 operations as he had access to regular reports regarding sales through all channels, accounts
24 receivable, inventory and demand.  Bloom  was also intimately involved in the preparation of Bare
25 Escentuals' financial statements and guidance, including the amounts of inventory, the performance
26 of various sales channels, what disclosures would be made, and the functioning of Bare Escentuals'
27 internal financial, accounting and disclosure controls.  Bloom was also fully aware of the sales of
28 Bare Escentuals' products at Costco and Target during the Class Period.  During the Class Period,

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 21 -

Bloom, along with Jones, sold 10,193,445 shares of Bare Escentuals stock held by Berkshire Partners for **$347+ million** in insider trading proceeds. ***These trades were completed during two short trading windows.*** On March 19, 2007, Berkshire Partners sold 6,315,116 shares representing approximately 82% of its total share holdings and on June 19, 2007, it sold another 3,878,329 shares representing approximately 77% of its remaining share holdings. As the following chart demonstrates, these sales were unusual in timing and amount and timed to take full advantage of the Class Period inflation in Bare Escentuals' stock price:



**BLOOM, BRADLEY M.**
**Monthly Insider Sales Dollar Volume**
**September 28, 2006 to October 30, 2008**

Class Period: 9/28/2006 - 10/30/08
Fifth Berkshire Assoc. LLC
Shares Sold: 10,193,445
Total Proceeds: $347,316,110

43.   Defendant John C. Hansen ("Hansen") has served as a Director of the Board of Bare Escentuals since June 2004 and served on the boards of each of Bare Escentuals' predecessor companies, MD Formulations and Bare Escentuals, since 1999 and 1990, respectively. Since March 1998, Hansen has also served as President of JH Partners, a private equity firm formerly known as Jesse.Hansen&Co. and a Private Equity Sponsor of Bare Escentuals. JH Partners initially invested in Bare Escentuals in the early 90s and was integrally involved in taking the Company public in its IPO. Hansen signed the false and misleading IPO, March 2007 and June 2007 Offering Registration Statement/Prospectuses and each of the false and misleading 10-Ks filed with the SEC during the

Class Period and is liable under both the Exchange Act and the Securities Act. Hansen was intimately knowledgeable about all aspects of Bare Escentuals' business operations as he had access to regular reports regarding sales through all channels, accounts receivable, inventory and demand. Hansen was also intimately involved in the preparation of Bare Escentuals' financial statements and guidance, including the amounts of inventory, the performance of various sales channels, what disclosures would be made, and the functioning of Bare Escentuals' internal financial, accounting and disclosure controls. Hansen was also intimately involved in and fully aware of the sales of Bare Escentuals' products at Costco and Target during the Class Period. During the Class Period, Hansen, through JH Partners Investment Co. related accounts, sold 8,854,768 shares of Bare Escentuals stock for *$284+ million* in insider trading proceeds. *These trades were completed primarily during two short trading windows.* On March 19, 2007, they sold 4,270,717 shares representing approximately 19% of the total share holdings of JH MDB Investors L.P., JH Partners LLC and Siberia Investment Company LLC, respectively, and on June 19, 2007, they sold another 2,622,800 shares representing approximately 14%, respectively, of the remaining share holdings of these entities. In addition, during a five-month period beginning in late 2007 and extending into 2008, Hansen sold an additional 1,961,251 shares held by Siberia Investment Company LLC for proceeds of over $50 million. As the following chart demonstrates, these sales were unusual in timing and amount and timed to take full advantage of the Class Period inflation in Bare Escentuals' stock price:

1
2
3
4
5
6
7
8
9
10
11
12
13



14       44.       Defendant Michael J. John ("John") has served as a Director of the Board of Bare

15   Escentuals since November 2005.  Since April 2004, John has also served as a senior partner of JH

16   Partners.    John signed the false and misleading IPO, March 2007 and June 2007 Offering

17   Registration Statement/Prospectuses and each of the false and misleading 10-Ks filed with the SEC

18   during the Class Period  and is liable under both the Exchange Act and the Securities Act.  John was

19   intimately knowledgeable about all aspects of Bare Escentuals' business operations as he had access

20   to regular reports regarding sales through all channels, accounts receivable, inventory and demand.

21   John  was also intimately involved in the preparation of Bare Escentuals' financial statements and

22   guidance, including the amounts of inventory, the performance of various sales channels, what

23   disclosures would be made, and the functioning of Bare Escentuals' internal financial, accounting

24   and disclosure controls.  John was also fully knowledgeable concerning the sales of Bare Escentuals'

25   products at Costco and Target during the Class Period.  During the Class Period, John, through JH

26   Partners' related entities, sold 5,057,472 shares of Bare Escentuals stock for **$170+ million** in insider

27   trading proceeds.  ***These trades were completed primarily during two short trading windows.***  On

28   March 19, 2007, he sold 2,929,533 shares representing approximately 19% of the total holdings of

1   JH MDB Investors L.P. and JH Partners LLC, respectively, and on June 19, 2007, he sold another

2   1,799,128 shares representing approximately 14%, respectively, of the remaining share holdings of

3   these entities.  In addition, in February 2008, John sold an additional 299,820 shares held by his

4   family trusts for proceeds of over $8.3 million.[2]  As the following chart demonstrates, these sales

5   were unusual in timing and amount and timed to take full advantage of the Class Period inflation in

6   Bare Escentuals' stock price:

7
8


**JOHN, MICHAEL J.**
**Monthly Insider Sales Dollar Volume**
**September 28, 2006 to October 30, 2008**

Class Period: 9/28/2006 - 10/30/08
JH MDB Investors, JHPartners
and Michael John Family Trusts
Shares Sold: 5,057,472
Total Proceeds: $170,219,317

19
20     45.      Defendant Lea Anne Ottinger ("Ottinger") has served as a Director of the Board of

21  Bare Escentuals since June 2004.  Ottinger also served as a Berkshire Partners vice president from

22  1985 to 1989.  Ottinger signed the false and misleading IPO, March 2007 and June 2007 Offering

23  Registration Statement/Prospectuses and each of the false and misleading 10-Ks filed with the SEC

24  during the Class Period and is liable under both the Exchange Act and the Securities Act.  Ottinger

25  was intimately knowledgeable about all aspects of Bare Escentuals' business operations as she had

26  ───────────────────────
27  [2] These trusts include M John Family LP, John GST Investment Irrevocable Trust, Michael John
    Children's Irrevocable Trust and Barbie John Children's Irrevocable Trust.

28

1   access to regular reports regarding sales through all channels, accounts receivable, inventory and

2   demand.  Ottinger  was also intimately involved in the preparation of Bare Escentuals' financial

3   statements and guidance, including the amounts of inventory, the performance of various sales

4   channels, what disclosures would be made, and the functioning of Bare Escentuals' internal

5   financial, accounting and disclosure controls.  Ottinger was also fully knowledgeable concerning the

6   sales of Bare Escentuals' products at Costco and Target during the Class Period.  On June 10, 2004,

7   in connection with the recapitalization transaction, Ottinger purchased 167,274 shares of Bare

8   Escentuals' common stock at a purchase price of $1.79 per share, for an aggregate price of

9   approximately $300,000.  As of July 2, 2006, Ottinger also held options to purchase 7,500 shares

10  with a revised exercise price of $0.46 per share.  During the Class Period, Ottinger sold 47,711

11  shares of her Bare Escentuals stock for $1.6+ million in insider trading proceeds.  ***These trades were***

12  ***completed during two very short trading windows.***  On March 19, 2007, Ottinger sold 33,711 shares

13  representing approximately 21% of her total share holdings and on June 19, 2007, she sold another

14  14,000 shares representing approximately 11% of her remaining share holdings.  As the following

15  chart demonstrates, these sales of stock she acquired for pennies on the dollar were unusual in timing

16  and amount and timed to take full advantage of the Class Period inflation in Bare Escentuals' stock

17  price:

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 26 -

**OTTINGER, LEA A.**
**Monthly Insider Sales Dollar Volume**
**September 28, 2006 to October 30, 2008**



Class Period: 9/28/2006 - 10/30/08
Shares Sold: 47,711
Total Proceeds: $1,614,254

46.     Defendant Karen M. Rose ("Rose") has served as a Director of the Board of Bare Escentuals since May 2006.  Rose signed the false and misleading IPO, March 2007 and June 2007 Offering Registration Statement/Prospectuses and the Company's Class Period Forms 10-K. Defendant Rose is liable for violating the Securities Act.  During the Class Period, Rose sold 5,134 shares of her Bare Escentuals stock for *$183+ thousand* in insider trading proceeds.  On June 19, 2007, Rose sold 5,134 shares representing approximately 14% of her total share holdings:

1
2
3
4
5
6
7
8
9
10
11
12
13



**ROSE, KAREN M.**
Monthly Insider Sales Dollar Volume
September 28, 2006 to October 30, 2008

Class Period: 9/28/2006 - 10/30/08
Shares Sold: 5,134
Total Proceeds: $3,863,374

14      47.     Defendant Glen T. Senk ("Senk") has served as a Director of the Board of Bare

15 Escentuals since November 2004.  Senk signed the false and misleading IPO, March 2007 and June

16 2007 Offering Registration Statement/Prospectuses and the Company's Class Period Forms 10-K.

17 Defendant Senk is liable for violating the Securities Act.  In November 2004, Senk received options

18 to purchase $300,000 of the Company's common stock at the fair market value on the date of

19 purchase, as well as an option to purchase 22,500 shares of its common stock, vesting over three

20 years after the date of the grant. The options were granted with an exercise price of $1.79 per share

21 and in December 2004, the Company sold 167,274 shares of its common stock to Sent at $1.79 per

22 share for an aggregate consideration of $300,000. In June 2006, the Company accepted a promissory

23 note from Senk in the principal amount of $5,282, which was repaid immediately upon

24 consummation of the June 2006 recapitalization.  As of July 2, 2006, Senk held options to purchase

25 15,000 shares with revised exercise prices of $0.46 per share.  During the Class Period, Senk sold

26 130,000 shares of his Bare Escentuals stock for *$3.8+ million* in insider trading proceeds.  On March

27 19, 2007, Senk sold 20,000 shares representing approximately 11% of his total share holdings and on

28 June 19, 2007, he sold another 20,000 shares representing approximately 13% of his remaining share

holdings.  In addition, on February 29, 2008, Senk sold an additional 90,000 shares, ***over 82% of his holdings***, for proceeds of over $2.4 million:



**SENK, GLEN T.**
**Monthly Insider Sales Dollar Volume**
**September 28, 2006 to October 30, 2008**

48.     Pursuant to the Exchange Act, the Defendants referenced in ¶¶38-45 above are liable under the Exchange Act as executives and/or controlling shareholders of Bare Escentuals and are referred to herein, along with defendants Rose and Senk, as the "Individual Defendants."  Pursuant to the Securities Act, the Defendants referred to herein in ¶¶38-39 and ¶¶40-47 above are liable under the Securities Act as executives and/or controlling shareholders of Bare Escentuals and are referred to herein, along with Defendant Miles, as the "Individual Defendants."

49.     Defendant Goldman Sachs & Co. ("Goldman Sachs") is a full-service global investment banking and securities firm.  Goldman Sachs was an underwriter for all three offerings and was allocated over 5.6 million shares to sell in the IPO, over 4.8 million shares in the March 2007 Offering, and was the sole underwriter in the 8 million share-June 2007 Offering

50.     Defendant CIBC World Markets Corp. ("CIBC World Markets") offers credit and capital markets products, securities, brokerage and asset management services.  CIBC World

1   Markets was an underwriter for both offerings and was allocated over 4.8 million shares to sell in the

2   IPO and over 3.6 million shares in the March 2007 Offering.

3          51.    Defendant Banc of America Securities LLC ("Banc of America") is the investment

4   banking arm of Bank of America.  Banc of America offers trading and brokerage services; debt and

5   securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts,

6   and mergers and acquisitions.  Banc of America was an underwriter for both offerings and was

7   allocated over 1.6 million shares to sell in the IPO and over 1 million shares in the March 2007

8   Offering.

9          52.    Defendant Piper Jaffray Companies ("Piper Jaffray") is an international middle

10  market investment firm serving corporations, private equity groups, public entities, nonprofit clients

11  and institutional investors.  Piper Jaffray was an underwriter for both offerings and was allocated

12  over 1.6 million shares to sell in the IPO and over 1 million shares in the March 2007 Offering.

13         53.    Defendant Thomas Weisel Partners LLC ("Thomas Weisel") is an investment

14  banking, brokerage and equity research firm serving emerging growth companies.  Thomas Weisel

15  Partners was an underwriter for both offerings and was allocated over 1.6 million shares to sell in the

16  IPO and over 1 million shares in the March 2007 Offering.

17         54.    Defendant SunTrust Robinson Humphrey, Inc., f/k/a SunTrust Capital Markets, Inc.

18  ("SunTrust"), is the full-service corporate and investment banking arm of SunTrust Banks, Inc.

19  Suntrust was an underwriter for both offerings and was allocated over 440,000 shares to sell in the

20  IPO and 600,000 shares in the March 2007 Offering.

21         55.    Pursuant to the Securities Act, the Defendants referenced in ¶¶49-54 above, referred

22  to herein as the "Underwriter Defendants," are liable for the false and misleading statements in the

23  IPO and March 2007 Registration Statements and Prospectuses.  These Defendants' failure to

24  conduct adequate due diligence investigations was a substantial factor leading to the harm

25  complained of herein.

26         56.    (a) The Underwriter Defendants are investment banking houses which specialize,

27  inter alia, in underwriting public offerings of securities.  They served as the underwriters of the IPO

28

1   and March 2007 and June 2007 Offerings and received fees of more than $48 million collectively.

2   The Underwriter Defendants determined that in return for their share of the IPO, March 2007 and

3   June 2007 Offering proceeds, they were willing to merchandize Bare Escentuals stock in the

4   Offerings.   The Underwriter Defendants arranged a multi-city road show prior to the Offerings

5   during which they, and certain of the Individual Defendants, including defendants Blodgett and

6   McCormick, met with potential investors and presented highly favorable information about the

7   Company and its sales model.

8           (b)      The Underwriter Defendants also demanded and obtained an agreement from Bare

9   Escentuals that Bare Escentuals would indemnify and hold the Underwriter Defendants harmless

10  from any liability under the federal securities laws.  They also made certain that Bare Escentuals had

11  purchased millions of dollars in directors' and officers' liability insurance.

12          (c)      Representatives of the Underwriter Defendants also assisted Bare Escentuals and the

13  Individual Defendants in planning the Offerings, and purportedly conducted an adequate and

14  reasonable investigation into the business and operations of Bare Escentuals, an undertaking known

15  as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter

16  Defendants in order to engage in the Offerings.  During the course of their "due diligence," the

17  Underwriter Defendants had continual access to confidential corporate information concerning Bare

18  Escentuals' business sales model, financial condition, internal control and its future business plans

19  and prospects.

20          (d)      In addition to availing themselves of virtually unbridled access to internal corporate

21  documents, agents of the Underwriter Defendants, including their counsel at Simpson Thatcher &

22  Bartlett in Palo Alto, California, met with Bare Escentuals' management and top executives and

23  engaged in "drafting sessions" between June 2006 and November 2006 and again between February

24  2007 and June 2007.  During these sessions, understandings were reached as to: (i) the strategy to

25  best accomplish the Offerings; (ii) the terms of the Offerings, including the price at which Bare

26  Escentuals stock would be sold; (iii) the language to be used in the Registration Statements; (iv)

27  what disclosures about Bare Escentuals would be made in the Registration Statements; and (v) what

28

1   responses would be made to the SEC in connection with its review of the Registration Statements.

2   As a result of those constant contacts and communications between the Underwriter Defendants'

3   representatives and Bare Escentuals management and top executives, the Underwriter Defendants

4   knew, or should have known, of Bare Escentuals' existing problems as detailed herein.

5         (e)      The Underwriter Defendants caused the Registration Statements to be filed with the

6   SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and

7   the Class.

8                          **THE FALSE AND DEFECTIVE IPO**
                   **REGISTRATION STATEMENT AND PROSPECTUS**
9

10        57.      On or about June 30, 2006, Bare Escentuals filed with the SEC a Form S-1

11  Registration Statement and Prospectus (collectively, the "IPO Registration Statement/Prospectus").

12  The Company initially forecast its shares would be sold in the $15 - $17 range.  After several

13  amendments, the IPO Registration Statement/Prospectus was declared effective, the IPO was priced

14  and on or about September 28, 2006, and Bare Escentuals sold 18.4 million shares of its common

15  stock to the public at $22.00 per share.  Though the IPO was priced at $22 per share, the stock

16  opened at $28, up 27.3% from its IPO price.

17        58.      The IPO Registration Statement/Prospectus contained untrue statements of material

18  fact or omitted to state other facts necessary to make the statements made therein not misleading and

19  was not prepared in accordance with applicable SEC rules and regulations.

20        59.      Specifically, the statement that "[a] core element of [the Company's] success [was its]

21  distinctive marketing strategy and ***multi-channel distribution model***" was materially false and

22  misleading as Defendants then knew the Company's haphazard expansion was rapidly cannibalizing

23  sales from the various sales channels.  Defendants also knew the direct-to-consumer sales channel in

24  particular was in jeopardy due to customers' growing dissatisfaction with the mandated "club" deal

25  sales and automatic credit card charges and would instead preferred to shop in malls – or at

26  discounters like Target and Costco.

27

28

60.   According the "Growth Strategy" published in the Company's IPO Registration Statement/Prospectus, defendants stated they planned to "[f]urther penetrate each of [their] multiple distribution channels" as follows:

> *Wholesale.*   **We intend to continue to increase net sales through key premium wholesale accounts, such as Sephora and Ulta, home shopping television, and spas and salons**. Within Sephora and Ulta, we will seek to improve our in-store product positioning and collaborative marketing efforts. In addition, we expect our premium wholesale sales will grow as Sephora and Ulta open new stores. **We also may explore additional opportunities to sell our products in premium department stores.**

> *Retail.*   We intend to expand our base of company-owned boutiques and to grow our infomercial sales. **We believe substantial opportunity exists to open additional domestic boutiques**. As of July 2, 2006, we operated 30 boutiques and reported average annual net sales of approximately $1,400 per square foot for the fiscal year ended January 1, 2006. **We intend to continue growing our infomercial sales by increasing and improving the effectiveness of our media spending.**

61.   Instead, Defendants were engaged in a rampant expansion effort to chase immediate sales at all costs that resulted in Bare Escentuals opening over 750 so-called "brick and mortar" sales channels – ***though absolutely no effort was being made internally to coordinate the multiple competing sales spots that were popping up*** – including multiple competing sales outlets in single shopping malls.   Indeed, according to the Company's 2008 annual financial report, "[a]s of December 28, 2008, [Bare Escentuals's] products were distributed in a total of approximately 795 North American premium wholesale locations, which include Ulta, Sephora, Nordstrom, Macy's, Sephora in JCPenney, Bloomingdales and Shoppers Drug Mart in Canada."   As a result, the Company's own boutiques were competing with – and being competed with – by not only Target and Costco but by multiple other retail locations within a single mall.   Moreover, the rampant expansion in brick-and-mortar sales locations was cannibalizing rather than "***growing…infomercial sales.***"

62.   As to "Competitive Strengths," the IPO Registration Statement/Prospectus stated that "the following competitive strengths position [Bare Escentuals] for continued, sustainable growth in the future," including describing an "Enthusiastic and loyal consumer base."   According to the IPO Registration Statement/Prospectus, Bare Escentuals' customers then "***exhibit[ed] brand loyalty and enthusiasm for [its] products, promoting sales of [its] products through word-of-mouth referrals***

1  *and high rates of participation in our infomercial continuity program*." These statements
2  attributing Bare Escentuals' "Competitive Strengths" to its customers' "brand loyalty,"
3  "enthusiasm," "word-of-mouth referrals," and "high rates of participation in [its] infomercial
4  continuity program" were false and misleading as the exponential sales obtained via Bare
5  Escentuals' direct-to-consumer infomercial and QVC sales program since its commencement in
6  2001 were instead attributable in large part to consumers being unwittingly joined as "club" sales
7  members, subjecting them to automatic re-orders of product they did not want. [Emphasis added.]

8       63.    The IPO Registration Statement/Prospectus also characterized the Company's sales
9  program as "[m]utually reinforcing distribution channels," and stated that its "multi-channel
10  distribution strategy provide[d] for greater consumer diversity, reach and convenience *while*
11  *reinforcing the authenticity and premium image of [the Company's] brands*." However, in reality,
12  the Company was selling its product to foreign distributors by the time of the IPO that had begun
13  reselling Bare Escentuals product to mass discounters like Costco and Target, significantly
14  undermining the Company's reputation as a "premium" product seller and stymieing Defendants'
15  efforts to continue demanding the premium prices Bare Escentuals had previously been able to
16  charge. [Emphasis added.]

17       64.    The IPO Registration Statement/Prospectus stated the Company "plan[ned] to open a
18  total of seven new boutiques in 2006 (of which five were open at July 2, 2006) and ten new
19  boutiques in 2007," *or a total of 12 boutique openings.* However, as the 2007 annual report would
20  disclose, "[a]s of December 30, 2007, [the Company had] 51 open company-owned boutiques," *21*
21  *more than it had in July 2006.*

22       65.    Concerning the Company's "Growth Strategy," the IPO Registration
23  Statement/Prospectus stated that Bare Escentuals intended to "continue to increase net sales through
24  key *premium wholesale accounts, such as Sephora and Ulta, home shopping television, and spas*
25  *and salons*," specifically stating that it might "explore additional opportunities to sell [its] products
26  in *premium department stores*." However, Costco and Target, to whom Bare Escentuals'
27  distributors were then selling and who, unbeknownst to investors, were preparing to sell material

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 34 -

1    amounts of Bare Escentuals product in the December 2006 Christmas season, were not "premium

2    department stores."  [Emphasis added.]

3          66.    As the IPO Registration Statement/Prospectus explained, in December 1998, the

4    Company entered into an agreement with QVC, Inc. under which it granted QVC "***the exclusive***

5    ***right to promote, advertise, market, sell and distribute*** [its] products in all distribution channels ***in***

6    ***the United States*** other than…company-owned boutiques and ***prestige*** retail channels."  The QVC

7    agreement defined "prestige retail channels" as "traditional department stores and specialty stores,

8    specialty boutiques and beauty salons," but explicitly "exclude[d] ***all other retail channels of***

9    ***distribution, including discount stores, drug stores, warehouse stores, superstores and retail outlet***

10   ***stores***."    And, in September 2006, Bare Escentuals and QVC entered into a letter agreement

11   amending their agreement that gave the Company "the right to enter into additional distribution

12   channels." Under the amended letter agreement, Bare Escentuals could "promote, advertise, market

13   and sell [its] products on [its] websites, advertising, catalogs, direct mail promotions and telephone

14   numbers listed in [its] websites, catalogs and direct mail promotions, so long as [it paid] QVC a

15   specified royalty on net sales…in these channels."  The amended letter agreement still "prohibit[ed]

16   [Bare Escentuals] from selling products through retail channels not considered 'prestige,' ***such as***

17   ***discount stores, warehouse stores and superstores***…."   And, pursuant to the amended letter

18   agreement, the Company "granted QVC the exclusive right to promote, advertise, market and sell

19   [its] products in Japan, Germany and the United Kingdom, subject to [its] rights to promote,

20   advertise, market and sell our products in the same distribution channels available to [the Company]

21   in the United States."  [Emphasis added]

22         67.    However, at the time of its IPO in September 2006, Bare Escentuals was not in

23   compliance with the spirit, much less the word, of its agreement with QVC that the SEC had

24   required the Company to file as an attachment to its IPO Registration Statement.  Instead, it was

25   selling to distributors who were in turn redistributing to discounters like Costco and Target.

26   Moreover, the Company simply had no legal ability to stop discounters from selling its product once

27   it was legally obtained.

28

68.    Further emphasizing the purported value of its premium brand loyalty, the IPO Registration Statement/Prospectus stated the Company planned to "[l]everage [its] strong market position in foundation to cross-sell [its] other products," stating that "[t]o date, [the Company had] ***demonstrated success in cross-selling [its] non-foundation products*** in channels where [it] interact[ed] directly with consumers, such as in our boutiques and on home shopping television." In reality, as would later be revealed, Bare Escentuals' cross-selling efforts had failed.  [Emphasis added.]

69.    Any of the defects in the Company's sales model could, on its own, throw sales projections off wildly – but collectively they rendered Bare Escentuals Class Period sales projections and stock valuations based on those projections (both internal and external), utterly meaningless. Indeed, just as the SEC had presciently admonished the Company to fully disclose in its IPO Registration Statement/Prospectus how much it relied upon third parties to develop and manufacture its products, the hundreds of millions of dollars the Company had  recently paid to its Private Equity Sponsors and executives in dividends just prior to the IPO,  and that its so-called "risk disclosures" should not – ***in fact could not*** – remain in the boilerplate fashion they were initially submitted to the SEC in, in an August 24, 2006 letter to Bare Escentuals CEO Leslie Blodgett, the SEC explicitly demanded that Defendants explain how the purported "value" of Bare Escentuals' stock had almost instantaneously increased ***400%*** from the $5.42 the Company's economists had valued it at to $22 in the months leading up to the IPO.  In its Comment Letter critiquing the Company's initial draft of the IPO Registration Statement/Prospectus, the SEC stated:

> ***It is unclear how your common stock value could have significantly increased in very short time periods.*** Please provide a reconciliation between the common stock values listed below. The reconciliation should show the estimated impact of each significant factor contributing to the difference in values. ***For example, the reconciliation should show how much of the increase in value was related to actual results exceeding forecasts***. Please address the following significant increases:
>
> • The fair value per share increased ***45% from $5.42 at December 20, 2005 to $7.88 at January 6, 2006***;
>
> • The fair value per share increased ***60% from $7.88 at March 31, 2006 to $12.64 at April 2, 2006***;

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 36 -

• The fair value per share increased *59% from $12.64 at June 6, 2006 to $20.15 at June 7, 2006*; and

• The fair value per share was *$13.30* at July 20, 2006. *The estimated IPO range per share of $22.00 to $26.00 results in an increase in value of 65% to 95% in an approximate one to two month period*.

70.     But rather than justifying this dramatic increase with indications of real stock *value*, i.e. by showing, for instance as the SEC suggested, that "*the increase in value was related to actual results exceeding forecasts*," Defendants simply restated the Company's interim financial reports for January 2006 - June 2006 in the final IPO Registration Statement/Prospectus "to reflect adjustments relating to the estimated fair value per share of the Company's common stock."

71.     As a result, the Underwriter Defendants' selling efforts were a huge success and the IPO, which had preliminarily been priced in the $15 - $17 range was priced at $22 per share.  The stock traded above $29 in the after-market on September 29, 2006.  The 16 million shares originally issued for the IPO all sold as did the 2.4 million over-allotment shares the underwriters were promised.  In total, the 18.4 million shares brought in over $404 million in proceeds and the Underwriter Defendants received over $28 million in fees.

## THE FALSE AND DEFECTIVE MARCH 2007 OFFERING REGISTRATION STATEMENT AND PROSPECTUS

72.     On or about February 16, 2007, Bare Escentuals filed with the SEC a Form S-1 Registration Statement and Prospectus (collectively, the "March 2007 Offering Registration Statement/Prospectus").  After an additional amendment, the March 2007 Offering Registration Statement/Prospectus was declared effective, the offering was priced and on or about March 13, 2007, Bare Escentuals and the "Selling Stockholders" sold  13.8 million additional shares of Bare Escentuals' common stock to the public at $34.50 per share.  Bare Escentuals itself issued and sold 575,000 new shares of Bare Escentuals common stock in the March 2007 Offering.  The following Bare Escentuals shareholders (the "Selling Stockholders") sold another 13,225,000 shares in the March 2007 Offering at $34.50 per share:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 37 -

| Shareholder | Number of Shares Offered | Gross Proceeds Received |
|---|---|---|
| Berkshire Partners (Jones/Bloom) | 6,315,116 | $217,871,502.00 |
| JH Partners (Hansen/Johnson) | 2,929,533 | $101,068,888.50 |
| Siberia Investment Company, LLC (John) | 1,341,184 | $46,270,848.00 |
| Blodgett and family | 1,220,187 | $42,096,451.50 |
| Ottinger | 33,711 | $1,163,029.50 |
| Senk | 20,000 | $690,000.00 |
| Other Selling Shareholders | 1,365,287 | $47,102,401.50 |

73.     Like the IPO Registration Statement/Prospectus, the March 2007 Offering Registration Statement/Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.  Specifically, describing the Company's "Competitive Strengths," the March 2007 Offering Registration Statement/Prospectus again stated that Bare Escentuals enjoyed an *"Enthusiastic and loyal consumer base"* and that its customers *"exhibit[ed] brand loyalty and enthusiasm for [its] products, promoting sales of [its] products through word-of-mouth referrals and high rates of participation in [its] infomercial continuity program."* These statements attributing Bare Escentuals' "Competitive Strengths" to its customers' "brand loyalty," "enthusiasm," "word-of-mouth referrals," and "high rates of participation in [its] infomercial continuity program" were false and misleading as the exponential sales racked up in the infomercial program since its commencement in 2001 were instead attributable in large part to consumers being unwittingly joined as "club members" and subjected to repeated additional charges to their credit cards for purchases they neither initiated nor wanted.  [Emphasis added.]

74.     Similarly, the March 2007 Offering Registration Statement/Prospectus again characterized the Company's sales program as "[m]utually reinforcing distribution channels," and stated that its "multi-channel distribution strategy provide[d] for greater consumer diversity, reach and convenience *while reinforcing the authenticity and premium image of [its] brands*."  However,

1   in reality, the Company had been selling its product to foreign distributors who in 2007 had

2   continued reselling it at big-box discounters Costco and Target significantly diminishing the

3   premium prices Bare Escentuals had previously been able to charge.  [Emphasis added.]

4          75.    Concerning the Company's "Growth Strategy," the March 2007 Registration

5   Statement/Prospectus again stated that Bare Escentuals intended to "continue to increase net sales

6   through key *premium wholesale accounts, such as Sephora and Ulta, home shopping television,*

7   *and spas and salons.*"  However, Costco and the other discounters Bare Escentuals' distributors

8   were selling to, unbeknownst to investors, were not "premium wholesale accounts."  Moreover,

9   contrary to the March 2007 Offering Registration Statement/Prospectus' statements that Bare

10  Escentuals "intend[ed] to expand [its] base of company-owned boutiques and to grow [its]

11  infomercial and online shopping sales," including *its express "belie[f that] substantial opportunity*

12  *exists to open additional domestic boutiques,"* Bare Escentuals' premium sales opportunities were

13  rapidly diminishing.  [Emphasis added.]

14         76.    Further emphasizing the purported value of its brand loyalty, the March 2007

15  Offering Registration Statement/Prospectus stated the Company planned to "[l]everage [its] strong

16  market position in foundation to cross-sell [its] other products," again stating that "[t]o date, [the

17  Company had] *demonstrated success in cross-selling [its] non-foundation products* in channels

18  where [it] interact[ed] directly with consumers, such as in our boutiques and on home shopping

19  television."  However, as would later be revealed, Bare Escentuals' cross-selling efforts had failed.

20  [Emphasis added.]

21         77.    According the "Growth Strategy" published in the Company's March 2007

22  Registration Statement/Prospectus, defendants stated they planned to "[f]urther penetrate each of

23  [their] multiple distribution channels" as follows:

24         •      *Wholesale. We intend to continue to increase net sales through key*
               *premium wholesale accounts, such as Sephora and Ulta, home shopping*
25             *television, and spas and salons.* Within Sephora and Ulta, we will seek to
               improve our in-store product positioning and collaborative marketing efforts.
26             *In addition, we expect our premium wholesale sales will grow as Sephora*
               *and Ulta open new stores.* We are also exploring additional opportunities to
27             sell our products in department stores.

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 39 -

- *Retail*. We intend to expand our base of company-owned boutiques and to grow our infomercial and online shopping sales. ***We believe substantial opportunity exists to open additional domestic boutiques***. As of December 31, 2006, we operated 33 boutiques. We had average annual net sales of approximately $1,800 per square foot for the twelve months ended December 31, 2006. ***We intend to continue growing our infomercial sales by increasing and improving the effectiveness of our media spending***

78.    Instead, Defendants were engaged in a rampant expansion effort to chase sales at all costs that resulted in Bare Escentuals opening over 750 so-called "brick and mortar" sales channels – ***though absolutely no effort was being made internally to coordinate the multiple competing sales spots that were popping up*** – including opening multiple competing sales outlets in single shopping malls.  Indeed, according to the Company's 2008 annual financial report, "[a]s of December 28, 2008, [Bare Escentuals's] products were distributed in a total of approximately 795 North American premium wholesale locations, which include Ulta, Sephora, Nordstrom, Macy's, Sephora in JCPenney, Bloomingdales and Shoppers Drug Mart in Canada."  As a result, the Company's own boutiques were competing with – and being competed with - by not only Target and Costco – but by multiple other retail locations within a single mall. And this would obliterate rather than grow the Company's "***infomercial sales."***

79.    As the IPO Registration Statement/Prospectus had, the March 2007 Registration Statement/Prospectus explained that in December 1998, the Company entered into an agreement with QVC, Inc. under which it granted QVC "***the exclusive right to promote, advertise, market, sell and distribute*** [its] products in all distribution channels ***in the United States*** other than…company-owned boutiques and ***prestige*** retail channels."  The QVC agreement defined "prestige retail channels" as "traditional department stores and specialty stores, specialty boutiques and beauty salons," but explicitly "exclude[d] ***all other retail channels of distribution, including discount stores, drug stores, warehouse stores, superstores and retail outlet stores***."  And, in September 2006, Bare Escentuals and QVC entered into a letter agreement amending their agreement that gave the Company "the right to enter into additional distribution channels." Under the amended letter agreement, Bare Escentuals could "promote, advertise, market and sell [its] products on [its] websites, advertising, catalogs, direct mail promotions and telephone numbers listed in [its]

websites, catalogs and direct mail promotions, so long as [it paid] QVC a specified royalty on net sales…in these channels."  The amended letter agreement still "prohibit[ed] [Bare Escentuals] from selling products through retail channels not considered 'prestige,' ***such as discount stores, warehouse stores and superstores***…."  And pursuant to the amended letter agreement, the Company "granted QVC the exclusive right to promote, advertise, market and sell [its] products in Japan, Germany and the United Kingdom, subject to [its] rights to promote, advertise, market and sell our products in the same distribution channels available to [the Company] in the United States."  [Emphasis added]

80.    However, at the time of the March 2007 Offering, defendants knew Bare Escentuals was not in compliance with the spirit, much less the word, of its agreement with QVC that the SEC had required the Company to file as an attachment to its IPO Registration Statement.  Instead, it was selling to distributors who were in turn redistributing to discounters like Costco and Target who were selling at significant discounts.  Moreover, Defendants knew the Company simply had no legal ability to stop discounters from selling its product once it was legally obtained, especially in light of the ongoing litigation with Costco that Bare Escentuals had initiated in January 2007.

81.    Nonetheless, the Underwriter Defendants' selling efforts were again a huge success and in addition to the 12 million shares originally registered, the underwriters exercised their overallotment option and sold a total of 13.8 million shares, bringing in over $476 million in proceeds and receiving over $20 million in fees.

### THE FALSE AND DEFECTIVE JUNE 2007 OFFERING REGISTRATION STATEMENT AND PROSPECTUS

82.    On or about May 14, 2007, Bare Escentuals filed with the SEC a Form S-1 Registration Statement and Prospectus (collectively, the "June 2007 Offering Registration Statement/Prospectus").    After an amendment, the June 2007 Offering Registration Statement/Prospectus was declared effective, the offering was priced and on or about June 14, 2007, Bare Escentuals and the "Selling Stockholders" sold 8 million additional shares of Bare Escentuals' common stock to the public at $36.50 per share.  Bare Escentuals itself issued and sold 100,000 new shares of Bare Escentuals common stock in the June 2007 Offering.  Additionally, the following

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 41 -

Bare Escentuals shareholders (the "Selling Stockholders") sold another 7.9 million shares in the June

2007 Offering at $36.50 per share, including:

| Shareholder | Number of Shares Offered | Gross Proceeds Received |
|---|---|---|
| Berkshire Partners (Jones/Bloom) | 3,878,329 | $141,559,008.50 |
| JH Partners (Hansen/John) | 1,799,128 | $65,668,172.00 |
| Siberia Investment Company, LLC (John) | 823,672 | $30,064,028.00 |
| Blodgett and family | 500,000 | $18,250,000.00 |
| McCormick | 20,072 | $732,628.00 |
| Rose | 5,134 | $187,391.00 |
| Ottinger | 14,000 | $511,000.00 |
| Senk | 20,000 | $730,000.00 |
| Other Selling Shareholders | 939,665 | $34,279,772.00 |

83.     Like the IPO March 2007 Registration Statement/Prospectus, the June 2007 Offering

Registration Statement/Prospectus contained untrue statements of material fact or omitted to state

other facts necessary to make the statements made therein not misleading and was not prepared in

accordance with applicable SEC rules and regulations.  Specifically, describing the Company's

"Competitive Strengths," the June 2007 Offering Registration Statement/Prospectus again stated that

Bare Escentuals enjoyed an *"Enthusiastic and loyal consumer base"* and that its customers

*"exhibit[ed] brand loyalty and enthusiasm for [its] products, promoting sales of [its] products*

*through word-of-mouth referrals and high rates of participation in [its] infomercial continuity*

*program."*  These statements attributing Bare Escentuals' "Competitive Strengths" to its customers'

"brand loyalty," "enthusiasm," "word-of-mouth referrals," and "high rates of participation in [its]

infomercial continuity program" were false and misleading as the exponential sales racked up in the

infomercial program since its commencement in 2001 were attributable in large part to consumers

being unwittingly entered as "club" sales members and subjected to repeated charges to their credit

cards for purchases initiated by Bare Escentuals, not them.  [Emphasis added.]

84.     Similarly, the June 2007 Offering Registration Statement/Prospectus again characterized the Company's sales program as "[m]utually reinforcing distribution channels," and stated that its "multi-channel distribution strategy provide[d] for greater consumer diversity, reach and convenience *while reinforcing the authenticity and premium image of [its] brands*."  Still, unbeknownst to investors, the Company had been selling its product to distributors who since 2006 had continued reselling it at big-box discounters Target and Costco, significantly diminishing the premium prices Bare Escentuals had previously been able to charge.  [Emphasis added.]

85.     Describing the Company's purportedly "Experienced management team," the June 2007 Offering Registration Statement/Prospectus stated "Our Chief Executive Officer, Leslie Blodgett…. *is supported by a senior management team* with complementary experiences managing prestige cosmetic brands within retail and wholesale distribution channels and overseeing operations in the branded consumer products industry," while in reality, McCormick and Miles were the only two other "senior management," both were relatively new to Bare Escentuals.  Moreover, due to management-style conflicts, McCormick would resign from Bare Escentuals' top accounting position in December 2008 and Miles would quit the firm altogether in November 2007.

86.     Concerning the Company's "Growth Strategy," the June 2007 Offering Registration Statement/Prospectus again stated that Bare Escentuals intended to "continue to increase net sales through key *premium wholesale accounts, such as Sephora and Ulta, home shopping television, and spas and salons.*"  However, Costco and the other discounters Bare Escentuals' distributors were selling to, unbeknownst to investors, were not "premium wholesale accounts."  Moreover, contrary to the June 2007 Offering Registration Statement/Prospectus' statements that Bare Escentuals "intend[ed] to expand [its] base of company-owned boutiques and to grow [its] infomercial and online shopping sales," including *its express "belie[f that] substantial opportunity exists to open additional domestic boutiques,"* Bare Escentuals' premium sales opportunities were rapidly diminishing.  [Emphasis added.]

87.     Further emphasizing the purported value of its brand loyalty, the June 2007 Offering Registration Statement/Prospectus stated the Company planned to "[l]everage [its] strong market

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS       - 43 -

position in foundation to cross-sell [its] other products," again stating that "[t]o date, [the Company

had] *demonstrated success in cross-selling [its] non-foundation products* in channels where [it]

interact[ed] directly with consumers, such as in our boutiques and on home shopping television."

However, as would later be revealed, Bare Escentuals' cross-selling efforts had failed.  [Emphasis

added.]

88.     The June 2007 Offering Registration Statement/Prospectus also expressly stated,

> On June 5, 2007, we announced that for the three months ending July 1, 2007 we
> anticipate fully diluted earnings to be between $0.20 and $0.22 per share and total
> sales growth compared to the three months ended July 2, 2006 to be between 27% to
> 30% *as we continue to experience strong consumer demand for our products*. We
> also announced that we expect sales growth for each channel to be in line with
> growth rates for the three months ended April 1, 2007 compared to the three months
> ended April 2, 2006, *with the exception of the infomercial channel, which we
> expect to be flat relative to the same period for the prior fiscal year*.

[Emphasis added.]

89.     In reality, the Company's 2Q 07 results, which would be issued on August 2, 2007,

would reveal that Bare Escentuals' infomercials were not producing anywhere near their previously

obtained level of sales, causing the Company's stock price to plunge more than 40% to less than $25

per share on extremely high volume on August 2, 2007.

90.     According to the "Growth Strategy" published in the Company's June 2007

Registration Statement/Prospectus, Defendants stated they planned to "[f]urther penetrate each of

[their] multiple distribution channels" as follows:

- *Wholesale. **We intend to continue to increase net sales through key
  premium wholesale accounts, such as Sephora and Ulta, home shopping
  television, and spas and salons. Within Sephora and Ulta, we will seek to
  improve our in-store product positioning and collaborative marketing
  efforts. In addition, we expect our premium wholesale sales will grow as
  Sephora and Ulta open new stores.** We are also exploring additional
  opportunities to sell our products in department stores.*

- *Retail. We intend to expand our base of company-owned boutiques and **to
  grow our infomercial and online shopping sales. We believe substantial
  opportunity exists to open additional domestic boutiques**. As of April 1,
  2007, we operated 33 boutiques. We had average net sales of approximately
  $1,900 per square foot for the twelve months ended April 1, 2007. We intend
  to continue growing our infomercial sales by increasing and improving the
  effectiveness of our media spending.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 44 -

91.     Instead, Defendants were engaged in a rampant expansion effort to chase immediate sales at all costs that resulted in Bare Escentuals opening over 750 so-called "brick and mortar" sales channels – *though absolutely no effort was being made internally to coordinate the multiple competing sales spots that were popping up* – including multiple competing sales outlets in single shopping malls.   Indeed, according to the Company's 2008 annual financial report, "[a]s of December 28, 2008, [Bare Escentuals's] products were distributed in a total of approximately 795 North American premium wholesale locations, which include Ulta, Sephora, Nordstrom, Macy's, Sephora in JCPenney, Bloomingdales and Shoppers Drug Mart in Canada."   As a result, the Company's own boutiques were competing with – and being competed with – by not only Target and Costco but by multiple other retail locations within a single mall.   And this would obliterate rather than grow the Company's "*infomercial sales.*"

92.     As the IPO and March 2007 Registration Statements/Prospectuses had, the June 2007 Registration Statement/Prospectus explained that in December 1998, the Company entered into an agreement with QVC, Inc. under which it granted QVC "*the exclusive right to promote, advertise, market, sell and distribute* [its] products in all distribution channels *in the United States* other than…company-owned boutiques and *prestige* retail channels."   The QVC agreement defined "prestige retail channels" as "traditional department stores and specialty stores, specialty boutiques and beauty salons," but explicitly "exclude[d] *all other retail channels of distribution, including discount stores, drug stores, warehouse stores, superstores and retail outlet stores*."   And, in September 2006, Bare Escentuals and QVC entered into a letter agreement amending their agreement that gave the Company "the right to enter into additional distribution channels." Under the amended letter agreement, Bare Escentuals could "promote, advertise, market and sell [its] products on [its] websites, advertising, catalogs, direct mail promotions and telephone numbers listed in [its] websites, catalogs and direct mail promotions, so long as [it paid] QVC a specified royalty on net sales…in these channels."   The amended letter agreement still "prohibit[ed] [Bare Escentuals] from selling products through retail channels not considered 'prestige,' *such as discount stores, warehouse stores and superstores*…."   And pursuant to the amended letter agreement, the Company

1  "granted QVC the exclusive right to promote, advertise, market and sell [its] products in Japan,

2  Germany and the United Kingdom, subject to [its] rights to promote, advertise, market and sell [its]

3  products in the same distribution channels available to [the Company] in the United States."

4  [Emphasis added]

5       93.    However, at the time of the June 2007 Offering, defendants knew Bare Escentuals

6  was not in compliance with the spirit, much less the word, of its agreement with QVC that the SEC

7  had required the Company to file as an attachment to its IPO Registration Statement.  Instead, it was

8  selling to distributors who were in turn redistributing to discounters like Costco and Target, who

9  were in turn selling the product at significant discounts.  Moreover, Defendants knew the Company

10  simply had no legal ability to stop discounters from selling its product once it was legally obtained,

11  especially in light of the ongoing litigation with Costco that Bare Escentuals filed in January 2007.

12       94.    Nonetheless, Goldman Sachs', the sole underwriter for the June 2007 Offering,

13  selling efforts were again a huge success and Goldman Sachs brought in $292 million in proceeds

14  and received over $5.8 million in fees.

15       **BACKGROUND TO THE EXCHANGE ACT CLASS PERIOD ALLEGATIONS**

16       95.    ***The allegations in this section pertain only to the Exchange Act claims.*** Bare

17  Escentuals was founded in 1976.  It was formerly known as STB Beauty, Inc. until it changed its

18  name to Bare Escentuals, Inc. in 2006 in preparation for the IPO.

19       96.    Bare Escentuals, together with its subsidiaries, develops, markets and sells cosmetics

20  and skin and body care product brands worldwide, including bareMinerals (mineral-based

21  foundations, eye shadows and blushes), RareMinerals (mineral-based facial cleansers, moisturizers

22  and acne treatments), Buxom (cosmetics including lip glosses and eye liners) and md formulations

23  (anti-aging and antioxidant skin care products).  The Company sells through a number of channels,

24  including traditional retail locations such as specialty beauty retailers Sephora and Ulta, certain

25  department stores and Company-owned boutiques, and a variety of domestic spa and salon locations.

26  Bare Escentuals also sells through so-called "direct-response television" sales programs, including

27  infomercials and home shopping television (primarily QVC), and online through its website.  The

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 46 -

1  Company also distributes its product for resale internationally through distributors located in the

2  U.K., Japan, France, Germany and Canada.

3         97.    The Company's exclusive supplier is BioKool, LLC and traditionally sold its product

4  in "kits" containing a compilation of products, including a variety of starter kits ranging in price

5  from $45 - $75.  Since 2002, the significant majority of the Company's sales were obtained through

6  direct-response television, which constituted 60% of sales during 2004-2007.  Bare Escentuals has

7  sold a large volume of product on QVC since 1997, and has been QVC's #1 seller since 2001.

8         98.    The Company's competitors include Avon, Bobbi Brown, Chanel, Clarins, Clinique,

9  Estée Lauder, L'Oréal, Lancôme, M.A.C., Maybelline, Neutrogena, Proctor & Gamble, Shiseido and

10  Smashbox.  There are no patents protecting Bare Escentuals' products, though it does have a

11  registered trademark.  There are no barriers to entry to its market.

12         99.    Bare Escentuals sells to premium wholesale customers QVC, Sephora and Ulta, who

13  in turn sell product to their customers.  The Company has no long-term contracts with these

14  customers.  During the Class Period, Bare Escentuals was selling a significant amount of product to

15  these premium wholesale customers, permitting Bare Escentuals to immediately book the sales

16  revenue upon shipment, which would lead to excessive stock overloads and drain later sales as the

17  wholesalers were forced to work down the massive inventories they received but could not sell.

18        100.    The Bare Escentuals brand dates back to the opening of its first boutique in 1976, and

19  its products have been marketed through the QVC home shopping network since 1997, but sales

20  never really took off until the introduction of Bare Escentuals' infomercials in 2001.  The longer

21  infomercials were 28 minutes long and featured demonstrations by Bare Escentuals' CEO Blodgett

22  applying the Company's powder-based foundation and related cosmetics.  The Company also

23  employed a shorter 60-120 second format that was broadcast more than 500 times a week.

24        101.    By 2002, consumers worldwide had flocked to try the cosmetic phenomenon known

25  as bare mineral powder makeup.  Women around the world viewed firsthand the cosmetic television

26  infomercial evolution, beginning the mineral makeup boom and increasing Bare Escentuals' sales

27  ten-fold, from annual sales of $25 million in 2001 to over $250 million in 2005.  Indeed, in the

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 47 -

1    months leading up to the Company's November 2006 IPO, the Company's grew exponentially to

2    more than $394.5 million in FY06.

3         102.    Bare Escentuals obtained this exponential 2001 - 2006 sales growth by distinguishing

4    itself from other cosmetic sellers in two distinctive ways.  First, Bare Escentuals was a first-mover in

5    the mineral powder makeup phenomenon that peaked in 2008 - by which time almost all worldwide

6    cosmetic companies, including Estée Lauder, M.A.C. Cosmetics, and L'Oréal Cosmetics, had

7    introduced their own versions of mineral type makeup.  Rather than the traditional glycerin-based

8    cosmetics, Bare Escentuals claimed its cosmetics were 100% natural, and thus better for the skin.

9    This "back to basics" health mantra that supported the Company's sales in boutiques in the more

10   health-conscious San Francisco Bay Area in the 90s was also well-received across the country

11   through the advent of the Company's infomercials.

12        103.    But the Bare Escentuals story has never really been about the product, *it's been about*

13   *brand development and about sales*.  Investors who bought more than $1.17+ billion of Bare

14   Escentuals stock in the three offerings the Company and its underwriters conducted between

15   November 2006 and June 2007 did not buy a product line, they bought a purportedly well-greased

16   sales machine.  In fact, Bare Escentuals does not now and never has manufactured *anything*.  Bare

17   Escentuals does not now and never has owned *a single patent* on any of its products.  The minerals

18   and powders that compose its cosmetics cost it next to nothing and Bare Escentuals buys the brushes

19   and other application supplies it packages with its cosmetics in China.  If for instance, a particular

20   Christmas kit does not sell as expected, the Company simply breaks it down and re-packages its

21   parts as a Mother's Day kit, a "Getting Started Kit" or some other package offering.  Indeed, after

22   reviewing an initial draft of the Company's proposed IPO Registration Statement/Prospectus, the

23   SEC specifically admonished that the Company "clarify that third parties develop and manufacture

24   your products" in an amended registration statement.

25        104.    And this second distinction is what actually forms the true basis of the phenomenal

26   run-up in Bare Escentuals' pre-IPO sales *– and as fate would have it, it's Achilles tendon too*.

27   Though the Company claimed at the time of the IPO and throughout the Class Period that its sales

28

1    channels were robust and diversified, in reality during the Company's uber-sales growth years, the

2    sales were really very controlled and that control permitted Bare Escentuals to make most of its sales

3    through prepackaged "kits" containing a variety of products Bare Escentuals selected and assembled.

4    It also permitted Bare Escentuals to charge premium prices for cosmetics that far exceeded market

5    prices.

6         105.    As the IPO Registration Statement/Prospectus explained, in December 1998, the

7    Company entered into an agreement with QVC, Inc. under which it granted QVC "***the exclusive***

8    ***right to promote, advertise, market, sell and distribute*** [its] products in all distribution channels ***in***

9    ***the United States*** other than…company-owned boutiques and ***prestige*** retail channels."  The QVC

10   agreement defined "prestige retail channels" as "traditional department stores and specialty stores,

11   specialty boutiques and beauty salons," but explicitly "exclude[d] ***all other retail channels of***

12   ***distribution, including discount stores, drug stores, warehouse stores, superstores and retail outlet***

13   ***stores***."

14        106.    In September 2006, Bare Escentuals and QVC entered into a letter agreement

15   amending their agreement that gave the Company "the right to enter into additional distribution

16   channels." Under the amended letter agreement, Bare Escentuals could "promote, advertise, market

17   and sell [its] products on [its] websites, advertising, catalogs, direct mail promotions and telephone

18   numbers listed in [its] websites, catalogs and direct mail promotions, so long as [it paid] QVC a

19   specified royalty on net sales…in these channels."  The amended letter agreement still "prohibit[ed]

20   [Bare Escentuals] from selling products through retail channels not considered 'prestige,' ***such as***

21   ***discount stores, warehouse stores and superstores***…."  Pursuant to the amended letter agreement,

22   the Company "granted QVC the exclusive right to promote, advertise, market and sell [its] products

23   in Japan, Germany and the United Kingdom, subject to [its] rights to promote, advertise, market and

24   sell our products in the same distribution channels available to [the Company] in the United States."

25        107.    Thus, like the investors who bought Bare Escentuals sto ck in the three stock

26   offerings at the start of the Class Period, and those who would continue buying its stock in the after

27   market throughout the Class Period, QVC understood that the Bare Escentuals success story was not

28

1   about manufacturing or even owning the products, ***but about controlling and owning the sales***

2   ***channels***.  Indeed, until June 2004, QVC itself owned a significant stake in Bare Escentuals, having

3   accepted hundreds of millions of dollars worth of stock and warrants in connection with its

4   agreements with Bare Escentuals.  However, in preparation for the Company's IPO, as part of an

5   omnibus restructuring in June 2004, QVC cashed in its stake in Bare Escentuals and Bare

6   Escentuals' executives turned to the Private Equity Sponsors to provide bridge financing to their

7   IPO.

8        108.    But at the time of its IPO in September 2006, Bare Escentuals was not in compliance

9   with the spirit, much less the word, of its agreement with QVC that the SEC had required the

10  Company to file as an attachment to its IPO Registration Statement.  In fact, though Bare Escentuals

11  repeatedly touted in the IPO Registration Statement/Prospectus and thereafter that its sales channels,

12  and "multi-channel distribution strategy provide[d] for greater consumer diversity, reach and

13  convenience ***while reinforcing the authenticity and premium image of [the Company's] brands***,"

14  Defendants concealed that, ***at the time of the IPO,*** Bare Escentuals product they themselves had

15  provided to distributors was destined for resale at big box discounters Costco and Target during the

16  2006 Christmas season.  Defendants even knew at some point before the Fall of 2007 that their

17  products were being sold on Target's website and that by early Spring 2008, Target was displaying

18  Bare Escentuals' products in its sales circular.

19       109.    Indeed, Bare Escentuals filed litigation against Costco in federal court in January

20  2007 the Company argued addressed "***100,000 high-end cosmetic kits that Costco purchased from***

21  ***a third party for millions of dollars***," repackaged and was selling in December 2006 at substantial

22  discounts to the prices Bare Escentuals, QVC and its other "prestige" wholesalers were charging.  In

23  that litigation, Defendants expressly averred that ***"Bare Escentuals ha[d] invested substantial time***

24  ***and money in developing, marketing, and selling its products, and in its reputation and goodwill***,"

25  and that "***Costco's unauthorized actions have resulted or will result in harm to Bare Escentuals'***

26  ***sales, brand name, market reputation, and goodwill***."

27

28
    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 50 -

110.   Moreover, Bare Escentuals' former Director of Production during the February-March 2007 to February-March 2008 time period (who was responsible for coordinating the production of Bare Escentuals' make-up products across all sales channels with Sourcing, Planning and Sales Departments), specifically recalled working on fulfilling a large special order that came in in October 2007 that this person believed ended up, partially or totally, on Target's shelves.  The Company's former Director of Production recalled working on fulfilling that particular order because it was so large and because it was being filled toward the end of the quarter.  This former Director of Production also recalled being under the distinct impression that Bare Escentuals was trying to fulfill its sales goals for that particular quarter at the time the order was filled, and that Production was working on specific kits designed just for this individual customer.

111.   Yet, Defendants concealed their knowledge of these big box discounter sales – including the aforementioned litigation – from the investing public until the Company's outside auditors mandated disclosure in connection with preparing the Company's 2007 annual financial report in February, 2008.  And even then, during the Company's earnings conference held February 28, 2008, Defendants attempted to falsely assure the investment community the "unauthorized" Target and Costco sales would be stopped.  As would be revealed, however, Bare Escentuals, which owns no patent on its products, has no legally enforceable right to stop big box discounters from selling its product so long as they legally procure the product.  ***Indeed, though it appears Bare Escentuals was eventually able to cut off Costco's supplier, Target continues selling Bare Escentuals on its website to this day.***

112.   The Target and Costco sales would dramatically dilute Bare Escentuals' pricing power though, forcing the Company to succumb to pricing pressures, eventually forcing the Company to disclose it was reducing the price of certain starter kits from $60 to as low as $15 at the end of the Class Period on October 31, 2008.

113.   The Target and Costco sales also jeopardized the Company's relations with its "prestige" wholesalers who neither wanted to compete with Costco and Target on price point nor to be perceived as selling cosmetics readily available to the masses.  Indeed, in retaliation, Sephora and

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 51 -

1    other wholesalers would dramatically slash their orders and the Company's sales declined

2    dramatically during 2007.  By the end of the Class Period on October 31, 2008, the Company would

3    be forced to disclose that the inventory it held at these retailers, essentially under consignment

4    contracts, was extremely bloated and far exceeded sales demand.  The resulting decline in sales to

5    the Company's prestige wholesalers would significantly diminish sales for several quarters and some

6    wholesalers are still engaged in further "destocking" efforts.

7           114.    According to the former Bare Escentuals Director of Retail Boutiques from

8    September 2005 to September 2007, the issue of sales at Target and Costco was common knowledge

9    at Bare Escentuals during the 1Q07 and 2Q07  and the issue was raised regularly at the meetings of

10   the Company's Directors of Finance, Wholesale Distribution, Inventory Control, Production and

11   Human Resources, and other departments at Bare Escentuals.  According to the former Director of

12   Retail Boutiques, approximately 30 executives attended these monthly meetings which were

13   typically conducted by CFO McCormick, and sometimes President Miles.  According to this former

14   Director of Retail Boutiques, the concern expressed amongst sales Directors was that these big-box

15   discounter sales would "cut into the brand name cache and could anger wholesalers, especially

16   Sephora," which "would not put up with" Costco and Target selling the same "Getting Started" kits

17   these prestige wholesalers were selling.  According to the former Director of Retail Boutiques,

18   during the executive's tenure at Bare Escentuals, the Sephora account was worth approximately

19   $180 million annually and Bare Escentuals' executives did not want to jeopardize that relationship.

20   According to the former Director of Retail Boutiques, McCormick assured the sales Directors the

21   Company "was looking into" the situation and meanwhile, Bare Escentuals' executives authorized

22   certain prestige wholesalers to honor the Target and Costco prices if customers complained,

23   including Macy's and Nordstrom.

24          115.    The Target and Costco sales would also ring a death-knell to the most lucrative aspect

25   of Bare Escentuals' already fragile infomercial and QVC sales model.  Unbeknownst to investors –

26   because Defendants actively concealed this fact too – a significant portion of Bare Escentuals' stellar

27   2001-2006 direct-to-consumer sales growth was dependent upon Bare Escentuals ability to

28

1   unwittingly sign up customers for "club" sales deals whereby their credit cards were later

2   automatically billed for multiple shipments beyond their initial orders without the customers'

3   consent.  Despite only having agreed to purchase an innocuous "starter kit," two to three months

4   after the initial product was delivered, these customers would be shipped – and their credit cars again

5   billed for – additional small but costly shipments.  Such automatically recurring credit card

6   transactions are notoriously easy to start but nearly impossible to stop.  As a result, the Company's

7   Customer Service and Accounts Receivable departments were receiving hundreds of complaints and

8   refund demands.  According to some customers though, the response was yet another shipment.

9        116.   Meanwhile, Bare Escentuals, which "recognize[d these] sales when merchandise

10  [was] shipped from a warehouse directly to…infomercial customers and online shopping customer,"

11  collected and reported millions of dollars in unearned revenues.  While Bare Escentuals was able to

12  capture, obtain and report several years worth of phenomenal premium sales employing this guise

13  leading up to its September 2006 IPO, not only would the repeat automatic sales these tactics

14  generated grow lean in the period following the IPO and the follow-on offerings, the Company

15  would be forced to refund previously-recognized sales and many would-be direct-to-consumer

16  customers became brick-and-mortar shoppers.  ***In fact, in the two years following the Company's***

17  ***IPO, the Company's  so-called direct-to-consumer sales plummeted  from $179 million in FY***

18  ***2006, representing 45.6% of all sales, to $170 million in FY 2008, representing just 30.6% all***

19  ***sales.***

20       117.   Concomitantly, Defendants' aggressive drive to haphazardly open hundreds of what

21  they would later refer to as "brick-and-mortar" sales channels during the Class Period was also

22  cannibalizing sales from the Company's other distribution channels, including its own boutiques,

23  infomercial sales, QVC and even the "prestige" wholesalers.

24       118.   Any of the defects in the Company's sales model could, on its own, throw sales

25  projections off wildly – but collectively they rendered Bare Escentuals Class Period sales

26  projections, and stock valuations based on those projections (both internal and external) utterly

27  meaningless.

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 53 -

**BARE ESCENTUALS PRIVATE EQUITY SPONSORS "KEPT COMING BACK TO THE TROUGH" VIA REPEATED PUBLIC STOCK OFFERINGS OF STOCK**

119.     ***The allegations in this section pertain only to the Exchange Act claims.***  The Company was acquired in 1990 by JH Partners (headed by defendants Hansen and John).   In November 2001, Bare Escentuals Inc. was merged with MD Formulations Inc., a cosmeceuticals firm, to form MD Beauty Inc.  The Company was incorporated again under the name STB Beauty Inc. in June 2004 by Berkshire Partners (headed by defendants Jones and Bloom) and JH Partners when they acquired majority control of the Company through a merger and $225 million recapitalization.  In the recapitalization transaction, the Company incurred approximately $100.0 million of new indebtedness, raised approximately $87.5 million of new equity financing and used $169.6 million to repurchase outstanding shares of capital stock and fully vested options.  Beginning on February 22, 2005, the Company would complete three more "recapitalizations," which essentially paid $646 million in dividends to Bare Escentuals' Private Equity Sponsors, including $577 million paid to Berkshire Partners and JH Partners alone.  In February 2006, Defendants changed the name of the new-privately owned company and market leader in mineral-based cosmetics to Bare Escentuals Inc. in preparation for its IPO.

120.     In September 2006, Defendants took the Company public in an IPO priced at $22 per share.  Issuance proceeds of $374 million were used to pay down debt and to buy out the management agreements with Bare Escentuals' Private Equity Sponsors, Berkshire Partners and JH Partners.  Through the IPO, the March 2007 and June 2007 Offerings, Berkshire Partners reduced its stake in Bare Escentuals from 47% pre-IPO to approximately 26% and JH Partners reduced its stake in Bare Escentuals from 32% pre-IPO to approximately 12%, with a combined reduction of its prior 79% ownership to 38%.

121.     As described in relevant part in an October 2006 exposé by *Business Week* entitled *"Gluttons At The Gate - Private equity are using slick new tricks to gorge on corporate assets.  A story of excess:"*

> The case of San-Francisco's Bare Escentuals Inc. (BARE) shows how reliant firms have become on public stock investors. In 2005 the cosmetics maker took on $412 million in debt, mostly to pay its owners, Boston's Berkshire Partners and San

Francisco's JH Partners, a total of $309 million in dividends and "transaction fees" in two installments eight months apart. ***The payments were a stretch for a company that earned only $24 million in 2005. In September, 2005, Standard & Poor's revised its outlook for the company to "negative" from "stable," citing its "very aggressive financial policy."***

***Yet Bare Escentuals' owners, who bought the company in June, 2004, kept coming back to the trough.*** In June, 2006, despite S&P's decision in May to lower the company's credit rating from to B to B- and the company's soaring debt-payoff costs, Bare Escentuals began to borrow again to pay its owners even larger amounts: a $340 million dividend, $218,00 in management fees, and $1.8 million in stock for arranging the dividend.



**Warning Signs** As private equity firms become more powerful, several distinct trends have emerged that suggest the industry is running unchecked

**HUGE DIVIDENDS AND FEES**
Firms are pulling record sums from the companies they own—in one case $1 billion. They're charging enormous fees for everything from dispensing advice to covering their taxes.

**SERIAL CHARGES**
Buyout firms are collecting big payments from companies several times a year, sometimes so much that it impairs the companies' financial strength.

**DEBT BOMBS**
Firms are loading up companies with so much debt that their credit ratings are suffering; some of them are even ending up in bankruptcy.

**QUICK FLIPS**
Firms are bringing private companies to the public stock market at record speed, in some cases less than a year after buying them.

On Sept. 29, investors picked up the tab through an IPO. Most of the money raised was used to repay debt, ***except for $1.8 million that went to the owners "as consideration for the termination of our management agreements with them."*** Bare Escentuals and its owners declined to comment on the payments. For now, the company is doing well both by its public investors and its owners. Its stock has jumped 44% since the IPO.

[Emphasis added.]

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

122.   ***The allegations in this section pertain only to the Exchange Act claims.***  During the Class Period, Individual Defendants Blodgett, Miles and McCormick, as senior executive officers and/or directors of Bare Escentuals, and defendants Jones (Bare Escentuals' Chairman and Berkshire Partners managing director), Bloom (Bare Escentuals director and Berkshire Partners founding and managing director), John (Bare Escentuals director and JH Partners senior partner) Hansen (Bare Escentuals director and JH Partners President), and Ottinger (Bare Escentuals director and Berkshire Partners LLC vice president from 1985 to 1989), were privy to confidential and proprietary information concerning Bare Escentuals, its operations, finances, financial condition and present and future business prospects.  These Individual Defendants also had access to material adverse non-public information concerning Bare Escentuals, as discussed in detail below.  Because of their

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 55 -

1   positions with Bare Escentuals and their substantial stock ownership, Individual Defendants

2   Blodgett, Miles, McCormick, Jones, Bloom, John, Hansen and Ottinger had access to non-public

3   information about the Company's business, finances, products, markets and present and future

4   business prospects via internal corporate documents, conversations and connections with other

5   corporate officers and employees, attendance at management and/or board of directors meetings and

6   committees thereof and via reports and other information provided to them in connection therewith.

7   Because of their possession of such information, these Individual Defendants knew or recklessly

8   disregarded that the adverse facts specified herein had not been disclosed to, and were being

9   concealed from, the investing public.

10          123.    Accordingly, Individual Defendants Blodgett, Miles, McCormick, Jones, Bloom,

11  John, Hansen and Ottinger, along with Bare Escentuals, are liable as direct participants in the wrongs

12  complained of herein under the Exchange Act. In addition, these Individual Defendants, by reason

13  of their status as senior executive officers and/or directors, were "controlling persons" within the

14  meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to

15  engage in the unlawful conduct complained of herein. Because of their positions of control, these

16  Individual Defendants were able to and did, directly or indirectly, control the conduct of Bare

17  Escentuals' business.

18          124.    Individual Defendants Blodgett, Miles, McCormick, Jones, Bloom, John, Hansen and

19  Ottinger, because of their positions with the Company and/or their substantial stock ownership,

20  controlled and/or possessed the authority to control the contents of Bare Escentuals' reports, press

21  releases and presentations to securities analysts and through them, to the investing public. These

22  Individual Defendants were provided with copies of the Company's reports and press releases

23  alleged herein to be misleading, prior to or shortly after their issuance and had the ability and

24  opportunity to prevent their issuance or cause them to be corrected. Thus, these Individual

25  Defendants had the opportunity to commit the fraudulent acts alleged herein.

26          125.    As senior executive officers and/or directors and as controlling persons of a publicly

27  traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 56 -

1    Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the

2    federal securities laws, Individual Defendants Blodgett, Miles , McCormick, Jones, Bloom, John,

3    Hansen and Ottinger had a duty to promptly disseminate accurate and truthful information with

4    respect to Bare Escentuals' financial condition and performance, growth, operations, financial

5    statements, business, products, markets, management, earnings and present and future business

6    prospects, and to correct any previously issued statements that had become materially misleading or

7    untrue, so that the market price of Bare Escentuals common stock would be based upon truthful and

8    accurate information. These Individual Defendants' misrepresentations and omissions during the

9    Class Period violated these specific requirements and obligations.

10          126.    Bare Escentuals and Individual Defendants Blodgett, Miles, McCormick, Jones,

11   Bloom, John, Hansen and Ottinger are liable as participants in a fraudulent scheme and course of

12   conduct that operated as a fraud or deceit on purchasers of Bare Escentuals common stock by

13   disseminating materially false and misleading statements and/or concealing material adverse facts.

14   The scheme: (i) deceived the investing public regarding Bare Escentuals' sales capabilities,

15   operations and management and the intrinsic value of Bare Escentuals' common stock; (ii) allowed

16   these Company insiders to collectively sell tens of millions of shares of their personally-held Bare

17   Escentuals common stock for hundreds of millions in proceeds; and (iii) caused Lead Plaintiffs and

18   members of the Class to purchase Bare Escentuals common stock at artificially inflated prices.

19          127.    The Class Period commences on September 28, 2006.  On that date, the Company

20   issued a release entitled "Bare Escentuals, Inc. Prices Initial Public Offering of Common Stock,"

21   which stated in relevant part:

22          Bare Escentuals, Inc. announced today the pricing of its initial public offering of
             16,000,000 shares of its common stock at a price to the public of $22.00 per
23          share. All of the shares to be sold in the offering are to be sold by the Company,
             and the net proceeds of this offering are intended to repay a portion of the
24          Company's outstanding indebtedness and to pay a fee in connection with the
             termination of the Company's management agreements with Berkshire Partners
25          LLC and JH Partners LLC. Bare Escentuals has granted the underwriters an
             option to purchase an additional 2,400,000 shares of common stock at the initial
26          public offering price to cover over-allotments, if any. The shares will trade on the
             Nasdaq Global Select Market under the symbol "BARE."

27

28
     CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 57 -

1       The offering is being made through an underwriting syndicate led by Goldman,
Sachs & Co. as sole book runner for the offering and CIBC World Markets as co-
2       lead manager. Banc of America Securities LLC, Piper Jaffray, Thomas Weisel
Partners LLC, SunTrust Robinson Humphrey and Sanders Morris Harris are
3       acting as co-managers.

4          128.   The Registration Statement/Prospectus used to conduct the September 28, 2006 IPO

5 was false and misleading in that that it misrepresented and/or failed to disclose, among the other

6 things detailed herein at ¶¶57-71, that: (i) the Company's "premium" product image was being

7 diluted by sales through discounters like Costco and Target then underway or in preparation; (ii) the

8 Company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (iii) the

9 Company's ability to garner the significantly-higher "club" sales program revenues it had previously

10 obtained through direct-to-consumer infomercial and QVC sales was diminishing as consumers

11 refused to participate in the automatic shipment/billing "club" deals and were instead shopping in the

12 rapidly growing number of brick-and-mortal sales channels – or simply buying at Target and Costco

13 at significant discounts.

14          129.   On November 7, 2006, Bare Escentuals issued a press release announcing its financial

15 results for the third quarter of fiscal 2006, the period ended October 1, 2006. For the quarter, the

16 Company reported net sales of $97.9 million and net income of $8.9 million, or $0.12 per diluted

17 share on approximately 73.5 million shares outstanding. Commenting on the announcement,

18 Defendant Blodgett stated in relevant part:

19       We are very pleased with the results achieved during the third quarter of fiscal
2006. ***Our strong performance reflects Bare Escentuals' continued growing***
20       ***brand awareness and the increasing consumer demand for our mineral-based***
***products, and is a testament to the hard work and dedication of our entire***
21       ***organization***. We at Bare Escentuals are extremely grateful for the loyalty and
passion of our Bare Escentuals community, who helped us win our second
22       consecutive Glamour magazine Glammy Award for Best Prestige Foundation.

23       We are delighted to have successfully completed our initial public offering and
we are extremely excited about our prospects for the future. Bare Escentuals
24       pioneered the mineral-based cosmetics category and ***we believe that our leading***
***market position, coupled with our solid relationships with our customers and***
25       ***reinforcing multi-channel distribution strategies, provides us with multiple***
***long-term growth opportunities, both domestically and internationally.*** We plan
26       to continue to selectively broaden our distribution and further increase brand
awareness through media and customer-focused events.

27

28 With regard to the Company's "guidance" for 2007, the press release stated that:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 58 -

> For the fourth quarter of fiscal 2006, the Company expects sales to grow in the range of 28% to 33% from the same period last year and diluted earnings per share to be in the range of $0.12 to $0.13 on approximately 92.5 million shares outstanding. The Company expects sales for fiscal 2007 to grow in the range of 18% to 22% compared to fiscal 2006 and diluted earnings per share to be in the range of $0.81 to $0.86 on approximately 92.6 million shares outstanding.

[Emphasis added.]

130. During the Conference Call on November 7, 2006, Blodgett stated:

- the Company had "***continued to selectively broaden [its] distribution***"; and

- Bare Escentuals' executives "believe[d] in taking a genuine approach with [its] ***branding and messaging***, and ***[its] customers really appreciate[d] the honesty***."

131. During that same call, Miles reiterated that the Company would "***continue to selectively expand [its] core distribution***, since [it] still ha[d] many customers out there that simply [could not] find [its] product." Miles also responded to an analyst's question inquiring whether "when you are looking at the Macy's, Nordstrom type rollouts, are you trying to avoid conflict between the two, or can you have both in the same place?," by stating: "certainly early on I think we could foresee that we won't overlap our retailers too much" and that they would ""try and really go to where our customers need our products in the areas ***where we are not available***."

132. During that same call, McCormick:

- addressed the Company's growing inventory, stating "we are continuing to invest in our demand planning and supply chain organizations, as well as into processes and systems, in an effort to ***tighten*** the link between supply and demand; and

- reiterated and explained the earnings guidance provided in the Company's release.

133. On November 15, 2006 the Company filed its interim financial report for the Q306 on Form 10-Q with the SEC, including Sarbanes Oxley certifications signed by Defendants Blodgett and McCormick, which stated in relevant part that each had "reviewed this…report" and that:

> 2.   Based on [their] knowledge, th[e] report [did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[at] report;

> 3.    Based on [their] knowledge, the financial statements, and other financial information included in th[at] report, fairly present in all material respects the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 59 -

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in th[at] report;

4.     The registrant's other certifying officer(s) and [they] [were] responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and ha[d]:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which th[at] report [was] being prepared;

(b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in th[at] report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by th[at] report based on such evaluation; and

(c)   Disclosed in th[at] report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that ha[d] materially affected, or [was] reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and [they] ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which [were] reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involve[d] management or other employees who ha[d] a significant role in the registrant's internal control over financial reporting.

134.    The statements above in ¶¶129-133 addressing the Company's 3Q06 financial results and 4Q 06 and FY06-07 financial projections were materially false and misleading because:

(a)     the Company's old infomercials were not performing according to internal expectations;

(b)     the Company's new infomercials had caused an immediate decrease in sales and were not performing to internal expectations;

(c)     Bare Escentuals' inventory levels at its premium wholesalers remained unchecked and was increasing;

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS         - 60 -

1    (d)    the Company was experiencing significant decreases in its sales through TV

2 marketer QVC, which accounted for approximately one-third of the Company's Class Period sales,

3 due to cutting the number of QVC advertising hours;

4    (e)    the Bare Escentuals' clientele was lower-income and faced more economic

5 exposure to rising gasoline prices and unemployment;

6    (f)    the initial exclusive sales through QVC, Sephora, Ulta, infomercials and its

7 own boutiques allowed Bare Escentuals to build its revenues without having to compete with the

8 industry's major players directly, while also putting its products in faster-growing outlets, but as the

9 business reached a more substantial size, it had to turn to the bigger distribution potential offered by

10 department stores as well, where it could not command the same price premiums it obtained in the

11 more insular markets and customers would not participate in the automatically recurring "club" deal

12 sales;

13    (g)    the Company's expansion outside of North American markets would fail

14 because QVC-type cable sales programs could not generate some of the volume of sales outside of

15 North America;

16    (h)    the Company had been unable to leverage its brand to cross-sell other

17 products;

18    (i)    the Company's rampant expansion without sufficient oversight or planning

19 was over-saturating certain markets and cannibalizing sales at other retailers, premium wholesalers,

20 the Company's own boutiques and its direct-to-purchaser infomercial and the QVC sales programs;

21    (j)    Bare Escentuals lacked effective controls over its sales channels and internal

22 controls – rendering its financial guidance meaningless; and

23    (k)    sales Bare Escentuals was making to foreign distributors, who in turn were

24 selling to discounters like Costco and Target, were cannibalizing Bare Escentuals' premium sales

25 and Bare Escentuals had no legal recourse against the discounters.

26    135.    On February 28, 2007, Bare Escentuals issued a press release announcing its financial

27 results for the 4Q 04 and FY 06, ended December 31, 2006.  For the quarter, the Company reported

28
CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS       - 61 -

net sales of $110.5 million and net income of $16.3 million, or $0.18 per diluted share.  Commenting on the announcement, defendant Blodgett stated in relevant part:

> We are extremely pleased with our performance for the fourth quarter and fiscal 2006. The Bare Escentuals brand continues to flourish *due to the amazing support of our customers, partners, and employees*. We plan to continue this momentum into 2007 with the launch of innovative new products *and the expansion of our distribution channels both here and abroad.* In addition, we'll be launching a nationwide tour to connect directly with our customers in order to ensure we're doing everything we can to exceed their expectations.

[Emphasis added.]

136.    With regard to the Company's "guidance" for 2007, the press release stated: "[t]he Company now expects fiscal 2007 diluted earnings per share to be in the range of $0.84 to $0.89 on approximately 92.6 million shares outstanding.  This change represents an increase of $0.03 over the prior earnings guidance."  Following the press release, Bare Escentuals held a conference call with investors and analysts to discuss the Company's earnings and operations.  With regard to the Company's infomercial business, President of Wholesale Sales Diane Miles ("Miles") stated in relevant part:

> *Our products, our marketing and our merchandising is translating well in all of our channels.* Our infomercial business ended the year at +33% over '05. Our infomercial continues to be key for creating awareness and educating the customer on the efficiency of our product. In 2006, our infomercial was shown over 540 times a week, which equates to 28,000 times a year. *At this point, we're happy with our existing level of exposure as it relates to the current frequency of our airing.* Hence, we expect only a modest growth in our media time for 2007. Our focus, therefore, will be further leverage of our existing brand awareness through a strategic expansion in bricks and mortar.
>
> *               *               *
>
> *As with the infomercial, we are very comfortable with our existing on-air presence and thus, we anticipate modest growth in 2007 with emphasis upon growing internet and improving continuity in this channel.*
>
> *               *               *
>
> Okay, so just on the infomercial, we're growing some and done back end but probably growing back end faster than front end. *So with the media spend, we're still attracting new customers. And then with the continuity, that's consistently growing as we increase the number of customers on our database.*

[Emphasis added.]

137.    On March 30, 2007, the Company filed its annual financial report for FY06 and 4Q06 on Form 10-K with the SEC, including Sarbanes Oxley certifications identical to the one identified herein at ¶133.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 62 -

138.    The statements identified above in ¶¶135-137 addressing the Company's 4Q 06 and FY 06 financial results and FY 07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

139.    On March 13, 2007, Bare Escentuals issued a press release which announced the pricing of a follow-on public offering of 12 million shares of its common stock at a price of $34.50 per share.  The Registration Statement/Prospectus used to conduct the March 2007 Offering was false and misleading in that that it misrepresented and/or failed to disclose, among the other things detailed herein at ¶¶72-81, that:  (i) the Company's "premium" product image was being diluted by sales through discounters like Costco and Target then underway or in preparation; (ii) the Company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (iii) the Company's ability to garner the significantly-higher "club" sales program revenues it had previously obtained through direct-to-consumer infomercial and QVC sales was diminishing as consumers refused to participate in the automatic shipment/billing "club" deals and were instead shopping in the rapidly growing number of brick-and-mortal sales channels – or simply buying at Target and Costco at significant discounts.

140.    On May 2, 2007, Bare Escentuals issued a press release announcing its financial results for the first quarter of fiscal 2007, ended April 1, 2007.  For the quarter, the Company reported net sales of $115.6 million and net income of $20.4 million, or $0.22 per diluted share. Commenting on the Company's performance during the quarter, defendant Blodgett stated in relevant part:

> The first quarter of 2007 was a very good quarter for the company and a continuation of the strong growth we delivered in 2006. While our sales and earnings speak to our outstanding performance, ***it is the strength of our brand and dedication of our customers that genuinely reflect our success.*** As we expand distribution channels worldwide, we remain committed to providing the highest quality bareMinerals products and customer service, as well as maintaining our brand excellence and industry leadership.

[Emphasis added.]

141.    With regard to the Company's "guidance" for 2007, the press release stated in relevant part:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS         - 63 -

1

2

3

> Based on stronger-than-expected first quarter results, Bare Escentuals expects fiscal 2007 diluted earnings per share to be in the range of $0.89 to $0.94 on approximately 93.2 million shares outstanding. This change represents an increase of $0.05 over the prior earnings guidance. The Company continues to anticipate that earnings will be weighted toward the second half of fiscal 2007.

4

5

6

142.    Following the press release, Bare Escentuals and other insiders held a conference call with investors and analysts to discuss the Company's earnings and operations.  With regard to the Company's infomercial business, defendant Blodgett stated in relevant part:

7

8

9

> We are also very excited to announce that we are launching our fifth bareMinerals infomercial this month. For the past five years the infomercial has been a key channel for us to market, educate, and acquire customers and we have taken our collective learning's to produce our highest quality infomercial to date.

10

> We believe this latest edition better demonstrates the connection we have with our customers and the contagious excitement surrounding Bare Escentuals.

11

12

13

> It includes some terrific footage of in-store events at our boutiques and at our prestige partners such as Sephora. And the testimonials manage to get better and better as we continue to use the voice of our customers to help educate and generate brand awareness.

*       *       *       *

14

15

Lori Scherwin - Goldman Sachs – Analyst

16

17

And then just lastly, you mentioned a change in the infomercial and I was just curious, Leslie, what you've seen in the last four times you upgraded the infomercial. Did it really result in an up tick in sales or was it just sort of reenergizing the media?

18

Leslie Blodgett - Bare Escentuals Inc. – CEO

19

20

Yes, we do see an upside in sales and every time we do a new infomercial it's a completely different looking show from many aspects. And the offer changes as well. So even people, I believe, who bought into the other one might want to try the new offer as well.

21

22

And, yes, we've included RareMinerals as a free gift in this infomercial too and that's a great value and a great way to sample our new exciting night treatment.

23

143.    On May 14, 2007, the Company filed its interim financial report for the 1Q 07 on Form 10-Q with the SEC, including Sarbanes Oxley certifications identical to the one identified herein at ¶133.

24

25

26

144.    The statements identified above in ¶¶140-143 addressing the Company's 1Q 07 financial results and FY 07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

27

28

145.     On June 5, 2007, Bare Escentuals issued a press release announcing that it was reaffirming its fiscal year 2007 guidance and that the Company was anticipating full year fiscal 2007 diluted earnings to be between $0.89 and $0.94 per share.  In addition, Bare Escentuals provided quarterly guidance for the second quarter of fiscal 2007, stating that for its second fiscal quarter ending June 30, 2007, "the Company anticipates fully diluted earnings to be between $0.20 and $0.22 per share."  "For the second quarter of fiscal 2007, total sales growth versus the prior year is expected to be in the range of 27% to 30% *as the Company continues to experience strong consumer demand for its products.*"  "On a channel basis, year-over-year sales growth for the second quarter of fiscal 2007 is expected to be in line with first quarter growth rates, with the exception of the Infomercial channel which is expected to be flat relative to prior year."  "The Company continues to expect modest growth in infomercial sales in fiscal 2007." [Emphasis added.]

146.     The statements identified above in ¶145 addressing the Company's FY07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

147.     On June 13, 2007, Bare Escentuals issued a press release announcing the "pricing of a public offering of 8 million more shares of its common stock at a price of $36.50 per share.  Of these shares, 100,000 shares of common stock were to be sold by Bare Escentuals and 7.9 million shares were to be sold by certain stockholders of the Company, including funds affiliated with Berkshire Partners and JH Partners and certain members of Bare Escentuals' management.  The Registration Statement/Prospectus used to conduct the June 2007 Offering was false and misleading in that that it misrepresented and/or failed to disclose, among the other things detailed herein at ¶¶82-94, that:  (i) the Company's "premium" product image was being diluted by sales through discounters like Costco and Target then underway or in preparation; (ii) the Company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (iii) the Company's ability to garner the significantly-higher "club" sales program revenues it had previously obtained through direct-to-consumer infomercial and QVC sales was diminishing as consumers refused to participate in the automatic shipment/billing "club" deals and were instead shopping in the rapidly growing number of brick-and-mortal sales channels – or simply buying at Target and Costco at significant discounts.

148.    On August 1, 2007, the Company issued a release entitled "Bare Escentuals, Inc. Reports Second Quarter Fiscal 2007 Results - Second Quarter Sales Increase 29% and Net Income Improves 93%," which also quoted Blodgett as stating that Bare Escentuals' "performance in the second quarter demonstrates the strength and breadth of our multi-channel business model," that the Company "achieved sales growth of 29% as [it] developed more points of distribution and satisfied the growing consumer demand for our products worldwide," and that Bare Escentuals and its management were "excited about [its] prospects and believe[d] that Bare Escentuals [was] well-positioned to continue to build upon [its] market leadership and brand excellence."  As to "Guidance," the release stated that "Bare Escentuals [was] reaffirming its previously issued fiscal 2007 guidance of diluted earnings per share in the range of $0.89 to $0.94 on approximately 93.2 million shares outstanding."  Though one of Bare Escentuals' newest infomercial had clearly underperformed, during the conference call later that day, Blodgett told investors "[o]ur other retail and wholesale channels performed ahead of expectations as we continue to be the leader in mineral-based cosmetics."

149.    On August 14, 2007, the Company filed its interim financial report for the 2Q07 on Form 10-Q with the SEC, including Sarbanes Oxley certifications identical to the one identified herein at ¶133.

150.    The statements identified above in ¶¶148-149 addressing the Company's 2Q07 financial results and FY07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

151.    On September 26, 2007, Defendants Blodgett and McCormick appeared at the Piper Jaffray Second Annual London Consumer Conference.  During their presentation, McComick "reaffirmed [Bare Escentuals'] guidance range of $0.89 to $0.94, sales growth of 27 to 30"% for fiscal 2007.  The statements made during that conference about the Company's business and sales model and addressing the Company's FY07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

152.    On October 31, 2007, the Company issued a release entitled "Bare Escentuals, Inc. Reports Third Quarter Fiscal 2007 Results - Third Quarter Sales Increase 29% and Net Income Improves 131%," which quoted Blodgett as stating the Company's "third quarter marked another quarter of strong sales growth and increased profitability," that Bare Escentuals' "strong financial performance reflect[ed its] continued ability to increase brand awareness, execute alongside [its] retail partners and expand [its] points of presence both domestically and abroad," and that as the Company and its executives "look[ed] to [its] next stage of growth, [they] remain[ed] committed to our multi-channel distribution model to educate consumers of the benefits of mineral-based makeup and extend the reach of the Bare Escentuals brand worldwide." As to "Guidance," the release stated Bare Escentuals was "affirming its fiscal 2007 diluted earnings per share guidance of a range of $0.89 to $0.94 on approximately 93.2 million shares outstanding."

153.    On November 14, 2007, the Company filed its interim financial report for the 3Q07 on Form 10-Q with the SEC, including Sarbanes Oxley certifications identical to the one identified herein at ¶133.

154.    The statements identified above in ¶¶152-153 addressing the Company's 3Q07 financial results and FY07 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

155.    On November 29, 2007, Bare Escentuals issued a release reiterating fiscal 2007 and fiscal 2008 guidance, stating in relevant part that: "Bare Escentuals [was] reiterating the Company's previously issued fiscal 2007 diluted earnings per share guidance of a range of $0.89 to $0.94 on approximately 93.2 million shares outstanding and its fiscal 2008 diluted earnings per share guidance of a range of $1.13 to $1.18." The statements addressing the Company's FY07 and FY08 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

156.    On January 30, 2008, the Company issued a release entitled "Bare Escentuals, Inc. Named Hottest Prestige Makeup Brand of 2007," which stated that "Bare Escentuals, Inc., the makers of bareMinerals(R), has been named Hottest Prestige Makeup Brand of 2007 based on a

consumer survey conducted by The NPD Group, Inc., a leading provider of consumer and retail market research information."  The Company's release stated in relevant part:

> "We are particularly proud of the awards voted on by consumers because *they validate that our brand and our products continue to be loved and adopted by consumers,*" said Leslie Blodgett, Chief Executive Officer. *"This award is another indication that our loyal customer base continues to grow stronger."*

[Emphasis added.]

157.    After the close of trading on February 26, 2008, the Company issued a release entitled "Bare Escentuals, Inc. Reports Fourth Quarter and Full Year Fiscal 2007 Results - Fourth Quarter Sales Increase 31% and Net Income Expands 65%," which quoted Blodgett in relevant part stating: "We are very pleased with our fourth quarter financial results as we experienced *continued strong brand momentum*," and that *"We attribute our performance to the great efforts put forth by our retail partners, suppliers, employees and, of course, the loyal community of Bare Escentuals customers."* As to "Guidance," the Company's release stated: "*For fiscal 2008, the Company continues to expect sales to grow in the range of 20% to 25%* compared to fiscal year 2007 *and diluted earnings per share to be in the range of $1.13 to $1.18*." [Emphasis added.]

158.    Parroting Defendants' statements during the earnings conference, Wedbush Morgan Securities reported "Infomercials showed encouraging signs of moderating their previous decline," stating "various tweaks the company made to the standard infomercial program showed a positive effect" and that "BARE [would] introduce its completely revamped infomercial in Q2:08." Similarly, Wachovia's February 27, 2008 report entitled "BARE: Strong Q4 – Expect Positive Momentum to Continue" stated *the Company's "Infomercial sales, while still down YOY, were better-than-expected, which gives further credibility to mgt's belief that the falloff in sales was related to creative issues with the infomercial, rather than a weakening of the brand,"* and maintaining its "2008 EPS estimate of $1.18, but adjusting [its] estimates to reflect more leverage in H2." Citi Investment Research raised its "2008, 2009 and 2010 EPS estimates, to $1.18, $1.42 and $1.69, respectively," and stated that "given [its] 40% target premium," it was "raising [its] target price on BARE's shares to $30." For its part, Goldman Sachs stated the Company's earnings guidance "increased confidence in [its] $1.18 estimate for 2008 for a few reasons," including that

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS       - 68 -

"sales growth and gross margins were ahead of expectations, *including a narrower -7% decline in infomercial sales*," and that "EPS [was] likely to be more back-end loaded due to heavier early-year spending."  SunTrust Robinson Humphrey reported that "[r]eassuringly, the infomercial channel *stabilized* ($30.9 million, -7% YoY), which had been a major concern heading into the quarter based on the channel's trend in recent quarters," leading the "company [to] reiterate[] its guidance for infomercial of quarterly revenue in the range of $26-29 million," and while SunTrust "believe[d] this [was] conservative given the resurgence in the quarter and the launch of its 6th iteration in Q2," SunTrust maintained its "2008 EPS $1.19 estimate," calling the shares "exceptionally cheap given Bare's expected growth this year (25%)."

159.    Bare Escentuals' stock rose 9.8% on February 27, 2008, closing at $28.69.

160.    On February 28, 2008, the Company filed its annual financial report for the 4Q07 and FY07 on Form 10-K with the SEC, including Sarbanes Oxley certifications identical to the one identified herein at ¶133.

161.    The statements identified above in ¶¶157-160 addressing the Company's 4Q07 and FY07 financial results and FY08 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

162.    On March 4, 2008, Goldman Sachs issued a report entitled "Insider selling and PE distribution a lingering supply overhang."  Specifically, Goldman Sachs alerted that "[s]ince February 27, insiders related to JH Investors and Siberia Investments ha[d] sold over 700,000 shares of Bare Escentuals" and that "BARE has indicated that Berkshire Partners (which had owned ~23m shares) [had] distributed a couple million shares to its limited partners, *which is not reflected in recent filings*."  Goldman Sachs also noted that "incremental supply of stock sold by JH Investors is material for BARE, which has had an average daily volume of about 1.1 million shares over the past three months," adding that "[p]erhaps of greater note is the distribution by Berkshire Partners, *which is not reflected in filings*."  Explaining it was "not clear to what extent the limited partners [had] been selling the distribution," "but this added supply coupled with the new 10b5-1 filing from Siberia implies that there is likely still a good amount of supply on the sell-side for the stock."  As to

1    "Implications," Goldman Sachs stated "insider selling is a negative indicator and, [that] on a trading

2    basis, the added supply could remain an overhang."

3        163.    On April 24, 2008, Suntrust Robinson Humphrey issued an investment report

4    acknowledging the "diversion of Bare's products to Target stores [was] ***an issue that continues to***

5    ***fester in the investment community,*** " but stating that SunTrust was "encouraged that: (1) BARE

6    [was] ***actively addressing the issue*** and [would] provide an update in its 1Q call;.(2) the products are

7    currently sold at Target with the same price points as other retailers; and (3) according to [its] rough

8    estimate, the total exposure [was] less than $5 million of revenue."   Still, SunTrust Robinson

9    Humphrey lowered its 12-month target from $45 to $35 to reflect recent multiple contraction in the

10    consumer products sector, stating that "[o]ver the next few quarters, Bare Escentuals [would] either

11    prove to be the next Estee Lauder, a force in the world of cosmetics, or the next Crocs, a ***faddish***

12    ***new product hamstrung by knock-offs*** ...."   Specifically, SunTrust explained,

13        **WHAT ABOUT TARGET?**

14
15
16
17        The diversion of Bare's products to Target stores is an issue that continues to fester in the investment community. In short, ***several of Bare's products started appearing in both Costco and Target stores last fall*** despite Bare's lack of a relationship with either vendor.   The products were likely sold to one of Bare's independent distributors who, in turn, sold (i.e. diverted) it to the unauthorized retailers. Bare has been successful in getting the product out of Costco but, to date, it remains in Target. ***Target has been unwilling to remove the product from its stores or divulge its source of inventory.***

18
19
20
21
22        Normally, this issue would be viewed as insignificant . . . However, ***the breadth of the problem has unnerved some investors. Target included Bare's starter kit in its spring planogram (shelf space allocated in EVERY store) and actually featured it in its Sunday circular a few weeks ago. These actions imply that there were more than a small amount of products being diverted.*** Bare's management did address the issue on its 4Q07 conference call in January ***but the concerns have only grown since then.***

23
24
25
26
27
28        We would certainly not list the Target issue as one of our favorite parts of the BARE story, but we also doubt it will develop into the company's Achilles' heel. First, if we assume that every one of the 1,500 TGT stores has 100 SKUs and the wholesale price is $25 ($49 retail), the total amount of product outstanding equates to roughly $4 million or 0.6% of BARE's revenue base. Second, Target is selling the product for the same retail price as BARE's authorized retail channels, which avoids any dilution of the prestige branding. ***Finally, we do believe Bare is aggressively pursuing the issue, has narrowed the source down to a handful of possibilities, and will address the issue on the upcoming conference call. Overall, we expect the issue to be resolved in the next quarter or two and believe it will have a minimal long term impact on Bare's operations.***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     - 70 -

1  [Emphasis added.]

2      164.   And, citing Bare Escentuals' purportedly "Controlled Growth Strategy" SunTrust

3  stated it was maintaining its belief in the Bare Escentuals business model and the "Buy" it was rating

4  Bare Escentuals stock at.  Stating that while "[w]e believe Bare could have rolled out its offering to

5  dozens of department stores and specialty retail stores over the past few years and further accelerated

6  its top-line growth[,] *[i]nstead, the company has chosen to focus on its company-owned boutiques*

7  *and to ride the growth of its fast growing retail partners, Sephora and Ulta,"* noting *"[t]his*

8  *strategy has created highly loyal retail partners, lead to 'prestige' brand equity, and enabled the*

9  *company to maintain its healthy operating margin (30%+)."*  Indeed, convinced that based on

10  defendants' assurances the Target and Costco sales were of no moment and a thing of the past,

11  SunTrust stated "[i]n our opinion, this controlled growth strategy will enable the company to

12  maintain consistent, profitable growth for several years to come."

13      165.   On April 24, 2008, Goldman Sachs weighed in as well, discounting that "sales per

14  outlet growth [had] slowed, leading to concerns about *new competitors*," and instead opining that

15  Bare Escentuals' "bottom-up distribution model [gave it] confidence in the prospects for above-

16  consensus sales growth despite SSS softness," "providing ample tailwind for the brand and driving

17  27%-28% EPS growth to $1.21 for 2008, even with higher support spending."  Goldman Sachs

18  maintained its "12-month $28 price target" which it said "implie[d] 17X-18X [its] 2009E EPS and

19  25%-plus upside from BARE's current trading range."

20      166.   The statements identified above in ¶¶163-165 addressing the Company's purported

21  handling of the Target and Costco sales and moderate growth plans were materially false and

22  misleading for the reasons identified herein at ¶134(i)-(k).

23      167.   On May 1, 2008, the Company issued a release entitled "Bare Escentuals, Inc.

24  Reports First Quarter Fiscal 2008 Results - First Quarter Sales Increase 21% and Net Income

25  Expands 26%," which quoted Blodgett stating: "We are pleased with our strong start to 2008 which

26  reflects a continuation of the positive brand momentum experienced in 2007."  As to "Guidance,"

27  the release stated that "*For fiscal 2008, the Company continues to expect sales to grow in the range*

28

1    *of 20% to 25% compared to fiscal year 2007 and diluted earnings per share to be in the range of*

2    *$1.13 to $1.18* on approximately 93.8 million shares outstanding."  [Emphasis added]

3         168.    Discussing the Target and Costco sales first disclosed during the Company's 4Q07

4    earnings conference in February 2008, defendants attempted to assure investors on May 1, 2008 that

5    the source was an international distributor that it had ceased doing business with in late 2007 *and*

6    *that it expected the Bare Escentuals products to sell out of Target over the next couple of quarters.*

7    Maintaining its "Buy" rating and price target of $35 per share, based on Defendants' false

8    reassurances SunTrust Robinson Humphrey reiterated management's promise that the "Target

9    diversion issue" was now behind Bare Escentuals.

10         169.    Despite that Q1 08 infomercial sales had declined to less than 20% of total sales,

11    based on Blodgett's reassurance that the Company was planning to introduce a new universal starter

12    kit in connection with its planned new infomercial campaign in late Q2 08, the investment

13    community still believed Bare Escentuals' growth story.  For instance, stock analyst Wedbush

14    reported on May 2, 2009 that the "upcoming re-launch of a new, completely revamped infomercial is

15    on schedule to take place in Q2, and could prove to be an important catalyst to reinvigorate this

16    distribution channel for Bare Escentuals," prompting it to maintain its "EPS forecast of $1.18, and

17    intitiat[e] 2009 EPS forecast of $1.47" per share.  Wedbush also maintained its "Buy" rating and

18    "price target of $29."  Similarly, Wachovia said *the Company's "infomercial business appears to*

19    *have stabilized and should improve when the new show is launched in late Q2,"* stating that it still

20    "believe[d] that BARE [was] one of the best growth stories around and would be buyers of the stock

21    at current levels."  Goldman Sachs called the Company's 1Q "Solid…relative to other US cosmetics

22    firms," stating Bare Escentuals was "set up for a great 2H," though noting "earnings are more back-

23    end loaded as the timing of the new Starter Kit launch was bumped back to 3Q."  Still, Goldman

24    Sachs maintained its "12-month P/E and DCF-based price target of $28, *or a conservative 18x*

25    *multiple of 2009 for a 20%-plus growth company.*"

26

27

28    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     - 72 -

170.     On May 9, 2008, the Company filed its interim financial report for the 1Q08 on Form 10-Q with the SEC, including a Sarbanes Oxley certification identical to the one identified herein at ¶133.

171.     The statements identified above in ¶¶167-170 addressing the Company's 1Q08 financial results and FY08 financial projections were materially false and misleading for all of the same reasons identified herein at ¶134.

172.     On June 3, 2008, the Company issued a release announcing the appointment of Michael Dadario as President of Retail.  According to the release, "[i]n this role, *[Dadario would] be responsible for Bare Escentuals' overall retail strategy and execution including merchandising, sales and operations for all domestic brick-and-mortar distribution channels,* including Bare Escentuals boutiques, premium wholesale locations, and spas and salons," that "Dadario [would] report directly to Leslie Blodgett, Chief Executive Officer of Bare Escentuals," that "Dadario [came] to Bare Escentuals with over 30 years of retail operations experience at companies including J. Crew, Inc. and Gap, Inc." and "Williams-Sonoma," and that defendants were "confident that Michael's extensive retail experience with many highly respected brands [would] help support the growth of our brick-and-mortar business, particularly as it relates to building the infrastructure necessary to ensure this consistency of execution."  Specifically, defendants stated Dadario had "spent a year teaching marketing at the prestigious Fashion Institute of Design & Marketing (FIDM) and . . . graduated from SUNY Brockport."  Lauding the pick, Wachovia reported that having met with management it was "more confident in the company's long- and short- term growth plans," stating that "[w]ith the addition of Dadario,…we believe the company is well positioned to manage the significant growth opportunities that lie ahead of it."  The June 3, 2008 Wachovia report also disclosed from its private meeting with management that the Company would offer "free samples through its premium wholesale and boutique stores" in order to "aggressively try to capture new customers."  Based on these developments, Wachovia provided a $30 - $32 price target "based on a 25-27x multiple of [its] 2008 estimate."  William Blair & Company concurred, stating it "view[ed] today's announcement as a favorable development . . . as it appears . . . Dadario's experience

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 73 -

1    building emerging retail brands dovetails nicely with the company's plans to aggressively grow its

2    brick-and-mortar business . . . ."  The statements regarding Dadario's appointment were false and

3    misleading as Defendants lacked any reasonable basis to discuss Dadario's qualifications.

4          173.    On July 30, 2008, the Company issued a release entitled "Bare Escentuals, Inc.

5    Reports Second Quarter Fiscal 2008 Results - Second Quarter Net Income Grows 22%," which

6    quoted Blodgett in relevant part stating that "We are pleased with our overall performance in the

7    quarter," "The strength of the Bare Escentuals brand helped us to extend our leading market share in

8    face makeup, and we continue to make strides in the eye, lip, and skincare categories," and that

9    "While we remain mindful of trends surrounding consumer spending and are thus taking a more

10   conservative view towards sales growth, *we continue to have confidence in our ability to expand*

11   *our product offering, develop more points of distribution and deliver earnings in line with our*

12   *prior expectations.*"  As to "Guidance," the release reduced Defendants' expectations, stating "[f]or

13   fiscal 2008, the Company now expects sales growth to be in the range of 15% to 20% compared to

14   the prior year."  However, the Company maintained its fiscal 2008 guidance, stating it "continue[d]

15   to expect diluted earnings per share for fiscal 2008 to be *in the range of $1.13 to $1.18*," with

16   Blodgett professing confidence the Company would be able to expand the number of products and

17   distribution points.  [Emphasis added.]

18         174.    On August 8, 2008, the Company filed its interim financial report for the 1Q08 on

19   Form 10-Q with the SEC, including Sarbanes Oxley certifications identical to the one identified

20   herein at ¶133.

21         175.    The statements identified above in ¶¶173-174 addressing the Company's 2Q08

22   financial results and FY08 financial projections were materially false and misleading for all of the

23   same reasons identified herein at ¶134.

24                    **THE TRUTH BEGINS TO BE REVEALED**

25         176.    *The allegations in this section pertain only to the Exchange Act claims.*  Beginning

26   on June 5, 2007, the Company issued a series of corrective disclosures which had the effect of

27   removing some, but not all, of the inflation in Bare Escentuals' stock price, including:

28   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 74 -

1        (a)     On June 5, 2007, the Company revealed that its infomercials were not

2 producing the previously-obtained level of sales, causing the Company's stock price to plunge more

3 than 40% to less than $25 per share;

4        (b)     On August 1, 2007, the Company advised investors sales from infomercials

5 might fall as much as 10% in the second half of 2007, causing the Company's stock to tumble more

6 than 12% on August 2, 2007;

7        (c)     On November 7, 2007, JH Partners filed a Form 4 with the SEC indicating

8 that it had distributed its entire 10.5 million share ownership of Bare Escentuals to its limited

9 partners, prompting SunTrust Robinson Humphrey to issue a report on November 8, 2007 that it was

10 "uncertain what percentage of LP's [would] hold on to the stock v. immediately sell," but stating

11 "certainly this event is causing today's weakness in the stock" and that the "weakness might

12 continue for the next week or two;"

13        (d)     On November 26, 2007 the Company disclosed that Defendant Miles,

14 President of Wholesale and International Sales at Bare Escentuals, had suddenly resigned, causing

15 the Company's stock price to plummet by $2.14 per share, or 9.2%, to $21.03, on the heels of reports

16 like Citi Investment Research's entitled "Barely Enough Management?," concluding that "[w]ith *an*

17 *already –thin senior management team*, comprised of Miles, CEO Leslie Blodgett, CFO Myles

18 McCormick (who only joined the Company a month before Miles), and Chief Marketing Officer Jim

19 Taschetta (who was only appointed last month), *we find Miles' departure to be noteworthy,*" and

20 Goldman Sachs' comment that Miles was Bare Escentuals' sole "expertise in department stores and

21 international – [both] critical future growth areas for Bare;"  [Emphasis added.]

22        (e)     During the Company's February 26, 2008 earnings conference, Defendants

23 first revealed that they had known Bare Escentuals products were being sold at both Target and

24 Costco, and that they had known about  at least the Costco sales since the IPO, significantly

25 threatening the premium prices their products could command in the market, and that the Company

26 had filed suit against Costco in January 2007 for trademark infringement and unfair competition,

27 with Blodgett stating "Bare Escentuals does not have a business relationship with either retailer and

28 CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 75 -

1  as such, we are aggressively pursuing our legal rights with respect to sale of Bare Escentuals

2  products through unauthorized channels," but acknowledging that the product had been obtained for

3  sale by these retailers lawfully, with Blodgett stating that *the Company was NOW "taking proactive*

4  *steps to develop methods to better track our products through the supply chain and prevent future*

5  *occurrences*;"

6         (f)    On July 30, 2008, the Company reduced its fiscal guidance from 20-25% to

7  15-20%, causing the Company's stock price to plunge over 30%, or by $5.39, to close at $11.54 per

8  share, as analysts slashed their stock ratings.  Goldman Sachs lowered its "12-month P/E and DCF-

9  based price target *by $9* to $16 *to reflect a higher discount rate stemming from uncertainty about*

10  *future revenues and because the stock market is less receptive to higher risk names*."  SunTrust

11  Robinson Humphrey noted that "[n]ot only are Bare customers choosing lower priced kits and 'open

12  box' products [rather than kits], the company is also seeing less success in attracting new customers

13  who typically shop at the mass channel," adding *"[t]his second issue has been exacerbated by the*

14  *high number of lower priced products which have hit mass shelves in the past six months . . . .*

15  We are clearly frustrated by the results and outlook.  We understand the macro factors impacting the

16  company but we had hoped that the infomercial business, *a channel which is impossible to track*,

17  had stabilized."  SunTrust also emphasized that the "Infomercial channel….typically consists of

18  lower income consumers who are more price sensitive" and that "BARE is the only public company

19  with such high exposure to this channel *and [that] there is not a good external way to track the*

20  *sales trends*";

21         (g)    On September 8, 2008, stock analyst SunTrust Robinson Humphrey reported

22  it was maintaining its "Buy" rating and price target of $20 per share, stating it did "not believe the

23  Infomercial business [would] provide *any further pain to the story*," as "[i]t now only represents

24  12% of the total base and management indicated that half of that [was] from customers *on the*

25  *automatic replenishment program…."*  [Emphasis added]; and

26         (h)    During September 2008, Defendants also kicked off the massive give away

27  program at its brick-and-mortar locations, intending to lure in customers as a last ditch effort to

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 76 -

combat its falling market share and declining prices competition was creating.  The Company prepared for distribution some 900,000 free ten-day samples that would be handed out until supplies ran out, hoping to draw in customers to purchase Getting Started kits and other higher-margin items.  First reporting on its channel checks the results of the program, on October 6, 2008, Wachovia published a report entitled "If You Give It (Away), They Should Come," in which Wachovia disclosed that according to beauty consultants in the 25 stores surveyed, only seven indicated consumers were buying the Getting Started kits Bare Escentuals was stockpiling in connection with the massive sales drive.  As a result, Wachovia said it was "not changing [its] Q3 sales growth estimates for premium wholesale (24-25%) and boutiques (43%) and [was] keeping Q3E EPS at $0.26."

177.     Meanwhile, customer outcry over the Company's mandated "club" sales practices reached critical mass as customers simply refused to allow automatic reshipments and automatic charges to their credit cards.  This was significant because, as the Company's 2008 Annual Report would disclose, "[f]or the years ended December 28, 2008, December 30, 2007 and **December 31, 2006**, approximately 43%, 47%, **50%**, respectively, of the Company's sales were generated through credit card purchases."  Once the Better Business Bureau and internet bloggers educated consumers about the pitfalls of Bare Escentuals' mandated "club" sales programs, including that the same consumers could simply make their purchases **in a store** to avoid the automated credit card charges, the Company's infomercial sales would plummet.  For instance, on May 1, 2008, a poster on www.viewpoints.com stated "I also don't like that it is one of those 'club deals' you have to elect the automatic shipping of product every 3-6 months in order to just get the basic package on TV and have to later call and cancel your 'membership'….Over all, I was not unsatisfied with the product but would probably not order again considering the price of the make up and the similar makeup that is now being offered directly in stores."  Another poster on www.makeupbag.com on July 13, 2008 explained:

> I went to the website and ordered a free trial yesterday after reading about it in your blog. *But I was just reading some things about the company on the BBB (better business bureau) and other website and I thought you should know about it.*

1       *The company offers you the "free kit", and apparently once you receive it, it comes*
2       *with a letter saying that if you don't return your "free product" within 30 days,*
    *they automatically charge your credit card US$96 every month or something like*
3       *that. And I also read that, by the time the product gets to your house, you only have*
    *a couple of weeks to send it back. So it is a big SCAM. I think it would be helpful if*
4       *you mentioned this detail on your blog post, so people don't fall in the trap. I am*
    *going to call them now and see if I can cancel my "free trial" order.*

5   [Emphasis added.]

6          178.    A poster on ripoffreport.com inferred he or she was a former Bare Escentuals

7   telephone sales person, stating:

8       People would call into their call center to complain about charges on their account
    when they'd called several months prior to cancel auto-ships. Because it was "out of
9       our time frame", there was nothing we could do about the charges. Some people
    didn't even know they were signed up for any auto-ship program because they were
10      lied to. The telemarkers would lie about anything under the sun to make a sale, and
    are still able to get away with it.

11

12      *I was supposed to lie to customers to make the company/client look good. This*
    *wasn't in the job description of course, and when I contacted the CEO of Bare*
    *Escentuals to inquire about the telemarketers lying and basically stealing money*
13      *from people, I was fired from my job.*

14  [Emphasis added.]

15         179.    Another poster on the ripoffreport.com site on September 11, 2008 stated:

16  I ordered the Bare Minerals starter kit for the advertised price of $39.95 on June 24,
    2008. I tried the products and even gave them the chance of trying it for a few days,
17  but I did not at all like them. I returned the whole package by USPS on July 14,
    2008, well within the 30 day money back guarantee time period.

18
    After returning the product, I e-mailed customer service to cancel my
19  account/membership and let them know of the product return along with all of my
    information. I was told I would receive my refund (excluding S&H of course) within
20  1-2 billing cycles.

21      *After a few weeks of not only NOT receiving my refund and canceling my*
    *membership, I find on my bank statement that I was billed again on August 5,*
22      *2008 for another $29.85!* Again, I contacted the company about not receiving my
    refund, my account still being open and being billed again. Again, I was told that my
23  account would be canceled and both charges would be credited to my account in 1-2
    billing cycles. Finally my online account was closed in August after having
24  contacting them 3 times.

25      *I have contacted them now 5 times about my refund without any resolution.* Since
    it'd been another 2 months, I contacted them and this time was told that if I had
26  a receipt/tracking number on the order I shipped back, that would speed up my
    refund. They did not tell me I needed a tracking number when I ordered, when I let
27  them know I was returning the products, on the website nor in any of the e-mails or
    phone calls about returning them.

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 78 -

1      *It has now been three months and I still have not yet received a refund.*

2      [Emphasis added.]

3          180.    *En masse* consumer abandonment of the Company's infomercial distribution channel

4      caused a significant decline in infomercial sales during the Class Period.  Attempting to assuage

5      growing concern in the investment community, Defendants issued a series of statements falsely

6      attributing the decline in sales to *temporary glitches* in the infomercial format itself, and promising

7      sales would return to pre-IPO levels once the revamped infomercial was run.  For instance, during

8      the Company's August 1, 2007 2Q 07 earnings conference, Defendants stated:

9          [Blodgett:] The quarter was not without its challenges, however, as *the latest version
           of our infomercial failed to perform to our expectations*. The infomercial has been a
10         key channel for us to market, educate and acquire customers, and we are committed
           to getting this business back on track. *From our experience, we know that updating
11         and improving the infomercial is an ongoing process, but we are focused on
           getting it right in order to build our business for the long term*.
12
                                    *       *       *       *
13
           [Miles:] With respect to our infomercial business the second quarter was clearly
14         challenging, as sales were down slightly versus the prior year. In May, we launched
           the fifth version of our bareMinerals infomercial. Despite high expectations based on
15         the show's updated testimonials and creative content, sales were immediately below
           our expectations. *We responded by testing various re-edits of the show while
16         reallocating the bulk of our media then to the previous version of the infomercial*.

17         *While this approach stabilized results and provided a lift over the new show's
           initial performance*, results still are not where we need them to be. As a result, in
18         June, we conducted customer research to determine which aspects of the show were
           and were not resonating with our customers. *Based on that feedback, we have since
19         re-shot certain scenes and will be testing versions of the new show which includes
           this footage in August and September.*
20
       [Emphasis added.]
21
           181.    In response to a question regarding the difference between the Company's prior
22
       statement in June 2007 that the infomercial business "would be up modestly for the year," and the
23
       continuing decline in infomercial sales, President Miles and Defendant McCormick stated, in
24
       relevant part:
25
           JIM DUFFY, ANALYST, THOMAS WEISEL PARTNERS….I guess I'm confused.
26         So what's changed in the infomercial business since the press release in early June
           when you thought it would be up modestly for the year?
27

28     CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 79 -

DIANE MILES: When we said that, we were actually doing some re-editing on our version five. ***When we did that re-editing, we did get some traction*** but not what we really needed. So then that led us to, as I said before, the consumer research, the dial testing. Then we did some re-shooting and we're now continuing to edit and test and it's just taking a long time to test all the different permutations and combinations. So rather than trying to be overly optimistic, ***we want to give some realistic projections for the fall, because we just don't know how long the editing and testing will take in order to get the traction that we need.***

JIM DUFFY: I see. So, you indicated that there was a slight pick up from May to June and yet your new guidance seems to imply further deceleration in the infomercial business into Q3 and Q4. Is that just being conservative or do you expect some other external factors to have an impact?

MYLES MCCORMICK: Well, I think it's a couple of things, Jim. ***One, it certainly is trying to be realistic relative to the timing of some of our editing processes here, as getting into the shoots is taking a bit longer than we had originally expected.*** But sort of more of the larger impact, frankly, has to do with an increase in comparables in the back half of the year against Q4 in the prior year where we had incremental sort of media spend against it in the prior year. On a sequential basis, you'll see a slight decline, or what I view today is that we see a slight decline between Q2 and Q3, but between Q3 and Q4 it'll roughly flat from a $9 million perspective. The decline on year-over-year is frankly more representative, more difficult comparison in the prior year than sequential declines being expected in the current year.

JIM DUFFY: Okay. And then just to help me understand, what's the typical lifecycle of an infomercial before you start to see a compromise in its performance and it's necessary to move to a new version?

MYLES MCCORMICK: Typically, we've seen the lifecycle, you know, for us it's been in 12 months. Sometimes a little bit longer than that. You know, you would imagine against somewhat depending on the size of the media you put against it, but generally speaking the infomercial is stronger at the start and weaker at the end. That weakness tends to fall over to the last quarter of the infomercial, which for us have been, that cycle has been closer to 12 months as I said. Historically, we've run it a bit longer, but more recent history has been roughly 12 months.

JIM DUFFY: Okay, and then with what you see in the infomercial business, is there any new thinking in terms of your channel strategy or your go-to-market strategy, channel mix, etc., or is it business as usual in the other channels?

LESLIE BLODGETT: ***Well, it's business as usual.*** We still continue to use the infomercial and the media to educate our customers, ***and at the same media spend we will see the same results at retail.*** So, we continually expand our points of distribution, bricks and mortar, and it'll be the same strategy.

[Emphasis added.]

182. With regard to the infomercial business, defendant McCormick added, in response to another analyst's inquiry:

JANET KLOPPENBURG, ANALYST, JJK RESEARCH….Hey Myles. Just to elaborate on that. So it sounds to me like perhaps the infomercial run rate has

1    worsened from June to July and do you attribute that to some of the disruption or the
     testing, *or do you think that's just more of consumer falloff?* And then with respect
2    to the SG&A stands in the third quarter, is some of that incremental spend related to
     the testing of the new infomercial, or is this more just on the hiring that we had
3    talked about, Myles, where some of it didn't get done in the first half and it's being
     shifted as you see the higher is in the back half. And maybe you could talk a little bit
4    about what you meant about the earnings being SKU'd to the fourth quarter. Thanks.

5    MYLES MCCORMICK: In terms of the SG&A, it absolutely has to do with the
     organization building; much less to do with the incremental investment on the
6    infomercial side. In terms of the infomercial business altogether, it's not as much as a
     deceleration between June and July as it was a deceleration between frankly April
7    and June itself and losing April out of the quarter and getting into a run rate of June.
     *As I said before, we've been able to stabilize the business and see incremental*
8    *improvement on the original V5.* That's not to the degree that we had hoped we'd
     see, so the subsequent shots and the tests coming up here. So it's much more to do
9    with current run rate today than anything else.

10   JANET KLOPPENBURG: I'm confused then, Myles. Maybe you can help me
     understand. I thought you said it had improved from May to June?
11
12   MYLES MCCORMICK: That's right. It did and May was sort of the lowest point of
     the quarter. And then if you look at it, April is the highest point of the quarter,
     followed by May the lowest point. *June stabilizing out sort of the business, back up*
13   *to sort of some of the levels we were seeing back in April.*

14   JANET KLOPPENBURG: But June went back up to April's level?

15   MYLES MCCORMICK: Directionally it did, that's correct. And so subsequently
     we're running off of those levels for the balance of the year. That's what it's looking
16   like.

17   JANET KLOPPENBURG: So it's slowed again is what you're telling us here in the
     third quarter?
18
19   MYLES MCCORMICK: We'll be slower on a sequential basis than it was in Q2,
     that's correct.

20   JANET KLOPPENBURG: *And you think that has to do with the consumer, or do*
     *you think that has to do with the fact that -- more to do with the consumer and*
21   *their spending patterns give the economy, or more to do with the infomercial, the*
     *structure of the programming?*
22
23   MYLES MCCORMICK: *Well you know, again, we continue to believe that the*
     *challenge that we have resides with creative aspects of the new show.* But as Diane
     mentioned, we're evaluating the potential impact of broader economic conditions on
24   this specific consumer.

25   JANET KLOPPENBURG: Right.

26   MYLES MCCORMICK: *That's certainly what we believe today given through the*
     *challenges we've seen in the near-term edits. We believe we're addressing elements*
27   *of that in the new shoot, but again we need to get evidence of that on the post-shoot*
     *performance before we comment too broadly on that….*
28
CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 81 -

1  [Emphasis added.]

2      183.    In response to the Company's August 1, 2007 announcement that its infomercial sales

3  were weakening, the price of Bare Escentuals common stock fell $4.02 per share on August 2, 2007,

4  or approximately 14%, to close at $24.27 per share, on extremely high trading volume.

5      184.    Again, during the Company's October 31, 2007 3Q 2007 earning conference,

6  defendant Blodgett attempted to assuage the investment community into believing ***temporary***

7  ***glitches*** in the infomercial format itself were to blame for the Company's "12% decline

8  in…infomercial business," rather than a more fundamental problem with the sales model,

9  specifically that consumers had been forewarned about the mandated "club" sales, including

10  automatic credit card charges, and were purchasing their mineral makeup through other sales

11  channels:

12          Our infomercials business has also been an important driver of overall brand
            awareness in addition to being a profitable customer acquisition channel. ***We believe***
13          ***that our strong results at retail reflect the educational and brand-building benefits***
            ***of the infomercial, and that will continue to be strategically important as brick and***
14          ***mortar retail drive our next stage of growth.*** This year; however, we've had some
            challenges with our infomercial. We launched a new show in May that did not
15          perform to our expectations. We have since tested various reedits of the program
            including a recent version in September that included new footage. But our efforts
16          have not yielded improved results. After a full evaluation, we recognize that this
            show (inaudible) made us successful in the past. The infomercial has always been
17          about telling a focused story about Bare Minerals foundation to women with skin
            issues. ***This time we tried to appeal to a much broader audience and spent too***
18          ***much time telling the story of the Bare Escentuals brand and not enough time***
            ***communicating what makes our foundation so unique and so effective.***
19
            ***Now, we very clearly know how to move forward….***
20
            ***In summary, we are extremely excited about the long-term opportunities for the***
21          ***Bare Escentuals brand***, as much as we're proud of our accomplishments to date, we
            recognize that there's a huge audience of women we've yet to touch. ***We believe that***
22          ***now more than ever our media-driven approach in conjunction with expanded***
            ***point of distribution is the best way to reach these women, and convert them to***
23          ***loyal Bare Escentuals users.***

24  [Emphasis added.]

25      185.    In response to the Company's announcement of continued weakness in its infomercial

26  business, including the lowering of FY 08 revenue growth from 20 - 25% to 15 - 20%, the price of

27

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 82 -

1    Bare Escentuals common stock fell $2.24 per share on October 31, 2007, or approximately 8%, to

2    close at $24.70 per share, on extremely heavy trading volume.

3         186.   After the close of trading on November 26, 2007, the Company issued a press release

4    announcing that President Miles had suddenly resigned "effective immediately."  In response to the

5    announcement of the resignation of Miles, shares of the Company's stock fell $2.14, or 9.2%, to

6    $21.03 per share on November 27, 2007.

7         187.   On February 26, 2008, during the Company's 4Q 07 and FY 07 earnings conference,

8    Defendants said that "[f]or fiscal 2008, the Company continues to expect sales to grow in the range

9    of 20% to 25% compared to fiscal year 2007 and diluted earnings per share to be in the range of

10   $1.13 to $1.18."  Once again, defendant Blodgett emphatically stated the infomercial sales channel

11   was continuing to perform:

12       The quarter truly exemplified the ability of Bare Escentuals to cut through the noise
     and communicate our message effectively to women in whichever channel they

13       prefer to shop. ***With respect to our infomercial business, we continued to re-edit
     and refine the current show throughout the fourth quarter and our efforts yielded***

14       ***improved results. Our focus now is on the next version of the infomercial which is
     on track for testing and launch in the second quarter. As we've said before, we***

15       ***strongly believe in the strategic importance of both the infomercial as well as QVC
     in building brand awareness, educating consumers and ultimately driving***

16       ***customer acquisition across channel.***

17   [Emphasis added.]

18        188.   This sentiment was repeated in responses to an analyst's specific inquiry:

19       JIM DUFFY: And then a question with regards to the infomercial business. ***How
     much opportunity did you have to actually influence results in the fourth quarter?***

20       ***Leslie, you had mentioned some changes that you had made enter quarter. How
     much was due to changes you made on the fly versus just improvement in yield***

21       ***organically?***

22       LESLIE BLODGETT: ***I believe that the changes, the edits all helped in the creative
     process, so I believe that all those little tweaks really did make a difference.***

23

24                *   *   *   *

25       NEELY TAMMINGA: Okay. That's helpful. And then just a couple other
     clarifications on the guidance and I have a question for Leslie. In terms of

26       infomercial guidance that I think originally the guidance on the last conference call,
     the quarter to quarter performance in terms of revenues I think was technically 26 to

27       29 million per quarter for infomercial and I think Bill was suggesting 27 to 30 so
     maybe just a little clarification on what we should be looking for on a quarter to
     quarter basis on infomercial and then more specifically does that then include the

28   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 83 -

relaunch in Q2? Does it include any sort of potential new infomercials? Obviously the skincare launch has been phenomenal based on what we've been able to see on our channel checks too. Just wondering do we accelerate some of the RareMinerals infomercial in 2008?

MYLES MCCORMICK: Let me take the guidance question first. I think at this point, as I said before, we are keeping expectations **pretty much in check right now**, 26 to 29 million. Certainly we did better in the quarter than certainly the trends coming into the quarter and a lot of that just went to the effectiveness that the team has been able to put in place. **So we certainly are optimistic for the sixth version to come out to perform at least in that range if not above that range.** I think at this point again we want to be conservative with respect to these expectations and as we get through the first half of the testing, we'll certainly have a conversation about that in Q2 at the time when we get greater visibility. In terms of how it will flow, the intent of the range itself was to provide for some aging of the infomercial, the fifth version of the infomercial in the first half of the year and then certainly an opportunity to accelerate from that in the back half of the year. I think directionally that's still appropriate. Again, we continue to make effort against improving the program, not necessarily the pace we were doing in Q4, but continue to be focused on making sure that it is driving within a consistent range of results.

NEELY TAMMINGA: **At the very least, in summary, you would say the infomercial probably has kind of found its footing at the very least.**

MYLES MCCORMICK: **Yes.**

[Emphasis added.]

189.     Defendants also disclosed on February 26, 2008, **for the first time**, that Bare Escentuals products were being sold in (or prepared for sale at) discount stores Target and Costco at the time of the IPO, **and that they had taken legal action  to stop the "unauthorized" sales**, with McCormick stating:

[W]e have seen unauthorized Bare Escentuals products appear in both Costco and Target stores. To be clear, Bare Escentuals does not have a business relationship with either retailer and, as such, we are aggressively pursuing our legal rights with respect to the sale of Bare Escentuals products through unauthorized channels.

**At the same time, we are taking proactive steps to develop methods to better track our products through the supply chain and prevent future occurrences.**

[Emphasis added.]

190.     Indeed, in its Complaint for Trademark Infringement and Unfair Competition filed against Costco in the U.S. District Court for the Southern District of California in January 2007, the Company averred that "Bare Escentuals has invested substantial time and money in developing, marketing, and selling its products, and in its reputation and goodwill," and that "**Costco's**

1    *unauthorized actions have resulted or will result in harm to Bare Escentuals' sales, brand name,*

2    *market reputation, and goodwill*."   Moreover, a declaration filed in the litigation signed by

3    Kimberly G. Russell, Bare Escentuals' Director of Intellectual Property and Senior Counsel, attaches

4    an e-mail Ms. Russell sent Costco's legal department on December 6, 2006 entitled "Bare Escentuals

5    Products in Costco" (quoted directly below) which, along with other filings made by Costco and

6    Bare Escentuals in the underlying litigation concerning Costco of having spent considerable time and

7    resources repackaging the Bare Escentuals product in its own "clamshell" over-packaging, clearly

8    indicates Bare Escentuals was well aware of the ongoing sale of its product in Costco during 2006:

9

10
```
Dear Ms. Buron,

I appreciate your getting back to me.

     As I mentioned in my voice mail messages, it is our understanding that there are
Bare Escentuals products being sold in the Simi Valley Costco. Because this product did
not come from Bare Escentuals itself or an authorized distributor, Bare Escentuals is
concerned that this goods may not be authentic. If they are not authentic goods, we need
the name of the entity, as well as the contact information provided, for this entity.

     If the goods are in fact authentic, such a sale is a violation of Bare Escentuals
policies and obligations and should not have taken place. Accordingly, we must know who
sold these goods to Costco. We also need Costco to confirm the quantity it purchased, as
well as confirmation that these products are only in the Simi Valley store.

     Given the seriousness of this matter, please provide us with this information by
Noon on Friday, December 8, 2007. Thank you in advance for your cooperation in getting to
the bottom of this matter.

     Sincerely,

     Kim
```

19       191.    In addition to Ms. Russell, Rule 26(f) disclosures filed in the underlying litigation

20    indicate Bare Escentuals executives Jennifer Biello, Territory Account Executive, and Michelle

21    Miracle, Regional Business Development Manager, both knew about Costco sales in Lancaster,

22    California, Sales Manager Kristin Hamilton knew about sales at Costco in Seattle, Washington, and

23    Leena Mehta knew about sales of Bare Escentuals products at Costco in Simi Valley, California.

24    The materiality of the Costco sales was conceded by Bare Escentuals in related litigation against

25    Costco Wholesale Corporation in Texas to enforce a discovery order Bare Escentuals obtained

26    concerning the identity of Costco's suppliers in the California action, where Bare Escentuals argued

27    *"[a]t issue in the California Lawsuit is the origin of certain goods being sold at Costco bearing*

28
CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 85 -

1  ***Bare Escentuals' trademarks, including the origin of 100,000 high-end cosmetic kits that Costco***

2  ***purchased from a third party for millions of dollars.***"  [Emphasis added.]

3       192.   In response to Bare Escentuals' claims, Costco's counsel argued "[t]he fact that

4  plaintiff does not want Costco to sell its merchandise does not prevent Costco from lawfully

5  purchasing that merchandise in the open market and selling it in its membership warehouses, and

6  does not make Costco's sale of plaintiff's products trademark infringement."  Indeed, Robert

7  Pugmire, Costco's vice-president – general merchandise manager, non-foods, testified on April 23,

8  2007 in the California proceedings that "[t]o date, Costco has purchased Bare Escentuals

9  merchandise from a single supplier" and that "[t]hat supplier has supplied a wide variety of products

10  and product lines (not only cosmetics) to Costco since 2005."  [Emphasis added.]

11       193.   As to sales of Bare Escentuals at Target, according to a March 7, 2008 account by

12  *Women's Wear Daily*, "Bare Escentuals [was then] attempting to settle the matter with Target's

13  management before pursuing legal action," quoting "an industry source briefed on the situation."

14  The *Women's Wear Daily* account also explained that "[a]s of Thursday [March 6, 2008], Target was

15  still selling Bare Escentuals' Beyond Basics kit for $49.99 on its Web site" and that "[i]n November

16  [2007], one of Target's vendors spotted Bare Escentuals products in the mass retailer's mock-up

17  display."

18       194.   Addressing the Costco and Target sales of Bare Escentuals products, during the

19  Company's May 1, 2008 1Q 08 earnings conference, Defendants conceded the product was obtained

20  lawfully by Costco and Target through a Bare Escentuals distributor, stating they "believe[d] the

21  product was sold to a distributor destined for international markets before being diverted back to

22  unauthorized channels in the US" and that Bare Escentuals had "ceased business for that distributor

23  in the third quarter of 2007."  ***However, a visit to the Target website (www.target.com) on***

24  ***December 20, 2009 revealed Target is still offering a "Bare Escentuals Crown Jewels Kit" for***

25  ***$52.00.***

26       195.   Finally, after the close of trading on October 30, 2008, the Company announced its

27  financial results for the third fiscal quarter and nine months ended September 28, 2008, including

28

1    reporting that net sales for the third quarter of fiscal 2008 were $130.2 million, net income was $22.9

2    million, or $0.25 per diluted share, and disclosing that for the nine months ended September 28,

3    2008, net sales had increased only 12% to $409.1 million from $366.4 million in the same period in

4    fiscal 2007.  In addition to missing its own financial guidance, the Company cut its full-year forecast

5    and announced new strategic initiatives.  Specifically, Blodgett admitted "….we recognize that we

6    can do things better," and that the Company had "recently [taken] actions aimed at rationalizing the

7    operating and cost structure of the Company."   Specifically, instead of the *$60* starter kit, Bare

8    Escentuals would offer a *$15* starter kit.  The Company was also reducing corporate headcount by

9    10%.  As to "Guidance," the release disclosed that Bare Escentuals "now expect[ed] sales and

10   earnings growth for fiscal 2008 of approximately 10% compared to the prior year," contrary to the

11   10%-15% guidance provided in July 2008, and that "[i]ncluded in the fiscal 2008 guidance [was]

12   approximately $0.01 to $0.02 per diluted share of one-time items associated with the Company's

13   strategic restructuring in the fourth quarter."

14          196.    Critically, during the Company's earning conference held later on October 30, 2008,

15   Defendants admitted that "[i]nventory at the end of the quarter was $96 million, *up 53% from $63*

16   *million in the prior year and higher than expected largely due to the slower selling of new starter*

17   *kits*."  Indeed, the "de-stocking" effort required to bring down inventories to rational levels at Bare

18   Escentuals and its wholesalers would take several quarters, weighing considerably on each quarters'

19   sales and earnings, *including causing an 11% decline in earnings for the 1Q 09*.  Indeed, Bare

20   Escentuals saw its inventory levels rise 55% in FY 08, while revenues rose just 2%.

21          197.    On this news, the Company's stock price plummeted *39%* to a new lifetime low of

22   $4.19 per share as analysts slashed Bare Escentuals' stock ratings, citing the need by the Company's

23   premium wholesalers to work down the bloated inventories Bare Escentuals had dumped on them

24   during the Class Period, management's decision to lower prices, broaden product offerings and

25   increase marketing spending:

26   •      Goldman Sachs announced it was "Halving price target on limited US growth
            outlook," lowering its "12-month P/E and DCF-based price target to $5.50
27          from 13," "forecast[ing] flat US sales even with visibility to 20-25% door

28   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 87 -

growth, which assumes that Bare Escentuals' market share is halved from 70% to 35% in mineral cosmetics category."

- Wachovia's Jason Gere guided his EPS estimates down for FY08 from $1.13 to $1.05 and for FY 09 from $1.30 to $1.09, stating "*Infomercial* remains a challenge, *with a greater than 20% decline in sales*, though *QVC* also experienced a *22% sales decline as a result of a timing shift pushing sales ($3-4MM) from its fall show into Q4*." Wachovia also noted Bare Escentuals' "Working capital levels are quote onerous; company needs to work down inventories to ensure cash flow stays healthy," explaining that "*[i]nventories increased 53% primarily related to slower sales of Getting Started Kits*...."

- Citi Investment Research noted "[t]op line growth of 3% was *very disappointing* as it was well-below our forecasts for 12% growth *(which had been in-line with mgmt's guidance)*" and that it would "lower [its] pro forma FY08 EPS to $1.07, FY09 to $1.18 (from $1.35) and FY10 to $1.34 (from $1.54)."

- Wedbush lowered its "Opinion to HOLD on Concerns Regarding New Strategic Initiatives," stating "*Management's plan to lower overall pricing ... could hurt brand exclusivity and aspirational appeal over the long run, a critical factor in the prestige cosmetics industry*," analyst Rommel Dionisio said in a note to clients. Increasing marketing spending would not only hurt operating margins but could prove futile against companies like Estée Lauder, L'Oréal, and "other deeper-pocketed competitors who can far outspend Bare Escentuals," Dionisio said. *Dionisio was also dismissive of the Company's attempts to broaden its offerings into related cosmetics categories, saying the Company had tried and failed with similar strategies in the past, adding that "[i]nfomercial sales declined a disappointing 21% to $23 million" and that "growth in other channels may cannibalize infomercial sales as well, given how much more accessible the product is becoming at retail."*

[Emphasis added.]

## POST CLASS PERIOD DISCLOSURES

198.    *The allegations in this section pertain only to the Exchange Act claims.*   On November 24, 2008, Citi Investment Research reported it had "recently met with several members of BARE's management team, including CEO Leslie Blodgett, President of Retail Michael Dadario and SVP of Finance Charles Bracher," noting it was "clear that there are both macro *and company-specific issues* that [had] recently weighed on BARE's results and its stock price." Citi noted that the Company had recently "lowered [its] guidance for revenues to come from [its] Infomercial segment, and [had] warned that Home Shopping Television segment could also be challenged," with Citi stating it "remain[ed] cautious with respect to the direct-to-consumer channels, as [it] believe[d]

this business may have reached something of a saturation point for the BARE brand."   Citi continued:

> Indeed, we learned that BARE will be changing their strategy for the Home Shopping Television segment in 2009, such that in an attempt to boost productivity of their on-air hours, the company will reduce their airtime next year. *As such, we have lowered our estimates for sales growth in this channel to reflect this strategic shift (as we now expect Home Shopping Television sales to decline 10% in 2009). What is more, BARE has changed their Infomercial strategy to include more short-form infomercials on more channels (for instance we were recently surprised to see a BARE infomercial on MSNBC).*

[Emphasis added.]

Citi predicted the Infomercial "shift too may negatively impact the already-struggling Infomercial business (*which we forecast is set to decline 20% in 2009*)."   The Citi report also stated the Company would "cut its investment in the ailing infomercial business, which had historically received 95% of BARE's ad dollars, and will fall to 50% in the near term, *with management having acknowledged that this could eventually go to zero.*"   Citi also disclosed that Bare Escentuals' "retailers [had] slowly been working through the [Getting Started Kits], such that BARE expects their inventory levels to return to normalized levels in 2H09."   *Discussing the deleterious impact the inventory glut had on the Company's balance sheet and cash flows, Citi explained that the Company's free cash flows would decline from $71 million in FY 07 to $46 million in FY 08, "which decrease is entirely attributable to the negative impact of higher inventory levels on operating cash flow."*   [Emphasis added.]

199.    On December 8, 2008, defendants disclosed that Executive VP, CFO and COO McCormick had resigned as the Company's principle accounting officer, though he would continue as its principle financial officer.

200.    On February 26, 2009, the Company reported 4Q 08 and FY 08 financial results, including a dramatic *29% decline in infomercial sales.*   Citing a highly uncertain retail environment and retailer inventory destocking, management discontinued providing annual revenue and earnings guidance.   During the conference call that day, Defendants explained the destocking was taking place at the Company's premium wholesalers, including Sephora, Ulta and QVC.   Stock analyst Wedbush noted that "Management did provide a Q1 guidance, expecting a teens revenue decline and

1   EPS of $0.12-0.15, below current Street consensus for a 6.5% revenue decline and EPS of $0.23."

2   Citing, among other concerns, *"the continuation of the recent disappointment in the infomercial*

3   *business,"* Wedbush lowered its price target on Bare Escentuals' stock 25% to $3 from $4.

4   Specifically, Wedbush noted "[i]nfomercial sales declined a disappointing 29% to $22 million,

5   continuing a trend of declining sales, *partially due to growth in other channels cannibalizing*

6   *infomercial sales given how much more accessible the product is becoming at retail*." As a result,

7   Citi Investment Research lowered its EPS target "for FY 09 to $0.60 (from $0.80) and FY to $0.75

8   (from $0.93)" and lowered its stock price "target multiple to 9.8x (which implies a 30% discount to

9   the market's 14x multiple on CIR's 2010 EPS estimate)." *Contrary to the FY 08 EPS guidance of*

10  *$1.13-1.18 per share provided on July 31, 2008 and confirmed on October 31, 2008, the Company*

11  *earned only $1.05 per share.*

12      201.    On April 30, 2009, analyst Wedbush noted the Company had experienced an 11%

13  decline in earnings for the 1Q 09 quarter, which Wedbush said was *"driven by retailer inventory*

14  *destocking and QVC, which had shifted hours out of Q1 into Q2 and Q3."* Indeed, according to

15  Wedbush, Bare Escentuals' "North American Direct-to-Consumer revenues fell 27% to $35 million,

16  due to an approximate *28% decrease in infomercial sales*, *as well as a decrease in the number of*

17  *QVC hours to 9 from 18*." Wedbush also noted that "Inventory increased 26% over the prior year"

18  and that "Management continues to anticipate lowering inventory meaningfully by mid-2009."

19      202.    On July 17, 2009, the Company disclosed in a filing with the SEC that the

20  employment of Michael Dadario, President Retail, had been terminated effective July 14, 2009 as a

21  result of his having been untruthful about his educational background. As stock analyst Wedbush

22  noted in its July 21, 2009 report, "Dadario, hired in June 2008, was responsible for Bare Escentuals'

23  overall retail strategy and execution, including merchandising, sales and operations for all brick-and-

24  mortar distribution channels." In its report that evening, Goldman Sachs also discussed the

25  termination of this "key executive," noting that "the continued turnover at the executive level is a bit

26  troubling."

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 90 -

## LOSS CAUSATION/ECONOMIC LOSS AS TO
## THE EXCHANGE ACT CLAIMS ONLY

203.    ***The allegations in this section pertain only to the Exchange Act allegations.***  During the Class Period, as detailed herein, Bare Escentuals and Individual Defendants Blodgett, Miles and McCormick, as senior executive officers and/or directors of Bare Escentuals, and defendants Jones (Bare Escentuals' Chairman and Berkshire Partners managing director), Bloom (Bare Escentuals director and Berkshire Partners founding and managing director), John (Bare Escentuals director and JH Partners senior partner) Hansen (Bare Escentuals director and JH Partners President), and Ottinger (Bare Escentuals director and Berkshire Partners LLC vice president from 1985 to 1989) engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Bare Escentuals' common stock and operated as a fraud or deceit on Class Period purchasers of Bare Escentuals common stock by actively concealing from investors that the Company was experiencing weakness in its infomercial business and related sales and operational problems, including the Target and Costco sales and their own rabid expansion of "brick and mortar" sales channels.  When these Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Bare Escentuals common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Bare Escentuals common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

204.    Defendants Bare Escentuals' and Individual Defendants Blodgett, Miles, McCormick, Jones, Bloom, John, Hansen and Ottinger's false and misleading statements had the intended effect and caused Bare Escentuals common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $44 per share.  By failing to disclose to investors that the Company was experiencing weakness in its infomercial business and related sales and operational defects and difficulties, these Defendants presented a misleading picture of Bare Escentuals' business and prospects.

205.    As a direct result of information disclosed on June 5, 2007, August 1, 2007, October 31, 2007, November 26, 2007, July 30, 2008 and October 30, 2008, the price of Bare Escentuals

1   common stock fell precipitously.   These drops removed the inflation from the price of Bare

2   Escentuals common stock, causing real economic loss to investors who had purchased Bare

3   Escentuals common stock during the Class Period.

4        206.   These declines in the price of Bare Escentuals common stock after the disclosures

5   alleged herein came to light were a direct result of the nature and extent of these Defendants' fraud

6   finally being revealed to investors and the market.   The timing and magnitude of the price decline in

7   Bare Escentuals common stock negates any inference that the loss suffered by Lead Plaintiffs and

8   the other Class members was caused by changed market conditions, macroeconomic or industry

9   factors or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss,

10  *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of these

11  Defendants' fraudulent scheme to artificially inflate the prices of Bare Escentuals common stock and

12  the subsequent significant decline in the value of Bare Escentuals common stock when these

13  Defendants' prior misrepresentations and other fraudulent conduct were revealed.

14       207.   Plaintiffs and the other members of the Class have suffered hundreds of millions of

15  dollars in damages as a result of their purchase of Bare Escentuals' common stock in the IPO, the

16  March 2007 and the June 2007 Offerings, and during the Class Period following those offerings.   As

17  consumers rejected the Company's "club" sales program and automatic recording/rebilling processes

18  *en masse*, the Company's direct-to-consumer infomercial and QVC sales plummeted.   The Company

19  also saw the sudden departure of its President, its Chief Marketing Officer and the resignation of its

20  President of Retail upon revelation that he had committed résumé fraud.   The market would also

21  learn that Bare Escentuals goods were being offered at mass discounters Target and Costco

22  throughout the Class Period, and that despite management's statements that these "millions of

23  dollars" in sales were "unauthorized" by Bare Escentuals and that it was aggressively taking action

24  to stop them, the sales were lawful and there was essentially little management could do to stop them

25  from cannibalizing Bare Escentuals' "premium" sales mantra.   Finally, on October 31, 2008,

26  management announced that the Company would be forced to slash prices and cut its financial

27  guidance going forward and during late 2008, with the Company completely revamping its

28   

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     - 92 -

1   marketing campaign, including offering lower priced starter kits (at $15-$30, rather than $60). The

2   Company also disclosed that its inventory levels rose 55% in FY 08, while revenues rose just 2%,

3   which would provide a substantial drain on future cash flows as wholesalers (and the Company)

4   worked down excessive inventory levels. Throughout 2009, the Company's sales have been ravaged

5   by "de-stocking" efforts at its premium wholesalers, resulting in Bare Escentuals reporting an 11.5%

6   revenue *decline* for 1Q 2009. As the truth about Bare Escentuals and its financial operations reached

7   the market, the price of the Company's common stock plummeted to as low as $4.20 per share in

8   intraday trading on October 31, 2008, almost *80%* below the IPO price and *more than 87%* below

9   the March 2007 Offering and June 2007 Offering prices.

10        208.    The Class Period stock price inflation was due to Company-specific misstatements as

11   the S&P 500 Index fell only approximately *30%* during this period and the stock of cosmetics

12   industry leader Estée Lauder Companies Inc. [EL] fell *less than 15%* and Proctor & Gamble Inc.

13   [PG] *did not decline at all*, while Bare Escentuals fell almost *90%* during the Class Period.

14   Moreover, these other stocks were relatively flat during the earlier period of significant incline in

15   Bare Escentuals' stock price:

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

19       209.    At all relevant times, the market for Bare Escentuals's common stock was an efficient

20  market for the following reasons, among others:

21       (a)     Bare Escentuals's stock met the requirements for listing, and was listed and actively

22  traded on the NASDAQ National Market, a highly efficient and automated market;

23       (b)     According to the Company's 2006-2008 Forms 10-K, there were approximately 90

24  million shares of Bare Escentuals common stock outstanding during the Class Period.  During the

25  Class Period, on average, at least 1 million and sometimes 10 million shares of Bare Escentuals

26  stock were traded on a daily basis, demonstrating a very active and broad market for Bare Escentuals

27  stock and permitting a very strong presumption of an efficient market;

28       (c)     As a regulated issuer, Bare Escentuals filed periodic public reports with the SEC;

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 94 -

1        (d)     Bare Escentuals regularly communicated with public investors via established market

2  communication mechanisms, including regular disseminations of press releases on the national

3  circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as

4  communications with the financial press and other similar reporting services;

5        (e)     Bare Escentuals was followed by several securities analysts who wrote reports that

6  were distributed to the sales force and certain customers of their respective firms during the Class

7  Period.  Each of these reports was publicly available and entered the public marketplace;

8        (f)     Numerous National Association of Securities Dealers ("NASD") member firms were

9  active market-makers in Bare Escentuals stock at all times during the Class Period; and

10        (g)     Unexpected material news about Bare Escentuals was rapidly reflected in and

11  incorporated into the Company's stock price during the Class Period.

12        210.    As a result of the foregoing, the market for Bare Escentuals common stock promptly

13  digested current information regarding Bare Escentuals from publicly available sources and reflected

14  such information in Bare Escentuals's stock price.  Under these circumstances, all purchasers of

15  Bare Escentuals common stock during the Class Period suffered similar injury through their

16  purchase of Bare Escentuals common stock at artificially inflated prices, and a presumption of

17  reliance applies.

18        211.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance to the extent

19  that defendants' statements were materially misleading in failing to disclose material facts about

20  Bare Escentuals that would have caused plaintiffs and the Class not to have purchased Bare

21  Escentuals stock at the artificially inflated prices at which such securities traded during the Class

22  Period.

23               **NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

24        212.    The statutory safe harbor provided for forward-looking statements under certain

25  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

26  specific statements pleaded herein either were not identified as "forward-looking statements" when

27  made or were not accompanied by meaningful cautionary statements identifying important factors

28

that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Bare Escentuals who knew that those statements were false when made.

213.     Indeed, after reviewing the Company's initial IPO Registration Statement/Prospectus, the SEC cautioned,

> Item 503(c) of Regulation S-K states that issuers should not "present risk factors that could apply to any issuer or to any offering." ***The risks you disclose relating to being a public company and becoming involved in securities class action litigation could apply to nearly any issuer in your industry and even in other industries.*** If you elect to retain these general risk factors in your prospectus, you must clearly explain how they apply to your company or offering.

214.     Yet like the Company's soon-to-be public investors, the SEC could not know precisely how "boiler-plate" Bare Escentuals' so-called "risk disclosures" were and how they conflated the misstatements by characterizing as minimal risks that which Defendants knew were monumental problems *already being experienced in the Company's sales channels and materials defects in its internal controls*.

## CLASS ACTION ALLEGATIONS

215.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Company's common stock pursuant or traceable to the Company's false and misleading Registration Statements for the IPO and the March 2007 Offering and/or during the September 28, 2006 to October 31, 2008 Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

216.   The members of the Class are so numerous that joinder of all members is impracticable.  The Company's common stock was actively traded on the NASDAQ National Market.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Bare Escentuals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

217.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

218.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

219.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:  (i) whether the Securities Act and the Exchange Act were violated by Defendants' acts as alleged herein; (ii) whether statements made by Defendants to the investing public in the IPO and/or March 2007 Offering Registration Statements misrepresented material facts about the business, operations and management of Bare Escentuals; (iii) whether statements made by Defendant Bare Escentuals and/or all Individual Defendants (except Rose and Senk) to the investing public during the Class Period misrepresented material facts about the business and operations of Bare Escentuals; (iv) whether the price of Bare Escentuals common stock was artificially inflated during the Class Period; and (v) to what extent the members of the Class have sustained damages and the proper measure of damages.

220.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

1    individual litigation make it impossible for members of the Class to individually redress the wrongs

2    done to them.  There will be no difficulty in the management of this action as a class action.

3                                          **COUNT I**

4                         **Violations of Section 11 of the Securities Act**
                          **Against All Defendants (Except Miles)**

5         221.    Lead Plaintiffs repeat and reallege ¶¶57-81 as if fully set forth herein.  For purposes

6    of this Count, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed

7    as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of

8    strict liability and/or negligence under the Securities Act.

9         222.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on

10    behalf of the Class, against all Individual Defendants (except Miles).

11        223.    The IPO and March 2007 Offering Registration Statements were false and

12    misleading, contained untrue statements of material facts, omitted to state other facts necessary to

13    make the statements made not misleading, and omitted to state material facts required to be stated

14    therein.

15        224.    Bare Escentuals is the registrant for the IPO and the March 2007 Offerings.  As issuer

16    of the shares, Bare Escentuals is strictly liable to Plaintiffs and the Class for the misstatements and

17    omissions.

18        225.    The Individual Defendants named in this Count were responsible for the contents and

19    dissemination of the Registration Statements.  Each of the Individual Defendants named in this

20    Count signed or authorized the signing of the IPO and the March 2007 Offering Registration

21    Statements or were identified in the Prospectus.

22        226.    The Underwriter Defendants named herein were responsible for the contents and

23    dissemination of the IPO and the March 2007 Offering Registration Statements.

24        227.    None of the Defendants named herein made a reasonable investigation or possessed

25    reasonable grounds for the belief that the statements contained in the IPO or March 2007 Offering

26    Registration Statements were true and without omissions of any material facts and were not

27    misleading.

28    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 98 -

1    228.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a

2    person who violated, §11 of the Securities Act.

3    229.    Plaintiffs acquired Bare Escentuals' common stock pursuant and/or traceable to the

4    IPO and/or March 2007 Offering Registration Statements.

5    230.    Plaintiffs and the Class have sustained damages.  At the time of their purchases of the

6    Company's common stock, Plaintiffs and other members of the Class were without knowledge of the

7    facts concerning the wrongful conduct alleged herein and could not have reasonably discovered

8    those facts.   Less than one year has elapsed from the time that Lead Plaintiffs discovered or

9    reasonably could have discovered the facts upon which this complaint is based and the time

10   Plaintiffs filed this complaint.  Less than three years elapsed between the time that the securities

11   upon which this Count is brought were offered to the public and the time Lead Plaintiffs filed this

12   complaint.

13                                      **COUNT II**

14               **Violations of Section 12(a)(2) of the Securities Act**
                 **Against All Defendants (Except Miles)**

15   231.    Plaintiffs repeat and reallege ¶¶57-81 as if fully set forth herein.  For purposes of this

16   Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging

17   fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability

18   and/or negligence under the Securities Act.

19   232.    By means of the defective Prospectuses, the Defendants named herein assisted in the

20   sale of shares of the Company's common stock to Plaintiffs and other members of the Class.

21   233.    The Prospectuses contained untrue statements of material fact, and concealed and

22   failed to disclose material facts, as detailed above.  Defendants named herein owed Plaintiffs and the

23   other members of the Class who purchased the Company's common stock pursuant to the

24   Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in

25   the Prospectuses to ensure that such statements were true and that there was no omission to state a

26   material fact required to be stated in order to make the statements contained therein not misleading.

27

28

1   These Defendants, in the exercise of reasonable care, should have known of the misstatements and

2   omissions contained in the Prospectuses as set forth above.

3        234.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known,

4   of the untruths and omissions contained in the Prospectuses at the time Plaintiffs acquired the

5   Company's common stock.

6        235.    By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the

7   Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members

8   of the Class who purchased the Company's common stock pursuant to the Prospectuses sustained

9   substantial damages in connection with their purchases of the common stock.   Accordingly,

10  Plaintiffs and the other members of the Class who hold such shares have the right to rescind and

11  recover the consideration paid for their shares, and hereby tender their shares to the Defendants sued

12  herein.  Class members who have sold their shares seek damages to the extent permitted by law.

13                                    **COUNT III**

14            **Violations of Section 15 of the Securities Act**
           **Against the Individual Defendants (Except Miles)**

15       236.    Plaintiffs repeat and reallege ¶¶57-81 as if fully set forth herein.  For purposes of this

16  Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging

17  fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability

18  and/or negligence under the Securities Act.

19       237.    This Count is brought pursuant to §15 of the Securities Act against the Individual

20  Defendants (except Miles).

21       238.    Each of these Defendants was a control person of Bare Escentuals by virtue of his or

22  her position as a director, senior officer and/or major shareholders of Bare Escentuals which allowed

23  each of these Defendants to exercise control over Bare Escentuals and its operations.

24       239.    Each of these Defendants was a culpable participant in the violations of §11 of the

25  Securities Act alleged in the Count above, based on their having signed or authorized the signing of

26  the Registration Statement and/or having otherwise participated in the process which allowed the

27  IPO and the March 2007 Offerings to be successfully completed.

28  CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 100 -

**COUNT IV**

**Violation of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against Defendants Bare Escentuals and All of the Individual Defendants
(Except Rose and Senk)**

240.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

241.     During the Class Period, these Defendants disseminated or approved the materially false and misleading statements specified above in ¶¶2-32 and ¶¶81-208, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

242.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

243.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bare Escentuals common stock.  Lead Plaintiffs and the Class would not have purchased Bare Escentuals common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

244.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Bare Escentuals common stock during the Class Period.

**COUNT V**

**Violation of §20(a) of the Exchange Act
Against All Individual Defendants (Except Rose and Senk)**

245.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

246.    Each of the Individual Defendants (except Rose and Senk) acted as controlling persons of Bare Escentuals within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Bare Escentuals, and their ownership of Bare Escentuals stock, these Defendants had the power and authority to cause Bare Escentuals to engage in the wrongful conduct complained of herein.  By reason of such conduct, these Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT VI**

**For Violation of Section 20A of the Exchange Act
Against Individual Defendants Blodgett, Ottinger, Senk, Bloom, Jones, Hansen and John**

247.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

248.    While Bare Escentuals' securities traded at artificially inflated and distorted prices, Individual Defendants Blodgett, Ottinger, Senk, Bloom, Jones, Hansen and John personally profited by selling 11,859,713 shares of their holdings in Bare Escentuals securities while in possession of adverse, material non-public information about Bare Escentuals, pocketing over $409 million in the aggregate in illegal insider trading proceeds, as detailed herein.  Plaintiffs and members of the Class traded contemporaneously with these Defendants by purchasing Bare Escentuals shares at artificially inflated prices on or within days of those purchases, and were damaged thereby, as the following chart demonstrates:

| Purchaser | Date | Shares | Price | Purchase Price |
|---|---|---|---|---|
| WESTMORELAND | 3/19/07 | 800 | $34.50 | $27,600 |

| Inside Seller | Date | Shares | Price | Total Proceeds |
|---|---|---|---|---|
| BLODGETT | 3/19/2007 | 1,220,169 | $33.03 | $40,302,182 |
| OTTINGER | 3/19/2007 | 33,711 | $33.03 | $1,113,474 |
| SENK | 3/19/2007 | 20,000 | $33.03 | $660,600 |
| BERKSHIRE PARTNERS (BLOOM/JONES) | 3/19/2007 | 6,315,116 | $33.03 | $208,588,281 |
| JH PARTNERS (HANSEN/JOHN) | 3/19/2007 | 2,899,720 | $33.03 | $95,777,752 |
| JH PARTNERS (HANSEN/JOHN) | 3/19/2007 | 29,813 | $33.03 | $984,723 |
| SIBERIA INVESTMENT (HANSEN/JOHN) | 3/19/2007 | 1,341,184 | $33.03 | $44,299,308 |

249. Plaintiffs and all the other members of the Class who purchased Bare Escentuals stock contemporaneously with the sales of Bare Escentuals stock by these Individual Defendants:

(a) have suffered substantial damages in that they paid artificially inflated prices for Bare Escentuals stock as a result of violations of §10(b) of the Exchange Act and Rule 10b-5 herein described; and

(b) would not have purchased Bare Escentuals stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by these Defendants' false and misleading statements.

250. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages.

251. By reason of the foregoing, Individual Defendants Blodgett, Ottinger, Senk, Bloom, Jones, Hansen and John violated §20A of the Exchange Act and are liable to Plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchase of Bare Escentuals stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class pray for judgment as follows:

1    A.    Determining that this action is a proper class action, certifying Plaintiffs as class

2    representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this

3    Complaint as the operable complaint for class purposes;

4    B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members

5    against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

6    wrongdoing, in an amount to be proven at trial, including interest thereon;

7    C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity

8    and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the

9    Class has an effective remedy;

10    D.    Ordering the Individual Defendants to disgorge their insider trading proceeds,

11    including a constructive trust over those proceeds;

12    E.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

13    action, including counsel fees and expert fees; and

14    F.    Awarding such other and further relief as the Court may deem just and proper.

15                                **JURY DEMAND**

16    Lead Plaintiffs hereby demand a trial by jury.

17    DATED:  December 23, 2009            SCOTT+SCOTT LLP
                                          ARTHUR L. SHINGLER III
18                                        MARY K. BLASY
                                          HAL D. CUNNINGHAM
19

20                                        */s/ Mary K. Blasy*
                                          MARY K. BLASY
21                                        600 B Street, Suite 1500
                                          San Diego, CA  92101
22                                        Telephone:  619/233-4565
                                          619/233-0508 (fax)
23
                                          SCOTT+SCOTT LLP
24                                        DAVID R. SCOTT
                                          108 Norwich Avenue
25                                        Colchester, CT  06415
                                          Telephone:  860/537-3818
26                                        860/537-4432 (fax)

27

28                                        *Lead Counsel for Lead Plaintiffs*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 104 -

1

2

<u>CERTIFICATE OF SERVICE</u>

3

I hereby certify that on December 23, 2009 I caused the foregoing to be electronically filed

4

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

5

the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused

6

the foregoing document or paper to be mailed via the United States Postal Service to the non-

7

CM/ECF participants indicated on the Manual Notice List.

8

I certify under penalty of perjury under the laws of the United States of America that the

9

foregoing is true and correct.  Executed on December 23, 2009

10

11

  /s/   *Mary K. Blasy*

12

MARY K. BLASY
SCOTT+SCOTT LLP

13

600 B Street, Suite 1500
San Diego, CA 92101

14

Telephone: 619-233-4565
Fax: 619-233-0508

15

E-mail: mblasy@scott-scott.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Vincent J. Takas, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Scott + Scott LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the **BARE ESCENTUALS, INC. (BARE)** security that is the subject of this action during the Class Period is/are as follows:

| No of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 100 | buy | 9/28/06 | $ 22.00 |
| 4,500 | buy | 5/29/07 | $ 42.61 |
| 375 | buy | 5/29/07 | $ 42.73 |
| 375 | sell | 12/27/07 | $ 24.21 |

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 21st day of December, 2009, at Burbank, California.

VINCENT J. TAKAS