1  SCOTT+SCOTT LLP
   ARTHUR L. SHINGLER III (181719)
2  MARY K. BLASY (211262)
   HAL D. CUNNINGHAM (243048)
3  600 B Street, Suite 1500
   San Diego, CA  92101
4  Telephone:  619/233-4565
   619/233-0508 (fax)
5  ashingler@scott-scott.com
   mblasy@scott-scott.com
6  hcunningham@scott-scott.com

7  – and –

8  DAVID R. SCOTT (*pro hac vice*)
   ERIN G. COMITE (*pro hac vice*)
9  P.O. Box 192
   156 South Main Street
10 Colchester, CT  06415
   Telephone:  860/537-3818
11 860/537-4432 (fax)
   drscott@scott-scott.com
12 ecomite@scott-scott.com

13 *Lead Counsel for Lead Plaintiffs*

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16
   IN RE BARE ESCENTUALS, INC.          Master File No. C-09-03268-PJH
17 SECURITIES LITIGATION
                                        LEAD PLAINTIFFS' CORRECTED
18 _____          MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN OPPOSITION TO
19 This Document Relates To:            THE BARE ESCENTUALS
                                        DEFENDANTS' MOTION TO DISMISS
20 All Actions                          THE CORRECTED CONSOLIDATED
                                        COMPLAINT FOR VIOLATIONS OF
21 _____          THE FEDERAL SECURITIES LAWS

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  I.      INTRODUCTION AND BACKGROUND TO THE ACTION ........................................1

3  II.     LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS .........................5

4  III.    THE COMPLAINT ALLEGES ACTIONABLE SECURITIES ACT CLAIMS .............6

5          A.      The Complaint Alleges Actionable Section 11 Claims ...............................7

6                  1.      The Registration Statements Used to Conduct the Offerings
                           Contained Materially Misleading Statements and Omissions ....................8

7

8                          a.      The Registration Statements Misstated Bare's Adherence to
                                   Its Purportedly Iron-Clad "Premium Sales" Restrictions .............10

9                          b.      The Registration Statements Concealed Bare's Reliance on
                                   Its "Negative Option" Sales Program .............................................13
10

11                         c.      The Registration Statements Misstated the Success of
                                   Bare's Efforts to Cross-Sell Non-Foundation Products.................16

12                         d.      The Registration Statements Misrepresented the Ongoing
                                   Cannibalization of Bare's Sales that the Rampant Store
13                                 Expansion Caused ..........................................................................17

14         B.      The Securities Act Defendants' "Seller Status" Is Adequately Alleged.............18

15         C.      Loss Causation is an Affirmative Defense that Must be Pled and Proved ...........19

16  IV.    PLAINTIFFS STATE ACTIONABLE EXCHANGE ACT CLAIMS ...........................20

17         A.      The Complaint Alleges Material Misstatements with Particularity.....................20

18                 1.      Defendants' Additional Class Period Misstatements.................................22

19         B.      The Complaint Also Raises a Strong Inference of Scienter ................................22

20                 1.      The Complaint Alleges the Bare Defendants' Integral Involvement
                           in Bare's "Core Operations" ...................................................................23
21

22                 2.      The Complaint Alleges the Selling Defendants Violated §10(b) and
                           Rule 10b-5 by Trading on Material, Non-Public Information ..................24

23                 3.      Confidential Witness and Primary Source Corroboration .........................27

24         C.      The §10(b) Allegations Demonstrate Defendants' False Statements and
                   Material Omissions Are the Proximate Cause of the Class's Losses ...................28
25

26         D.      Defendants' Statements Are Not Protected By The Safe Harbor Or
                   Bespeaks Caution Doctrine ...................................................................................29

27  V.     CONCLUSION .......................................................................................................30

28

LEAD PLAINTIFFS' OPP. TO BARE ESCENTUALS DEFENDANTS' MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009).................................................................................................21

5

*Batwin v. Occam Networks, Inc.,*
    No. CV 07-2750, 2008 WL 2676364 (C.D.Cal. July 1, 2008) ..................................5

6

7

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................................21

8

9

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)............................................................................................28, 29

10

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) .....................................................................................................9

11

12

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ........................................................................17, 18, 30

13

14

*Gompper v. VISX, Inc.,*
    298 F.3d 893 (9th Cir. 2002) .....................................................................................23

15

*Gray v. First Winthrop Corp.,*
    82 F.3d 877 (9th Cir. 1996) .......................................................................................30

16

17

*Hanon v. Dataproducts Corp.,*
    976 F. 2d 497 (9th Cir. 1992) ....................................................................................15

18

19

*Herman & McLean v. Huddleston,*
    459 U.S. 375 (1983).......................................................................................7, 9, 11, 16

20

*Huddleston v. Herman & MacLean,*
    640 F.2d 534 (5th Cir. 1981) .....................................................................................16

21

22

*In Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) .....................................................................................24

23

24

*In re Cardinal Health, Inc. Sec. Litig.,*
    426 F. Supp. 2d 688 (S.D. Ohio 2006) .....................................................................26

25

*In re Countrywide Fin. Corp. Sec. Litig.,*
    No. CV-07-05295, 2009 WL 943271 (C.D. Cal. April 6, 2009)..............................6, 7, 19, 28

26

27

*In re Daou Sys., Inc.,*
    411 F.3d 1006 (9th Cir.2005) .......................................................................18, 22, 28

28

*In re DDi Sec. Litig.,*
   No. CV 03-7063, 2005 WL 3090882 (C.D. Cal. July 21, 2005) .................................8

*In re Exodus Commc'ns, Inc. Sec. Litig.,*
   No. C 01-2661, 2005 WL 1869289 (Aug. 5, 2005).................................................8

*In re Gilead Scis. Sec. Litig.,*
   536 F.3d 1049 (9th Cir. 2008) ...........................................................................20

*In re Glen Fed, Inc. Sec. Litig.,*
   11 F.3d 843 (9th Cir. 1993) ..............................................................................18

*In re Indep. Energy Holdings PLC Sec. Litig.,*
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)..................................................................19

*In re Metropolitan Sec. Litig.,*
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) .............................................................30

*In re OPUS360 Corp. Sec. Litig.,*
   No. 01 Civ. 2938, 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) ...............................19

*In re Petco Animal Supplies Inc. Sec. Litig.,*
   No. 05-CV-0823, 2005 WL 5957816 (S.D. Cal. Aug. 1, 2005)...........................6, 23, 24

*In re Stac Electronics Sec. Litig.,*
   89 F.3d 1399 (9th Cir. 1996) ..............................................................................7

*In re Surebeam Corp. Sec. Litig.,*
   No. 03 CV 1721, 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ....................................5

*In re Syncor Int'l Corp. Sec. Litig.,*
   327 F. Supp. 2d 1149 (C.D. Cal. 2004) ...............................................................25

*In re Time Warner, Inc. Sec. Litig.,*
   9 F.3d 259 (2nd Cir.1993) .............................................................................8, 10

*In re UTStarcom, Inc. Sec. Litig.,*
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................26

*In re Wells Fargo Sec. Litig.,*
   12 F.3d 922 (9th Cir. 1993) ..............................................................................21

*In re Westinghouse Sec. Litig.,*
   90 F.3d 696 (3rd Cir. 1996) ..............................................................................19

*Johnson v. Alijan,*
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) , *aff'd*, 490 F.3d 778 (9th Cir. 2007)............24, 25, 26

*Knollenberg v. Harmonic, Inc.*,
  152 Fed.Appx. 674 (9th Cir. 2005).............................................................7

*Kronfeld v. Trans World Airlines, Inc.*,
  832 F.2d 726 (2nd Cir. 1987)..................................................................10

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .............................................6, 21, 23, 26

*Levine v. AtriCure, Inc.*,
  508 F.Supp.2d 268 (S.D.N.Y. 2007)....................................................19

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005)..................................................................29

*Lone Star Ladies Inv. Club v. Schlotsky's, Inc.*,
  238 F.3d 363 (5th Cir. 2001) ...................................................................4

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
  540 F. 3d 1049 (9th Cir. 2008) .......................................................25, 28

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
  523 F.3d 75 (1st Cir. 2008)....................................................................16

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ...................................................................5

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................5, 25, 26

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226, 1232 (9th Cir. 2004) ............................................25, 27

*Pinter v. Dahl*,
  486 U.S. 622 (1988).................................................................................18

*Pirraglia v. Novell, Inc.*,
  339 F.3d 1182 (10th Cir. 2003) .............................................................25

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ...............................................................18

*S.E.C. v. Adler*,
  137 F.3d 1325 (11th Cir.) ......................................................................24

*S.E.C. v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) ...............................................................23

*S.E.C. v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2nd Cir.1968)....................................................................................8

*Schaffer v Evolving Sys., Inc.*,
  29 F. Supp. 2d 1213 (D. Colo. 1998)........................................................................8

*Schlagal v. Learning Tree Int'l*,
  No. CV 98-6384, 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) ...............................25

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)...........................................................................9, 15, 16

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ....................................................................................6

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................................5

*St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*,
  605 F.2d 1169 (10th Cir. 1979) ................................................................................14

*Steckman v. Hart Brewing Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ..................................................................................16

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2nd Cir. 1999)......................................................................................27

*Stocke v. Shuffle Master, Inc.*,
  615 F. Supp. 2d 1180 (D. Nev. 2009).......................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................22, 29

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)..............................................................................................4, 11

*U.S. v. 0'Hagan*,
  521 U.S. 642 (1997)..................................................................................................24

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3rd Cir. 1997) ....................................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ....................................................................................27

**STATUTES**

15 U.S.C.
  §77k(a) ...........................................................................................................11, 15
  §77k(b)(3) ...............................................................................................................7
  §78u-4(b)(1)(B) .....................................................................................................20
  §78j(b) ....................................................................................................................20

17 C.F.R.
  §240.10b-5-1(b) .....................................................................................................24
  §240.10b5-1(c)(1)(i)(A) .........................................................................................26
  §240.10b-5 .............................................................................................................20

Federal Rules of Civil Procedure
  Rule 8 .....................................................................................................................20
  Rule 8(a) .................................................................................................................20
  8(a)(2) ......................................................................................................................7
  Rule 9 ......................................................................................................................7
  Rule 9(b) .................................................................................................................20
  Rule 12(h)(2) ......................................................................................................5, 20
  Rule 15(a) ...............................................................................................................30

**OTHER AUTHORITIES**

70 Fed. Reg. 44722-01 (Aug. 3, 2005) ...................................................................18

1    Lead Plaintiffs Westmoreland County Retirement System and Vincent J. Takas (collectively,

2    "Plaintiffs" or "Lead Plaintiffs"), respectfully submit this corrected memorandum of points and

3    authorities in opposition to the Bare Escentuals Defendants' motion to dismiss Plaintiffs' Corrected

4    Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint").[1]

5                        **ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

6    Whether Defendants have demonstrated they are entitled to dismissal as a matter of law of

7    any of the Complaint's claims before discovery has commenced.

8    **I.       INTRODUCTION AND BACKGROUND TO THE ACTION**

9    Bare Escentuals, Inc. ("Bare") was acquired by private equity fund JH Partners, LLC

10   ("JH Partners") in 1990 and through successive corporate transactions, wound up owned jointly by

11   JH Partners and Berkshire Partners LLC ("Berkshire") by 2004.  Meanwhile, Bare had begun

12   marketing its makeup products on the QVC home shopping network in 1997, subject to an

13   exclusivity agreement with QVC, then also one of its significant venture capital financiers.  In 2001,

14   Bare began developing its own infomercial program, which dramatically increased sales from $25

15   million in 2001 to $250+ million in 2005 and to $394.5 million in 2006.  During 2005 – 2006, JH

16   Partners and Berkshire purchased QVC's interest in Bare and caused Bare to undergo three

17   "capitalizations," taking on enormous debt, in order to pay the private equity firms $646 million in

18   dividends.  In an effort to cash in on Bare's growing infomercial sales success, JH Partners and

19   Berkshire took Bare public in a $400+ million initial public stock offering ("IPO") in September

20   2006.  From the IPO proceeds, JH Partners and Berkshire were paid several hundred million dollars

21   purportedly in exchange for their "management agreements" with Bare.  Though JH Partners and

---

23   [1]    On April 29, 2010, after conferring with defendants, Lead Plaintiffs applied to the Court for
24   leave to file a single, consolidated opposition to defendants' collective motions to dismiss.
     Defendants opposed this request. While Lead Plaintiffs' application was pending, on April 30, 2010,
25   Lead Plaintiffs filed their consolidated memorandum in opposition to defendants' motions to
     dismiss.  On May 3, 2010, the Court denied Lead Plaintiffs' application.  Accordingly, consistent
26   with the Court's May 3 Order and the page limitations set forth in the Court's March 1, 2010 Order
     and Civil L.R. 7-3(a), Lead Plaintiffs submit this corrected opposition to the Bare Escentuals
27   Defendants' motion to dismiss, as well as a now-corrected opposition to the Underwriter
     Defendants' motion to dismiss.

1    Berkshire each reduced their respective ownership interests in Bare from 32% pre-IPO to 12%, and

2    from 47% pre-IPO to approximately 26%, in connection with the IPO and two additional secondary

3    stock offerings they caused Bare to undertake in March 2007 ($476+ million) and June 2007 ($292

4    million) (the "Offerings"), the Bare Board of Directors remained comprised of three Berkshire

5    designees (Ross M. Jones, Bradley M. Bloom and Lea Anne Ottinger) and two JH Partners

6    designees (Michael J. John and John C. Hansen) until JH Partners, Berkshire and Bare's

7    management could sell their remaining multi-hundred million dollar interests in Bare.  Though the

8    sales effort began in earnest in late October 2008, following several successive quarters of

9    significantly diminished infomercial sales performance, JH Partners and Berkshire were not able to

10   off-load the rest of their interest in Bare until December 2009 when they and Bare's senior

11   executives agreed to sell the Company to Shiseido Co. Ltd., a Japanese Company.  Bare's public

12   shareholders were all cashed out in the sale.

13        As the *Business Week* exposé in the Complaint reflects, this private-to-public-to-private

14   round trip resulted in a huge windfall to JH Partners, Berkshire and Bare's senior executives, at the

15   expense of Bare's public investors.  In fact, in addition to the $428+ million Bare sold, the private

16   equity firms and the Bare executive Defendants sold another $700+ million of Bare stock to the

17   public in the three Offerings.  Plaintiffs bring this class action pursuant to §§11, 12(a)(2) and 15 of

18   the Securities Act of 1933 ("Securities Act"), alleging that both the IPO and the March 2007

19   Offering were conducted pursuant to registration statements and prospectuses (collectively,

20   "Registration Statements") that included misrepresentations and omitted material facts about Bare

21   and its sales and distribution practices that rendered its business and financial prospects misleading.

22   Plaintiffs also bring separate class claims pursuant to §§10(b), 20(a) and 20A  of the Securities

23   Exchange Act of 1934 ("Exchange Act") on behalf of the public purchasers of Bare's stock between

24   the September 28, 2006 IPO and October 30, 2008, the day before the bottom fell out on Bare's

25   stock price ("Class Period").  The Exchange Act claims allege fraud whereas the Securities Act

26   claims cover far fewer persons and allege negligence.

27        Both prior to and following the IPO, the executive management of Bare was conducted by

28   Leslie A. Blodgett ("Blodgett"), who along with JH Partners and Berkshire, made all significant

1   business decisions for the enterprise.[2]  The Registration Statements, however, failed to disclose that

2   the so-called "infomercial continuity program" profits that had been driving Bare's exponential

3   profits since 2001, operated in reality as a negative option sales program whereby unwitting

4   customers who signed up for one-time purchases instead received automatic reshipments of

5   expensive product for which their credit cards were billed – whether they wanted them or not.  Nor

6   did the Registration Statements disclose that despite its purported "exclusivity" arrangement with

7   QVC and prestige sales channel-only mantra, Bare had been selling product to offshore distributors

8   who in turn were selling Bare's purportedly prestige brands to buyers at big-box discounters Target

9   and Costco.  Bare claimed compliance with its QVC agreement while being able to ship product at

10  the end of quarters in order to report significant financial results, making the Company appear more

11  profitable prior to the Offerings.  The Registration Statements also failed to disclose that Defendants

12  were rapidly opening hundreds of stores around the country – often double and triple stacking Bare

13  points of sale within a single mall – resulting in massive cannibalization of sales in Bare's various

14  sales channels.

15      Soon – too soon – the façade would shatter.  After reporting several quarters of flattening

16  infomercial sales – the secret to Bare's success – the Company's stock price was pummeled

17  following its October 30, 2008 significant earnings miss and the Company's disclosure it would

18  have to slash the sales price of its "Get Started Kit" from $60 to $15 in recognition of Bare's

19  declining infomercial business, consumer backlash against its use of a negative option sales program

20  and the fact that Bare's once exclusive prestige brand was now sitting on discount racks.  The

21  Company's stock price – taken public at $22 per share in the IPO in September 2006 – sold again at

22  $34.50 per share in March 2007 and at $36.50 in June 2007 – would fall precipitously, closing just

23  above $4 per share on October 31, 2009 – ***erasing hundreds of millions of dollars in market***

24

25  [2]      Blodgett was Bare's Chairman and CEO until it was recently sold to Shiseido.  McCormick
26  served as Bare's CFO until 12/8/08 when he resigned the CFO position but continued as Bare's
    Chief Operating Officer ("COO") until its sale to Shiseido.  Miles served as Bare's President of
27  Wholesale and International Sales until she suddenly resigned on 11/26/07.  Collectively, Blodgett,
    McCormick and Miles are referred to herein as the "Officer Defendants."

28

1  *capitalization*.  Defendants immediately began attempting to find a buyer for Bare so they could

2  cash in, which finally occurred when the sale to Shiseido closed in March 2010.

3        Defendants[3] have moved to dismiss the Complaint's Securities Act claims, arguing that the

4  Registration Statements did not allege falsity and that Plaintiffs' claims are time-barred.

5  Defendants' motion mischaracterizes the Complaint and the pleading standard though; this is not, as

6  Defendants portend, a "mini-trial" before discovery, and the case is not about, as Defendants argue,

7  their business failures – it's about unbridled greed, obfuscation and self-dealing carried out in

8  violation of the federal securities laws.

9        In an action arising under §11 of the Securities Act, Plaintiffs need not plead or prove fraud

10  or scienter; as the Fifth Circuit noted, the "liability of an issuer ... for a material misstatement or

11  omission is '***virtually absolute***.'"[4]  *Lone Star Ladies Inv. Club v. Schlotsky's, Inc.,* 238 F.3d 363, 369

12  (5th Cir. 2001).  For these purposes, an omission is material if there is a substantial likelihood that

13  the "disclosure of the omitted fact would have been viewed by the reasonable investor as having

14  significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway,*

15  *Inc.*, 426 U.S. 438, 449 (1976).  Thus, the question before the Court is whether a reasonable investor

16  would have wanted to know that Bare's customers were in an uproar about its negative option sales

17  program, its purportedly "prestige" brand was now available at Target and Costco, its infomercial

18  business was suffering and its rapidly growing points of sales were cannibalizing one another –

19  rendering all efforts to forecast future financial performance meaningless.  The answer is clear; of

20

21  _____

22  [3]       The "Bare Defendants" are defined herein as Bare; the Officer Defendants; and the "Director
    Defendants" (Ross M. Jones ("Jones"), Bradley M. Bloom ("Bloom"), John C. Hansen ("Hansen"),

23  Michael J. John ("John"), Lea Anne Ottinger ("Ottinger"), Karen M. Rose ("Rose") and Glen T.
    Senk ("Senk")), all of whom who signed false and misleading Registration Statements and all of

24  whom (except Miles, Rose and Senk), with Bare, are collectively are attributed with selling over
    $1.1 billion of stock in the Offerings.  The "Underwriter Defendants" are Goldman, Sachs & Co.,

25  CIBC World Markets, Banc of America Securities LLC, Piper Jaffray Companies, Thomas Weisel
    Partners LLC and Suntrust Robinson Humphrey, Inc.

26  [4]       Unless otherwise noted, all citations are omitted and emphasis is added.  Further, unless
    otherwise noted, all Exhibit references ("Ex.") are attached to the Declaration of Mary K. Blasy in

27  Support of Lead Plaintiffs' Oppositions to Defendants' Motions to Dismiss.

28

1  course these facts would have taken on actual significance in the mind of an investor contemplating

2  an investment in Bare.

3      Plaintiffs' Complaint adequately states a claim for material misstatements and omissions in

4  the Registration Statements in violation of §§11, 12(a)(2) and 15 of the Securities Act, which are not

5  time-barred nor "sound in fraud."[5]  The Complaint also states an alternative claim for purchasers on

6  the public market during the Class Period under §§10(b), 20(a) and 20A of the Exchange Act.  In

7  moving to dismiss, the Bare Defendants, and the Underwriter Defendants who carried this out for

8  them, blithely attribute the Class's damages to "the worst global economic recession since the

9  1930s" and blame the victims, arguing "only an investor deliberately not paying attention could

10  have" failed to discover the truth.  In doing so, these Defendants ignore the well-pleaded allegations

11  clearly showing that Bare's demise was of its own making, investor losses were caused by their

12  concealment alleged herein, and the market responded appropriately.  Defendants' motions should

13  be denied.[6]

14  **II.     LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS**

15      A motion to dismiss tests whether the allegations in a complaint, if true, amount to an

16  actionable claim.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "All allegations of material

17  fact made in the complaint are taken as true and construed in the light most favorable to the

18  plaintiff." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,

19

---

20  [5]     Plaintiffs expressly incorporate by reference their responses to the Underwriter Defendants'

21  argument the Securities Act claims are time-barred filed herewith. Plaintiffs' control person and
    contemporaneous trading claims meet the applicable Rule 8 standard.  *See Batwin v. Occam*

22  *Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364, at *24 (C.D.Cal. July 1, 2008).  The Officer
    Defendants concede control (Bare Mtn. at 30) and the IPO Registration Statement confirms Jones',

23  Bloom's, John's and Hansen's actual control.  *See* Ex. E at 30-31; *see also In re Surebeam Corp.*
    *Sec. Litig.*, No. 03 CV 1721, 2005 WL 5036360, at *25 (S.D. Cal. Jan. 3, 2005) (traditional indicia

24  of control include such hallmarks as "owning stock in the target company, or having a seat on the
    board").  Other than claiming Plaintiffs do not adequately allege a predicate Exchange Act violation,

25  the §§20(a) and 20A, Defendants have waived any challenges to sufficiency of these claims.  *See*
    Fed. R. Civ. P. 12(h)(2).

26  [6]     Because Plaintiffs' allegations are discussed in detail in the argument below, Plaintiffs will

27  not burden the Court here with a summary of their allegations that inevitably would repeat much of
    what is presented below.

28

1  320 F.3d 920, 931 (9th Cir. 2003).  "A complaint should not be dismissed unless it appears beyond a

2  doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or

3  her to relief."  *Id.*  In so doing, a complaint's allegations ***must be*** weighed "in their totality" not

4  "individually."  *Id.* at 945; *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.

5  2008) ("*Tellabs* counsels us to consider the totality of circumstances" and "permits a series of less

6  precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon*

7  *Graphics*, *Vantive*, and *Read-Rite* notwithstanding."); and *Siracusano v. Matrixx Initiatives, Inc.*,

8  585 F.3d 1167, 1183 (9th Cir. 2009) (same).

9  　　　　Critically, here, where Defendants improperly submit a 5-inch stack of exhibits they ask the

10  Court to take judicial notice of in support of their purported motion for ruling ***on the pleadings,***

11  claiming that, ***as a matter of law,*** the Complaint must be dismissed ***before discovery commences –***

12  the Court cannot consider matters outside the complaint with exceptions for (1) authenticated

13  documents that have been incorporated into the complaint and (2) facts that are subject to judicial

14  notice.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).  Importantly, the

15  district court may take judicial notice of matters of public record, but "***[d]isputed factual questions***

16  ***are not suitable for judicial notice.***"  *In re Petco Animal Supplies Inc. Sec. Litig.,* No. 05-CV-0823,

17  2005 WL 5957816, at *2 (S.D. Cal. Aug. 1, 2005) (for instance "a newspaper article, is not suitable

18  for judicial notice").[7]  As such, Plaintiffs moved separately to strike Defendants' improper

19  submissions – the arguments "supported" by those submissions – and Defendants' other arguments

20  based on conjecture arising outside the four corners of the Complaint.

21  **III.　　　　THE COMPLAINT ALLEGES ACTIONABLE SECURITIES ACT CLAIMS**

22  　　　　Plaintiffs bring §11 claims, which provide a remedy for plaintiffs who purchased a security

23  they can trace to a defective registration statement, against: (1) those Officer Defendants who signed

24  the Registration Statements; (2) the Director Defendants; and (3) the Underwriter Defendants that

25

26  [7]　　*See also In re Countrywide Fin. Corp. Sec. Litig.*, No. CV-07-05295, 2009 WL 943271, at *3
(C.D. Cal. April 6, 2009) ("*Countywide Sec.")* ("The Court cannot take notice of the transcript ***and***

27  accept its identification of the speaker over the SAC's identification without converting Sieracki's
motion into one for summary judgment.  Fed. R. Civ. Proc. 12(d).") (emphasis in original).

28

1  acted as underwriters in the Offerings.  The §12(a)(2) claims are brought against the Underwriter

2  Defendants that allegedly served as "sellers" within the meaning of the Securities Act for the

3  Offerings, and against the Bare Defendants (except Miles).  Section 15 claims are brought against

4  the Officer and Director Defendants who served as "control persons" of Bare when the Registration

5  Statements were filed and became effective, claims the Officer Defendants do not challenge.

6  **A.   The Complaint Alleges Actionable Section 11 Claims**

7  "To state a claim under Section 11(a), a plaintiff must allege that: (1) the registration

8  statement contained an omission or misrepresentation; and (2) the omission or misrepresentation was

9  material." *Knollenberg v. Harmonic, Inc.*, 152 Fed.Appx. 674, 683-84 (9th Cir. 2005).  "Defendants

10 are liable for innocent or negligent material misstatements or omissions, subject to a few affirmative

11 defenses." *Countrywide Sec.*, 588 F.Supp.2d at 1162.  The affirmative defense is due diligence.  15

12 U.S.C. §77k(b)(3); *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996).  Reliance is

13 not an element.  *Countrywide Sec.*, 588 F. Supp. 2d at 1162.

14 Unlike a securities action brought under the anti-fraud provisions of the Exchange Act,

15 plaintiffs who assert violations solely of the Securities Act are still required to plead "a short and

16 plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P.

17 8(a)(2); *Harmonic,* 152 Fed.Appx. at 683-84.  The stricter fraud and scienter pleading requirements

18 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") do not apply to §11 claims

19 disclaiming allegations of fraud, including the strictures of Fed. R. Civ. P. 9.  *Id.*  In fact, §11

20 imposes strict liability against the issuer of securities when a registration statement contains material

21 misstatements or omits material facts.  *Id.; see also Herman & McLean v. Huddleston*, 459 U.S.

22 375, 382 (1983) (liability is "virtually absolute").

23 Defendants argue that Plaintiffs' Section 11 and 12(a)(2) claims "sound in fraud" and must

24 therefore be pleaded with "particularity" under Rule 9(b).  *See* Bare Mtn. at 5-7.  They are wrong.

25 The claims asserted against those who signed the false and misleading Registration Statements sound

26 in negligence. *See also* §III.A.1 of Lead Plaintiffs' Opposition to the Underwriters' Motion to

27 Dismiss.

28

1.   **The Registration Statements Used to Conduct the Offerings Contained Materially Misleading Statements and Omissions**

The Complaint alleges the Registration Statements contained material untrue statements and omissions regarding the Company's operations, such as its marketing strategy and multi-channel distribution model, and its infomercial and related sales that were misleading because Defendants misrepresented and/or failed to disclose, among other things: (i) the Company's "premium" product image was being diluted by sales through discounters like Costco and Target; (ii) the Company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (iii) the Company's ability to continue garnering the premium "club" deal sales revenues from its direct-to-consumer infomercial and QVC sales program was diminishing as consumers refused to permit unwanted additional shipments to be billed to their credit cards – simply making their purchases through shopping mall "prestige" vendors – or, for the very cost-conscious, at Target or Costco.  ¶¶30, 57-81, 221, 223, 227, 231, 233.  Defendants, however, urge this Court to dismiss the Securities Act claims by merely suggesting contrary "facts" they urge the Court can weigh against the Complaint's allegations in determining, ***as a matter of law***, the challenged misstatements were not false.  Defendants' suggestions that the Complaint's allegations are lacking because they are not authenticated by their own earnings restatement, lack trial-level proof or are not sufficiently corroborated by confidential witnesses are similarly misdirected.  Where Plaintiffs adequately allege specific misrepresentations and omissions contained in the Registration Statements and Prospectuses, and further allege how those misrepresentations and omissions were misleading, "[n]othing more is required."  *In re Exodus Commc'ns, Inc. Sec. Litig.,* No. C 01-2661, 2005 WL 1869289, at *13 (Aug. 5, 2005); *In re DDi Sec. Litig.,* No. CV 03-7063, 2005 WL 3090882, at *12-13 (C.D. Cal. July 21, 2005); *see also In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 268 (2nd Cir.1993).

First, even where a corporation is under no duty to disclose information, but it voluntarily undertakes to make a public statement that is reasonably calculated to influence the investing public, such a statement may not be "false or misleading or ... so incomplete as to mislead."  *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2nd Cir.1968).  Thus, "'a duty to ***speak the full truth*** arises

1    when the defendant undertakes to say anything.'" *Schaffer v Evolving Sys., Inc.*, 29 F. Supp. 2d

2    1213, 1221 (D. Colo. 1998).  *See* Plaintiffs' detailed allegations of affirmative falsity at ¶¶58-70 and

3    73-80.

4         Second, in the context of a public offering, there is a strong affirmative duty of disclosure.

5    *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976) (the Securities Act "was designed to

6    provide investors with full disclosure of material information concerning public offerings").  The

7    preparation of a registration statement embodies nothing if not an affirmative duty to disclose a

8    broad range of material information.  *Huddleston,* 459 U.S. at 381-82.  Section 11 is "intended to

9    ensure that issuers, under pain of civil liability, not cut corners in preparing registration statements

10   and that they ***disclose all material information*** required by the applicable statutes and regulations."

11   *Id.  See also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1204 (1st Cir. 1996); *Huddleston*, 459 U.S.

12   at 381-82.  Accordingly, the federal securities laws, and the SEC rules adopted pursuant thereto,

13   impose specific disclosure obligations on issuers and those directors of an issuer who sign a

14   registration statement.  SEC Regulation C, Rule 404 requires that an issuer provide all information

15   called for in the "General Instructions" to the Form  S-1 Registration Statement, which is the form

16   used by Defendants herein.   "Part 1 - Information Required in Prospectus," of the "General

17   Instructions," in turn, lists numerous disclosures required under SEC Regulation S-K.  Some of the

18   disclosures which Defendants were required to make pursuant to Regulation S-K were:

19       •   Item 11(h) of the "General Instructions" requires compliance with Reg S-K
             §303(a)(3)(i), which mandates that a registrant "***describe any…significant***
20           ***components of revenues … that … should be described in order to understand the***
             ***registrant's results of operations"*** and §303(a)(3)(ii), which mandates that a
21           registrant "***describe any known trends or uncertainties that have had or that the***
             ***registrant reasonably expects will have a material favorable or unfavorable impact***
22           ***on net sales or revenues or income from continuing operations***."  Plaintiffs have
             alleged, notwithstanding the requirement imposed upon Defendants to disclose such
23           trends, Defendants failed to disclose the self-cannibalizing effect Bare's rampant
             store openings were having on sales, "premium" product image dilution through
24           sales to big-box discounters Target and Costco, failing efforts to revitalize
             infomercial sales and to cross-sell, and heavy reliance on an negative option sales
25           program that could not provide long-term, consistent sales ¶¶30, 57-81, 221, 223,
             227, 231, 233.

26       •   Item 11(a) of the "General Instructions" requires compliance with Reg S-K §101,
27           which mandates a detailed description of an issuer's business.  For instance, Item
             101(c)(i) required Defendants to include a detailed description of Bare's "principal
28           products and services," including the "***methods of distribution of, the segment's***

*principal products and services*." Here, Plaintiffs have alleged that (i) at the time of the IPO and the March Offering, Bare was in violation of its exclusivity agreement with QVC and was shipping to distributors who instead were selling its product at Costco and Target. ¶¶7-18, 63, 65-67. Plaintiffs also allege Bare was relying on a negative option sales program that provided unreliable sales revenues. ¶¶18-19, 74, 79-80. Plaintiffs also allege Bare was opening stores at a breakneck pace that exceeded the number of planned store openings disclosed in the prospectus and was resulting in unchecked cannibalization of its QVC and infomercial sales. ¶¶20-21, 59-61, 64, 77-78. None of this was disclosed in the Registration Statements. Thus, the Complaint properly alleges material facts which Defendants were required to include in the Registration Statements.

- Item 101(c)(iv) also requires specific disclosure of the "importance…of all…licenses, franchise and concessions held." Plaintiffs specifically allege that at the time of the IPO and March Offering, Bare was covertly distributing product through non-prestige distributors, sales that both violated its agreement with QVC and denigrated its premium mantra. ¶¶63, 65-67, 74, 79-80. Defendants counter that "[s]ince October 2005, Bare's sales policy, as publicly disclosed on its website," only permitted sales to "authorized accounts that promote Bare's 'premium brand image' and that distributors who violate this policy "[would] not receive future shipments.'"

Third, even in the absence of misstatements or a statutory duty to disclose, a registration statement must include all statements necessary to prevent the statements made therein from being misleading. "A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *Time Warner*, 9 F.3d at 268. Thus, where a registration statement discusses some aspect of the issuers' business, "the question presented is whether that discussion omitted to state material facts necessary to make the statements therein not misleading; not whether, considered in the abstract, there was an obligation to disclose those facts at that time." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 735 (2nd Cir. 1987).

Thus, it cannot be denied that Bare and the Securities Act Defendants had a duty to be honest and truthful in the Registration Statements – *a duty they failed to uphold*.

  a.  **The Registration Statements Misstated Bare's Adherence to Its Purportedly Iron-Clad "Premium Sales" Restrictions**

The Complaint alleges that despite Bare's claimed adherence to premium sales channel restrictions described in the Registration Statements, "at the time of its IPO in September 2006, Bare Escentuals was not in compliance with the spirit, much less the word, of its QVC exclusivity agreement," filed *in toto* as an attachment to the IPO Registration Statement. ¶¶6-11. "In fact, though Bare Escentuals repeatedly touted in the IPO Registration Statement/Prospectus and

1   thereafter that its sales model and its 'multi-channel distribution strategy provide[d] for greater

2   consumer diversity, reach and convenience while reinforcing the authenticity and premium image of

3   [the Company's] brands,' Defendants concealed, at the time of the IPO, that Bare Escentuals product

4   the Company itself had put into the chain of commerce through distributors was being prepared for

5   resale at big-box discounters Costco and Target for the 2006 Christmas season." *Id.* "Defendants

6   also knew at some point before the Fall of 2007 that their products were being sold on Target's

7   website." *Id.* By January 2007, Bare would, as required by the QVC agreement, file suit in federal

8   court against Costco.  ¶12.  The Company characterized the litigation (in pleadings) as involving

9   "100,000 high-end cosmetic kits that Costco purchased from a third party ***for millions of dollars***"

10   that had been repackaged for sale in December 2006 "at substantial discounts to the prices Bare

11   Escentuals, QVC and its other 'prestige' wholesalers were charging." *Id.*  Still, the Registration

12   Statements made absolutely no mention of Bare's sales to overseas distributors who were selling its

13   product back to Target and Costco.  ¶¶7-17, 63, 65-67, 74, 79-80.

14   Complaint ¶¶63, 65-67, 74, 79-80 allege direct misstatements.  As these were "untrue

15   statement[(s)] of a material fact," they are actionable under §11.  *See* 15 U.S.C. §77k(a); *see also*

16   *Huddleston*, 459 U.S. at 381-82 ("Section 11 of the 1933 Act ... was designed to assure compliance

17   with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on

18   the parties who play a direct role in a registered offering.").  Moreover, beyond the direct

19   misstatements concerning the Costco and Target sales, their nondisclosure was a material omission.

20   *See TSC Indus.*, 426 U.S. at 449-50 (while a material fact is one of which "there must be a

21   substantial likelihood that the disclosure of the omitted fact would have been viewed by the

22   reasonable investor as having significantly altered the 'total mix' of information made available,"

23   "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor

24   that reasonable minds cannot differ on the question of materiality is it appropriate for the district

25   court to rule that the allegations are inactionable as a matter of law.'"  *Weiner v. Quaker Oats Co.*,

26   129 F.3d 310, 317 (3rd Cir. 1997).

27   Notably, the Bare Defendants do not disclaim falsity; instead they appear to argue lack of

28   materiality.  *See* Bare Mtn. at12 ("Bare's premium image was not harmed by a single distributor who

1   diverted immaterial amounts of Product to Costco and Target."). While "harm" to Bare's "premium

2   image" is a disputed matter of fact that is not amenable to resolution on a Rule 12(b)(6) motion to

3   dismiss, the Complaint's allegations expressly allege "harm," an allegation the Bare Defendants

4   wholly ignore. *See* ¶12 (directly citing Bare in its own filings in federal court in the *Costco* litigation

5   "explicitly aver[ing] … that 'Bare Escentuals ha[d] invested substantial time and money in

6   developing, marketing, and selling its products, and in its reputation and goodwill,' and that

7   'Costco's unauthorized actions **have resulted or will result in harm to Bare Escentuals' sales,**

8   **brand name, market reputation, and goodwill**'"). *Id.* Plaintiffs also allege (supported by

9   statements from Bare's former Director of Production) that it was known within Bare where at least

10  one such Target order was destined and that the product was being "filled toward the end of the

11  quarter" in order to meet unmet sales quotas, and to increase reported revenues. ¶13. Plaintiffs also

12  allege the practices "dramatically dilute[d] Bare Escentuals' pricing power," eventually requiring

13  Bare to slash prices to match Target's and Costco's, causing prestige distributors to "dramatically

14  slash their orders," resulting in sales declines and costly inventory buildups at these retailers, and

15  caused Bare to experience diminished sales from its internet site. ¶¶7-17.

16       The Bare Defendants' other arguments that the Complaint's allegations require additional

17  corroborating witness testimony, more specifics as to the "amounts involved" and lost sales, and that

18  Plaintiffs must overcome their claim that "Bare's premium image [did not] suffer[] at all because of

19  this minimal product diversion," are similarly misplaced. Bare Mtn. at 13. The Complaint's

20  allegations far exceed the applicable Rule 8(a) standards. The assertion that the Court can rule as a

21  matter of law that Bare's premium image was not harmed because the Company won "a 'Glammy

22  Award,' voted on by readers of Glamour Magazine" borders on the absurd. *Id.* at 12-13. Not only

23  would crediting Defendants' bald assertion that "Bare's strong growth and increasing earnings

24  would not have occurred if Bare was undercutting its premium image and retail pricing strategy"

25  (*Id.* at 13) require the Court to improperly consider assertions that conflict with the Complaint's

26  allegations, it would require the Court to improperly resolve conflicted issues of fact on a Rule

27  12(b)(6) motion to dismiss.

28

b.   **The Registration Statements Concealed Bare's Reliance on Its "Negative Option" Sales Program**

The Complaint alleges that Bare's sales were heavily reliant upon "club" sales where customers who placed single orders would be repeatedly shipped – and their credit cards repeatedly billed for – additional unwanted "small but costly shipments." ¶¶18-19.  The Complaint alleges that "[s]uch automatically recurring credit card transactions are notoriously easy to start but nearly impossible to stop." *Id.*  The Complaint alleges that while this allowed Bare to "capture, obtain and report several years worth of phenomenal premium sales employing this guise leading up to its September 2006 IPO, not only would the repeat sales these tactics generated grow lean in the period following the IPO and the follow-on offerings, the Company would be forced to refund previously recognized sales and many would-be direct-to-consumer sales customers became brick-and-mortar shoppers instead," and indeed, "in the two years following the Company's IPO, the Company's so-called direct-to-consumer sales plummeted from $179 million in FY 2006, representing 45.6% of all sales, to $170 million in FY 2008, representing just 30.6% all sales." *Id.*

Instead of disclosing the impact the practices were having on sales, the growing harm to Bare's reputation with customers and the potential liability associated with such practices (both in terms of customer refunds and regulatory risk), the Complaint alleges that the Registration Statements falsely described Bare's "infomercial continuity program" as offering "Competitive Strengths" that generated "brand loyalty and enthusiasm for [Bare's] products," and "position[ed] [Bare] for continued, sustainable growth in the future." ¶¶62, 73.

The Bare Defendants challenge the Complaint's specificity claiming, among other things, that the Complaint fails to allege "how many customers were ***members***" at any given time.  Bare Mtn. at 10-11. Yet Defendants do not attempt to argue this does not meet Rule 8(a) standards – they allege it fails to comply with Rule 9(b)'s and the PSLRA's heightened pleading standards, which it does, but need not have for purposes of this allegation.

The Bare Defendants also claim "Plaintiffs do not allege that there was anything improper with the club program under applicable consumer protection laws, and there are no allegations that Bare's club program was ever investigated by any governmental agency." *Id.*  Wrong.  Complaint

1   ¶¶177-79 definitely challenge the materiality and the propriety of the sales.  The "Better Business

2   Bureau" may not be a "governmental agency," but it definitely investigated and reported

3   wrongdoing.  ¶177.  Defendants' claims that none of Plaintiffs' allegations challenge the "overall

4   performance of Bare's club program" both misstates the Complaint's allegations and misses the

5   point.  Bare Mtn. at 12; *see gen.* ¶177 ("Once the Better Business Bureau and internet bloggers

6   educated consumers about the pitfalls of Bare Escentuals mandated 'club' sales programs, including

7   that the same consumers could simply make their purchases *in a store* to avoid the automated credit

8   card charges, the Company's infomercial sales would plummet.").  Defendants do not seriously

9   contend the sales did not "plummet," they just opportunistically blame the "worst global economic

10  recession since the 1930s" for the reversals from Bare's pre-IPO stellar sales and earnings reports.

11  Bare Mtn. at 2.  This directly (and implausibly) conflicts with the Complaint's well-pled – graphical

12  – allegations demonstrating that Bare's stock price declines were "due to Company-specific

13  misstatements as the S&P 500 Index fell only approximately 30% during this period and stock of

14  [competitors] Estée Lauder…fell *less than 15%* and Proctor & Gamble…*did not decline at all,*

15  while Bare Escentuals fell almost *90%*."  ¶32.

16      Moreover, though the Complaint's allegations of improper sales practices, customer unrest

17  and Bare's resulting diminishing sales more than adequately meet Rule 8(a)'s "short and plain

18  statement" requirements, just to demonstrate how disingenuous the Bare Defendants' arguments are,

19  Plaintiffs are submitting a copy of pleadings filed by a Bare competitor in a false advertising and

20  unfair competition dispute – just two months ago – which allege that "[i]n the months leading up to

21  [Bare's] [IPO], its sales rose to more than $394.5 million," from $250 million the previous year,

22  largely attributable to club sales.[8] *Id.* at 22.  Yet, claimant alleges that "[w]hile [Bare] has achieved

23

24

25  [8]      *See Bare Escentuals, Inc. v. Intelligent Beauty LLC*, No. 09cv382, Defendant Intelligent
    Beauty LLC's First Amended Answer and Counterclaim to Plaintiff's First Amended Complaint,

26  (N.D. Cal. Feb. 2, 2010) (Ex. B).  The Court can take judicial notice of the *Intelligent Beauty*
    complaint and related pleadings for the limited purpose of rebutting the Bare Defendants' false claim

27  that the negative option sales program's *bona fides* have never been challenged.  *See, e.g., St. Louis
    Baptist Temple, Inc. v. Federal Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("it has

28  been held that federal courts, in appropriate circumstances, may take notice of proceedings in other

1   impressive sales through its Direct to Consumer segment over the past ten years, it turns out that

2   such impressive sales have been obtained…in substantial part through what amounts to a systemic,

3   false and misleading advertising and marketing scheme." *Id.*  The claimant also alleges that "as part

4   of the 'Get Started Kits' in the channels of distribution owned or controlled by the company,

5   customers are required to enroll in the 'exclusive' bareminerals club – a 'negative option' continuity

6   program whereby customers are automatically shipped and charged for mineral-based makeup

7   products during regular intervals," pursuant to "marketing, promotion and sale[s]" practices "replete

8   with false and misleading 'value' claims." *Id.* at 23.  Specifically, the sales pitch is that club

9   members "***Save over 70!***" on their purchases, receiving a "$210 value for only $59.98." *Id.* at 24.

10  According to the claimant, "represented percentage and absolute dollar savings are materially false,"

11  accusing Bare of failing "to disclose to consumers anywhere on its website that many of the products

12  in the kit are significantly smaller than what is available at retail." *Id.*  The claimant also accuses

13  Bare of falsely claiming "club" members will obtain additional savings by shipping small quantities

14  of expensive product sold at far above retail prices. *Id.* at 25.  Discovery was taken in the case

15  recently, ***immediately preceding entry into a confidential settlement***, and according to a letter filed

16  with the court in that action by Bare's counsel in that case, by that point in time, ***"BE ha[d] reviewed***

17  ***and produced nearly 80,000 pages of consumer communications" purportedly addressing***

18  ***customer complaints related to the negative option program.***[9]

19          Complaint ¶¶59, 62, and 73 allege direct misstatements touting the "brand loyalty" and

20  "enthusiasm" for the negative option sales program.  These were "untrue statement[(s)] of a material

21  fact" and they are actionable under §11.  *See* 15 U.S.C. §77k(a); *see also  Hanon v. Dataproducts*

22  *Corp.,* 976 F. 2d 497, 504 (9th Cir. 1992).

23

24

_____

25  courts, both within and without the federal judicial system, if those proceedings have a direct relation

26  to matters at issue").

27  [9]      *See* Feb. 18, 2010 letter from Bryan Cave LLP to Magistrate Judge Joseph C. Spero, filed in
    N.D. Cal. 3:09-cv-00382-CRB.  Ex. C.

28

1    Moreover, by not disclosing the Company's past and current reliance on the lucrative

2    negative option sales in the Registration Statements, ***sales that could not last indefinitely***,

3    Defendants violated Section 11.  As discussed above, Bare was required to comply with Regulation

4    S-K 303, which required Defendants to disclose any "known trends or uncertainties."  *See Shaw*, 82

5    F.3d at 1205.  The Ninth Circuit has held that because Section 11 imposes liability if a registrant

6    "omits to state a material fact required to be stated" in the registration statement, "any omission of

7    facts 'required to be stated' under Item 303 will produce liability under Section 11."  *Steckman v.*

8    *Hart Brewing Inc.,* 143 F.3d 1293, 1296 (9th Cir. 1998). Because "[t]he existence of a material

9    omission is usually a question for the trier of fact," securities fraud claims should not be dismissed

10   for failure to plead that element unless the court can "say that as a matter of law the complaint fails

11   to raise a reasonable inference that [there] was a material omission."  *Miss. Pub. Employees' Ret.*

12   *Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 87 (1st Cir. 2008).

13           c.    **The Registration Statements Misstated the Success of Bare's Efforts to**
                    **Cross-Sell Non-Foundation Products**
14
15           The Complaint directly challenges the Registration Statements' purportedly ***then-current***

16   statements that "[t]o date, [Bare had] ***demonstrated success in cross-selling [its] non-foundation***

     ***products*** in channels where [it] interact[ed] directly with consumers, such as in our boutiques and on

17   home shopping television" were false and misleading because, as would later be revealed, the cross-

18   selling efforts had never gotten off the ground.  ¶¶68, 76.  According to the Complaint's allegations,

19   Bare's President of Retail expressly conceded on October 30, 2008 that "the Company had tried and

20   failed" with cross-selling and "attempts to broaden its offerings into related cosmetic categories."

21   ¶¶172, 197.  These allegations contained "representation[s] of present fact," which, as the *Shaw*

22   court recognized, can give rise to a duty to disclose.  *Id.,* 82 F.3d at 1213;

23           Notably, the Bare Defendants do not bother to challenge whether these falsity allegations

24   state a cognizable claim as a matter of law – instead moving directly into attempting to prove with

25   materials outside the Complaint (that have not been properly authenticated, much less been subjected

26   to examination) that the allegations are false, which is inappropriate at this stage, ***and that to the***

27

28

1   *extent cross-selling did fail*, the Company's boilerplate risk disclosure warned these efforts might be

2   unsuccessful.  Bare Mtn at 10.

3   　　　As the Fifth Circuit has observed, however: "To warn that the untoward may occur when the

4   event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen

5   when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544

6   (5th Cir. 1981) (*rev'd on other grounds, Huddleston,* 459 U.S. 375, 103 (1983)).  The bespeaks

7   caution doctrine provides [the] basis for dismissal "as a matter of law only when reasonable minds

8   could not disagree as to whether the *mix* of information in the document is misleading.'" *Fecht v.*

9   *Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis in original).[10]

10　　　　　**d.　　The Registration Statements Misrepresented the Ongoing**
　　　　　　　　　　**Cannibalization of Bare's Sales that the Rampant Store Expansion**
11　　　　　　　　　　**Caused**

12   　　　The Complaint challenges the Registration Statements' characterization of its rapid store

13   expansion as "[a] core element of [the Company's] success." ¶¶59-61, 75, 77-78.  It also alleges that

14   that stated "opportunities" of "open[ing] additional domestic boutiques" conflicted with statements

15   touting Bare's ability to concomitantly "continue to grow[] infomercial sales." *Id.*  Significantly, the

16   Complaint alleges all of this transpired while *"absolutely no effort was being made internally to*

17   *coordinate the multiple competing sales spots that were popping up –* including multiple competing

18   sales outlets in single shopping malls." *Id.*  For instance, the IPO Registration Statement stated only

19   twelve new stores would be opened in 2007 – but 21 were opened.  *Id.*  As of December 28, 2008,

20   the number of "premium wholesale locations" grew to 795.  ¶78 As a result, the Complaint alleges

21   the over-paced store openings were "rapidly cannibalizing sales" from other channels.  ¶¶59-61, 75,

22   77-78.  When the Company disclosed on October 30, 2008 its 3Q 08 sales growth had declined, that

23

24   [10]   　　Not only have the Courts taken this position – the SEC does too.  *See* Securities & Exchange
25   Commission, *Amicus Curiae* Brief, *Slayton v. Am. Express Co.*, No. 08-5442-cv (2nd Cir. Jan. 21,
　　2010) (Ex. D) ("This cautionary language was not 'meaningful' under the safe harbor since,
26   according to plaintiffs' allegations, which must be taken as true on a motion to dismiss, at the time
　　that defendants were warning of potential deterioration in the high yield sector, they were aware that
27   such deterioration was actually occurring.  *It is misleading and therefore insufficient for a*
　　*company to warn of a potentiality that it is aware currently exists."*).

28

1   it missed its own 3Q 08 financial guidance and was cutting its full-year FY 08 forecast, Defendants

2   disclosed they were slashing "Get Started Kit" prices from $60 and $15 and would have to

3   workdown a 53% year-over-year inventory increase that had built up at key retailers, one analyst

4   specifically commented that "infomercial sales declined a disappointing 21%" and that "growth in

5   other channels may cannibalize infomercial sales…given how much more accessible the product is

6   becoming at retail." ¶195.  "On this news, the Company's stock price plummeted 39% to a new

7   lifetime low of $4.19 per share … ."  *Id.*

8          The Bare Defendants again avoid arguing that the claims are not cognizable as a matter of

9   law, and instead proffer contradictory factual propositions of their own: "Plaintiffs' allegation …

10   fails because the business model proved to be a great success" and averring that "boutiques were

11   three to four times more profitable," again improperly asking this Court to credit and weigh "facts"

12   not present in the four corners of the Complaint or incorporated therein by reference for the truth of

13   the matter asserted and to make contested factual findings in their favor. *See* Bare Mtn. at 9-10; *see*

14   *In re Glen Fed, Inc. Sec. Litig.*, 11 F.3d 843, 848 (9th Cir. 1993).

15          Defendants also proffer that even if the massive store build-out did cannibalize sales, "Bare

16   was forthright about this risk, stating that its goal was to distribute through as many channels as

17   feasible to increase brand awareness and gain market share" and that the "risk of cannibalization was

18   factored into its growth plans."  Bare Mtn. at 10.  Defendants "bear a heavy burden of proof" in

19   order to prevail on a truth-on-the-market defense.  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir.

20   1996).  The question "whether adverse facts were adequately disclosed is a mixed question to be

21   decided by the trier of fact," and can be resolved at the pleading stage only where the adequacy of

22   the disclosure is "'so obvious that reasonable minds [could] not differ.'"  *Fecht*, 70 F.3d at 1081.

23   The adequacy of Defendants' proffered counterbalancing disclosures is far from obvious.

24   **B.      The Securities Act Defendants' "Seller Status" Is Adequately Alleged**

25          The Bare Defendants speciously contend they are not §12(a)(2) "sellers" because the

26   Offerings were conducted under "firm commitment underwriting," despite that Bare Escentuals sold

27   more than $400 million worth of its common stock pursuant to the IPO (¶¶29, 71) and the Company

28   and several Bare Defendants reaped more than $476 million in the March 2007 Offering.  *See* Bare

1   Mtn. at 15-17 and ¶¶72, 81.  Not only have courts overwhelmingly rejected this argument, the SEC

2   has too. 70 Fed. Reg. 44722-01 at 44769 (Aug. 3, 2005); *see also Pinter v. Dahl*, 486 U.S. 622, 647

3   (1988) (a "seller" of a security can be a person who *either* "passes title" to the securities to the

4   plaintiff, *or* "solicits the purchase, motivated at least in part by a desire to serve his own financial

5   interests or those of the securities owner."); *Daou*, 411 F.3d at 1029 (same).  Defendants' combined

6   actions clearly plead "solicitor seller" status.  *See* ¶¶38-39, 41-47, 56(c-d), 232 (Bare Defendants

7   solicited the purchase of Bare common stock by planning the Offerings, drafting, executing and

8   disseminating the defective Prospectus) and ¶56(a) (Blodgett and McCormick participated in a

9   multi-city road show prior to the Offerings during which they met with potential investors and

10  presented highly favorable information about the Company and its sales model); ¶¶29, 71, 72, 81

11  (the Bare Defendants were motivated to solicit purchasers where the Company raised $404.8 million

12  in the IPO and the Company *and several Individual Defendants* reaped more than $476 million in

13  the March 2007 follow-on offering) (*see In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp.

14  2d 741, 761 (S.D.N.Y. 2001) ("that these Individual Defendants stood to gain more than $30 million

15  in capital from the Secondary Offering - is sufficient" to show they were motivated by financial gain

16  for purposes of §12(a)(2)); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3rd Cir. 1996);

17  *In re OPUS36O Corp. Sec. Litig.*, No. 01 Civ. 2938, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2,

18  2002) (issuers *and their officers and directors* may be liable as "solicitor sellers" in the "firm

19  commitment underwriting" context).

20       Drawing all inferences in Plaintiffs' favor, the Complaint satisfactorily alleges the Bare

21  Defendants are liable as solicitor sellers under §12(a)(2).

22       **C.       Loss Causation is an Affirmative Defense that Must be Pled and Proved**

23       As the *Countrywide Sec.* court explained, "Loss causation is not a §11 element."  588

24  F. Supp. 2d at 1170; *see also Levine v. AtriCure, Inc.*, 508 F.Supp.2d 268, 272 (S.D.N.Y. 2007).

25  Rather, "§11(e) makes the absence of loss causation [or "negative causation"] an affirmative defense

26  to reduce or avoid liability under §11."  *Id.; see also Levine*, 508 F. Supp. 2d at 272.  "'Because an

27  analysis of causation is often fact-intensive, negative causation is generally established by a

28  defendant on a motion for summary judgment or at trial.'"  *Id..*  Only "where the face of the

1  complaint or judicially noticeable facts demonstrate that the plaintiff cannot establish loss causation"

2  is "12(b)(6) dismissal … appropriate." *Id.* Where, as here, there are "many alleged misstatements of

3  varying substance over such a long period of time, it is all but certain that some corrective

4  information leaked into the market," leading to "explanations" that also turn out to be false. *Id.*

5  Under these circumstances, "negative causation" requires resolution of contested factual disputes

6  and cannot be resolved on the pleadings. *Id.*

7  **IV.      PLAINTIFFS STATE ACTIONABLE EXCHANGE ACT CLAIMS**

8  Section 10(b) of the Exchange Act and SEC Rule 10b-5 make it unlawful for any person to:

9  (1) to engage in fraud, (2) to make an untrue statement regarding a material fact or (3) to make a

10  misleading statement by omitting a material fact, in connection with the purchase or sale of any

11  security.  15 USC §78j(b); 17 CFR §240.10b-5.  To state a claim under §10(b), Plaintiffs must

12  allege: "'(1) a material misrepresentation or omission of fact [falsity], (2) scienter, (3) a connection

13  with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.'"

14  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  ***Defendants only challenge***

15  ***falsity, scienter and loss causation (as to their statements in the Registration Statements),***

16  ***conceding the sufficiency of the remaining elements of the claim.*** *See* Fed. R. Civ. P. 12(h)(2).[11]

17  **A.      The Complaint Alleges Material Misstatements with Particularity**

18  Rules 8(a), 9(b) and the PSLRA apply and require that a plaintiff plead the falsity of a

19  defendant's misrepresentations by "specify[ing] each statement alleged to have been misleading"

20  and "the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B);

21  Fed. R. Civ. P. 8 and 9.  Plaintiffs more than adequately satisfy this standard, as discussed below.

22  Since Defendants are unable to credibly challenge the sufficiency of Plaintiffs' claims, they instead

23

24  [11]      Like the Underwriter Defendants (who are only named in the Securities Act claims), the Bare
25  Defendants only challenge loss causation to the extent the claims are based on the offering
documents addressed at §III.A. *See* Bare Mtn. at 15 n.2.  Defendants have waived any loss causation
26  challenge as to other misrepresentations alleged in the §10(b) claim.  Fed. R. Civ. P. 12(h)(2).
Moreover, as the Exchange Act claims offer a two-year statute of limitations, the Bare Defendants
27  do not come even close to carrying their extraordinary burden of proving on the pleadings Plaintiffs'
Exchange Act claims are time-barred.

28

LEAD PLAINTIFFS' OPP. TO BARE ESCENTUALS DEFENDANTS' MOTION TO DISMISS

20

1    impermissibly resort to ***challenging the truth*** of Plaintiffs' allegations.  Defendants improperly

2    attempt to introduce mounds of materials that are neither incorporated in the Complaint nor subject

3    to judicial notice for the "truth of the matter," attempting to ***prove challenged misstatements true***,

4    including claiming that this Company that drastically underperformed in the market during the Class

5    Period was actually a huge "success," in what can only be described as naked ambition to get their

6    "innocent explanations" before the Court.  Bare Mtn. at 1, 4, 8-10, 12, 19-23; ¶¶31-32.  Respectfully,

7    the Court cannot credit facts Defendants cherry pick from various sundry sources outside the four

8    corners of the Complaint in order to permit Defendants to recast the Complaint's allegations as

9    strawmen.

10          First, as argued in Plaintiffs' Motion to Strike filed concurrently herewith, the Court cannot

11   consider ***disputed facts at all*** under Defendants' proffered guise of judicial notice.  *Lee*, 250 F.3d at

12   690 (courts may judicially notice "***undisputed*** matters of public record," but not "***disputed*** facts

13   stated in public records.")  (emphasis in original).  Second, the U.S. Supreme Court's *Ashcroft v.*

14   *Iqbal*, 129 S. Ct. 1937 (2009) simply did not abandon wholesale the Federal Rules of Civil

15   Procedure in favor of a free-for-all where Rule 12(b)(6) operates as a pre-discovery summary

16   judgment motion – and the Court chooses between the Complaint's allegations and some "more

17   plausible" version of the facts Defendants attempt to concoct.  *Iqbal*, 129 S. Ct. at 1949.  While both

18   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Iqbal* hold that "a complaint must contain

19   sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,'" this

20   "standard is not akin to a 'probability requirement.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*,

21   550 U.S. at 570).  At most, then, the cases simply require that if the facts ***alleged in a complaint***

22   could support either an inference of wrongdoing or an "'obvious alternative explanation'" then the

23   plausibility standard requires the court to choose the "obvious alternative explanation."  *Iqbal*, 129 S.

24   Ct. at 1951-52.  Here, as explained *infra* at §III.A, Plaintiffs' factual allegations do not make

25   "obvious" the "alternative explanation" advanced by the Defendants, *i.e.*, that at the time of the IPO

26   and throughout the Class Period they truly believed Bare had long-term potential as a viable publicly

27   traded company.  Third, the Bare Defendants' attempt to create a new legal standard whereby

28   Plaintiffs' scienter pleading burden is "heightened" because of the absence of a restatement is not the

1  law and must be rejected. Bare Mtn. at 2, 15.  *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926-27

2  (9th Cir. 1993) (sustaining allegations that reserves were understated without restatement).

### 1.  Defendants' Additional Class Period Misstatements

4  In addition to the four misstatements detailed above in §III.A *infra* (*i.e.* ¶134 (h-k)), Plaintiffs

5  allege a variety of misstatements (or omissions) the Exchange Act Defendants made (or failed to

6  make) during the Class Period falsely touting the strength of the Company's sales and distribution

7  model that were false and misleading when made. *See* ¶134.  It would be impossible to meaningfully

8  summarize the 100+ page Complaint here in order to outline every Class Period misstatement, but as

9  a sampling, Plaintiffs will detail the Class Period -demise of Bare Escentuals' infomercial business.

10  The Complaint alleges at ¶60 that the IPO Registration Statement, at ¶¶75, 77 that the March

11  2007 Registration Statement, and at ¶¶86, 90 that the June 2007 Registration Statement expressly

12  stated that as part of Bare's "Growth Strategy," Bare still believed it probable that it could ***further***

13  ***penetrate*** each of its multiple distribution channels, including growing infomercial sales.  The

14  Complaint also alleges that each of the Bare Defendants (except Miles, Rose and Senk) signed and

15  caused to be issued the IPO, March 2007 and June 2007 Registration Statements, and thus, are

16  culpable for their misstatements.  ¶¶38-39, 41-45.  On February 28, 2007, President of Wholesale

17  Sales, Diane Miles, added "[w]ith regards to the Company's infomercial business" that Defendants

18  were "***very comfortable with our existing on-air presence and thus, we anticipate modest growth***

19  ***in 2007 with emphasis upon growing internet and improving continuity in this channel***" and that

20  ***"with the continuity, that's consistently growing as we increase the number of customers on our***

21  ***database."*** ¶136.

### B.  The Complaint Also Raises a Strong Inference of Scienter

23  In the Ninth Circuit, a strong inference of scienter is plead by alleging defendants acted either

24  intentionally or with deliberate recklessness.[12] *Daou*, 411 F.3d at 1022.  In addition to the

---

26  [12]  The U.S. Supreme Court's recent decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
27  551 U.S. 308 (2007), specifically addressed the analysis of scienter under the PSLRA.  The Court
reaffirmed that it had "long recognized that meritorious private actions to enforce federal antifraud
28  securities laws are an essential supplement to criminal prosecutions and civil enforcement actions"

Defendants' stock sales detailed below, Defendants' scienter has been established by showing "an

extreme departure from the standards of ordinary care, and which presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it." *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003).[13]

### 1. The Complaint Alleges the Bare Defendants' Integral Involvement in Bare's "Core Operations"

As alleged with specificity in the Complaint, each of the Bare Defendants was a key player –

either an officer of Bare with day-to-day, hands-on responsibilities, or a principal of the private

equity firms that were managing Bare at the time of the IPO.  In addition to being intimately

knowledgeable of "hot button" issues like sales of Bare products at big-box discounters and rampant

customer complaints (and refund demands) arising out of the "club" sales program, the Complaint

also alleges the Exchange Act Defendants knew (or were reckless in not knowing) that Bare's

infomercials were not performing to internal expectations.  ¶134(a).  Each of the Exchange Act

Defendants is alleged to be "intimately knowledgeable about all aspects of Bare Escentuals' business

operations," to have "access to regular reports regarding sales through all channels, accounts

---

brought by the DOJ and the SEC. *Id.* at 313.  With that goal in mind, the Court set out three "prescriptions." *Id.*  First, that courts must "accept all factual allegations in the complaint as true." *Id.* at 322.  Second, that "courts must consider the complaint *in its entirety*" and consider "whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.  And third, when evaluating a defendant's scienter, courts must consider whether an inference of scienter is "cogent" and "at least as likely as" – *but not more likely than* – "any plausible opposing inference." *Id.* "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, *or even the 'most plausible of competing inferences.*'" *Id.* at 324.  Rather, a strong inference exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

[13]    Instead of addressing the Complaint's cogent scienter allegations, Defendants proffer strawmen versions of the facts they believe are easier to topple.  Plaintiffs' Motion to Strike challenges the worst of these offenses.  While the Ninth Circuit requires that "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all reasonable inferences to be drawn from the allegations*, including inferences unfavorable to the plaintiffs," that does not authorize the fabrication of a completely contrary set of new "facts" for the Court to consider in the pre-discovery stages. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). Defendants' request that the Court do so here speaks volumes about their apparent inability to proffer a cogent argument why the facts actually pled are not cognizable. *Lee*, 250 F.3d at 689-90; *Petco*, 2005 WL 5957816, at *3.

receivable, inventory and demand," to be "intimately involved in the preparation of Bare Escentuals'

financial statements and guidance, including the amounts of inventory, the performance of various

sales channels, what disclosures would be made, and the functioning of Bare Escentuals' internal

financial, accounting and disclosure controls," to be "intimately involved in and fully aware of the

sales of Bare Escentuals' products at Costco and Target during the Class Period."[14]  In short, the

Complaint alleges dire problems with Bare's core sales and distribution operations.

## 2. The Complaint Alleges the Selling Defendants Violated §10(b) and Rule 10b-5 by Trading on Material, Non-Public Information

Insider trading can serve as an independent violation of §10(b).  *U.S. v. O'Hagan*, 521 U.S.

642, 651-52 (1997); *Petco*, 2005 WL 5957816, at *9.  For an insider trading violation, a plaintiff

need only allege that defendants possessed (and failed to disclose) material inside information before

trading.  *Johnson v. Alijan,*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778

(9th Cir. 2007); *S.E.C. v. Adler*, 137 F.3d 1325, 1337-39 (11th Cir.).  "A purchase or sale of a

security of an issuer is 'on the basis of' material nonpublic information about that security or issuer

if the person making the purchase or sale was aware of the material nonpublic information when the

person made the purchase or sale." 17 C.F.R. §240.10b-5-1(b). "Scienter is an element of … insider

---

[14]     The Ninth Circuit has repeatedly held that allegations regarding fraud in a company's "core business" operations, like Bare's infomercial business, are sufficient to plead scienter. *In Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), the Ninth Circuit recently reiterated its holding in America West that courts may infer that high-level managers knew about problems and customer cancellations in a company's core business operations. *Id.* at 987. As in *Applied Signal*, it is "absurd to suggest" that Bare's top executives would have been unaware of problems in Bare's once all-important sales and distribution operations. *Id.* at 988. Here, Blodgett, McCormick and Miles are the Company's top three officers and speak repeatedly throughout the Class Period not only about the results in this channel, but directly address how specific infomercials were performing vis-à-vis others, and why – and Blodgett is the star of the infomercials. *See* ¶¶180-88, 100. To be sure, Jones and Bloom, and John and Hansen, are all directors of Bare, but they are all also managing directors of private equity funds Berkshire and JH Partners, respectively.  ¶¶41-44. Berkshire and JH Partners were early, significant investors in Bare (in fact JH Partners once owned Bare outright), operated Bare pursuant to a management agreement for long duration, and were collectively selling hundreds of millions of dollars worth of Bare stock during the Class Period. *Id.*; *see also* ¶119.  Indeed, ¶24 of the Complaint contains an October 2006 exposé by Business Week explaining that Bare was borrowing funds and selling stock between 2005-2006 primarily to turn it over to Berkshire and JH Partners.  The Complaint also alleges that Ottinger, a fifth Bare director, served as Berkshire's vice president from 1985 to 1989 and participated with Berkshire and JH Partners in Bare's 2004 recapitalization transaction.  ¶45.

1    trading, therefore, must be plead with particularity under the PSLRA." *Petco*, 2005 WL 5957816, at

2    *35.  ***The Complaint does so***.

3          There can be no doubt the selling Defendants sold stock while in possession of material, non-

4    public adverse information, almost all of which occurred in two brief periods during the March and

5    June 2007 Offerings.  ¶¶38-47 (Blodgett sold over 1.7 million shares for $58+ million, McCormick

6    sold 20,000 shares for $700+ million, Jones/Berkshire sold over 10 million shares for over $347

7    million, Bloom/Berkshire sold over 10 million shares for $347+ million, Hansen/JH Partners sold

8    over 8.8 million shares for $284+ million, John/JH Partners sold over 5 million shares for $170+

9    million and Ottinger sold over 47,000 shares for over $1.6 million).  Contrary to Defendants'

10   attempts to re-cast the Complaint's allegations more to their liking, including arguing that the over

11   hundreds of millions of dollars in stock sales by the private equity funds Jones, Bloom, Hansen and

12   John are managing partners of cannot be attributed to those Defendants, these private equity firm

13   managing directors had ***every*** incentive to make their firms profitable.[15]

14         The "relevant factors from which the court may infer an indicia of scienter are: (a) the

15   ***amount*** and percentage of shares sold by insiders; (b) the ***timing*** of the sales; and (c) whether the

16   sales were consistent with the insider's ***prior trading history***."  *Johnson*, 394 F. Supp. 2d at 1199-

17   1201.  "It is clear that courts should consider how the three factors regarding suspicious trading may

18   be interrelated."  *Id.* at 1200 n.11.  As to the first factor, "the Court considers the ***amount and***

19   ***percentage*** of the shares sold," with unusually large sales alone being indicative of scienter,

20

21   [15]     The fact that Miles did not sell does not negate a strong inference of scienter with respect to
     her, much less the other Officer Defendants.  *See Am. West*, 320 F.3d at 920 (where nine insiders
22   sold, and three others did not, court found strong inference of scienter as to insiders who sold, partly
     based on sales, and for other reasons as to the non-selling defendants); *Schlagal v. Learning Tree*
23   *Int'l*, No. CV 98-6384, 1998 WL 1144581, at *17 (C.D. Cal. Dec. 23, 1998) (absence of insider
     selling by CFO did not negate scienter); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th
24   Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell . . . that they
     lacked motive to defraud investors."); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149,
25   1165 (C.D. Cal. 2004) ("lack of stock sales by a defendant is not dispositive as to scienter").  In
     *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F. 3d 1049 (9th Cir. 2008), the court found that
26   one insider's lack of selling cut against scienter when viewed together with the sales by other
     insiders that "were simply . . . in line with prior patterns." *Id.* at 1067.  Here, as discussed herein, the
27   trading by the selling Defendants is suspicious in timing and amounts, suggesting that there was
     indeed "insider information from which to benefit."  *Id.*

28

LEAD PLAINTIFFS' OPP. TO BARE ESCENTUALS DEFENDANTS' MOTION TO DISMISS          25

1   regardless of the percentage sold.[16]  *Id.* at n.10 (distinguishing Ninth Circuit decisions focusing

2   singularly on percentage of stock sold).  Here, the Complaint attributes the selling Defendants with

3   over $1.1 billion in Class Period stock sales.  Sales of such large amounts of stock "***near*** the stock's

4   peak" are suspicious, indicative of scienter, and downright "troubling."  *Am. West*, 320 F.3d at 939.

5   Likewise, as to the second "timing" factor, "the fortuitous timing of [the Selling Defendants'] stock

6   sales remain suspect" and Lead "Plaintiff's allegations regarding the timing of the stock sales …

7   tend to support the element of scienter."  *Johnson*, 394 F. Supp. 2d at 1199-1201.  Finally, because

8   the selling Defendants too "began to sell large blocks of [Bare] stock ***for the first time*** in [the spring

9   of 2007]," the third "prior trading history" factor also supports finding a strong inference of scienter.

10   *Am. West*, 320 F.3d at 940 ("the sudden flurry of massive insider trading over this three month

11   period of time, after an extended period of inactivity, appears unusual").[17]

12         Defendants claim these sales were not indicative of scienter because they still had some stock

13   left over after the three Offerings.  But in so doing Defendants ask this Court to overlook both that

14   the Company's stock was crashing down at the end of the Class Period, making it less profitable to

15   sell, and that immediately at the end of the Class Period, in October 2008, Defendants undertook to

16   take Bare private again in a sale that would cash out the entirety of the stock held by every one of

17   them except Blodgett.  *In re Cardinal Health, Inc. Sec. Litig.,* 426 F. Supp. 2d 688, 731 (S.D. Ohio

18

19   [16]      Indeed, these are life-altering sums, creating fortunes of dynastic proportions.  The huge
     dollar amounts are remarkable.  "Astronomical" sales are generally probative of scienter even where,
20   according to Defendants, they represent a small percentage of holdings.  *See Nursing Home Pension
     Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("Few [executives] could sell
21   $900 million worth of stock and only sell 2.1% of their holdings. . . . [W]here . . . stock sales result
     in a truly astronomical figure, less weight should be given to the fact that they may represent a small
22   portion of the defendant's holdings.").

23   [17]      Defendants attempt to argue that because ***some*** of John's personal stock sales ***may have been***
     conducted pursuant to a 10b5-1 trading plan, scienter is disproved.  They are wrong.  Because the
24   existence of a valid 10b5-1 trading plan and John's compliance with it are disputed matters of fact,
     even if Defendants' contested factual assertions supported their arguments (***which they do not***), the
25   Court could not consider those "facts" for "the truth of the facts recited therein" to reach the
     inferences of non-culpability Defendants proffer.  *Lee*, 250 F.3d at 689-90.  Whether John had an
26   effective, written 10b5-1 plan and his sales complied with that plan presents an "affirmative defense"
     that must be pled and proved.  17 C.F.R. §240.10b5-1(c)(1)(i)(A); *In re UTStarcom, Inc. Sec. Litig.*,
27   617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180,
     1193 (D. Nev. 2009).

28

1   2006) ("'an insider may not always trade all his shares in the company. . . ; the trader may hold on to

2   a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the

3   SEC'").   In connection with negotiating the terms of this sale, according to Defendants' own

4   statements to investors and to the SEC, Blodgett flatly demanded that all of her shares be

5   repurchased, though she eventually conceded to continuing to hold a modicum of stock in Bare's

6   new indirect owner (a subsidiary of Shiseido).  See Dkt. No. 22-10 at 19.  Though the sale was not

7   disclosed until January 2010, Defendants' own statements to investors and the SEC indicate they

8   began negotiations to sell Bare at the end of the Class Period.  See Dkt. 22-10 at 13-14. Indeed,

9   many courts have found that sales of 40% of holdings support scienter.  *See, e.g., Stevelman v. Alias*

10  *Research Inc.*, 174 F.3d 79, 86 (2nd Cir. 1999); *Oracle Corp.*, 380 F.3d at 1232 (massive dollar

11  amounts can trump percentage of holdings sold).  The Court should reject this affirmative defense at

12  the pleadings stage.

13                    **3.        Confidential Witness and Primary Source Corroboration**

14          Plaintiffs may rely upon Confidential Witness so long as they are "described with sufficient

15  particularity to establish their reliability and personal knowledge" and the statements attributed to

16  them "must themselves be indicative of scienter."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

17  981, 995 (9th Cir. 2009).  Both requirements are met here.  First, the Complaint describes several

18  key confidential witnesses, each of whom was a high-level Bare executive and each of whom can

19  speak to what was being communicated to Bare's most senior executives.  Each is also described *in*

20  *toto* each time mentioned.   For instance, Bare's former Director of Production spoke to the

21  Company's knowledge of involvement with shipments going to Target when Defendants were

22  disclaiming any involvement in the sales to big-box discounters (¶¶13-14), one of its former Lead

23  Business Managers spoke to discounts Bare's senior executives were instructing being paid to Bare

24  customers who complained about the Target/Costco price differentials be paid (¶15), and its former

25  Director of Retail Boutiques described the issue of Target/Costco sales being common knowledge at

26  Bare and their impact on relations with customers and wholesalers were discussed at meetings with

27  Miles and McCormick. ¶¶17, 114.  The Complaint also contains pleadings filed by Bare and Costco

28  in the *Costco* litigation that was filed in the weeks following the IPO.   ¶¶190-92.  As to the

Company's negative option sales program, a former Bare Assistant Controller spoke to customer complaints. ¶18. The Complaint contains one letter from the SEC challenging the "value" Bare was assigning to its stock in advance of the IPO (¶22) and one very critical of the boilerplate risk disclosures contained in the Registration Statements. ¶213. The Complaint also contains graphical stock charts that contradict the Bare Defendants' arguments in this motion that: (i) the Company was a huge "success" and its stock price plummet in late 2008 was instead caused by the "worst recession in the financial markets since the 1930s" (¶32 and Bare Mtn. at 2), and (ii) that the Exchange Act Defendants' Class Period stock sales were not suspicious. Bare Mtn. at 24-27. ¶¶38-47.

C.    **The §10(b) Allegations Demonstrate Defendants' False Statements and Material Omissions Are the Proximate Cause of the Class's Losses**

For §10(b) purposes, the Complaint far exceeds the requirement that it provide an "indication" of the causal connection by pleading both the stock price increases and decreases attributable to Defendants' false statements. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also* ¶204("By failing to disclose to investors that the Company was experiencing weakness in its infomercial business and related sales and operational defects and difficulties, these Defendants presented a misleading picture of Bare Escentuals' business and prospects."); *Id.* ("as a direct result of information disclosed on June 5, 2007, August 1, 2007, October 31, 2007, November 26, 2007, July 30, 2008 and October 30, 2008, the price of Bare Escentuals common stock fell precipitously" and "[t]hese drops removed the inflation from the price of Bare Escentuals common stock, causing real economic loss to investors who had purchased Bare Escentuals common stock during the Class Period"); and ¶¶ 176-197 (same). Loss causation is *per se* an issue of disputed fact that cannot be resolved on a motion to dismiss (*see Countrywide Sec.*, 588 F. Supp. 2d at 1173[18]) and Plaintiffs allege numerous concrete disclosures of the practices they allege were damaging and the market's growing awareness of (and reaction to) those facts. ¶¶31-32; 176-197.

_____

[18]    While these disclosures do not include any express concession by Bare that it previously misrepresented any facts and, as Defendants repetitively note, the Company's financial statements were not restated, "neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled." *Corinthian Colleges*, 540 F. 3d at 1064.

### D.   Defendants' Statements Are Not Protected By the Safe Harbor or Bespeaks Caution Doctrine

Defendants cannot escape liability under the PSLRA's "safe harbor" provision or "bespeaks caution" doctrine either.  The statements Defendants attack are not forward-looking, are not accompanied by meaningful cautionary language, or mix representations of historical and present facts.  *See Tellabs*, 513 F.3d at 705 ("a mixed present/future statement is not entitled to the safe harbor" protection).  Moreover, Plaintiffs have alleged Defendants had actual knowledge that the statements were false, and therefore the safe harbor provision does not apply.  *Dura*, 548 F. Supp. 2d at 1143 ("even when a forward-looking statement is accompanied by the requisite cautionary language, the speaker may still be liable if the statement is made with actual knowledge"); *see also* 1/21/10 SEC *Amicus Curiae* Brief (Ex. D at 2 and 9-14) ("***It is misleading and therefore insufficient for a company to warn of a potentiality that it is aware currently exists.***").  In any event, should this Court find that any of Defendants' misstatements were forward-looking when made, and are subject to either the PSLRA safe harbor or the bespeaks caution doctrine, the cautionary language in the Company's SEC filings is insufficient to protect Defendants from liability as a matter of law at this stage.  In this case, the general disclaimers, in addition to those Defendants point out in their brief (Bare Mtn. at 8-9, 10, 21, 28), that "[a] change in consumer preferences for [our mineral-based foundation] products could harm our business;" "our infomercials might not continue to be an effective distribution channel;" or "we might not be successful in marketing and selling [newly-developed] products" were so generic that they could have applied to any company in any industry, rendering them meaningless.[19]  June 30, 2006 Form S-1 at 12, 17, 27; Mar. 30, 2007 Form 10-K at 17, 21, 31.  Rote cautionary language does nothing to counter the impact of present factual misstatements.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 947 (9th Cir. 2005) ("Dismissal on the pleadings under the bespeaks caution doctrine ... requires a

---

[19]     Indeed, the Complaint alleges that after reviewing the Company's initial IPO Registration Statement/Prospectus, the SEC specifically cautioned the Company that its risk disclosures were too boilerplate and "***could apply to nearly any issuer in your industry and even in other industries***." ¶213.  The SEC explicitly warned Bare:  "If you elect to retain these general risk factors in your prospectus, ***you must clearly explain how they apply to your company or offering***."  *Id.*

1  stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that

2  reasonable minds could not disagree that the challenged statements were not misleading.'"); *Gray v.*

3  *First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (cautionary language was inadequate where

4  plaintiffs alleged specific factual misrepresentations and the risk disclosures were "so generalized in

5  nature that a reasonable jury could nonetheless find the prospectus misleading"); *Fecht*, 70 F.3d at

6  1082 ("Inclusion of *some* cautionary language is not enough to support a determination as a matter

7  of law that defendants' statements were not misleading."   (emphasis in original.)); *In re*

8  *Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1293 (E.D. Wash. 2007) (dismissal was

9  inappropriate where "reasonable minds could disagree as to whether the challenged statements were

10  misleading").   Accordingly, all challenged statements are actionable.

11  

**V.       CONCLUSION**

12       For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Bare

13  Defendants' motion to dismiss.  In the event the Court chooses to convert this motion to a motion for

14  summary judgment, Plaintiffs request an opportunity to conduct discovery before making further

15  submissions in order to respond on a complete factual record.  In the event the Court grants any of

16  the motion in whole or in part, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a)

17  of the Federal Rules of Civil Procedure.[20]

18  Dated: May 4, 2010                         Respectfully submitted,

19                                             SCOTT+SCOTT LLP

20                                             /s/ Mary Blasy
                                               MARY BLASY
21                                             600 B Street, Suite 1500
                                               San Diego, CA 92101
22                                             Telephone: 619-233-4565

23

24  [20]     Leave to amend "'should [be] freely give[n] when justice so requires." *Foman v. Davis*, 371
    U.S. 178, 182 (1962); *In re Saxton, Inc. Sec. Litig.*, 156 Fed.Appx. 917, 921 (9th Cir. 2005)
25  (dismissal for "fail[ure] to meet the PSLRA pleading requirement for scienter, and deni[al of] leave
    to amend based on futility" reversible error); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,
26  1052 (9th Cir. 2003) (same). Though Plaintiffs believe that the Complaint provides exactly what is
    required of a plaintiff bringing a securities action under the Securities Act in this Circuit, a short and
27  plain statement of their allegations required under Rule 8, and that Plaintiffs' Exchange Act claims
    exceed applicable Rule 8, Rule 9 and PSLRA standards, leave to replead is respectfully sought
28  should any of the claims be dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile: 619-233-0508
mblasy@scott-scott.com

SCOTT+SCOTT LLP
David R. Scott (*pro hac vice*)
Erin G. Comite (*pro hac vice*)
P.O. Box 192
156 South Main Street
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
drscott@scott-scott.com

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on May 4, 2010, I caused the foregoing to be electronically filed with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing

5  document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants

6  indicated on the Manual Notice List.

7     I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on May 4, 2010.

9

10                                        /s/ Mary Blasy
                                          MARY BLASY
11                                        SCOTT+SCOTT LLP
                                          600 B Street, Suite 1500
12                                        San Diego, CA 92101
                                          Telephone: 619-233-4565
13                                        Facsimile: 619-233-0508
                                          mblasy@scott-scott.com
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28