1  SCOTT+SCOTT LLP
   ARTHUR L. SHINGLER III (181719)
2  MARY K. BLASY (211262)
   HAL D. CUNNINGHAM (243048)
3  600 B Street, Suite 1500
   San Diego, CA  92101
4  Telephone:  619/233-4565
   619/233-0508 (fax)
5  ashingler@scott-scott.com
   mblasy@scott-scott.com
6  hcunningham@scott-scott.com

7    – and –

8  DAVID R. SCOTT (*pro hac vice*)
   ERIN G. COMITE (*pro hac vice*)
9  P.O. Box 192
   156 South Main Street
10 Colchester, CT  06415
   Telephone:  860/537-3818
11 860/537-4432 (fax)
   drscott@scott-scott.com
12 ecomite@scott-scott.com

13 *Lead Counsel for Lead Plaintiffs*

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16

17 IN RE BARE ESCENTUALS, INC.              Master File No. C-09-03268-PJH
   SECURITIES LITIGATION
18                                          LEAD PLAINTIFFS' CORRECTED
   _____           MEMORANDUM OF POINTS AND
19                                          AUTHORITIES IN OPPOSITION TO
   This Document Relates To:               THE UNDERWRITER DEFENDANTS'
20                                          MOTION TO DISMISS THE
   All Actions                             CORRECTED CONSOLIDATED
21                                          COMPLAINT FOR VIOLATIONS OF
                                           THE FEDERAL SECURITIES LAWS
22 _____

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION AND BACKGROUND TO THE ACTION ........................................1

3   II.     LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS..........................5

4   III.    THE COMPLAINT ALLEGES ACTIONABLE SECURITIES ACT CLAIMS ..............6

5           A.      The Complaint Alleges Actionable Section 11 Claims ........................................6

6                   1.      The Complaint Complies with the Applicable Rule 8(a) Standard
                            and the Section 11 Claims Do Not "Sound in Fraud" ................................7

7
                    2.      The Registration Statements Used to Conduct the Offerings
8                           Contained Materially Misleading Statements and Omissions ..................10

9                           a.      The Registration Statements Misstated Bare's Adherence to
                                    Its Purportedly Iron-Clad "Premium Sales" Restrictions .............13
10
                            b.      The Registration Statements Concealed Bare's Reliance on
11                                  Its "Negative Option" Sales Program ............................................14

12                          c.      The Registration Statements Misstated the Success of
                                    Bare's Efforts to Cross-Sell Non-Foundation Products................17
13
                            d.      The Registration Statements Misrepresented the Ongoing
14                                  Cannibalization of Bare's Sales that the Rampant Store
                                    Expansion Caused ........................................................................18
15
            B.      Because All Securities Act Claims Were Brought Less than One Year
16                  After a Reasonable Investor Would Have Discovered the Facts Underlying
                    the Misstatements in the Registration Statement, Plaintiffs' Securities Act
17                  Claims Are Timely................................................................................................19

18          C.      Loss Causation Is not an Element of, But an Affirmative Defense to, a
                    Securities Act Claim that Must be Pled and Proved ............................................23
19
    IV.     CONCLUSION.....................................................................................................24
20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)...........................................................................................11

5

*Betz v. Trainer Wortham & Co., Inc.,*
  519 F.3d 863 (9th Cir. 2008) ...............................................................19, 20, 22

6

7

*Citibank Global Mkts., Inc. v. Rodriguez Santana,*
  573 F.3d 17 (1st Cir. 2009).................................................................................23

8

9

*Durning v. First Boston Corp.,*
  815 F.2d 1265 (9th Cir. 1987) ...........................................................................16

10

*Eckstein v. Balcor Film Investors,*
  8 F.3d 1121 (7th Cir. 1993) ...............................................................................17

11

12

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976)...........................................................................................11

13

*Fecht v. Price Co.,*
  70 F.3d 1078 (9th Cir. 1995) .......................................................................18, 19

14

15

*First Virginia Bankshares v. Benson,*
  559 F.2d 1307 (5th Cir. 1997) ...........................................................................15

16

17

*Freedman v. Louisiana Pacific Corp.,*
  922 F. Supp. 377 (D.Or. 1996) ..........................................................................15

18

*Fujisawa Pharm. Co. v. Kapoor,*
  115 F.3d 1332 (7th Cir. 1997) ...........................................................................20

19

20

*Gray v. First Winthrop Corp.,*
  82 F.3d 877 (9th Cir. 1996) ...............................................................................20

21

22

*Gross v. Medaphis Corp.,*
  977 F. Supp. 1463 (N.D. Ga. 1997)...................................................................18

23

*Halperin v. eBanker USA.com, Inc.,*
  295 F.3d 352 (2nd Cir. 2002) ............................................................................16

24

25

*Hanon v. Dataproducts Corp.,*
  976 F. 2d 497 (9th Cir. 1992) ............................................................................16

26

27

*Herman & McLean v. Huddleston,*
  459 U.S. 375 (1983).............................................................................7, 11, 14, 17

28

*Huddleston v. Herman & MacLean,*
   640 F.2d 534 (5th Cir. 1981) ...................................................................................17

*In re Alcatel Sec. Litig.,*
   382 F. Supp. 2d 513 (S.D.N.Y. 2005).....................................................................22

*In re Ambac Fin. Group, Inc. Sec. Litig.,*
   No. 08 Civ. 411, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) ...............................22

*In re Countrywide Fin. Corp. Sec. Litig.,*
   No. CV-07-05295, 2009 WL 943271 (C.D. Cal. April 6, 2009) ................................ *passim*

*In re Daou Sys., Inc.,*
   411 F.3d 1006 (9th Cir.2005) .........................................................................7, 8, 10

*In re DDi Sec. Litig.,*
   No. CV 03-7063, 2005 WL 3090882 (C.D. Cal. July 21, 2005) ..............................11

*In re Dynegy Sec. Litig.,*
   339 F. Supp. 2d 804 (S.D. Tex. 2004) .....................................................................23

*In re Elect. Data Systems Corp. "ERISA" Litig.,*
   305 F. Supp. 2d 658 (E.D. Tex. 2004) .....................................................................21

*In re Exodus Commc'ns, Inc. Sec. Litig.,*
   No. C 01-2661, 2005 WL 1869289 (Aug. 5, 2005).............................................11, 22

*In re Glen Fed, Inc. Sec. Litig.,*
   11 F.3d 843 (9th Cir. 1993) .....................................................................................18

*In re Initial Public Offering Sec. Litig.,*
   358 F.Supp.2d 189 (S.D.N.Y. 2004).........................................................................16

*In re Metropolitan Sec. Litig.,*
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) ...........................................................20, 23

*In re NationsMart Sec. Litig.,*
   130 F. 3d 309 (8th Cir. 1997) .....................................................................................7

*In re Paracelsus Corp.,*
   6 F. Supp. 2d 626 (S.D. Tex. 1998) .........................................................................18

*In re Portal Software, Inc. Sec. Litig.,*
   C 03-5138, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ........................................8

*In re Premiere Techs. Inc.,*
   No. 1:98-CV-1804, 2000 WL 33231639 (N.D. Ga. Dec. 8, 2000).........................17

*In re Prudential Sec. Ltd. P'ships Litig.*,
　　930 F. Supp. 68 (S.D.N.Y. 1996) ....................................................................19

*In re Surebeam Corp. Sec. Litig.*,
　　No. 03 CV 1721, 2005 WL 5036360 (S.D.Cal. Jan. 3, 2005) .................................16

*In re Time Warner, Inc. Sec. Litig.*,
　　9 F.3d 259 (2nd Cir.1993) ....................................................................11, 13

*In re Towne Servs., Inc., Sec. Litig.*,
　　184 F. Supp. 2d 1308 (N.D. Ga. 2001) ..........................................................17

*In re Worlds of Wonder Sec. Litig.*,
　　35 F.3d 1407 (9th Cir.1994) ....................................................................23

*Isquith ex rel. Isquith v. Middle S. Utils., Inc.*,
　　847 F.2d 186 (5th Cir. 1988) ...................................................................11

*Johnson v. Aljian*,
　　490 F.3d 778 (9th Cir. 2007) ...................................................................21

*Knollenberg v. Harmonic, Inc.*,
　　152 Fed. Appx. 674 (9th Cir. 2005) ........................................................6, 7, 8

*Kronfeld v. Trans World Airlines, Inc.*,
　　832 F.2d 726 (2nd Cir. 1987) ..................................................................13

*Levine v. AtriCure, Inc.*,
　　508 F.Supp.2d 268 (S.D.N.Y. 2007) ...........................................................23

*Lone Star Ladies Inv. Club v. Schlotsky's, Inc.*,
　　238 F.3d 363 (5th Cir. 2001) ....................................................................4

*Mass. Bricklayers and Masons Funds and Pipefitters' Retirement Fund Local 598 v. Deutsche Alt-A Securities*,
　　No. CV 08-3178, 2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010)...............................20

*McCalden v. Calif. Library Ass'n*,
　　955 F.2d 1214 (9th Cir.1990) ....................................................................8

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
　　523 F.3d 75 (1st Cir. 2008)................................................................16, 17

*Molsbergen v. U.S.*,
　　757 F.2d 1016 (9th Cir. 1985) ...................................................................8

*Navarro v. Block*,
　　250 F.3d 729 (9th Cir. 2001) ....................................................................5

LEAD PLAINTIFFS' CORRECTED OPP. TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................5

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ....................................................................19

*S.E.C. v. Texas Gulf Sulphur Co.*,
   401 F.2d 833 (2nd Cir.1968)........................................................................11

*Salomon Smith Barney v. Asset Securitization Corp.*,
   98 Civ. 4186, 1999 WL 1095605 (S.D.N.Y. Dec. 3, 1999)........................19

*Schaffer v Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998)......................................................11, 15

*Schwartz v. Celestial Seasonings, Inc.*,
   124 F.3d 1246 (10th Cir. 1997) ....................................................................7

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)........................................................8, 12, 16, 17

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ......................................................................6

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ........................................................................5

*Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir.1996) ......................................................................6, 8

*Steckman v. Hart Brewing Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ....................................................................16

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) ....................................................................................23

*Toombs v. Leone*,
   777 F.2d 465 (9th Cir. 1985) ......................................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)................................................................................4, 14

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ....................................................................8, 9

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3rd Cir. 1997) ................................................................14, 15

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77k(a) ..................................................................................................................15, 19
  §77k(a)(2), (5) ........................................................................................................8
  §77k(b)(3) ..............................................................................................................7

Federal Rules of Civil Procedure
  Rule 8 ....................................................................................................................10
  Rule 8(a) ........................................................................................................7, 9, 15
  Rule 8(a)(2) ............................................................................................................7
  Rule 8(e) ................................................................................................................7
  Rule 9 ..............................................................................................................7, 10
  Rule 9(b) ........................................................................................................*passim*
  Rule 12(g-h) ...........................................................................................................6
  Rule 15(a) .............................................................................................................24

1    Lead Plaintiffs Westmoreland County Retirement System and Vincent J. Takas (collectively,

2    "Plaintiffs" or "Lead Plaintiffs"), respectfully submit this corrected memorandum of points and

3    authorities in opposition to the Underwriter Defendants' motion to dismiss Plaintiffs' Corrected

4    Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint").[1]

5                          **ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

6        1.        Whether Defendants have demonstrated they are entitled to dismissal as a matter of

7    law of any of the Complaint's claims before discovery has commenced.

8        2.        Whether Defendants have demonstrated any of the Complaint's claims are time-

9    barred, as a matter of law.

10       **I.        INTRODUCTION AND BACKGROUND TO THE ACTION[2]**

11       Bare Escentuals, Inc. ("Bare") was acquired by private equity fund JH Partners, LLC

12   ("JH Partners") in 1990 and through successive corporate transactions, wound up owned jointly by

13   JH Partners and Berkshire Partners LLC ("Berkshire") by 2004.  Meanwhile, Bare had begun

14   marketing its makeup products on the QVC home shopping network in 1997, subject to an

15   exclusivity agreement with QVC, then also one of its significant venture capital financiers.  In 2001,

16   Bare began developing its own infomercial program, which dramatically increased sales from $25

17   million in 2001 to $250+ million in 2005 and to $394.5 million in 2006.  During 2005 – 2006, JH

18   Partners and Berkshire purchased QVC's interest in Bare and caused Bare to undergo three

19   "capitalizations," taking on enormous debt, in order to pay the private equity firms $646 million in

---

[1]     On April 29, 2010, after conferring with defendants, Lead Plaintiffs applied to the Court for leave to file a single, consolidated opposition to defendants' collective motions to dismiss. Defendants opposed this request. While Lead Plaintiffs' application was pending, on April 30, 2010, Lead Plaintiffs filed their consolidated memorandum in opposition to defendants' motions to dismiss.  On May 3, 2010, the Court denied Lead Plaintiffs' application.  Accordingly, consistent with the Court's May 3 Order and the page limitations set forth in the Court's March 1, 2010 Order and Civil L.R. 7-3(a), Lead Plaintiffs submit this corrected opposition to the Underwriter Defendants' motion to dismiss, as well as a now-corrected opposition to the Bare Escentuals Defendants' motion to dismiss.

[2]     Though the Underwriter Defendants and the Bare Escentuals Defendants filed separate motions to dismiss, to the extent the Underwriter Defendants expressly adopted certain of the Bare Defendants' grounds for dismissal as to the Securities Act claims, Plaintiffs' opposition to the Bare Defendants' arguments are incorporated herein by reference (in addition to what is stated herein).

---

1    dividends.  In an effort to cash in on Bare's growing infomercial sales success, JH Partners and

2    Berkshire took Bare public in a $400+ million initial public stock offering ("IPO") in September

3    2006.  From the IPO proceeds, JH Partners and Berkshire were paid several hundred million dollars

4    purportedly in exchange for their "management agreements" with Bare.  Though JH Partners and

5    Berkshire each reduced their respective ownership interests in Bare from 32% pre-IPO to 12%, and

6    from 47% pre-IPO to approximately 26%, in connection with the IPO and two additional secondary

7    stock offerings they caused Bare to undertake in March 2007 ($476+ million) and June 2007 ($292

8    million) (the "Offerings"), the Bare Board of Directors remained comprised of three Berkshire

9    designees (Ross M. Jones, Bradley M. Bloom and Lea Anne Ottinger) and two JH Partners

10   designees (Michael J. John and John C. Hansen) until JH Partners, Berkshire and Bare's

11   management could sell their remaining multi-hundred million dollar interests in Bare.  Though the

12   sales effort began in earnest in late October 2008, following several successive quarters of

13   significantly diminished infomercial sales performance, JH Partners and Berkshire were not able to

14   off-load the rest of their interest in Bare until December 2009 when they and Bare's senior

15   executives agreed to sell the Company to Shiseido Co. Ltd., a Japanese Company.  Bare's public

16   shareholders were all cashed out in the sale.

17          As the *Business Week* exposé in the Complaint reflects, this private-to-public-to-private

18   round trip resulted in a huge windfall to JH Partners, Berkshire and Bare's senior executives, at the

19   expense of Bare's public investors.  In fact, in addition to the $428+ million Bare sold, the private

20   equity firms and the Bare executive Defendants sold another $700+ million of Bare stock to the

21   public in the three Offerings.  Plaintiffs bring this class action pursuant to §§11, 12(a)(2) and 15 of

22   the Securities Act of 1933 ("Securities Act"), alleging that both the IPO and the March 2007

23   Offering were conducted pursuant to registration statements and prospectuses (collectively,

24   "Registration Statements") that included misrepresentations and omitted material facts about Bare

25   and its sales and distribution practices that rendered its business and financial prospects misleading.

26   Plaintiffs also bring separate class claims pursuant to §§10(b), 20(a) and 20A  of the Securities

27   Exchange Act of 1934 ("Exchange Act") on behalf of the public purchasers of Bare's stock between

28   the September 28, 2006 IPO and October 30, 2008, the day before the bottom fell out on Bare's

1   stock price ("Class Period").  The Exchange Act claims allege fraud whereas the Securities Act

2   claims cover far fewer persons and allege negligence.

3        Both prior to and following the IPO, the executive management of Bare was conducted by

4   Leslie A. Blodgett ("Blodgett"), who along with JH Partners and Berkshire, made all significant

5   business decisions for the enterprise.[3]  The Registration Statements, however, failed to disclose that

6   the so-called "infomercial continuity program" profits that had been driving Bare's exponential

7   profits since 2001, operated in reality as a negative option sales program whereby unwitting

8   customers who signed up for one-time purchases instead received automatic reshipments of

9   expensive product for which their credit cards were billed – whether they wanted them or not.  Nor

10  did the Registration Statements disclose that despite its purported "exclusivity" arrangement with

11  QVC and prestige sales channel-only mantra, Bare had been selling product to offshore distributors

12  who in turn were selling Bare's purportedly prestige brands to buyers at big-box discounters Target

13  and Costco.  Bare claimed compliance with its QVC agreement while being able to ship product at

14  the end of quarters in order to report significant financial results, making the Company appear more

15  profitable prior to the Offerings.  The Registration Statements also failed to disclose that Defendants

16  were rapidly opening hundreds of stores around the country – often double and triple stacking Bare

17  points of sale within a single mall – resulting in massive cannibalization of sales in Bare's various

18  sales channels.

19        Soon – too soon – the façade would shatter.  After reporting several quarters of flattening

20  infomercial sales – the secret to Bare's success – the Company's stock price was pummeled

21  following its October 30, 2008 significant earnings miss and the Company's disclosure it would

22  have to slash the sales price of its "Get Started Kit" from $60 to $15 in recognition of Bare's

23  declining infomercial business, consumer backlash against its use of a negative option sales program

24  _____

25  [3]      Blodgett was Bare's Chairman and CEO until it was recently sold to Shiseido.  McCormick
26  served as Bare's CFO until 12/8/08 when he resigned the CFO position but continued as Bare's
    Chief Operating Officer ("COO") until its sale to Shiseido.  Miles served as Bare's President of
27  Wholesale and International Sales until she suddenly resigned on 11/26/07.  Collectively, Blodgett,
    McCormick and Miles are referred to herein as the "Officer Defendants."

28

LEAD PLAINTIFFS' CORRECTED OPP. TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS

3

09-cv-03268-PJH

1    and the fact that Bare's once exclusive prestige brand was now sitting on discount racks.  The

2    Company's stock price – taken public at $22 per share in the IPO in September 2006 – sold again at

3    $34.50 per share in March 2007 and at $36.50 in June 2007 – would fall precipitously, closing just

4    above $4 per share on October 31, 2009 – ***erasing hundreds of millions of dollars in market***

5    ***capitalization***.  Defendants immediately began attempting to find a buyer for Bare so they could

6    cash in, which finally occurred when the sale to Shiseido closed in March 2010.

7          The Underwriter Defendants have joined the Bare Defendants'[4] request to dismiss the

8    Complaint's Securities Act claims, arguing that the Registration Statements did not allege, among

9    other things falsity, and arguing separately that Plaintiffs' claims are time-barred.  Defendants'

10   motions mischaracterize the Complaint and the pleading standard though; this is not, as Defendants

11   portend, a "mini-trial" before discovery, and the case is not about, as Defendants argue, their

12   business failures – it's about unbridled greed, obfuscation and self-dealing carried out in violation of

13   the federal securities laws.

14         In an action arising under §11 of the Securities Act, Plaintiffs need not plead or prove fraud

15   or scienter; as the Fifth Circuit noted, the "liability of an issuer ... for a material misstatement or

16   omission is '***virtually absolute***.'"[5]  *Lone Star Ladies Inv. Club v. Schlotsky's, Inc.,* 238 F.3d 363, 369

17   (5th Cir. 2001).  For these purposes, an omission is material if there is a substantial likelihood that

18   the "disclosure of the omitted fact would have been viewed by the reasonable investor as having

19   significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway,*

20   *Inc.*, 426 U.S. 438, 449 (1976).  Thus, the question before the Court is whether a reasonable investor

21

22   [4]      The "Bare Defendants" are defined herein as Bare; the Officer Defendants; and the "Director
     Defendants" (Ross M. Jones ("Jones"), Bradley M. Bloom ("Bloom"), John C. Hansen ("Hansen"),
23   Michael J. John ("John"), Lea Anne Ottinger ("Ottinger"), Karen M. Rose ("Rose") and Glen T.
     Senk ("Senk")), all of whom who signed false and misleading Registration Statements and all of
24   whom (except Miles, Rose and Senk), with Bare, collectively are attributed with selling over $1.1
     billion of stock in the Offerings.  The "Underwriter Defendants" are Goldman, Sachs & Co., CIBC
25   World Markets, Banc of America Securities LLC, Piper Jaffray Companies, Thomas Weisel Partners
     LLC and Suntrust Robinson Humphrey, Inc.

26   [5]      Unless otherwise noted, all citations are omitted and emphasis is added.  Further, unless
27   otherwise noted, all Exhibit references ("Ex.") are attached to the Declaration of Mary K. Blasy in
     Support of Lead Plaintiffs' Oppositions to Defendants' Motions to Dismiss.

28

LEAD PLAINTIFFS' CORRECTED OPP. TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS     4

1    would have wanted to know that Bare's customers were in an uproar about its negative option sales

2    program, its purportedly "prestige" brand was now available at Target and Costco, its infomercial

3    business was suffering and its rapidly growing points of sales were cannibalizing one another –

4    rendering all efforts to forecast future financial performance meaningless.  The answer is clear; of

5    course these facts would have taken on actual significance in the mind of an investor contemplating

6    an investment in Bare.

7         Plaintiffs' Complaint adequately states a claim for material misstatements and omissions in

8    the Registration Statements in violation of §§11, 12(a)(2) and 15 of the Securities Act, which are not

9    time-barred nor "sound in fraud."  In moving to dismiss, the Bare Defendants, and the Underwriter

10   Defendants who carried this out for them, blithely attribute the Class's damages to "the worst global

11   economic recession since the 1930s" and blame the victims, arguing "only an investor deliberately

12   not paying attention could have" failed to discover the truth.  In doing so, these Defendants ignore

13   the well-pleaded allegations clearly showing that Bare's demise was of its own making, investor

14   losses were caused by their concealment alleged herein, and the market responded appropriately.

15   Defendants' motions should be denied.[6]

16   **II.      LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS**

17        A motion to dismiss tests whether the allegations in a complaint, if true, amount to an

18   actionable claim.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "All allegations of material

19   fact made in the complaint are taken as true and construed in the light most favorable to the

20   plaintiff." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,

21   320 F.3d 920, 931 (9th Cir. 2003).  "A complaint should not be dismissed unless it appears beyond a

22   doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or

23   her to relief."  *Id.*  In so doing, a complaint's allegations ***must be*** weighed "in their totality" not

24   "individually."  *Id.* at 945; *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir.

25

26   _____

     [6]      Because Plaintiffs' allegations are discussed in detail in the argument below, Plaintiffs will
27   not burden the Court here with a summary of their allegations that inevitably would repeat much of
     what is presented below.
28

1  2008) ("*Tellabs* counsels us to consider the totality of circumstances" and "permits a series of less

2  precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon*

3  *Graphics*, *Vantive*, and *Read-Rite* notwithstanding."); and *Siracusano v. Matrixx Initiatives, Inc.*,

4  585 F.3d 1167, 1183 (9th Cir. 2009) (same).[7]

5  **III.       THE COMPLAINT ALLEGES ACTIONABLE SECURITIES ACT CLAIMS**

6          Plaintiffs bring §11 claims, which provide a remedy for plaintiffs who purchased a security

7  they can trace to a defective registration statement, against: (1) those Officer Defendants who signed

8  the Registration Statements; (2) the Director Defendants; and (3) the Underwriter Defendants that

9  acted as underwriters in the Offerings.  The §12(a)(2) claims are brought against the Underwriter

10  Defendants that allegedly served as "sellers" within the meaning of the Securities Act for the

11  Offerings.[8]

12          **A.       The Complaint Alleges Actionable Section 11 Claims**

13          "To state a claim under Section 11(a), a plaintiff must allege that: (1) the registration

14  statement contained an omission or misrepresentation; and (2) the omission or misrepresentation was

15  material." *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 683-84 (9th Cir. 2005) (citing *Stac*

16  *Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir.1996)).  "Defendants are liable for innocent or

17  negligent material misstatements or omissions, subject to a few affirmative defenses." *Countrywide*

18  *Sec.*, 588 F.Supp.2d at 1162.  The affirmative defense is due diligence.  15 U.S.C. §77k(b)(3); *Stac*,

19  89 F.3d at 1404.  Reliance is not an element.  *Countrywide Sec.*, 588 F. Supp. 2d at 1162.

20

21

22

---

23  [7]        To the extent Defendants attempted to negate certain of the Complaint's allegations with disputed issues of fact from outside the complaint, Plaintiffs moved separately to strike Defendants'

24  improper submissions – the arguments "supported" by those submissions – and Defendants' other arguments based on conjecture arising outside the four corners of the Complaint. *See In re*

25  *Countrywide Fin. Corp. Sec. Litig.*, No. CV-07-05295, 2009 WL 943271, at *3 (C.D. Cal. April 6, 2009) ("*Countywide Sec.*") ("The Court cannot take notice of the transcript **and** accept its

26  identification of the speaker over the SAC's identification without converting Sieracki's motion into one for summary judgment.  Fed. R. Civ. Proc. 12(d).") (emphasis in original).

27  [8]        The Underwriter Defendants challenge only the timeliness of the Complaint's §12(a)(2) claims against them and, as such, any challenges to standing are waived.  *See* F.R.C.P. 12(g-h).

28

Courts across the country recognize that, unlike a securities action brought under the anti-fraud provisions of the Exchange Act, plaintiffs who assert violations solely of the Securities Act are still required to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2); *Harmonic,* 152 Fed.Appx. at 683-84; *In re NationsMart Sec. Litig.*, 130 F. 3d 309, 315 (8th Cir. 1997); *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1251-52 (10th Cir. 1997). The stricter fraud and scienter pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") do not apply to §11 claims disclaiming allegations of fraud, including the strictures of Fed. R. Civ. P. 9. *See Harmonic,* 152 Fed.Appx. at 683-84. In fact, §11 of the Securities Act imposes strict liability against the issuer of securities when a registration statement contains material misstatements or omits material facts. *Huddleston*, 459 U.S. at 382 (liability of an issuer under §11 is "virtually absolute" even for innocent misrepresentations); *see also Harmonic*, 152 Fed.Appx. at 683-84 (same). Thus, Plaintiffs are required only to plead a short and plain statement of their claims.

### 1. The Complaint Complies with the Applicable Rule 8(a) Standard and the Section 11 Claims Do Not "Sound in Fraud"

Defendants argued that Plaintiffs' Section 11 and 12(a)(2) claims "sound in fraud" and must therefore be pleaded with "particularity" under Rule 9(b). *See Bare Mtn.* at 5-7. They are wrong. The claims asserted against the Underwriter Defendants and those who signed the false and misleading Registration Statements sound in negligence.[9]

Securities Act claims are subject to Rule 8(a)'s ordinary notice pleading requirements unless the allegations "sound in fraud."[10] *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir.2005). In evaluating a Securities Act claim, a court must strip away the allegations that sound in fraud and see

---

[9] The liability of the Underwriter Defendants is based on strict liability, subject to affirmative defenses, for signing one or more materially misleading Registration Statements or underwriting the security. 15 U.S.C. §77k(a)(2), (5); *see Herman & McLean v. Huddleston*, 459 U.S. 375, 382 (1983) (section 11 liability for innocent or negligent misstatements); *Daou*, 411 F.3d at 1027.

[10] As the Supreme Court has noted, "a §10(b) plaintiff carries a heavier burden than a section 11 plaintiff. Most significantly, he must prove that the defendant acted with scienter, *i.e.*, with intent to deceive, manipulate, or defraud." *Huddleston*, 459 U.S. at 383.

1    if the remaining allegations state a claim.  *Id.* at 1028; *see also Harmonic,* 152 Fed.Appx. at 683-84;

2    *Countywide Sec.*, 588 F. Supp. 2d at 1162.  Indeed the Ninth Circuit has consistently held that, in

3    light of Rule 8(e)'s liberal pleading policy, a pleading "'should not be construed as an admission

4    against another alternative or inconsistent pleading in the same case.'"  *McCalden v. Calif. Library*

5    *Ass'n*, 955 F.2d 1214, 1219 (9th Cir.1990), quoting *Molsbergen v. U.S.*, 757 F.2d 1016, 1019

6    (9th Cir. 1985); *see also In re Portal Software, Inc. Sec. Litig.*, C 03-5138, 2006 WL 2385250, at *3

7    (N.D. Cal. Aug. 17, 2006) ("[P]laintiffs can allege that defendants committed fraud for purposes of

8    the section 10 claim while relying on a negligence theory for the section 11 claim.").

9            The Complaint's Securities Act allegations do not sound in fraud as it does the work of

10   "stripping" the allegations that sound in fraud.  *Daou* endorses a bright line only where plaintiffs

11   allege "a unified course of fraudulent conduct and rely entirely on that course of conduct ***as the basis***

12   ***of a claim***."  *Daou*, 411 F.3d at 1027 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-

13   04 (9th Cir. 2003)); *see also Harmonic,* 152 Fed.Appx. at 683-84; *see also Shaw v. Digital Equip.*

14   *Corp.,* 82 F.3d 1194, 1223 (1st Cir. 1996) (same).  Similarly, *Stac* held that the particularity

15   requirements of Rule 9(b) are applicable to §11 claims only "where the gravamen of the complaint is

16   plainly fraud" and a plaintiff makes only "nominal efforts" to disclaim fraud as to some defendants.

17   89 F.3d at 1405 n. 2.

18           Plaintiffs here do not rely on a unified course of ***fraudulent*** conduct against all Defendants.

19   Rather, Plaintiffs describe a unified course of self-cannibalizing sales operations, "premium" product

20   image dilution through sales to big-box discounters, failing efforts to revitalize Bare's infomercial

21   sales and to cross-sell, and heavy reliance on a negative option sales program that could not provide

22   long-term, consistent sales.  ¶¶30, 57-81, 221, 223, 227, 231, 233.  No ***fraud*** lies in these practices

23   alone.  The alleged ***fraudulent*** conduct discussed in §IV, is distinct from this conduct.  The ***fraud***

24   consists in ***intentionally misrepresenting*** Bare's business practices and financial results over a 24-

25   month period.  Not all Defendants are alleged to have participated in the ***fraud***.  The Complaint

26   clearly specifies which Defendants participated in which allegedly fraudulent conduct.  For example,

27   the six Underwriter Defendants are nowhere implicated in fraudulent conduct.  Neither are

28   Defendants Rose and Senk.  As to those Defendants who are implicated in ***fraud***, the Complaint

1    provides additional, particularized allegations.  *See, e.g.*, ¶¶49-94, 221-235 (expressly alleging

2    mental states less than ***fraud*** against some Defendants and specifying the nonfraudulent course of

3    conduct giving rise to the Securities Act violations).

4          Conversely, Plaintiffs allege the Underwriter Defendants and the Defendants who signed the

5    false and misleading Registration Statements acted negligently and failed to conduct reasonable

6    investigations (*see, e.g.*, ¶¶56(c), 56(d), 227, 233), and expressly disclaim fraud.  *See, e.g.*, ¶¶1, 221,

7    231.  As recently found in the *Countrywide Sec.* action where a 400+ page complaint named 50

8    defendants in 21 causes of action, some arising under the Securities Act, some under the Exchange

9    Act, all arising out of a single course of conduct: systematically applying insufficient underwriting

10   standards:

11          The [Complaint's] carefully circumscribed fraud allegations recognize important
            truths where §11 and §10(b) claims are pled together: §11 liability arises against a
12          vast array of participants in an offering.  It is unlikely that so many individuals and
            entities could all act fraudulently together.   At some point, repeated
13          misrepresentations, ***as well as additional corroborating facts***, may allow an
            inference of fraud as to some participants.  Heightened pleading standards properly
14          force plaintiffs to limit their fraud allegations to those participants who are likely to
            have acted fraudulently.  ***Heightened pleading gives those participants the deserved***
15          ***protection of Rule 9(b)***; and frees the rest from defending against unreasonable and
            unfounded fraud claims.

16
                 ***But it eviscerates §11 to give all defendants Rule 9(b) protection when (1) only***
17          ***certain defendants are expressly alleged to act fraudulently; (2) a complaint***
            ***specifies unique, particularized facts as to those defendants; and (3) the***
18          ***particularized facts raise a scienter inference as to those defendants, but not all.***
            *Accord In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1266 (N.D. Cal.
19          2000) (holding that a '33 Act §14(a) claim sounded in fraud only as to some
            defendants, as to whom particularized fraud allegations were specifically made).
20
     *Countrywide Sec.*, 588 F.Supp.2d at 1163; *see also Occam Networks*, 2008 WL 2676364, at *23
21
     (section 11 claim against underwriter did not sound in fraud where complaint mentioned underwriter
22
     by name only twice and consistently referred to "defendants" collectively).  Here, as in *Harmonic*,
23
     *Countrywide Sec.* and *Occam*, Rule 9(b) only applies to Plaintiffs' allegations of ***fraud***.  Here, the
24
     Complaint's allegations constitute far more than the "nominal effort" to disclaim fraud made by the
25
     plaintiffs in *Daou* and *Stac*.  Because the claims against these Defendants sound only in negligence,
26

27

28

LEAD PLAINTIFFS' CORRECTED OPP. TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS          9

and provide strict liability, the Securities Act claims are subject only to Rule 8(a)'s ordinary notice pleading standard.[11]

### 2. The Registration Statements Used to Conduct the Offerings Contained Materially Misleading Statements and Omissions

The Complaint alleges the Registration Statements contained material untrue statements and omissions regarding the Company's operations, such as its marketing strategy and multi-channel distribution model, and its infomercial and related sales that were misleading because Defendants misrepresented and/or failed to disclose, among other things: (i) the Company's "premium" product image was being diluted by sales through discounters like Costco and Target; (ii) the Company's efforts to revitalize its infomercial sales and to cross-sell were failing; and (iii) the Company's ability to continue garnering the premium "club" deal sales revenues from its direct-to-consumer infomercial and QVC sales program was diminishing as consumers refused to permit unwanted additional shipments to be billed to their credit cards – simply making their purchases through shopping mall "prestige" vendors – or, for the very cost-conscious, at Target or Costco. ¶¶30, 57-81, 221, 223, 227, 231, 233. Defendants, however, urge this Court to dismiss the Securities Act claims by merely suggesting contrary "facts" they urge the Court can weigh against the Complaint's allegations in determining, ***as a matter of law***, the challenged misstatements were not false.

---

[11] As the Ninth Circuit observed in *Vess*, 317 F.3d at 1103-05, such allegations are not subject to Rule 9(b) simply because they appear in the same complaint as other allegations of fraud. Rather, where a complaint pleads both fraud and non-fraud claims, the heightened pleading requirements of Rule 9(b) apply only to the fraud claims, not to the non-fraud claims. *Id. Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009), on which Defendants rely (Bare Mtn. at 6), does not require a different result because the complaint in that case is markedly different from the instant Complaint, where the *Rubke* plaintiffs failed to segregate their Securities Act and Exchange Act claims and never alleged negligence. See Ex. A, *Rubke v. Capitol Bancorp Ltd*, No. 3:05cv04800, First Amended Complaint (N.D.Cal. July 31, 2006). The Ninth Circuit found the *Daou* complaint, like the *Rubke* complaint, made "a 'wholesale adoption' of the securities fraud allegations for purposes of the Securities Act claims." 411 F.3d at 1028. *Daou* also found plaintiffs "never rel[ied] on such conduct as negligence or mistake in stating their claims" and warned, "a district court is not required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability." *Id.* But such is not the case here, where negligence and fraud allegations are expressly made and distinctly pleaded separately. Here, the Complaint simply pleads alternate theories of liability, and in so doing, alleges facts sufficient to give Defendants notice under Rule 8 that Defendants are liable under the Securities Act for negligent misrepresentations in the Registration Statements. Tellingly, Defendants' entire falsity argument assumes a Rule 9 standard and stripped of its demands for that level of specificity, does not seriously challenge the falsity pled.

---

1  Defendants' suggestions that the Complaint's allegations are lacking because they are not

2  authenticated by their own earnings restatement, lack trial-level proof or are not sufficiently

3  corroborated by confidential witnesses are similarly misdirected.  Where Plaintiffs adequately allege

4  specific misrepresentations and omissions contained in the Registration Statements and

5  Prospectuses, and further allege how those misrepresentations and omissions were misleading,

6  "[n]othing more is required."  *In re Exodus Commc'ns, Inc. Sec. Litig.,* No. C 01-2661, 2005 WL

7  1869289, at *13 (Aug. 5, 2005); *In re DDi Sec. Litig.,* No. CV 03-7063, 2005 WL 3090882, at *12-

8  13 (C.D. Cal. July 21, 2005); *see also In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2nd

9  Cir.1993).[12]

10      First, even where a corporation is under no duty to disclose information, but it voluntarily

11  undertakes to make a public statement that is reasonably calculated to influence the investing public,

12  such a statement may not be "false or misleading or ... so incomplete as to mislead."  *S.E.C. v. Texas*

13  *Gulf Sulphur Co.*, 401 F.2d 833, 862 (2nd Cir.1968).  Thus, "'a duty to **speak the full truth** arises

14  when the defendant undertakes to say anything.'"  *Schaffer v Evolving Sys., Inc.*, 29 F. Supp. 2d

15  1213, 1221 (D. Colo. 1998).  *See* Plaintiffs' detailed allegations of affirmative falsity at ¶¶58-70 and

16  73-80.

17      Second, in the context of a public offering, there is a strong affirmative duty of disclosure.

18  *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976) (the Securities Act "was designed to

19  provide investors with full disclosure of material information concerning public offerings").  The

20  preparation of a registration statement embodies nothing if not an affirmative duty to disclose a

21  broad range of material information.  *Herman,* 459 U.S. at 381-82.  Section 11 is "intended to ensure

22

23  [12]   In fact, the U.S. Supreme Court has "recognized time and again, a 'fundamental purpose' of
the various Securities Acts, 'was to substitute a philosophy of full disclosure for the philosophy of

24  *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'"
*Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).  The need for issuers to disclose material

25  information is even more "crucial in the context of a public offering," like the ones in this case,
because investors must rely solely on offering documents prepared by the issuer.  *Shaw*, 82 F.3d at

26  1208.  "'The objective of a prospectus is to solicit investment by the general public,'" and so issuers
are required to disclose the "'factors entering into prudent investment decisions'" in a

27  "'standardized, comprehensible, and accurate manner.'"  *Isquith ex rel. Isquith v. Middle S. Utils.,
Inc.*, 847 F.2d 186, 201 (5th Cir. 1988).

28

1  that issuers, under pain of civil liability, not cut corners in preparing registration statements and that

2  they **disclose all material information** required by the applicable statutes and regulations." *Id. See*

3  *also Shaw*, 82 F.3d at 1204; *Huddleston*, 459 U.S. at 381-82.  Accordingly, the federal securities

4  laws, and the SEC rules adopted pursuant thereto, impose specific disclosure obligations on issuers

5  and those directors of an issuer who sign a registration statement.  SEC Regulation C, Rule 404

6  requires that an issuer provide all information called for in the "General Instructions" to the Form

7  S-1 Registration Statement, which is the form used by Defendants herein.  "Part 1 - Information

8  Required in Prospectus," of the "General Instructions," in turn, lists numerous disclosures required

9  under SEC Regulation S-K.  Some of the disclosures which Defendants were required to make

10  pursuant to Regulation S-K were:

- Item 11(h) of the "General Instructions" requires compliance with Reg S-K §303(a)(3)(i), which mandates that a registrant "**describe any…significant components of revenues … that … should be described in order to understand the registrant's results of operations**" and §303(a)(3)(ii), which mandates that a registrant "**describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations**."  Plaintiffs have alleged, notwithstanding the requirement imposed upon Defendants to disclose such trends, Defendants failed to disclose the self-cannibalizing effect Bare's rampant store openings were having on sales, "premium" product image dilution through sales to big-box discounters Target and Costco, failing efforts to revitalize infomercial sales and to cross-sell, and heavy reliance on an negative option sales program that could not provide long-term, consistent sales ¶¶30, 57-81, 221, 223, 227, 231, 233.

- Item 11(a) of the "General Instructions" requires compliance with Reg S-K §101, which mandates a detailed description of an issuer's business.  For instance, Item 101(c)(i) required Defendants to include a detailed description of Bare's "principal products and services," including the "**methods of distribution of, the segment's principal products and services**."  Here, Plaintiffs have alleged that (i) at the time of the IPO and the March Offering, Bare was in violation of its exclusivity agreement with QVC and was shipping to distributors who instead were selling its product at Costco and Target.  ¶¶7-18, 63, 65-67.  Plaintiffs also allege Bare was relying on a negative option sales program that provided unreliable sales revenues.  ¶¶18-19, 74, 79-80.  Plaintiffs also allege Bare was opening stores at a breakneck pace that exceeded the number of planned store openings disclosed in the prospectus and was resulting in unchecked cannibalization of its QVC and infomercial sales.  ¶¶20-21, 59-61, 64, 77-78.  None of this was disclosed in the Registration Statements.  Thus, the Complaint properly alleges material facts which Defendants were required to include in the Registration Statements.

- Item 101(c)(iv) also requires specific disclosure of the "importance…of all…licenses, franchise and concessions held."  Plaintiffs specifically allege that at the time of the IPO and March Offering, Bare was covertly distributing product through non-prestige distributors, sales that both violated its agreement with QVC

and denigrated its premium mantra. ¶¶63, 65-67, 74, 79-80. Defendants counter that "[s]ince October 2005, Bare's sales policy, as publicly disclosed on its website," only permitted sales to "authorized accounts that promote Bare's 'premium brand image' and that distributors who violate this policy "[would] not receive future shipments.'"

Third, even in the absence of misstatements or a statutory duty to disclose, a registration statement must include all statements necessary to prevent the statements made therein from being misleading. "A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *Time Warner*, 9 F.3d at 268. Thus, where a registration statement discusses some aspect of the issuers' business, "the question presented is whether that discussion omitted to state material facts necessary to make the statements therein not misleading; not whether, considered in the abstract, there was an obligation to disclose those facts at that time." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 735 (2nd Cir. 1987).

Thus, it cannot be denied that the Securities Act Defendants had a duty to be honest and truthful in the Registration Statements – *a duty they failed to uphold.*

### a. The Registration Statements Misstated Bare's Adherence to Its Purportedly Iron-Clad "Premium Sales" Restrictions

The Complaint alleges that despite Bare's claimed adherence to premium sales channel restrictions described in the Registration Statements, "at the time of its IPO in September 2006, Bare Escentuals was not in compliance with the spirit, much less the word, of its QVC exclusivity agreement," filed *in toto* as an attachment to the IPO Registration Statement. ¶¶6-11. "In fact, though Bare Escentuals repeatedly touted in the IPO Registration Statement/Prospectus and thereafter that its sales model and its 'multi-channel distribution strategy provide[d] for greater consumer diversity, reach and convenience while reinforcing the authenticity and premium image of [the Company's] brands,' Defendants concealed, at the time of the IPO, that Bare Escentuals product the Company itself had put into the chain of commerce through distributors was being prepared for resale at big-box discounters Costco and Target for the 2006 Christmas season." *Id.* "Defendants also knew at some point before the Fall of 2007 that their products were being sold on Target's website." *Id.* By January 2007, Bare would, as required by the QVC agreement, file suit in federal court against Costco. ¶12. The Company characterized the litigation (in pleadings) as involving

"100,000 high-end cosmetic kits that Costco purchased from a third party **for millions of dollars**" that had been repackaged for sale in December 2006 "at substantial discounts to the prices Bare Escentuals, QVC and its other 'prestige' wholesalers were charging." *Id.*  Still, the Registration Statements made absolutely no mention of Bare's sales to overseas distributors who were selling its product back to Target and Costco.  ¶¶7-17, 63, 65-67, 74, 79-80.

Complaint ¶¶63, 65-67, 74, 79-80 allege direct misstatements.  As these were "untrue statement[(s)] of a material fact," they are actionable under §11.  *See* 15 U.S.C. §77k(a); *see also Huddleston*, 459 U.S. at 381-82 ("Section 11 of the 1933 Act ... was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.").  Moreover, beyond the direct misstatements concerning the Costco and Target sales, their nondisclosure was a material omission. *See TSC Indus.*, 426 U.S. at 449-50 (while a material fact is one of which "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," "'[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'" *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3rd Cir. 1997).

### b.   The Registration Statements Concealed Bare's Reliance on Its "Negative Option" Sales Program

The Complaint alleges that Bare's sales were heavily reliant upon "club" sales where customers who placed single orders would be repeatedly shipped – and their credit cards repeatedly billed for – additional unwanted "small but costly shipments." ¶¶18-19.  The Complaint alleges that "[s]uch automatically recurring credit card transactions are notoriously easy to start but nearly impossible to stop." *Id.*  The Complaint alleges that while this allowed Bare to "capture, obtain and report several years worth of phenomenal premium sales employing this guise leading up to its September 2006 IPO, not only would the repeat sales these tactics generated grow lean in the period following the IPO and the follow-on offerings, the Company would be forced to refund previously

1    recognized sales and many would-be direct-to-consumer sales customers became brick-and-mortar

2    shoppers instead," and indeed, "in the two years following the Company's IPO, the Company's so-

3    called direct-to-consumer sales plummeted from $179 million in FY 2006, representing 45.6% of all

4    sales, to $170 million in FY 2008, representing just 30.6% all sales." *Id.* Instead of disclosing the

5    impact the practices were having on sales, the growing harm to Bare's reputation with customers and

6    the potential liability associated with such practices (both in terms of customer refunds and

7    regulatory risk), the Complaint alleges that the Registration Statements falsely described Bare's

8    "infomercial continuity program" as offering "Competitive Strengths" that generated "brand loyalty

9    and enthusiasm for [Bare's] products," and "position[ed] [Bare] for continued, sustainable growth in

10   the future." ¶¶62, 73.

11          Defendants challenge the Complaint's specificity claiming, among other things, that the

12   Complaint fails to allege "how many customers were **members**" at any given time. Bare Mtn. at 10-

13   11. Yet Defendants do not attempt to argue this does not meet Rule 8(a) standards – they allege it

14   fails to comply with Rule 9(b)'s and the PSLRA's heightened pleading standards, which it does, but

15   need not have for purposes of this allegation. Defendants also claimed "Plaintiffs do not allege that

16   there was anything improper with the club program under applicable consumer protection laws, and

17   there are no allegations that Bare's club program was ever investigated by any governmental

18   agency." *Id.* Wrong. Complaint ¶¶177-79 definitely challenge the materiality and the propriety of

19   the sales.

20          Complaint ¶¶59, 62, and 73 allege direct misstatements touting the "brand loyalty" and

21   "enthusiasm" for the negative option sales program. These were "untrue statement[(s)] of a material

22   fact" and they are actionable under §11. *See* 15 U.S.C. §77k(a); *see also First Virginia Bankshares*

23   *v. Benson,* 559 F.2d 1307, 1313-14 (5th Cir. 1997) (party who chooses to speak is bound "not only

24   to state the truth but also not to suppress or conceal any facts within his knowledge which will

25   materially qualify those stated"); *Schaffer v. Evolving Sys., Inc.,* 29 F. Supp. 2d 1213, 1221 ("[A]

26   duty to **speak the full truth** arises when a defendant undertakes a duty to say anything.'"); (D. Colo.

27   1998) *accord Freedman v. Louisiana Pacific Corp.,* 922 F. Supp. 377, 387 (D.Or. 1996) ("'[T]he

28   securities laws do not impose general duties to speak ... . However, when a corporation makes

affirmative statements which are rendered misleading by omissions of material facts, the corporation has a duty to disclose whatever additional information is necessary to rectify the misleading statements."). *See also Hanon v. Dataproducts Corp.,* 976 F. 2d 497, 504 (9th Cir. 1992).

Moreover, by not disclosing the Company's past and current reliance on the lucrative negative option sales in the Registration Statements, ***sales that could not last indefinitely***, Defendants violated Section 11. As discussed above, Bare was required to comply with Regulation S-K 303, which required Defendants to disclose any "known trends or uncertainties." *See Shaw*, 82 F.3d at 1205. The Ninth Circuit has held that because Section 11 imposes liability if a registrant "omits to state a material fact required to be stated" in the registration statement, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11." *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1296 (9th Cir. 1998); *see also Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) (adequacy of disclosure under Item 303 is a factual question and "adequacy of disclosure is normally a jury question."); *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721, 2005 WL 5036360, at *13 (S.D.Cal. Jan. 3, 2005) (denying motions to dismiss because the "Complaint sufficiently alleges enough facts from which a reasonable jury could conclude that the SureBeam prospectus violated Section 303"); *In re Initial Public Offering Sec. Litig.,* 358 F.Supp.2d 189, 211 (S.D.N.Y. 2004) (denying motion to dismiss S-K 303 falsity claims in Section 11 case, citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2nd Cir. 2002) for the proposition that "that materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission"). Because "[t]he existence of a material omission is usually a question for the trier of fact," securities fraud claims should not be dismissed for failure to plead that element unless the court can "say that as a matter of law the complaint fails to raise a reasonable inference that [there] was a material omission." *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 87 (1st Cir. 2008).

### c. The Registration Statements Misstated the Success of Bare's Efforts to Cross-Sell Non-Foundation Products

The Complaint directly challenges the Registration Statements' purportedly ***then-current*** statements that "[t]o date, [Bare had] ***demonstrated success in cross-selling [its] non-foundation products*** in channels where [it] interact[ed] directly with consumers, such as in our boutiques and on home shopping television" were false and misleading because, as would later be revealed, the cross-selling efforts had never gotten off the ground.  ¶¶68, 76.  According to the Complaint's allegations, Bare's President of Retail expressly conceded on October 30, 2008 that "the Company had tried and failed" with cross-selling and "attempts to broaden its offerings into related cosmetic categories." ¶¶172, 197.  These allegations contained "representation[s] of present fact," which, as the *Shaw* court recognized, can give rise to a duty to disclose.  *Id.,* 82 F.3d at 1213;

Notably, Defendants do not bother to challenge whether these falsity allegations state a cognizable claim as a matter of law – instead moving directly into attempting to prove with materials outside the Complaint (that have not been properly authenticated, much less been subjected to examination) that the allegations are false, which is inappropriate at this stage, ***and that to the extent cross-selling did fail***, the Company's boilerplate risk disclosure warned these efforts might be unsuccessful.  Bare Mtn at 10.  Yet, as the Fifth Circuit has observed: "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) (*rev'd on other grounds, Huddleston,* 459 U.S. 375, 103 (1983)).  "Warnings ... that put investors on notice that there is a chance things may not go as hoped in the future ... do not put investors on notice that statements made in the prospectus are untrue at the time, or that important facts have been left out of the prospectus." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993); *In re Towne Servs., Inc., Sec. Litig.*, 184 F. Supp. 2d 1308, 1319 (N.D. Ga. 2001) (a §11 complaint states actionable misstatements where the prospectus' statements about the company's computer systems were "false and misleading because (1) they failed to disclose ***already-existing*** problems and resulting customer losses, and (2) simultaneously made assurances about the reliability of Towne's systems and ***provided only vague***

1   *warnings* about the threat posed by a system failure and/or customer attrition"). Otherwise

2   actionable omissions concerning past or present problems cannot be immunized by forward-looking

3   statements about similar problems. *See, e.g., In re Premiere Techs. Inc.*, No. 1:98-CV-1804, 2000

4   WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000) ("Statements and omissions of past and current

5   circumstances cannot be cured by reference to future difficulties and undetected problems."). "[T]he

6   statutory safe harbor, like the 'bespeaks caution' doctrine, does not insulate defendants from private

7   securities liability based on statements that misrepresent historical/hard or current facts." *Gross v.*

8   *Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997). Moreover, the bespeaks caution

9   doctrine provides [the] basis for dismissal "as a matter of law only when reasonable minds could not

10  disagree as to whether the ***mix*** of information in the document is misleading.'" *Fecht v. Price Co.*,

11  70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis in original).

12          **d.    The Registration Statements Misrepresented the Ongoing**
            **Cannibalization of Bare's Sales that the Rampant Store Expansion**
13          **Caused**

14          The Complaint challenges the Registration Statements' characterization of its rapid store

15  expansion as "[a] core element of [the Company's] success." ¶¶59-61, 75, 77-78. It also alleges that

16  that stated "opportunities" of "open[ing] additional domestic boutiques" conflicted with statements

17  touting Bare's ability to concomitantly "continue to grow[] infomercial sales." *Id.* Significantly, the

18  Complaint alleges all of this transpired while ***"absolutely no effort was being made internally to***

19  ***coordinate the multiple competing sales spots that were popping up*** – including multiple competing

20  sales outlets in single shopping malls." *Id.*

21          Defendants again avoid arguing that the claims are not cognizable as a matter of law, and

22  instead proffer contradictory factual propositions of their own: "Plaintiffs' allegation … fails

23  because the business model proved to be a great success" and averring that "boutiques were three to

24  four times more profitable," again improperly asking this Court to credit and weigh "facts" not

25  present in the four corners of the Complaint or incorporated therein by reference for the truth of the

26  matter asserted and to make contested factual findings in their favor. *See* Bare Mtn. at 9-10; *see also*

27  *In re Paracelsus Corp.*, 6 F. Supp. 2d 626, 630 (S.D. Tex. 1998). *In re Glen Fed, Inc. Sec. Litig.*, 11

28  F.3d 843, 848 (9th Cir. 1993). Defendants also proffer that even if the massive store build-out did

1   cannibalize sales, "Bare was forthright about this risk, stating that its goal was to distribute through

2   as many channels as feasible to increase brand awareness and gain market share" and that the "risk

3   of cannibalization was factored into its growth plans."  Bare Mtn. at 10.

4          However, defendants "bear a heavy burden of proof" in order to prevail on a truth-on-the-

5   market defense.  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996).  The question "whether

6   adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact," and

7   can be resolved at the pleading stage only where the adequacy of the disclosure is "'so obvious that

8   reasonable minds [could] not differ.'"  *Fecht*, 70 F.3d at 1081.  The adequacy of Defendants'

9   proffered counterbalancing disclosures is far from obvious.  Indeed, the "'doctrine of bespeaks

10  caution provides no protection to someone who warns his hiking companion to walk slowly because

11  there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot

12  away.'"  *Salomon Smith Barney v. Asset Securitization Corp.*, 98 Civ. 4186, 1999 WL 1095605, at

13  *5 (S.D.N.Y. Dec. 3, 1999) (citing *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72

14  (S.D.N.Y. 1996) and upholding §11 claims).

15      **B.    Because All Securities Act Claims Were Brought Less than One Year After a
            Reasonable Investor Would Have Discovered the Facts Underlying the
16          Misstatements in the Registration Statement, Plaintiffs' Securities Act Claims
            Are Timely**

17          Defendants contend that Plaintiffs' Section 11 and 12(a)(2) claims are time-barred.  The U.S.

18  Supreme Court recently ruled in *Merck & Co., Inc. v. Reynolds*, U.S. 2010 (slip op.) No. 08-905

19  (April 27, 2010) Ex. F, that the limitations period in a securities class action does not begin to run

20  until the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, "the facts

21  constituting the violation," – irrespective of whether the actual plaintiff undertook a reasonably

22  diligent investigation.  *Id.* at 12-17.

23          Here, the Underwriter Defendants claim Plaintiffs were on inquiry notice "long before

24  August 2008" but did not name them as Defendants in the Complaint until August 25, 2009.  UW

25  Mtn. at 1.  Under the "notice-plus-reasonable-diligence" test recently adopted by the Ninth Circuit

26  and the Supreme Court, this Court must first determine when the Plaintiffs had "inquiry notice" of

27  the facts giving rise to the claim.  *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 876 (9th Cir.

28

2008).  "A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further."  *Id.*  Once a plaintiff has inquiry notice, the court must then determine when the investor, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged misconduct.  The Supreme Court said in *Merck* the clock may not start ticking before discovery was possible though.  *Merck,* slip op. at 12-17.  A defendant seeking to dismiss a claim on the basis of inquiry notice "undertake[s] a heavy burden." *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1287 (E.D. Wash. 2007); *cf. Mass. Bricklayers and Masons Funds and Pipefitters' Retirement Fund Local 598 v. Deutsche Alt-A Securities*, No. CV 08-3178, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) ("Questions of fact regarding circumstances of discovery of allegedly false information preclude the entry of judgment at this stage of the proceedings.").  The issue can be resolved before trial only in the rare case "'when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the [wrongful] conduct.'"  *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996).  The Ninth Circuit cautioned in *Betz* that inquiry notice should not be broadly construed, explaining that information will not trigger inquiry notice unless it is "'sufficiently probative of fraud – sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate.'"  *Betz*, 519 F.3d at 876 (quoting *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997)).  Inquiry notice, moreover, is a question of fact generally inappropriate for resolution on a motion to dismiss, or even on summary judgment.  The issue can be resolved before trial only in the rare case "when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the [wrongful] conduct."  *Gray,* 82 F. 3d at 881.

The Underwriter Defendants contend that Plaintiffs were sufficiently on inquiry notice regarding the Complaint's allegations before August 2008. UW Mtn. at 1.  They are wrong.  The final eventful disclosure that the market took note of occurred October 30, 2008, well less than one year before the Underwriters were named as Defendants.  As §III.B above makes clear, the market did not become ***painfully*** aware of the "club" sales, the effects of sales cannibalization or Bare's

1   inability to cross-sell until the 3Q 08 earnings release.[13]  The Underwriter Defendants' argument that

2   "[i]nformation about Costco's sales of Bare's products entered the public arena in January 2007,

3   when Bare sued Costco in federal district court in an effort to enjoin the sales," putting the onus on

4   investors to diligently scour the same federal PACER dockets they apparently chose not to scour in

5   advance of the March 2007 Offering misses the point.   The IPO had already been conducted.

6   Moreover, investors are not required to hire private investigators to demonstrate diligence –

7   underwriters are.  Even when investors did finally learn about the Costco/Target sales in February

8   2008, they were vigorously reassured Bare was actively working to stop them, so even actual

9   discovery in February 2008 would not have remotely created sufficient suspicion of wrongdoing to

10  incite a reasonable investor to investigate further.   This is true primarily because the Bare

11  Defendants continued misstating the risk to Bare's business model even as they disclosed the Costco

12  lawsuit on February 28, 2008, including Blodgett's statement that Bare had no "business relationship

13  with either retailer" and so Bare was "aggressively pursuing [its] legal rights with respect to sale of

14  Bare Escentuals products through unauthorized channels" (¶176(e)), "falsely assur[ing] the

15  investment community that the 'unauthorized' Target and Costco sales would be stopped." ¶14.  As

16  Plaintiffs allege, however, and as the Bare Defendants now confirm, Bare had no legal recourse to

17  stop the sales and indeed, at least as to Target, they continue to this day.  ¶14; Bare Mtn. at 13 ("A

18  company cannot … pursuant to the long-standing 'first sale' doctrine, prevent the subsequent resale

19  of authentic product by a later, innocent purchaser.").[14]  Finally, the Underwriter Defendants did not

20  attempt to come forward with SEC filings showing it was disclosed in the Registration Statements or

21  periodic or current reports.

22

23  [13]   Indeed, as the *Countrywide Sec.* court found, it is "unnecessary to address *Betz's* reasonable
    diligence prong" where Bare's negative option program "could not have been maintained though the
24  class period if reasonable investors had inquiry notice."  588 F. Supp. 2d at 1159.

25  [14]   Defendants' reliance on the highly criticized *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir.
    1985) decision is misplaced.  A Ninth Circuit panel expressly criticized *Toombs* in *Johnson v. Aljian*,
26  490 F.3d 778, 781 n.13 (9th Cir. 2007), noting the "rule has incurred forceful, and we think justified,
    criticism" and finding such a rule inapplicable to Section 10(b) claims and expressing reservation as
27  to whether the rule would survive application to a Securities Act claim); *see also In re Elect. Data
    Systems Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 677 (E.D. Tex. 2004).

28

LEAD PLAINTIFFS' CORRECTED OPP. TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS       **21**

1    Second, in light of Blodgett's false assurances, and continued concealment of Bare's

2    declining business prospects, the stock chart in ¶32 of the Complaint actually demonstrates the stock

3    price increased on Defendants' February 28, 2008 statements.  As such, an investor exercising

4    reasonable diligence would not have thought to investigate Bare's misstatements prior to October

5    2008 – much less bring suit.  "Where a market appears to have all the ordinary hallmarks of

6    efficiency but a complaint still plausibly alleges the market was fooled, it is preposterous to argue at

7    the pleadings stage that a 'reasonable investor' should have been on inquiry notice."  *See*

8    *Countrywide Sec.*, 588 F.Supp.2d at 1159; *see also Betz*, 519 F.3d at 877-78 ("Our hesitation to

9    approve **summary judgment** in securities fraud cases is especially pronounced where the plaintiff

10   alleges that the defendants' reassurances convinced the plaintiff to postpone his or her legal

11   action."); *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411, 2010 WL 727227, at *27

12   (S.D.N.Y. Feb. 22, 2010) (same); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 527 (S.D.N.Y. 2005)

13   (same).  As the Supreme Court held in *Merck*, "inquiry notice" does not occur until investors

14   exercising reasonable diligence actually obtain "facts constituting the violation" – not at "some

15   earlier moment before 'discovery.'"  *Merck*, slip op. at *15-*16.[15]  Because this Court cannot

16   conclude as a matter of law that Plaintiffs were on inquiry notice of the wrongdoing more than one

17   year before the Complaint was filed, the Court need not determine when an investor, acting with

18   reasonable diligence, would have actually discovered the facts underlying the alleged wrongdoing.

19   Even assuming *arguendo* that Plaintiffs had inquiry notice by August 2008 as the

20   Underwriter Defendants suggest, they "do not suggest, let alone specify, what plaintiffs should or

21   could have done that would have alerted them to the facts underlying their causes of action against

22   the Underwriter Defendants" between that time and when the Complaint was filed.  *Exodus*

23

24   [15]   Indeed, the *Merck* court specifically considered whether disclosures made in the form of an
     FDA warning letter coupled with pleadings filed in products-liability actions alleging that Merck had
25   concealed information about Vioxx and intentionally downplayed its risks put securities investors on
     notice of the "facts constituting the violation" – ruling it did not.  *Merck*, slip op. at *18.  The *Merck*
26   decision focuses on whether those disclosures put plaintiffs on inquiry notice of defendants' scienter
     in an Exchange Act case, finding it did, but the analysis is equally dispositive of the Underwriter
27   Defendants' claims here because the February 28, 2008 disclosure could not have put investors on
     notice – **as a matter of law** – of their Securities Act claims.  *Id.*

28

*Commc'ns, Inc.*, 2005 WL 1869289, at *9.  Thus, Plaintiffs have no obligation to plead additional "facts establishing diligent inquiry."[16]  UW Mtn. at 23.

**C.   Loss Causation Is not an Element of, But an Affirmative Defense to, a Securities Act Claim that Must be Pled and Proved**

As the *Countywide Sec.* court explained, "Loss causation is not a §11 element."  588 F. Supp. 2d at 1170 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir.1994) and *Levine v. AtriCure, Inc.*, 508 F.Supp.2d 268, 272 (S.D.N.Y. 2007).  Rather, "§11(e) makes the absence of loss causation [or "negative causation"] an affirmative defense to reduce or avoid liability under §11." *Id.* (citing 15 U.S.C. §77k(e) (containing a proviso to the damages calculation: "if the defendant proves that any portion or all of" the presumptive damages) and *Levine*, 508 F. Supp. 2d at 272.  "'Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.'" *Id.* (citing *Levine*, 508 F.Supp.2d at 272).  Only "where the face of the complaint or judicially noticeable facts demonstrate that the plaintiff cannot establish loss causation" is "12(b)(6) dismissal … appropriate." *Id.* Where, as here, there are "many alleged misstatements of varying substance over such a long period of time, it is all but certain that some corrective information leaved into the market," leading to "explanations" that also turn out to be false. *Id.*  Under these circumstances, "negative causation" requires resolution of contested factual disputes and cannot be resolved on the pleadings. *Id.*[17]

---

[16]    Plaintiffs have pleaded compliance with the statute of limitations for Securities Act claims. *See, e.g., Countrywide Sec.*, 588 F. Supp. 2d at 1173; *In re Dynegy Sec. Litig.*, 339 F. Supp. 2d 804, 836 (S.D. Tex. 2004) ("Lead Plaintiff alleges that plaintiffs became aware of facts underlying the §11 claims arising from [defendant's] debt security offerings . . . less than one year before Lead Plaintiff filed its Consolidated Complaint[.] The court concludes that these allegations are sufficient to plead compliance with the statute of limitations . . . because they give defendants fair notice of what plaintiffs' claim for compliance is and the grounds on which it rests.") (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002)).  In the event the Court finds otherwise, Plaintiffs seek leave to amend for that limited purpose.  *See Metropolitan*, 532 F. Supp. 2d at 1286, 1305.

[17]    Though also faced with a long relevant period during which several partial disclosures were made, raising disputed questions of fact as to defendants' "negative causation defense," along with corrective disclosures defendants argued put investors on inquiry notice, the *Countrywide Sec.* court found it was "not possible, at th[at] juncture, to establish what corrective or notice effect on investors they would have had, either individually or in combination." 588 F.Supp.2d 1173 n.52; *see also Citibank Global Mkts., Inc. v. Rodriguez Santana*, 573 F.3d 17, 23 (1st Cir. 2009) ("***Because section***

1

## IV.   CONCLUSION

2      For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Underwriter

3  Defendants' motion to dismiss.  In the event the Court chooses to convert this motion to a motion for

4  summary judgment, Plaintiffs request an opportunity to conduct discovery before making further

5  submissions in order to respond on a complete factual record.  In the event the Court grants any of

6  the motion in whole or in part, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a)

7  of the Federal Rules of Civil Procedure.

8  Dated: May 4, 2010                              Respectfully submitted,

9                                                  SCOTT+SCOTT LLP

10                                                 /s/ Mary Blasy
                                                   MARY BLASY
11                                                 600 B Street, Suite 1500
                                                   San Diego, CA 92101
12                                                 Telephone: 619-233-4565
                                                   Facsimile: 619-233-0508
13                                                 mblasy@scott-scott.com

14                                                 SCOTT+SCOTT LLP
                                                   David R. Scott (*pro hac vice*)
15                                                 Erin G. Comite (*pro hac vice*)
                                                   P.O. Box 192
16                                                 156 South Main Street
                                                   Colchester, CT 06415
17                                                 Telephone: 860-537-5537
                                                   Facsimile: 860-537-4432
18                                                 drscott@scott-scott.com

19

20

21

22

23

24

25

26  _____

27  *11 places the burden of showing due diligence on the defendants,…it cannot support their motion*
    *to dismiss unless…[the] facts establish the affirmative defense with certitude.*").

28

1

### CERTIFICATE OF SERVICE

2      I hereby certify that on May 4, 2010, I caused the foregoing to be electronically filed with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing

5   document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants

6   indicated on the Manual Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on May 4, 2010.

9

10                                    /s/ Mary Blasy
                                      MARY BLASY
11                                    SCOTT+SCOTT LLP
                                      600 B Street, Suite 1500
12                                    San Diego, CA 92101
                                      Telephone: 619-233-4565
13                                    Facsimile: 619-233-0508
                                      mblasy@scott-scott.com
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28