1  JEROME F. BIRN, JR., State Bar No. 128561
   jbirn@wsgr.com
2  KEITH E. EGGLETON, State Bar No. 159842
   keggleton@wsgr.com
3  KELLEY M. KINNEY, State Bar No. 216823
   kkinney@wsgr.com
4  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
5  650 Page Mill Road
   Palo Alto, CA 94304-1050
6  Telephone:  (650) 493-9300
   Facsimile:   (650) 565-5100

7

8  Attorneys for Defendants
   BARE ESCENTUALS, INC., LESLIE A.
9  BLODGETT, MYLES B. MCCORMICK,
   ROSS M. JONES, BRADLEY M. BLOOM,
10 JOHN C. HANSEN, MICHAEL J. JOHN,
   LEA ANNE OTTINGER, KAREN M. ROSE,
11 GLEN T. SENK, AND DIANE M. MILES

12

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                       OAKLAND DIVISION

16 IN RE BARE ESCENTUALS, INC.        )   Master File No.:  C-09-03268-PJH
   SECURITIES LITIGATION             )
17 _____   )   **REPLY BRIEF IN SUPPORT OF**
                                     )   **MOTION TO DISMISS THE**
18                                    )   **CORRECTED CONSOLIDATED**
                                     )   **COMPLAINT FOR VIOLATIONS OF**
19 This Document Relates To:         )   **FEDERAL SECURITIES LAWS**
                                     )
20 All Actions                       )   Date:    July 14, 2010
                                     )   Time:    9:00 a.m.
21                                    )   Dept:    Courtroom 3
                                     )
22                                    )   Before: Judge Phyllis J. Hamilton
                                     )
23 _____   )

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION.............................................................................................................1

ARGUMENT ...................................................................................................................2

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 11.................................2

    A.    Plaintiffs Ignore the Applicable Pleading Standards.............................................2

        1.    The Complaint Fails to Plead Facts Giving Rise to a "Plausible" Claim That the Prospectuses Contained Material Misstatements. ............2

        2.    Plaintiffs Misstate Their Pleading Burdens Under Items 101 and 303 of Regulation S-K—Which Are Nowhere Alleged in the Complaint........4

        3.    Because the "Gravamen" of the Complaint Is Fraud and It Alleges a "Unified Course" of Fraudulent Conduct, Plaintiffs Must Plead Facts Sufficient To Satisfy Rule 9(b). ........................................................5

    B.    Plaintiffs Have Not Pled Facts Showing That Either the November 2006 IPO or March 2007 Prospectus Contained a Materially False Statement. ..............7

        1.    Plaintiffs Plead No Facts Giving Rise to a Plausible Claim That Bare Misrepresented Its Multi-Channel Business Model or Growth Strategy..............................................................................................7

        2.    Plaintiffs Offer No Facts Giving Rise to a Plausible Claim That Bare Misrepresented Its Club Program..........................................................9

        3.    Plaintiffs Offer No Facts Showing That Bare's Premium Image Was Harmed by Immaterial Product Diversion to Target and Costco..............11

    C.    Plaintiffs Cannot Establish Loss Causation ..........................................................13

II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 12(a)(2) .....................13

III.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b).........................15

    A.    Plaintiffs Offer No Meaningful Argument to Show That Any Challenged Statement Was False When Made...........................................................................15

    B.    The Complaint Fails to Raise a Strong Inference of Scienter. ...............................16

        1.    Plaintiffs Offer No Direct Evidence of Scienter. ...................................16

        2.    The Facts Alleged Do Not Support the Rarely Applied and Narrow "Core Operations" Inference...................................................................16

        3.    The Stock Sales Allegations Do Not Provide the Missing Strong Inference of Scienter ...................................................................17

IV.   THE FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE................................19

V.      PLAINTIFFS' CLAIMS ARE TIME BARRED ............................................................20

CONCLUSION .........................................................................................................................20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................ 1, 2, 3

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ................................................................................................................ 3

*Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................................................................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 1, 2, 3

*Belodoff v. Netlist, Inc.*, No. SA CV 07-00677, 2008 WL 2356699 (C.D. Cal. May 30, 2008) .......................................................................................................... 7, 9

*Belodoff v. Netlist, Inc.*, No. SA CV 07-00677, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ........................................................................................................... 10

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ...................... 16, 17

*Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................... 15

*Citiline Holdings, Inc. v. iStar Fin., Inc.*, – F. Supp. 2d –, 2010 WL 1172647 (S.D.N.Y. Mar. 26, 2010) .................................................................................. 14

*Conley v. Gibson*, 355 U.S. 41 (1957) ......................................................................... 3

*Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ................................................................................. 3, 4

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 Fed. Appx. 665 (2d Cir. 2009) .................................................................................. 4

*Gold v. Morrice*, No. CV 07-00931, 2008 WL 467619 (C.D. Cal. Jan. 31, 2008) ....... 4

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) .................................... 14

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999) ................................................. 19

*Hockey v. Medhekar*, No. C-96-0815, 1997 WL 203704 (N.D. Cal. Apr. 15, 1997) ......... 19

*In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542 (8th Cir. 2004) ..................................... 18

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......... 7, 13

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) ......................................... 5, 6, 14

*In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ......................................................................................... 19

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)............................ 17, 18

*In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) ................................ 4, 5, 6, 9

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002)................................ 18

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996) ................................ 14

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994)............................ 9

*J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384 (6th Cir. 2008) ............................ 4

*Loan Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001) ........................... 14

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996) ................................ 4

*Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010)................................ 20

*Metzler v. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) ...................... 17, 18

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)................................ 3

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004)................................ 18

*Pa. Ave. Funds v. Borey*, No. C06-1737, 2009 WL 902070 (W.D. Wash. Mar. 30, 2009)................................ 17

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998)................................ 13

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 Fed. Appx. 617 (2d Cir. 2009) ................................ 3

*Pinter v. Dahl*, 486 U.S. 622 (1988) ................................ 13, 14

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) ................................ 14

*Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009) ................................ 13

*Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124 (N.D. Cal. 2006)................................ 5, 6

*Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009)................................ 5, 15

*Schneider v. Cal. Dept. of Corr.*, 151 F.3d 1194 (9th Cir. 1998)................................ 4, 17

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996)................................ 14

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ................................ 4, 8

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)............................ 16, 18, 19

1

## STATUTES

2 15 U.S.C. § 77k(a)(1) ................................................................................. 13

3 15 U.S.C. § 77l(a)(2) .................................................................................. 13

4 15 U.S.C. § 77m ........................................................................................ 20

5 15 U.S.C. § 78u-5(c)(1) ............................................................................. 19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>INTRODUCTION</u>**

The Complaint fails to state a claim under Section 11 because it offers no well-pleaded facts sufficient to create a "plausible" claim that Bare Escentuals ("Bare") made a false statement in its September 2006 IPO or March 2007 prospectuses, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1495-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570-71 (2007), let alone specific facts showing that a fraud occurred, as required to meet Rule 9(b) and the Reform Act.  The Court does not even need to consider the unchallenged and undeniable facts of Bare's outstanding financial performance from its IPO through mid-2008—the type of facts that courts have long considered on a motion to dismiss where as here there are no accounting allegations.  Simply comparing the key sweeping, conclusory assertions of Plaintiffs' Opposition ("Opp.") with the paltry facts alleged in the Complaint shows the implausibility of these claims.

Plaintiffs assert that customers were abandoning the club program "en masse," that Bare was "investigated" by the Better Business Bureau, and (reaching beyond the Complaint) that Bare produced 80,000 pages of customer complaints about the club program in a case that Bare filed against a competitor.  Opp. at 13-15.  Nonsense.  The Complaint offers only (i) the postings of anonymous bloggers (¶¶ 177-79), (ii) a former assistant controller who recalls an unspecified number of complaints about unspecified issues and an unspecified conversation among unspecified people about terminating the club program (¶ 18), and (iii) a former accounts receivable manager who recalls an unspecified number of complaints about unspecified amounts over an unspecified period of time (¶ 18).  Bare was not "investigated" by the Better Business Bureau—the Complaint cites no more than the posting of one anonymous blogger who allegedly read unspecified material on the BBB's website (¶ 177).  Bare did not produce 80,000 pages of customer complaints—the record in the lawsuit (attached to Plaintiffs' declaration) shows that the documents concerned comparative product issues and that this trademark infringement/false advertising case settled with the competitor's agreement to cease the advertising campaign.

Plaintiffs assert that Bare was complicit with an international distributor who resold product to Target/Costco in order to boost revenues and thereby violated its QVC contract and undercut retail pricing.  Opp. at 10-11.  Nonsense again.  The Complaint offers only (i)

inconsistent allegations that Bare sued Costco and took steps to cut off this distributor while rapidly expanding its own retail boutiques, (ii) a director of production who "believed" some of an October 2007 order "ended up" at Target, (iii) a lead business manager from Southern California who received five complaints per month about unspecified lower Target/Costco prices; and (iv) a director of retail boutiques who recalls unspecified discussions at unidentified meetings.

Plaintiffs' windy recitation of pre-class period events—Bare's pre-IPO financings or SEC comments on the pre-IPO prospectus (¶¶ 22, 69)—is simply irrelevant. All of this was disclosed. Likewise, we would be pleased to talk all day about Shiseido's post-class period tender offer at a 40% premium in a transaction valued at $1.7 billion—hardly suggestive of a failed company with a broken business model conducting a fire sale—but none of this is relevant either.

All of these failings explain why Plaintiffs struggle mightily to avoid mention of Bare's actual financial performance for any period of time. The indisputable facts that Bare twice raised its financial guidance in 2007, exceeded it with sales growth of 30%, and otherwise met its guidance through mid-2008 belie any claim that Bare misrepresented its "broken" business model, much less committed fraud. Indeed, Plaintiffs cannot even bear mention that the global recession just might plausibly explain the slowdown in growth that Bare reported for the third quarter of 2008. Plaintiffs' studious effort to craft the Complaint to omit this information defies "common sense" and shows the implausibility of their claim. *Iqbal*, 129 S. Ct. at 1940, 1950.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 11

### A.    Plaintiffs Ignore the Applicable Pleading Standards.

#### 1.    The Complaint Fails to Plead Facts Giving Rise to a "Plausible" Claim That the Prospectuses Contained Material Misstatements.

Plaintiffs fail to plead facts showing a "plausible" claim for relief under the Supreme Court standard applicable to Rule 8(a) articulated in *Twombly*, 550 U.S. at 557, 570, and *Iqbal*, 129 S. Ct. at 1949-50. Mtn. at 5-7. Plaintiffs' Opposition makes two fundamental legal errors.

First, Plaintiffs do not even mention these Supreme Court cases in their Section 11 argument, let alone explain why the Complaint satisfies the new standard. Opp. at 6-18. Instead,

Plaintiffs recite the old, rejected standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that a complaint cannot be dismissed "'unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim.'"  Opp. at 5-6 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003)). *Twombly* held that *Conley's* no-set-of-facts standard had "earned its retirement."  550 U.S. at 562.

*Twombly* gives district courts "'the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'"  *Id*. at 558 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).  A plaintiff must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  A plaintiff must allege *facts* which "raise a right to relief above the speculative level" and that "state a claim for relief that is plausible on its face."  *Id*. at 570.

*Iqbal* underscores the point.  A court first must separate "'naked assertion[s]' devoid of 'further factual enhancement,'" 129 S. Ct. at 1949 (alteration in original) (quoting *Twombly*, 550 U.S. at 557), "threadbare recitals," and "conclusory statements," all of which are "disentitle[d] . . . to the presumption of truth."  *Iqbal*, 129 S. Ct. at 1949, 1951.  A court next determines if the remaining facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 1940, 1949.  To do so, a court should conduct a "context-specific" analysis, that "draw[s] on its experience and common sense."  *Id*. at 1940, 1950.   If a complaint alleges facts "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility.'"  *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 557).

Courts have applied Rule 8's new "plausibility" standard to dismiss Section 11 claims. *See Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) (complaint insufficient to support falsity); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008) (allegations did not "rise above the 'speculative level' and into the realm of 'plausible' pleading'") (citation omitted), *aff'd*, 347 Fed. Appx. 617 (2d Cir. 2009); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) (claims "simply too conclusory"), *aff'd*, 347 Fed. Appx. 665 (2d Cir. 2009); *Gold v. Morrice*, No. CV 07-

1   00931, 2008 WL 467619, at *2 (C.D. Cal. Jan. 31, 2008) (complaint "lacks clarity in articulating

2   grounds for its claim").

3        Plaintiffs' second fundamental error is to urge the Court to ignore the full text of

4   documents cited in the Complaint or judicially-noticeable facts, such as the prospectuses, press

5   releases, and Bare's financial results.  Opp. at 6.  Although consideration of these undisputed facts

6   is not necessary given the Complaint's paltry allegations, they provide additional grounds for

7   dismissal.  Courts have long been wise to plaintiffs who try to avoid dismissal by quoting

8   selectively from documents or omitting inconsistent judicially-noticeable facts.  *See Lovelace v.*

9   *Software Spectrum Inc*., 78 F.3d 1015, 1018 n.1 (5th Cir. 1996).  It is established law in the Ninth

10  Circuit that such information is considered on a motion to dismiss.  *E.g.*, *In re Stac Elecs. Sec.*

11  *Litig.*, 89 F.3d 1399, 1403-05 (9th Cir. 1996) (dismissing Section 11 claims); *Steckman v. Hart*

12  *Brewing, Inc*., 143 F.3d 1293, 1295-96 (9th Cir. 1998) (same).  Courts considering Section 11

13  claims after *Twombly/Iqbal* have followed the same logic.  *See Coronel*, 2009 WL 174656, at *1

14  n.1 (considering exhibits, statements, documents incorporated by reference, documents filed with

15  SEC, and matters subject to judicial notice); *Garber*, 537 F. Supp. 2d at 607, 610, 612 (same).

16        **2.    Plaintiffs Misstate Their Pleading Burdens Under Items 101 and 303 of
                Regulation S-K—Which Are Nowhere Alleged in the Complaint.**

17

18        For the first time in their Opposition, Plaintiffs argue that Bare violated Section 11

19  because the prospectuses failed to disclose "known trends" and "uncertainties," certain "methods

20  of distribution," and the importance of all "licenses, franchise, and concessions[,]" as required by

21  Items 303(a)(3)(ii), 101(c)(1), and Item 101(c)(iv) of SEC Regulation S-K.  Opp. at 9-10.  The

22  absence of these allegations from the Complaint warrants dismissal.  *Schneider v. Cal. Dept. of*

23  *Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (opposition's new allegations not considered on

24  motion to dismiss).  This argument adds nothing, except to show that these claims sound in fraud.

25        To state a claim under Item 303, Plaintiffs must plead facts showing that Bare (1) actually

26  *knew* of an existing, material adverse trend, and (2) believed this trend was reasonably likely to

27  cause future material adverse impacts.  *See Steckman*, 143 F.3d at 1296-98; *J&R Mktg., SEP v.*

28  *Gen. Motors Corp.*, 549 F.3d 384, 391-92 (6th Cir. 2008) (duty of disclosure under Item 303

requires knowledge).  A violation of Item 303 requires the concealment of known material trends that are believed will continue, not a failure to predict the future.  *See Stac*, 89 F.3d at 1409 (companies not required to predict future).  Plaintiffs' injection of Item 303 implicitly concedes that their Section 11 claim involves knowledge and concealment, *i.e.*, that it "sounds in fraud."

Plaintiffs gain no traction from Item 101.  To state a claim under Section 101(c)(i), Plaintiffs must allege the failure to disclose "[t]he principal products produced and services rendered by the registrant in the segment and the principal markets for, and methods of distribution of, the segment's principal products and services."  Plaintiffs do not seriously contend that Bare failed to do so; they simply recycle their key alleged omissions.  Opp. at 9-10.  Bare provided lengthy disclosure as required by this provision.  *E.g.*, Ex. 44 at 84-93; Ex. 45 at 85-93.[1] Likewise, Item 101(c)(iv) requires disclosure of "[t]he importance to the segment and the duration and effect of all patents, trademarks, licenses, franchises and concessions held."  The QVC agreement was an exhibit to the registration statements.  Ex. 44 at II-4, II-6 - II-7; Ex. 45 at II-4 - II-6 and Ex. 10.42 thereto; Ex. 46 at II-4 and Exs. 10.13-10.15 thereto.  The allegation that Bare failed to disclose the supposed breach of this agreement fails because Plaintiffs plead no facts showing that there were problems with the successful QVC relationship.  Mtn. at 21-22.

> ### 3. Because the "Gravamen" of the Complaint Is Fraud and It Alleges a "Unified Course" of Fraudulent Conduct, Plaintiffs Must Plead Facts Sufficient To Satisfy Rule 9(b).

Because Plaintiffs have failed to plead a plausible claim under Rule 8 they clearly have failed to meet the more stringent requirements of Rule 9(b).  Moreover, Defendants demonstrated that Rule 9(b) applies, as the Complaint "sounds in fraud" under applicable Ninth Circuit law because the "gravamen" of the Complaint is fraud and it alleges a "unified course" of fraudulent conduct.  Mtn. at 6-7; *see Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1135 (N.D. Cal. 2006), *aff'd*, 551 F.3d 1156, 1161 (9th Cir. 2009); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005); *Stac*, 89 F.3d at 1403-05.

---

[1] Exhibits ("Ex.") 1-43 are attached to the Declaration of Molly Arico; Exs. 44-53 are attached to the Supplemental Declaration of Molly Arico, filed herewith.

In their opposition to the Underwriters' motion, Plaintiffs argue that Rule 9(b) does not apply because the Section 11 claims sound only in negligence. Und. Opp. at 8. This argument fails because the same conduct underlies both the Section 11 and the Section 10(b) fraud claims. The teaching of *Stac*, *Daou*, and *Rubke* is that the nature of the alleged *conduct*, the "*gravamen*," determines if a complaint sounds in fraud. Plaintiffs cannot avoid Rule 9(b) simply by artful drafting. When a plaintiff relies upon the same alleged conduct, it does not matter if the plaintiff inserts disclaimers in bold text or strips the adjectives and adverbs signaling fraud in their Section 11 claim. If the conduct at issue in the Section 10(b) claim is allegedly fraudulent, it cannot in the same complaint be alleged to be mere negligence. That would put pleading form over substance.

Thus, in *Stac*, the court held that Rule 9(b) applies where claims are "grounded in fraud," meaning that "the gravamen of the complaint is plainly fraud" and there is no "other basis" for the Section 11 claims. 89 F.3d at 1404-05 & n.2. *Daou* relied upon *Stac*, reaffirming that Rule 9(b) applies where the complaint alleges and relies upon "a unified course of . . . conduct." 411 F.3d at 1027. *Rubke* leaves no doubt that Rule 9(b) applies where the same factual allegations support both Section 11 and Section 10(b) claims: where the "complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) . . . we can assume that it sounds in fraud."[2] 551 F.3d at 1161.

Plaintiffs themselves describe their Section 11 and Section 10(b) claims as relying upon the same "unified course" of self-cannibalizing sales practices, premium image dilution, failing infomercial sales, and reliance on an unsustainable club program. Und. Opp. at 8. The same conduct is at issue in both claims. Indeed, in describing their Section 11 claims, Plaintiffs cannot help but use words that sound in fraud: "Defendants *concealed*" that product sold to a distributor was resold to Target and Costco (Opp. at 11 (citing ¶¶ 6-11) (emphasis added); ¶ 14); "defendants

---

[2] Plaintiffs try to distinguish *Rubke* because "the *Rubke* plaintiffs failed to segregate their Securities Act and Exchange Act claims." Und. Opp. at 10 n.11 and Ex. A thereto ("*Rubke* Complaint"). This distinction is of no consequence. As in *Rubke*: Plaintiffs "allege the same misrepresentations in support of their 1933 and 1934 Act claims" (*Rubke*, 460 F. Supp. 2d at 1136; *Rubke* Complaint); Plaintiffs base Section 11 and 10(b) claims on allegations that Defendants made knowingly false statements in a registration statement. *Compare* ¶¶ 59, 80 (alleging Defendants "knew," yet failed to disclose, certain material information) *with Rubke* Complaint ¶¶ 30, 31, 39, 46, 49-51, 75, 81, 90 (same).

1   knew" of Bare's diluted premium image (¶¶ 66, 67, 80 (emphasis added)); "it was *known*" that at

2   least one Target order "was being 'filled toward the end of the quarter' in order to meet unmet

3   sales quotas, and to increase reported revenues." (Opp. at 12 (citing ¶ 13) (emphasis added));

4   Defendants "*actively concealed*" that the club deal was a "*guise*" to generate revenue (Opp. at 13

5   (citing ¶¶ 18-19) (emphasis added)); and Plaintiffs challenge "the *propriety* of the [club] sales,"

6   which they call "*tactics*" and describe as "*improper* sales practices."  (Opp. at 13-14 (citing ¶¶ 18-

7   19) (emphasis added)).  Allegations of defendants' knowledge and concealment and the use of

8   "improper" "guises" or "tactics" state quintessential fraud claims, not negligence claims.  *See,*

9   *e.g.*, *Belodoff v. Netlist, Inc.*, No. SA CV 07-00677, 2008 WL 2356699, at *6 (C.D. Cal. May 30,

10  2008) (claims cannot be due to anything other than intent to deceive).

11        Plaintiffs cite *Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364 (C.D.

12  Cal. July 1, 2008), which proves the point.  The court held that a Section 11 claim sounds in

13  fraud, notwithstanding the disclaimers in the complaint, because both Section 10(b) and 11 claims

14  relied upon a unified course of conduct and  alleged misstatements about revenue with the

15  knowledge of improper sales practices.  *Id.* at *3.

16        *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132 (C.D. Cal.

17  2008), does not suggest a different result.  The 416-page complaint there alleged 21 claims against

18  50 defendants arising from an alleged massive subprime mortgage fraud.  *Id.* at 1142.  The

19  allegations there were "extraordinary" and, "[g]iven the gravity" of the allegations, the court

20  allowed claims to proceed that would not be actionable "in the vast majority of cases."  *Id.* at

21  1144, 1153.  Moreover, plaintiffs alleged different conduct by different defendants over time and

22  accused only a few defendants of fraud, *id.* at 1145-46, not a "unified course of . . . conduct."

23      **B.      Plaintiffs Have Not Pled Facts Showing That Either the November 2006 IPO
                 or March 2007 Prospectus Contained a Materially False Statement.**

24

25          **1.      Plaintiffs Plead No Facts Giving Rise to a Plausible Claim That Bare
                      Misrepresented Its Multi-Channel Business Model or Growth Strategy.**

26        Defendants showed that both the IPO and March 2007 prospectuses disclosed in detail

27  Bare's unique business model and growth strategy, along with numerous associated risks.  Mtn. at

28  8-9; Ex. 11 at 1.  Bare disclosed its intent to grow both the wholesale and retail sides of the

business.  Mtn. at 8.  Bare's predictions "bespoke caution" because it warned of potential competition, difficulty in managing growth, and dependence on the success of new products.  Mtn. at 9.  Plaintiffs offer no facts showing that anything said about the business model was untrue at the time—or ever.

Plaintiffs merely repeat the Complaint's conclusory assertions.  Opp. at 17-18 (*e.g.*, "the over-paced store openings were 'rapidly cannibalizing sales'").  Plaintiffs never allege what Bare predicted and how it ultimately performed.  Plaintiffs cannot plead a "plausible" claim that the business model was broken without these basic facts.  The reason Plaintiffs are trying to hide the ball is because Bare delivered excellent results and met or exceeded its guidance through the middle of 2008, belying any claim of a broken business model.  Mtn. at 9-10, 19.  It goes without saying that Plaintiffs have failed to plead facts showing that the "self-cannibalizing effect of Bare's rampant store openings" was a known trend that should have been disclosed pursuant to Item 303.  *See Steckman*, 143 F.3d at 1296-98 (rejecting Section 11 claim where actual results did not reflect alleged material adverse trend).

Plaintiffs point to an analyst report stating that "growth in other channels *may* cannibalize infomercial sales."  Opp. at 18; Ex. 47 (emphasis added).  Plaintiffs ignore that the analyst report was issued in October 2008, long after the September 2006 and March 2007 offerings.  Nothing the analyst says suggests that a statement in either prospectus was false.  Read in context, the analyst is discussing only one of Bare's sales channels and events that occurred in July 2008, including "the challenging macro environment," and merely speculates that cannibalization "may" happen after October 2008.  Ex. 47.

Plaintiffs argue that Bare's alleged announcement that it was slashing the price of its Getting Started Kit demonstrates cannibalization.  Opp. at 18.  But the announcement at issue was made on October 30, 2008, ¶ 195, and Plaintiffs misrepresent the facts.  Bare did not state that it was slashing existing prices; Bare announced a new, lower-priced kit with different products in response to the difficult consumer environment.  Mtn. at 22.

Plaintiffs mistakenly argue that the court should not consider the risk factors in the prospectuses because such a "truth-on-the-market defense" is unsuitable for a motion to dismiss.

1   Opp. at 18.  Defendants are relying upon the "bespeaks caution" doctrine, not the truth-on-the-

2   market defense.  Mtn. at 9-10.  The Ninth Circuit has repeatedly held that a prospectus that

3   includes sufficient risk disclosures "bespeaks caution" and cannot give rise to a Section 11 claim.

4   *E.g.*, *Stac*, 89 F.3d at 1408; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.

5   1994); *see Belodoff*, 2008 WL 2356699, at *10.

6           Plaintiffs assert without a factual basis that Bare's efforts to cross-sell non-foundation

7   products "never got[ ] off the ground" and "failed."  Opp. at 16.  Because Plaintiffs offer no facts

8   showing what results were predicted and what occurred, Plaintiffs fail to plead a plausible claim

9   that cross-selling failed.  Plaintiffs' reticence is understandable.  Sales of non-foundation products

10  grew from $128.6 million in 2005, to $206.7 million in 2006, and to $275.9 million in 2007, and

11  Bare received industry awards for these products.  ¶ 187; Exs. 18-20.  These undeniable results

12  belie any claim that such products had "failed."  *See* Ex. 17 at 13; Ex. 48 at 5 (foundation

13  products as percentage of sales).  Moreover, Bare's predictions bespoke caution, as it warned that

14  efforts to develop such products might not succeed (Ex. 17 at 13, 28; Ex. 12 at 13, 28).

15          Plaintiffs erroneously state that Bare's President of Retail admitted in October 2008 that

16  cross-selling efforts had "failed."  Opp. at 16.  Plaintiffs have the wrong person.  They are quoting

17  an analyst, Mr. Dionisio (¶197), not the former President of Retail, Mr. Dadario (¶ 172).

18                      **2.      Plaintiffs Offer No Facts Giving Rise to a Plausible Claim That Bare
                                  Misrepresented Its Club Program.**

19

20          Defendants showed that the claims about the continuity (or club) program were unfounded

21  speculation.  Mtn. at 10-12.  The Complaint does not plead any *facts* showing the number of

22  customers or revenue generated by the club program at any time, how the program performed

23  compared to expectations for any period, or that there was anything improper under applicable

24  consumer protection laws—and thus offers no plausible basis for a claim.  *Id*. at 10-11.  Indeed,

25  the two confidential witnesses put forward (ignored in Plaintiffs' Opposition) did not work at

26  Bare until *after* the offerings at issue.  *Id.*; ¶ 18.  Plaintiffs have therefore failed to plead facts

27  showing Bare's knowledge and concealment of a material adverse trend in violation of Item 303.

28

1   *See Belodoff v. Netlist, Inc.*, No. SA CV 07-00677, 2009 WL 1293690, at *12 (C.D. Cal. Apr. 17,

2   2009) (no facts evidencing known adverse trend of declining customer demand).

3        Plaintiffs also tell an inconsistent (and thus implausible) story about this sales channel.  On

4   the one hand, Plaintiffs assert the decline was attributable to the "en masse" departure of

5   customers from the club program; on the other hand, Plaintiffs assert that a new infomercial

6   introduced in May 2007 was poorly received and caused the decline.  *Compare* ¶ 134(a)-(b) *with*

7   ¶ 180.  While Plaintiffs allegations are implausible on their face, additional facts provide another

8   basis to dismiss.  The performance of this channel negates any claim there were undisclosed

9   problems at the time of the offerings:  net sales for the infomercial channel rose 33% to $129

10   million in fiscal 2006 and 12.2% in the first quarter of 2007. Ex. 2 at 46; Ex. 49 at 23.  Plaintiffs

11   argue that the Court may infer problems with the club program because sales in the direct-to-

12   consumer channel, which includes both infomercial and club sales, "plummeted" from $179

13   million in 2006 to $170 million in 2008.  Plaintiffs ignore that this 5% decline occurred in one

14   channel while Bare was otherwise meeting or exceeding its public guidance.

15        Plaintiffs misleadingly suggest that the Better Business Bureau "definitely investigated

16   and reported wrongdoing" about the club program.  Opp. at 14.  The support for this contention,

17   however, is an anonymous blogger's post to www.makeupbag.com.  This blogger supposedly

18   "read[] some things about the company on the BBB" website.  ¶ 177.

19        Plaintiffs dismiss the global recession and strain to argue that there must have been

20   problems with the club program because the stock price of supposedly comparable companies

21   Estée Lauder and Procter & Gamble performed better than Bare during 2007-2008.  Opp. at 14.

22   Plaintiffs offer no factual or logical basis to believe there is any connection between the relative

23   stock performance of these companies and Bare's club program.  Estée Lauder and P&G are

24   much larger, more diverse companies:  for the September 2008 quarter, Bare reported sales of

25   $130.2 million compared to $1.9 billion for Estée Lauder and $22 billion for P&G; moreover,

26   Estée Lauder has diverse beauty products including fragrance and hair care, and P&G also sells

27   household cleaning products (Mr. Clean, Tide), razors, home appliances, and shampoo.  Ex. 9;

28   Ex. 50; Ex. 51 at 1.  Finally, in October 2008, Estée Lauder itself noted the "very challenging

1   global macroeconomic environment," "a time of extraordinary uncertainty," and economic

2   challenges that will be "extensive and ongoing."  Ex. 50.

3          Reaching outside their Complaint, Plaintiffs contend that court filings made by Intelligent

4   Beauty—a company that Bare sued for false advertising, trademark infringement and unfair

5   competition—support Plaintiffs' claims about the club program.  Opp. at 14-15.  Plaintiffs

6   misleadingly suggest that a statement by Bare's counsel in a joint discovery letter (*id.* at 15 n.9

7   (citing Blasy Decl., Ex. C)) shows Bare had "'reviewed and produced nearly 80,000 pages of

8   consumer communications' purportedly addressing customer complaints related to the negative

9   option program," which immediately prompted a "confidential" settlement.  Opp. at 15 (quoting

10  Blasy Decl., Ex. C at 5).  But Plaintiffs have misleadingly curtailed the quotation, which actually

11  reads:  "BE has reviewed and produced nearly 80,000 pages of consumer communications

12  <u>responsive to a long list of search terms identified by IB</u>."  *Id.*  Nothing in the search terms—

13  which are also attached to the discovery letter—suggests that the 80,000 pages had anything to do

14  with the terms or performance of the club program.  *Id.*  Simply reading the search terms—*e.g.*,

15  "acne," "rash," "break out," "flaky," "cakey," "goopy," and "harmful w/5 chemical"—proves the

16  point.  Blasy Decl., Ex. C at Ex. E ¶¶ 5-7.  Moreover, nothing in the terms of the settlement

17  suggests there was merit to Intelligent Beauty's counter-claim.  Ex. 52.  Indeed, Intelligent Beauty

18  agreed to cease the offending advertising and stop infringing Bare's trademarks.  *Id.* ¶¶ 3-6.

19                    **3.      Plaintiffs Offer No Facts Showing That Bare's Premium Image Was**
20                                **Harmed by Immaterial Product Diversion to Target and Costco.**

21          There is no plausible basis for Plaintiffs' claim that Bare misrepresented that it was a

22  premium cosmetic brand.  The threadbare support is the fact that a single distributor improperly

23  diverted product to Target and Costco, supposedly jeopardizing Bare's agreement with QVC and

24  causing unspecified price pressures.  Mtn. at 12-15.

25          Plaintiffs' allegation that Bare was complicit with the product diversion to boost revenue

26  (¶ 13) is plainly implausible because, as the Complaint elsewhere alleges, Bare sued Costco in

27  early 2007 to cut off the offending distributor.  Mtn. at 12; ¶¶ 66, 79, 189-94.  Recognizing how

28  this undercuts their claim, Plaintiffs now speculate that Bare sued only because this was "required

1   by the QVC agreement."  Opp. at 11.  No facts are alleged to support this new theory.  The

2   reasonable, common sense explanation for Bare's decision to sue Costco in federal court is that

3   Bare was trying to protect its legal rights, not that the lawsuit was a half-hearted effort forced

4   upon Bare by QVC.  The notion that Bare would itself undercut retail prices is rendered absurd by

5   the Complaint's own allegation (¶¶ 61, 78) that Bare was simultaneously spending millions of

6   dollars to rapidly expand its own retail boutiques.  Mtn. at 12.

7          Plaintiffs offer no facts to support the assertion that Bare's premium image or relationship

8   with QVC or other premium wholesalers suffered at all, let alone that any harm was done by

9   product diversion.  Opp. at 12.  As the Complaint notes, Bare received numerous awards for its

10  prestige products.  ¶¶ 129, 156; Mtn. at 12.  Plaintiffs do not allege facts showing a decline in

11  sales to QVC or premium wholesalers.  Although not needed to dismiss this implausible and

12  unsupported claim, sales in the home shopping channel (which includes QVC) increased from $38

13  million in 2005, to $49.8 million in 2006, and to $60.6 million in 2007.  ¶¶ 137, 160; Ex. 2 at 46,

14  49; Ex. 6 at 45.  Overall, sales in the premium wholesale channel (which includes Sephora and

15  Ulta) increased 121% to $109.8 million in 2006 and 49% to $163.8 million in 2007.  ¶¶ 135-36;

16  Ex. 4; ¶¶ 187-89; Ex. 6 at 45.  These excellent results in "premium" sales channels render

17  implausible any contention that Bare lacked a premium image at the time of the offerings.

18         The Complaint does not even plead a factual basis to infer that the amount of product

19  diverted to Target and Costco caused Bare to reduce retail prices or lose material sales.  Mtn. at

20  14.  The Costco product diversion supposedly involved "100,000 high-end cosmetic kits."  Opp.

21  at 11 (emphasis omitted); ¶ 12.  The only information about discounts caused by Target or Costco

22  comes from one confidential witness, who worked in Southern California after the offerings (from

23  March 2007 to June 2008), received five inquiries per month, and was supposedly told to match a

24  $10 discount per kit.  ¶ 15.  Even assuming (implausibly) that *all* of these kits ended up at Target

25  or Costco, *all* generated a $10 discount, and *all* of these customers otherwise would have bought

26  product at other Bare locations, this amounts to only $1 million in discounts, which is immaterial

27  compared to sales of $394.5 million in 2006 (¶ 135; Ex. 4) and $511 million in 2007 (Ex. 27).

28

C.      **Plaintiffs Cannot Establish Loss Causation**

A Section 11 claim may be dismissed for lack of loss causation where it appears from the face of the complaint that the allegedly misleading statements were never corrected and thus could not have caused loss.  Mtn. at 15; *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 468, 470 (S.D.N.Y. 2009). Plaintiffs do not point to a single corrective disclosure concerning Bare's business model, club program, or premium image that can be linked to any alleged misrepresentation.  Opp. at 19-20. The decision in *Countrywide* is obviously distinguishable, as there the complaint identified numerous corrective disclosures concerning the misrepresentations at issue, Countrywide's mortgage lending practices, and financial condition.  588 F. Supp. 2d at 1153-54.

## II.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 12(a)(2)

The Section 12(a)(2) claim should be dismissed because the IPO and March 2007 offerings were "firm commitment" underwritings, meaning that the Bare Defendants sold shares directly to the Underwriters, who were obligated to buy all the shares and assume all financial liability if they could not resell them.  Thus, the Bare Defendants neither passed title to the securities to Plaintiffs, nor actively solicited Plaintiffs for their financial gain.  Mtn. at 15-17; *see Pinter v. Dahl*, 486 U.S. 622, 648 (1988).

Plaintiffs concede that the Bare Defendants did not pass title.  Opp. at 19.  Plaintiffs argue that they may be liable under the active solicitation prong of *Pinter* because they were involved in the offering, signed the prospectuses, participated in road shows prior to the offerings, and benefited financially from the offerings.  *Id.*

This argument fails because it would erase a critical distinction between Section 11— which imposes liability on a person who signs a registration statement containing a misstatement—and Section 12—which imposes liability only on a person who "offers or sells" a security.  15 U.S.C. § 77k(a)(1); 15 U.S.C. § 77l(a)(2).  As *Pinter* explains:  "Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and therefore we may conclude that

1   Congress did not intend such persons to be defendants in § 12 actions."  486 U.S. at 650 n.26.  In

2   other words, "a buyer cannot recover against his seller's seller."  *Id.* at 644 n.21.

3          Although the Ninth Circuit has not decided the issue,[3] other Courts of Appeal and district

4   courts in this Circuit have held that routine activities by company officers and directors that are a

5   normal part of any offering are insufficient to meet the "active solicitation" prong of Pinter.  As

6   the Fifth Circuit explained, "[v]irtually all issuers routinely promote a new issue, if only in the

7   form of preparing a prospectus and conducting a road show."  *Loan Star Ladies Inv. Club v.*

8   *Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001).  If such participation sufficed to create

9   Section 12 liability, stock purchasers could always bring suit against issuers under the "active

10   solicitation" prong, even where they did not purchase the securities directly from the issuers.  *Id.*;

11   *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (signing prospectus and

12   participating in usual offering activities do not show solicitation); Mtn. at 16-17 (citing cases).[4]

13          The argument that the Bare Defendants made money as a result of the offerings is beside

14   the point.  In a firm commitment underwriting, such as Bare's, the selling shareholders realize

15   their profits by selling their shares directly to the underwriter, leaving the underwriter with the

16   responsibility for selling its shares to investors.  *See Rosenzweig*, 332 F.3d at 871; *Shaw v. Digital*

17   *Equip. Corp.*, 82 F.3d 1194, 1215-16 (1st Cir. 1996), *superseded by statute as stated in Greebel v.*

18   *FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999).

19

20

21

22

---

23        [3] In *Daou*, the district court dismissed the Section 12 claim for failure to adequately plead
     false statements.  In reversing, the Ninth Circuit held that the complaint adequately alleged false
24   statements, but did not reach the "active solicitor" issue.  411 F.3d at 1029-30.

25        [4] *In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996), Opp. at 19, supports Defendants,
     as it did not involve a firm commitment offering.  Westinghouse "directly sold securities pursuant
26   to the challenged DRP prospectus."  *Id.* at 716 n.18.  The two cases Plaintiffs cite out of the
     Southern District of New York (Opp. at 19) are outliers.  Other courts in that District have
27   criticized their analysis.  *See, e.g., Citiline Holdings, Inc. v. iStar Fin., Inc.*, – F. Supp. 2d –, 2010
     WL 1172647, at *3-4 (S.D.N.Y. Mar. 26, 2010) (*Pinter* holds that Congress did not intend to
28   impose liability under Section 12 for mere participation).

**III.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)**

> **A.     Plaintiffs Offer No Meaningful Argument to Show That Any Challenged Statement Was False When Made.**

The Section 10(b) claim apparently relies upon the same arguments as the Section 11 claim.  Opp. at 22.  Plaintiffs do not respond to Defendants' arguments that the Complaint fails to plead particularized facts (1) showing that any statement was false when made and (2) giving rise to a "cogent" and "compelling" inference of scienter.  Mtn. at 17-23.  Plaintiffs simply throw up their hands:  "[i]t would be impossible to meaningfully summarize the 100+ page Complaint here."  Opp. at 22.  This cannot suffice.  Plaintiffs bear the burden of meeting the requirements of Rule 9(b) and the Reform Act.  *Rubke*, 551 F.3d at 1164.  Their failure to respond amounts to improper "puzzle-style" pleading that has placed the burden on the Court to sort out the statements and match them with the corresponding adverse facts.  *See Brodsky v. Yahoo! Inc*., 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008).

Plaintiffs discuss only two statements, the forward-looking statement in the prospectuses that Bare believed it could further penetrate existing sales channels, and Ms. Miles' statement on February 28, 2007 that Bare "anticipate[s] modest growth" in infomercial sales.  Opp. at 22.  Plaintiffs contend that Defendants knew at the time of the "demise" of the infomercial channel because of problems with the club program.  Opp. at 22.  Defendants showed above why these allegations fail to state a plausible claim under Rule 8(a) and so they clearly fail under Rule 9(b) and the Reform Act.  *See supra* at § I.B.2; Mtn. at 10-12, 19-21.

Moreover, Plaintiffs provide no particularized facts showing that Defendants knew these predictions were false when made.  Plaintiffs concede and it is undeniable that Bare's prior infomercials were successful.  Opp. at 1; ¶¶ 4, 101; Ex. 37 at 7; Ex. 2 at 46.  The Complaint alleges that the problematic fifth infomercial was not launched until May 2007.  ¶¶ 134(a)-(b), 180.  The safe harbor and bespeaks caution doctrine protect these statements because the prospectuses warned that "infomercials might not continue to be an effective distribution channel, which could harm our net sales," its "future growth and profitability will depend in part on the effectiveness and efficiency of our media spending, including our ability to . . . determine the

appropriate creative message," and "infomercials and advertising may not result in increased sales." Ex. 17 at 17; Ex. 12 at 17.  Finally, though unnecessary for dismissal, it is undeniable that the infomercial channel was only one component of the overall forecast that Bare *exceeded* because it did expand existing sales channels:  in 2006, sales increased 52% to $394.5 million; in 2007, sales increased 30% to $511 million.  Mtn. at 4.

**B.    The Complaint Fails to Raise a Strong Inference of Scienter.**

**1.    Plaintiffs Offer No Direct Evidence of Scienter.**

Plaintiffs argue broadly that "each" Defendant was a "key player," was "intimately knowledgeable of 'hot button' issues," and "intimately involved" in the preparation of financial statements.  Opp. at 23-24.  There is no factual basis for these assertions.  None of Plaintiffs' purported confidential witnesses provides any direct evidence of any defendant's state of mind.  The Ninth Circuit has repeatedly rejected such boilerplate allegations of knowledge.  *E.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009).

Plaintiffs do not offer any information concerning anyone other than Mr. McCormick and Ms. Miles, and the information provided is in no way probative of scienter.  One anonymous person says that the issue of Target/Costco sales was raised in early 2007 at meetings attended "sometimes" by Ms. Miles and by Mr. McCormick, who was "looking into" the situation.  ¶¶ 17, 114.  Mtn. at 24.  No facts suggest that either person endorsed such sales, concealed them, or believed the amounts affected Bare's overall performance.

**2.    The Facts Alleged Do Not Support the Rarely Applied and Narrow "Core Operations" Inference.**

Plaintiffs argue that the Court should infer fraud because the Complaint shows "fraud" in a "core business" operation, Bare's infomercial business.  Opp. at 24 n.14.  As the Ninth Circuit has explained, the so-called "core operation" inference of fraud is a "narrow exception" that applies only "where the falsity is patently obvious—where the 'facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them.'"  *Zucco*, 552 F.3d at 1001 (alteration in original) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008), and *Am. W. Holding*, 320 F.3d at 943 n.21)).  In *Berson*, plaintiffs proffered detailed

1    confidential witness reports showing that stop work orders had halted $10-$15 million of work on

2    the company's largest contract, halted another $8 million contract, caused the reassignment of 50-

3    75 employees, and required massive volumes of paperwork.  *Berson*, 527 F.3d at 988 n.5.  In

4    *America West*, the airline was fined for numerous and repeated safety violations.  320 F.3d at 929.

5           Plaintiffs fail to set forth the type of meaningful, particularized facts showing the existence

6    of significant problems in a core operation that were at issue in *Berson* or *America West*.  Bare

7    performed indisputably well from its September 2006 IPO through the middle of 2008.  The type

8    of naked speculation offered by Plaintiffs about the club program cannot satisfy the narrow "core

9    operations" exception and permit a strong or "compelling" inference of scienter.

10                  **3.      The Stock Sales Allegations Do Not Provide the Missing Strong
                              Inference of Scienter**

11

12          Plaintiffs argue that insider trading may be an independent violation of Section 10(b).

13   Opp. at 24.  Although that may be so, no such claim is alleged here.  ¶¶ 247-51; Mtn. at 30.  A

14   complaint cannot be amended via an opposition memorandum.  *Schneider*, 151 F.3d at 1197 n.1.

15          In any event, Plaintiffs' discussion of "insider trading" is beside the point.  The question is

16   whether Plaintiffs have alleged particularized facts giving rise to a cogent and compelling

17   inference of scienter.  A plaintiff asserting an insider trading case under Section 10(b) likewise

18   must plead such particularized facts; the existence of the trading alone is never sufficient.  *E.g.*,

19   *Pa. Ave. Funds v. Borey*, No. C06-1737, 2009 WL 902070, at *14 (W.D. Wash. Mar. 30, 2009)

20   (dismissing §10(b) insider trading claim where no strong inference of scienter alleged).

21          The relevant inquiry is whether stock sales, evidence of mere motive, are sufficiently

22   unusual or suspicious to give rise to a strong inference of fraud.  Mtn. at 24-27.  To analyze this,

23   courts consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales;

24   and (3) whether the sales were consistent with the insider's prior trading history."  *In re Silicon

25   Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

26          Defendants showed that neither the amounts nor small percentages sold by the key officers

27   give rise to a strong inference.  Mtn. at 24-26 (citing cases).  CEO Leslie Blodgett sold 19% of her

28   holdings in the March offering and 8% in the June offerings (*Metzler v. GMBH v. Corinthian Colls.*,

*Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (CEO's sales of "only 37%" of total holdings insufficient)); in August 2007, she invested $1.1 million and exercised options to acquire 889,728 shares, which she held; at the end of the class period, she held almost 6.5 million shares and vested options, more than she held at the beginning of the class period.  Mtn. at 25; Ex. 45 at 123-24; Ex. 53 at 12-13.  Plaintiffs cannot seriously equate Ms. Blodgett's sales to those of Mr. Ellison discussed in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, where the sale of 2.1% generated $900 million, a "novel situation" to say the least.  380 F.3d 1226, 1232 (9th Cir. 2004); Opp. at 26 n.16.

CFO Myles McCormick sold less than 7% of his holdings in the June offering for $700,000. (We assume Plaintiffs' statement that he sold "$700+ million" is a typo.  Opp. at 25.).  He held almost 450,000 shares and vested options through the class period.

Likewise, the directors' sales are not suspicious.  Mr. John sold 14.5% of his holdings in February 2008, all pursuant to a Rule 10b5-1 trading plan, a fact that may rebut an inference of scienter on a motion to dismiss.  *Metzler*, 540 F.3d at 1067 n.11.  Ms. Ottinger sold 17% in the March and 8% in the June offerings (¶¶ 45, 72, 82, 248; Ex. 35) and held 159,558 shares and vested options at the end of the class period.  Mtn. at 26.

Plaintiffs improperly argue that the Court should consider sales made by non-defendant private equity and investment firms affiliated with Messrs. Jones, Bloom or Hansen.  Opp. at 25. Plaintiffs offer no facts showing that these sales were directed by those directors or that they personally benefitted from them.  Mtn. at 26; *see In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 549, 550 (8th Cir. 2004).  None personally sold stock during the class period.  Mtn. at 26 n.6.

The timing of Defendants' stock sales is also not suspicious.  *Id.* at 25.  Plaintiffs ignore that the sales occurred early in the class period, before Bare had reported its favorable results for 2007 and long before growth slowed in mid-2008.  *Id.*

Defendants' trading history is not probative of scienter.  Plaintiffs argue that the lack of pre-class period sales supports an inference of scienter, Opp. at 26, but ignore that Bare was not a public company before the class period.  Thus, Plaintiffs cannot provide a "meaningful trading history" showing that the class period sales were "dramatically out of line with prior trading practices."  *Zucco*, 552 F.3d at 1005-06; *Silicon Graphics*, 183 F.3d at 986; *In re Vantive Corp.*

1   *Sec. Litig.*, 283 F.3d 1079, 1095-96 (9th Cir. 2002).  In *Vantive*, the court held that where a

2   defendant joined a company "'four months into the class period, he has no relevant trading

3   history'" and "'[b]ecause [the defendant] had no trading history, we cannot conclude that his

4   trades were out of line with past practice.'"  *Zucco*, 552 F.3d at 1005 (alterations in original)

5   (quoting *Vantive*, 283 F.3d at 1095).  In contrast, in *America West* most individuals sold 100% of

6   their shares and none had sold for twenty months before the class period.  320 F.3d at 939.

7   **IV.    THE FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE SAFE**
8   **HARBOR AND THE BESPEAKS CAUTION DOCTRINE**

9          All of the forward-looking statements made in press releases, conference calls, and the

10  March and June prospectuses are protected by the safe harbor; forward-looking statements in the

11  IPO prospectus are protected by the bespeaks caution doctrine.  Mtn. at 27-29.

12         Plaintiffs argue the safe harbor does not apply because the statements are a "mix

13  representations of historical and present facts."  Opp. at 29.  Because Plaintiffs do not refer to any

14  challenged statement, the Court may ignore the point.  In any case, courts recognize that certain

15  "present tense" statements are in substance forward-looking.  *See Harris v. Ivax Corp.*, 182 F.3d

16  799, 805 (11th Cir. 1999) (statement "whose truth or falsity is discernible only after it is made

17  necessarily refers only to future perfomance"); *Hockey v. Medhekar*, No. C-96-0815, 1997 WL

18  203704, at *5 (N.D. Cal. Apr. 15, 1997) (future predictions are forward-looking).

19         The cautionary language and risk factors included in the prospectuses, press releases, and

20  Forms 10-K were more than sufficient.  Mtn. at 28.  Plaintiffs argue that the warnings were

21  "generic" and so meaningless, referring to pre-offering SEC Staff comments.  Simply reading the

22  risk factors in the final prospectus, revised "in accordance with the Staff's comment," Ex. 26 at 4,

23  belies this assertion.  *See* Mtn. at 28.

24         Plaintiffs recite the shopworn argument that the safe harbor does not apply because

25  Defendants knew the risks were actually occurring.  Opp. at 29.  While we dispute this assertion,

26  the short answer is that state of mind is irrelevant.  The safe harbor applies where statements are

27  identified as forward-looking and accompanied by meaningful cautionary language.  15 U.S.C. §

28  78u-5(c)(1); *see In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138, 2006 WL 2385250, at *12

(N.D. Cal. Aug. 17, 2006) (if statement accompanied by meaningful cautionary language, defendants' state of mind irrelevant).

## V.   PLAINTIFFS' CLAIMS ARE TIME BARRED

The face of the complaint concedes that "the nature and extent of these Defendants' fraud" was "revealed to investors and the market" on June 5, 2007 (and again on August 1, October 31, and November 26, 2007).  ¶¶ 203, 205-06.  Thus, Plaintiffs were required to file their Securities Act claims within one year—by June 5, 2008—and their Exchange Act claims within two years— by June 5, 2009.  Mtn. 29-30.  Moreover, the one-year statute for Securities Act claims surely began to run by February 26, 2008, when Bare publicly discussed the Target/Costco issue.  Opp. at 21; *see* Und. Mtn. at 21.  This case, however, was not filed until July 17, 2009.  Mtn. at 29-30.

*Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010), is consistent with this analysis.  It holds that the limitations period under the Exchange Act begins when the plaintiff "did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'— whichever comes first."  *Id.* at 1798 (alteration in original).  The statutory language of the Securities Act is to the same effect.  15 U.S.C. § 77m.  Plaintiffs' own allegations demonstrate that a diligent plaintiff would have discovered the relevant facts in June 2007.  Clearly, if "investors and the market" were aware of "the nature and extent of these Defendants' fraud" on June 5, 2007, ¶¶ 203, 205-06, a reasonably diligent plaintiff would then have discovered "the facts constituting the violation."

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated:  June 4, 2010                          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile:  (650) 493-6811

By:   /s/ Jerome F. Birn, Jr.
        Jerome F. Birn, Jr.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendants Bare Escentuals, Inc.,
Leslie A. Blodgett, Myles B. McCormick,
Ross M. Jones, Bradley M. Bloom, John C. Hansen,
Michael J. John, Lea Anne Ottinger, Karen M. Rose,
Glen T. Senk and Diane M. Miles

1

**ECF CERTIFICATION**

2      I, Kelley M. Kinney, am the ECF User whose identification and password are being used

3 to file the Reply Brief in support of Defendants' Motion to Dismiss Plaintiffs' Corrected

4 Consolidated Complaint.  In compliance with General Order 45.X.B, I hereby attest that Jerome

5 F. Birn, Jr. has concurred in this filing.

6

7 Dated:  June 4, 2010                    By:   /s/ Kelley M. Kinney
                                                Kelley M. Kinney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28