1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5
6
7
8
IN RE BARE ESCENTUALS, INC.
9  SECURITIES LITIGATION
   _____
10                                        No. C 09-3268 PJH
11 This document relates to:            **ORDER GRANTING IN PART AND**
                                        **DENYING IN PART MOTIONS TO**
12 All Actions                          **DISMISS**
   _____/
13

14     The individual defendants' and the underwriter defendants' motions to dismiss and

15 plaintiffs' motion to strike came on for hearing before the court on July 21, 2010.  Lead

16 plaintiffs Westmoreland County Retirement System and Vincent J. Takas, on behalf of

17 certain purchasers of Bare Escentuals' common stock (collectively "plaintiffs"), appeared

18 through their counsel, Mary Blasy.  Defendant Bare Escentuals, Inc. ("Bare" or "the

19 Company"), along with numerous individual defendants[1] (all collectively "Individual

20 defendants"), appeared through their counsel, Jerome F. Birn, and Kelley M. Kinney.  The

21 investment banking defendants, Goldman, Sachs & Co., CIBC World Markets Corp., Banc

22 of America Securities LLC, Piper Jafray Companies, Thomas Weisel Partners LLC, and

_____

24     [1]     The specific individual defendants are named as follows:  Leslie A. Blodgett
(CEO and Director of the Board of Bare Escentuals); Myles B. McCormick (Executive VP,
25 CFO, and COO of Bare Escentuals), Ross M. Jones (Director and Chairman of the Board of
Bare Escentuals, and managing director of Berkshire Partners LLC), Bradley M. Bloom
26 (Director of the Board of Bare Escentuals and managing director of Berkshire Partners LLC),
John C. Hansen (Director of the Board of Bare Escentuals and President of JH Partners),
27 Michael J. John (Director of the Board of Bare Escentuals and senior partner of JH Partners),
Lea Anne Ottinger (Director of the Board of Bare Escentuals and vice president at Berkshire
28 Partners), Karen M. Rose (Director of the Board of Bare Escentuals), Glen T. Senk (Director
of the Board of Bare Escentuals), and Diane M. Miles (President of Wholesale and Int'l Sales
at Bare Escentuals).

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  SunTrust Robinson Humphrey, Inc. (collectively the "Underwriter defendants"), appeared

2  through their counsel, Kris Elder and Robin Wechkin.  Having read the parties' papers and

3  carefully considered their arguments and the relevant legal authority, and good cause

4  appearing, the court GRANTS in part and DENIES in part the Individual defendants' motion

5  to dismiss, DENIES the Underwriter defendants' motion to dismiss, and GRANTS in part

6  and DENIES in part plaintiffs' motion to strike.

7                                    **BACKGROUND**

8         This is a securities class action brought against defendants Bare Escentuals, certain

9  of its current and former directors and executives, and its investment bankers, for violations

10  of the federal securities laws.  See generally Corrected Consolidated Complaint ("CCC").

11         Plaintiffs generally assert claims based on alleged violations of the Securities Act of

12  1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  They

13  allege Securities Act claims on behalf of purchasers of Bare Escentual's common stock

14  issued pursuant to certain allegedly false Registration Statements and Prospectuses filed

15  with the Securities and Exchange Commission ("SEC"), in connection with the Company's

16  September 28, 2006 initial public offering ("IPO"); and the March 14, 2007 follow-on offering

17  ("March 2007 Offering").  Plaintiffs also allege Exchange Act claims on behalf of

18  themselves and all other purchasers of Bare Escentuals stock issued between September

19  28, 2006 and October 30, 2008 (the "Class Period") .  See CCC, ¶¶ 1, 215.

20  A.    General Background Allegations

21         Bare develops, markets and sells branded cosmetics and skin care products under

22  its bareMinerals, RareMinerals, Buxom, and md brands.  It utilizes what it characterizes as

23  a "distinctive marketing strategy and a multi-channel distribution model utilizing traditional

24  retail distribution channels consisting of;" "premium wholesale, including Sephora, Ulta and

25  selected department stores;" company-owned boutiques; spas and salons; and direct to

26  consumer distribution channels like QVC, infomercials, and online shopping.  CCC, ¶ 2.

27         The Bare Escentuals brand dates back to the opening of its first boutique in 1976,

28

United States District Court

For the Northern District of California

1   with products marketed through the QVC home shopping network since 1997.  See id., ¶ 3.

2   It was not until 2001-2006, however, that Bare Escentuals experienced exponential sales

3   growth.  This was in part due to the fact that Bare Escentuals was a "first-mover" in the

4   mineral powder makeup phenomenon (which peaked in 2008).  By 2002, consumers had

5   flocked to try the "bare mineral powder makeup" that Bare Escentuals specialized in.  To

6   that end, Bare Escentuals' sales increased ten-fold, from annual sales of $25 million in

7   2001 to over $250 million in 2005.  In the months leading up to the company's late 2006

8   IPO, the company's sales rose to more than $394.5 million.  See CCC, ¶¶ 3-5.

9        Plaintiffs allege several instances of allegedly wrongful conduct on the Company's

10  part vis-a-vis its investors.  Back in December 1998, for example, the Company entered

11  into an agreement with QVC, pursuant to which QVC was granted the exclusive right to

12  promote, advertise, market, sell and distribute Bare Escentuals products in all distribution

13  channels in the United States other than company-owned boutiques and prestige retail

14  channels.  Id., ¶ 8.  In September 2006, Bare Escentuals and QVC entered into a letter

15  agreement amending the 1998 agreement.  Id., ¶ 9.  Pursuant to the amended letter

16  agreement, Bare Escentuals could promote, advertise, market and sell its products on its

17  websites, advertising, and catalog and mail promotions, as long as it paid QVC a royalty.

18  Bare Escentuals was still prohibited from selling products through retail channels not

19  considered 'prestige,' like discount stores, warehouse stores and superstores.  Id.  And

20  QVC, in turn, was granted the exclusive right to promote, advertise, market and sell Bare

21  Escentuals products in Japan, Germany, and the United Kingdom.  Id.

22       In September 2006, however, and at the time of Bare Escentuals' IPO, plaintiffs

23  allege that the company was not in compliance with the spirit or word of the QVC

24  exclusivity agreement.  In fact, allege plaintiffs, while Bare Escentuals repeatedly touted its

25  "multi-channel distribution strategy" in its IPO Registration Statement/Prospectus filed with

26  the SEC, and furthermore touted its ability to reinforce the premium image of the

27  company's brands, defendants were at the time concealing that Bare Escentuals had

28

3

United States District Court

For the Northern District of California

already undertaken preparations to provide its products to big box discounters Costco and Target for the 2006 Christmas season.  See CCC, ¶ 11.  Defendants were also aware, at some point before Fall 2007, that their products were being sold on Target's website, and that by early Spring 2008, Target was displaying Bare Escentuals' products in its sales circular.  Id.  As proof of this, plaintiffs allege that Bare Escentuals filed litigation against Costco in federal court in January 2007, seeking to stop Costco from selling Bare Escentuals products – an act that Bare Escentuals alleged in the lawsuit was "unauthorized."  Id., ¶ 12.  Nonetheless, allege plaintiffs, defendants concealed their knowledge of these big box discounter sales, including the Costco litigation, from the investing public, until the company's outside auditors mandated disclosure in connection with disclosure of the company's 2007 annual financial report in February 2008.  CCC, ¶ 14.

Plaintiffs allege that the Target and Costco sales dramatically diluted Bare Escentuals' pricing power, and forced the company to disclose that it was reducing the price of certain makeup starter kits from $60, to as low as $15 by the end of the Class Period on October 30, 2008.  CCC, ¶ 15.  The Target and Costco sales also purportedly jeopardized the company's relations with its prestige wholesalers, and Sephora and other wholesalers would slash their orders and contribute to a decline in sales during 2007.  CCC, ¶ 16.

Plaintiffs further allege that, unbeknownst to investors – because defendants allegedly concealed this fact – a significant portion of the company's 2001-2006 direct to consumer sales growth was dependent upon Bare Escentuals' ability to unwittingly sign up customers for "club" sales programs – wherein customers' credit cards were automatically billed for multiple shipments beyond their initial orders, and without the customers' consent.  See CCC, ¶ 18.  Bare Escentuals, which recognized these "club" sales when merchandise was shipped from a warehouse directly to customers, was able to "capture, obtain, and report several years worth of phenomenal premium sales" employing this "guise" leading up

4

United States District Court

For the Northern District of California

to the September 2006 IPO.  See id., ¶ 19.  Eventually, however, the company would be forced to refund preciously-recognized sales, and many direct to consumer sales customers became brick-and-mortar shoppers instead.  Thus, in the two years following the company's September 2006 IPO, the direct to consumer sales "plummeted" from $179 million in FY 2006 (representing 45.6% of all sales) to $170 million in FY 2008 (representing 30.6% of all sales).  Id., ¶ 19.

Concomitant with the foregoing, plaintiffs further allege that Bare's aggressive drive to open hundreds of "brick-and-mortar" sales channels during the class period, was also cannibalizing sales from the company's other distribution channels – including its own boutiques, infomercial sales, QVC and even prestige wholesalers.  See CCC, ¶¶ 20-21.  The Company's IPO Registration Statement/Prospectus, for example, stated that Bare planned to further penetrate its "multiple distribution channels" via increasing sales through its key premium wholesale accounts, by expanding its base of company-owned boutiques, and growing its infomercial sales.  Instead, plaintiffs allege that by December 31, 2008, Bare had opened over 750 "brick and mortar" sales channels, including sales outlets in single shopping malls.  According to plaintiffs, no effort was made by Bare to coordinate the "multiple competing sales spots that were popping up."  Id., ¶ 21.  As a result, say plaintiffs, Bare's own boutiques were competing with multiple other of its retail and wholesale sales outlets, and the "rampant expansion" in brick and mortar sales locations was at the expense of infomercial sales growth.  Id., ¶ 61.

In addition, plaintiffs allege that Bare planned to "[l]everage [its] strong market position in foundation to cross-sell [its] other products," and to that end, expressly stated that "[the Company had] demonstrated success in cross-selling [its] non-foundation products in channels where [it] interact[ed] directly with consumers, such as in [Bare] boutiques and on home shopping television."  CCC, ¶ 68.  In reality, allege plaintiffs, Bare's cross-selling efforts had failed.  Id.

Plaintiffs generally allege that all the foregoing defects in the Company's sales model

United States District Court

For the Northern District of California

could, and did, render sales projections inaccurate by throwing them off.  Collectively, the foregoing defects rendered Bare Escentuals' class period sales projections and stock valuations utterly meaningless.  Id., ¶ 22.

Meanwhile, plaintiffs allege the company's insiders were "cashing in."  Beginning in June 2004, the company's two private equity sponsors – Berkshire Partners LLC ("Berkshire Partners") and JH Partners, LLC ("JH Partners") – began a series of "recapitalizations" in which their affiliates and certain members of the company's management acquired a majority controlling interest in the company.  CCC, ¶ 25.  To that end, on June 10, 2004, Bare Escentuals entered into management agreements with Berkshire Partners and JH Partners.  Id.  In February 2005, the company took on another series of "recapitalizations," whereby the company took on debt and used significant cash to pay hundreds of millions of dollars in dividends to its private equity sponsors and executives.  Then, in September 2006, the company completed its IPO in order to repay the outstanding indebtedness and to buy out the management agreements with Berkshire Partners and JH Partners.  Id., ¶ 26.  As proof, plaintiffs point out that all the foregoing was detailed in an October 2006 expose that was published in Business Week.  Id., ¶ 24 .

In March 2007, Bare Escentuals, its private equity partners, and certain of the company's senior executives again went back to the capital markets, as Bare Escentuals issued and offered another 575,000 shares (i.e., March 2007 Offering).  See CCC, ¶ 27.  Then again, in June 2007, Bare Escentuals offered another 100,000 shares ("June 2007 Offering").  Id., ¶ 28.

Simultaneously, plaintiffs also allege that defendants issued a series of false and misleading statements concerning Bare Escentuals' sales practices and business model.  See CCC, ¶ 29.  Generally, as detailed in greater specificity throughout the complaint, plaintiffs allege that defendants' Registration Statements/Prospectuses issued in connection with the IPO, the March 2007 offering, and the June 2007 offering, were false when filed with and declared effective by the SEC.  They misrepresented and/or failed to

United States District Court

For the Northern District of California

1   disclose, among other things, that: (a) the company's premium product image was being

2   diluted by sales through discounters like Costco and Target; (b) the company's efforts to

3   revitalize its infomercial sales and to cross-sell were failing; and (c) the company's ability to

4   continue garnering the premium "club" deal sales revenues from its direct to consumer

5   infomercial and QVC sales program was diminishing.

6       As a result, the company's stock traded up to $28 in its first day of trading following

7   the IPO, and continued to be inflated by defendants' false statements, trading over $43 per

8   share in May 2007, and permitting Bare Escentuals to issue and sell over 18 million shares

9   in its September 2006 IPO, and allowing the company's private equity sponsors and

10  executives to receive over $700 million in proceeds in the March and June 2006 follow-on

11  offerings.

12      On October 30, 2008, the company management announced that the company

13  would be forced to cut prices and its financial guidance going forward and during late 2008,

14  with the company revamping its marketing campaign, and offering lower priced starter kits.

15  See CCC, ¶ 31.  The company also disclosed that its inventory levels rose 55% in FY 08,

16  while revenues rose just 2%.  Plaintiffs allege that, as the truth about Bare Escentuals and

17  its financial operations reached the market, the price of the company's common stock

18  plummeted, to close at $4.18 per share on October 31, 2008 – almost 80% below the IPO

19  price and more than 87% below the March 2007 and June 2007 offering prices.  CCC, ¶

20  31.  In addition, throughout 2009, plaintiffs allege that Bare Escentuals' sales have been

21  ravaged by "de-stocking" efforts at its premium wholesalers, resulting in the company

22  reporting an 11.5% revenue decline for the first quarter 2009.  Id..

23  B.    Alleged Misrepresentations/Statements

24      In addition to the foregoing general allegations, plaintiffs' complaint more specifically

25  details various groupings of allegedly false and deceptive misrepresentations and/or

26  statements made by defendants.  The relevant groupings of misrepresentations and/or

27  statements are as follows:  (i) false and deceptive IPO Registration Statement/Prospectus;

28

7

(ii) false and deceptive March 2007 Offering Registration Statement/Prospectus; and (iv)
defendants' other false and misleading class period statements.

      i.    IPO Registration/Statement Prospectus

On June 30, 2006, Bare Escentuals filed with the SEC a Form S-1 Registration
Statement and Prospectus ("IPO Offering Statement/Prospectus").  CCC, ¶ 57.  The
company initially forecast its shares would be sold in the $15-$17 range.  On September
28, 2006, the IPO resulted in Bare Escentuals' sale of 18.4 million shares of its common
stock at $22.00 per share.  The stock opened at $28 per share, however, up 27.3% from its
IPO price.  Id.

Plaintiffs allege the following untrue statements in connection with the Registration
Statement/Prospectus:

- the statement that "a core element of the Company's success was its
distinctive marketing strategy and multi-channel distribution model" was false
because defendants knew then that the company's expansion was
cannibalizing sales from various sales channels;

- the statement that defendants planned to "further penetrate each of their
multiple distribution channels" by increasing net sales to premium wholesale
accounts and by expanding company-owned boutiques was false, since
defendants instead engaged in a rampant expansion effort to chase
immediate sales that resulted in the cannibalization of sales, instead of sales
growth;

- the statement that Bare Escentuals' customers "Exhibited brand loyalty and
enthusiasm for its products" was false, since the direct to customer sales
program started in 2001 was really the result of unwittingly joining customers
as "club" sales members, without their consent;

- the statement that the company's "multi-channel distribution strategy provided
for greater consumer diversity reach and convenience while reinforcing the
authenticity and premium image of the company's brands" was false, since
the company was in reality selling to mass discounters like Costco and
Target, thereby significantly undermining the company's reputation as a
premium product seller;

- the statement that the company "planned to open a total of seven new
boutiques in 2006 and ten new boutiques in 2007" for a total of 12 boutique
openings was false, since as of December 30, 2007, the company actually
had 51 open company-owned boutiques;

- the statement that Bare Escentuals intended to "continue to increase net
sales through key premium wholesale accounts" and would "explore
additional opportunities to sell its products in premium department stores"

8

1  was false, since Bare Escentuals was selling to Costco and Target – entities that were not "premium" department stores

2

3  • statements contained in Bare Escentuals' December 1998 agreement with QVC and the September 2006 written amendment to that agreement – which were attached to the SEC Statement/Prospectus – to the effect that QVC had the exclusive right to promote and sell Bare Escentuals products, were false, since Bare Escentuals was selling to Costco and Target; and

4

5

6  • the statement that the company had to date "demonstrated success in cross-selling its non-foundation products" in certain sales channels was false, since in reality, Bare Escentuals' cross-selling efforts had failed

7

8  See CCC, ¶¶ 57-71.

9  ii.   March 2007 Registration/Statement Prospectus

10  On February 16, 2007, Bare Escentuals filed with the SEC a Form S-1 Registration

11 Statement and Prospectus ("March 2007 Offering Statement/Prospectus").  CCC, ¶ 72.

12 After an additional amendment, the offering was priced and on March 13, 2007, Bare

13 Escentuals, and certain selling stockholders, sold 13.8 million additional shares of its

14 common stock at $34.50 per share.  Bare Escentuals itself sold 575,000 new shares of

15 stock, and the remaining 13.225 million shares were sold by Berkshire Partners, JH

16 Partners, and other private companies and Bare Escentuals management.

17  Plaintiffs allege the following untrue statements in connection with the March 2007

18 Registration Statement/Prospectus:

19  • once again, the statement that Bare Escentuals' customers "Exhibited brand loyalty and enthusiasm for its products" was false, since the direct to customer sales program started in 2001 was really the result of unwittingly joining customers as "club" sales members, without their consent;

20

21

22  • once again, the statement that the company's "multi-channel distribution strategy provided for greater consumer diversity reach and convenience while reinforcing the authenticity and premium image of the company's brands" was false, since the company was in reality selling to mass discounters like Costco and Target, thereby significantly undermining the company's reputation as a premium product seller;

23

24

25  • again, the statement that Bare Escentuals intended to "continue to increase net sales through key premium wholesale accounts" and that the company believed "that substantial opportunity exists to open additional domestic boutiques" was false, since Bare Escentuals was selling to Costco and Target – entities that were not "premium" department stores, since the company's premium sales opportunities were rapidly diminishing;

26

27

28

9

United States District Court

For the Northern District of California

- the repeat statement that the company had to date "demonstrated success in cross-selling its non-foundation products" in certain sales channels was false, since in reality, Bare Escentuals' cross-selling efforts had failed;

- again, the statement that defendants planned to "further penetrate each of their multiple distribution channels" by increasing net sales to premium wholesale accounts and by expanding company-owned boutiques was false, since defendants instead engaged in a rampant expansion effort to chase immediate sales that resulted in the cannibalization of sales, instead of sales growth; and

- again, statements contained in Bare Escentuals' December 1998 agreement with QVC and the September 2006 written amendment to that agreement – which were attached to the SEC Statement/Prospectus – to the effect that QVC had the exclusive right to promote and sell Bare Escentuals products, were false, since Bare Escentuals was selling to Costco and Target.

See CCC, ¶¶ 72-81.

iii.    June 2007 Registration/Statement Prospectus

On May 14, 2007, Bare Escentuals filed with the SEC a Form S-1 Registration Statement and Prospectus ("June 2007 Offering Statement/Prospectus").  CCC, ¶ 82.  After an additional amendment, the offering was priced and on June 14, 2007, Bare Escentuals, and certain selling stockholders, sold 8 million additional shares of its common stock at $36.50 per share.  Bare Escentuals itself sold 100,000 new shares of stock, and the remaining 7.9 million shares were sold by Berkshire Partners, JH Partners, and other private companies and Bare Escentuals management.

Again, as with the IPO and the March 2007 Registration Statement/Prospectus, plaintiffs assert that the June 2007 Offering Statement/Prospectus contained untrue statements.  Those allegedly misleading statements overlap with the statements identified above in connection with the IPO and March 2007 Registration Statements/Prospectuses. The June 2007 Registration Statement/Prospectus also adds, however, the following two misrepresentations:

- the statement that the company's "chief executive officer, Leslie Blodgett... is supported by a senior management team with complementary experiences managing prestige cosmetic brands within retail and wholesale distribution channels and overseeing operations in the branded consumer products industry" was false, since in reality, only individual defendants McCormick and Miles were the other "senior management," and both were relatively new to

United States District Court

For the Northern District of California

1    Bare Escentuals; and

2    • the statement that the company "continued to experience strong consumer demand for" its products, and that its sales growth for each channel would be in line with growth rates for the three months ended April 1, 2007 compared to the three months ended April 2, 2006, "with the exception of the infomercial channel, which [was] expected to be flat relative to the same period for the prior fiscal year," was false.  In reality, allege plaintiffs, the company's quarter 2 results for 2007 would reveal that the company's infomercials were not producing anywhere near their previously obtained level of sales, causing the company's stock price to plunge more than 40%.

7    See CCC, ¶¶  82-94.

8    iv.    false and misleading class period statements

9    The class period commences on September 28, 2006.  See CCC, ¶ 127.  The class

10   period allegations are stated only as to the Exchange Act claims, and deal specifically with

11   the actions and statements of: individual defendants Blodgett, Miles and McCormick, as

12   senior executive officers and/or directors of Bare Escentuals; and defendants Jones,

13   Bloom, John, Hansen, and Ottinger (i.e., the "Individual defendants").

14    Plaintiffs allege numerous false and/or misleading statements made by defendants

15   throughout the class period, the vast majority of which were made in connection with the

16   company's press releases and financial reporting.  Specifically, plaintiffs allege the

17   following listing (in chronological order) of the differing bases for defendants' allegedly false

18   statements:

19   • September 28, 2006 release relating to the IPO

20   • September 28, 2006 IPO Registration Statement/Prospectus

21   • November 7, 2006 press release re Q3 2006 financial results

22   • November 7, 2006 conference call involving Blodgett, Miles, and McCormick

23   • November 15, 2006 interim financial report for Q3 2006 on SEC Form 10-Q

24   • February 28, 2007 press release re financial results for Q4 and fiscal year ("FY") 2006

25
26   • March 30, 2007 annual financial report for FY06 and Q4 2006 on SEC Form 10-K

27   • March 13, 2007 press release re follow-on public offering of 12 million shares

28

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

•     May 2, 2007 press release re financial results for Q1 2007

•     conference call following May 2, 2007 press release involving Blodgett, Goldman Sachs

•     May 14, 2007 interim financial report for Q1 2007 on SEC Form 10-Q

•     June 5, 2007 press release re FY 2007 guidance

•     June 13, 2007 press release re public offering of 8 million shares

•     August 1, 2007 press release re Q2 2007 results

•     August 14, 2007 interim financial report for Q2 2007 on SEC Form 10-Q

•     statements made by Blodgett and McCormick at September 26, 2007 Piper Jaffray Second Annual London Consumer Conference

•     October 31, 2007 press release re Q3 2007 financial results

•     November 14, 2007 interim financial report for Q3 2007 on SEC Form 10-Q

•     November 29, 2007 press release re fiscal 2007 and 2008 guidance

•     January 30, 2008 press release entitled "Bare Escentuals, Inc. Named Hottest Prestige Makeup Brand of 2007"

•     February 26, 2008 release re Q4 2007 and FY 2007 financial results

•     February 28, 2008 annual financial report for Q4 2007 and FY 2007 on SEC Form 10-K

•     March 40, 2008 Goldman Sachs report entitled "Insider selling and PE distribution a lingering supply overhang"

•     April 24, 2008 Suntrust Robinson Humphrey investment report re diversion of Bare products to Target stores

•     April 24, 2008 Goldman Sachs statements re Bare's "sales per outlet growth" and "bottom up distribution model"

•     May 1, 2008 release re Q1 2008 fiscal results

•     May 1, 2008 statements to investors re Target and Costco sales disclosed during Q4 2007 earnings conference in Feb. 2008

•     May 9, 2008 interim financial report for Q1 2008 on SEC Form 10-Q

•     June 3, 2008 release re appointment of Michael Dadario as President of Retail

•     July 30, 2008 release re Q2 2008 fiscal results

•     August 8, 2008 interim financial report for Q1 2008 on SEC Form 10-Q

1

2    <u>See</u> CCC, ¶¶ 122-175.

3    C.    The Instant Action and Motion

4    Plaintiffs filed the instant action on July 17, 2009.  The operative corrected

5    consolidated complaint was filed on February 11, 2010.  Plaintiffs' complaint asserts six

6    claims against defendants: (1) violation of Section 11 of the Securities Act (against all

7    defendants except Miles); (2) violation of Section 12(a)(2) of the Securities Act (against all

8    defendants except Miles); (3) violation of Section 15 of the Securities Act (against the

9    individual defendants except Miles); (4) violation of Section 10(b) of the Exchange Act and

10   Rule 10b-5 Promulgated Thereunder (against Bare Escentuals and all individual

11   defendants except Rose and Senk); (5) violation of Section 20(a) of the Exchange Act

12   (against all individual defendants except Rose and Senk); and (6) violation of Section 20A

13   of the Exchange Act (against individual defendants Blodgett, Ottinger, Senk, Bloom, Jones,

14   Hansen, and John).  <u>See generally</u> Complaint.

15   Defendants have now filed two motions to dismiss plaintiffs' claims.  First, Bare and

16   the individual defendants move to dismiss plaintiffs' claims on various grounds.  They have

17   filed a corresponding request for judicial notice in connection with the motion.  Second, the

18   underwriter defendants have filed their own motion to dismiss.  Plaintiffs, besides filing a

19   joint opposition to both motions, have also filed a motion to strike the request for judicial

20   notice.

21                                    **DISCUSSION**

22   A.    Legal Standard

23   A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

24   alleged in the complaint.  <u>Ileto v. Glock, Inc.</u>, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

25   Review is limited to the contents of the complaint.  <u>Allarcom Pay Television, Ltd. v. Gen.</u>

26   <u>Instrument Corp.</u>, 69 F.3d 381, 385 (9th Cir. 1995).  To survive a motion to dismiss for

27   failure to state a claim, a complaint generally must satisfy only the minimal notice pleading

28

**United States District Court**

For the Northern District of California

1   requirements of Federal Rule of Civil Procedure 8.

2       Rule 8(a)(2) requires only that the complaint include a "short and plain statement of

3   the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Specific

4   facts are unnecessary – the statement need only give the defendant "fair notice of the claim

5   and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell

6   Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  All allegations of material fact are

7   taken as true.  Id. at 94.  However, a plaintiff's obligation to provide the grounds of his

8   entitlement to relief "requires more than labels and conclusions, and a formulaic recitation

9   of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and

10  quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a

11  right to relief above the speculative level. Id.

12      A motion to dismiss should be granted if the complaint does not proffer enough facts

13  to state a claim for relief that is plausible on its face. See id. at 558-59. "[W]here the well-

14  pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

15  the complaint has alleged-but it has not show[n] that  the pleader is entitled to relief.

16  Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1950 (2009).

17      In addition, when resolving a motion to dismiss for failure to state a claim, the court

18  may not generally consider materials outside the pleadings.  Lee v. City of Los Angeles,

19  250 F.3d 668, 688 (9th Cir. 2001).  There are several exceptions to this rule.  The court

20  may consider a matter that is properly the subject of judicial notice, such as matters of

21  public record.  Id. at 689; see also  Mack v. South Bay Beer Distributors, Inc., 798 F.2d

22  1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the

23  complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion

24  to one for summary judgment).  Additionally, the court may consider exhibits attached to

25  the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542,

26  1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all

27  parties as authentic.  See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th

28

United States District Court

For the Northern District of California

1    Cir. 2002).

2         Finally, in actions alleging fraud, "the circumstances constituting fraud or mistake

3    shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint

4    must allege specific facts regarding the fraudulent activity, such as the time, date, place,

5    and content of the alleged fraudulent representation, how or why the representation was

6    false or misleading, and in some cases, the identity of the person engaged in the fraud.  In

7    re GlenFed Sec. Litig., 42 F.3d 1541, 1547-49 (9th Cir.1994).

8    B.    Bare and Individual Defendants' Motion to Dismiss

9         The Individual defendants, led by Bare, contend that the Corrected Consolidated

10   Complaint must be dismissed because plaintiffs have failed to allege any viable claims

11   against defendants under the Securities Act and the Securities Exchange Act.  Specifically,

12   defendants assert that:  (1) plaintiffs fail to state a claim pursuant to Section 11 of the

13   Securities Act; (2) plaintiffs fail to state a claim pursuant to 12(a)(2) of the Securities Act;

14   (3) plaintiffs fail to state a claim pursuant to Section 10(b) of the Securities Exchange Act;

15   (4) that plaintiffs' claims are barred by the applicable statutes of limitation; and (5) plaintiffs

16   fail to state control person claims, or insider trading claims under applicable provisions of

17   the Securities Act and Securities Exchange Act.

18        1.    Section 11 of the Securities Act

19        The Individual defendants generally contend that plaintiffs have failed to assert a

20   viable Section 11 claim, because plaintiffs have failed to satisfactorily allege any facts

21   demonstrating that the IPO and/or March 2007 registration statements at issue – which

22   form the predicate basis for plaintiffs' Securities Act claims – contained either material

23   misstatements, or were fraudulent, pursuant to Rule 8(a) or alternatively, Rule 9(b)

24   standards.  Defendants also assert that plaintiffs have failed to adequately plead loss

25   causation.  Plaintiffs, in response, counter that their Section 11 claims do not "sound in

26   fraud," thereby obviating any need for heightened scrutiny pursuant to Rule 9(b), and that

27   the complaint's allegations are more than sufficient to plead actionable material

28

15

**United States District Court**
For the Northern District of California

1   misstatements under Rule 8(a).  They also contend that loss causation is not an element of

2   a claim asserted under Section 11, and so cannot form a basis upon which to dismiss

3   plaintiffs' claims.

4          Resolution of these competing arguments requires analysis of the following issues:

5   (a) the standards applicable to section 11 claims; (b) whether the claims "sound in fraud,"

6   thereby triggering the heightened pleading standards of Rule 9(b); (c) whether plaintiffs

7   have sufficiently alleged material misstatements in connection with the IPO and March

8   2007 Registration Statements; and (d) whether the complaint fails to establish loss

9   causation.

10         Preliminarily, however, the court must address defendants' requests for judicial

11  notice filed in connection with the motion to dismiss, and plaintiffs' motion to strike in

12  response thereto.  Defendants, through an original and a supplemental request, seek an

13  order judicially noticing a total of 53 exhibits – which exhibits consist of documents

14  incorporated by reference into plaintiffs' complaint, Bare's SEC filings, certain press

15  releases and conference call transcripts cited in the complaint, unrelated court filings, and

16  Bare's website.  Defendants seek the court's review of the content of these exhibits at

17  various points in their arguments, in order to support their broader dismissal argument.

18  Plaintiffs, however, object on grounds that it is impermissible at the pleading stage for the

19  court to take judicial notice of facts that are substantively in dispute, and which go to the

20  merits of plaintiffs' claims.  In the event the court is inclined to grant defendants' judicial

21  notice request, plaintiffs assert they need discovery in order to determine the probative

22  value of the evidence.

23         As plaintiffs themselves concede, while there is a general rule against referencing

24  evidence outside the four corners of the complaint, an exception to the rule arises where a

25  plaintiff references and relies on a particular document as part of the moving allegations of

26  the complaint.  In such cases, the court is justified in looking outside the four corners of the

27  complaint, to the document itself if offered.  <u>See, e.g., Twombly</u>, 550 U.S. at 569 n. 13 ("the

28

District Court [is] entitled to take notice of the full contents of the published articles referenced in the complaint, from which [] truncated quotations [are] drawn."); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").  The court is also permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC, as well as of press releases and conference call transcripts cited in the complaint containing alleged "safe harbor" warnings.  See Dreiling v. American Exp. Co., 458 F.3d 942, 946 fn. 2 (9th Cir. 2006); In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (judicial notice of such press releases proper).  Moreover, the court may take judicial notice of the existence of unrelated court documents, although it will not take judicial notice of such documents for the truth of the matter asserted therein.

Thus, to the extent defendants seek judicial notice of exhibits that are referenced and relied upon in plaintiffs' complaint, as well as SEC filings, press releases and conference call transcripts cited in the complaint, and unrelated court documents the court will consider these exhibits and GRANTS defendants' request.  However, where inappropriate, the court will not consider these documents for the truth of the matters asserted therein.  In addition, the court DENIES defendants' request for judicial notice, to the extent defendants request that the court take judicial notice of Bare's sales policy, as posted at an undisclosed date on Bare's website.[2]

For the same reasons, plaintiffs' motion to strike defendants' requests for judicial notice is also GRANTED in part and DENIED in part.

---

[2]   It should be noted that plaintiffs have also filed a request for judicial notice, requesting that the court take judicial notice of certain unrelated court filings. Defendants have not opposed the request, and for the reasons enunciated above, the court accordingly GRANTS plaintiffs' request for judicial notice.

17

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    The court now turns to the issues for review in connection with plaintiffs' section 11

2  claims.

3              a.    standards applicable to Section 11 claims

4    Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a

5  registration statement may sue based on material omissions or misrepresentations in that

6  statement.  15 U.S.C. § 77k(a).  Persons liable under § 11(a) are those who signed the

7  registration statement, directors of or partners in the issuer, professionals who participated

8  in the preparation of the registration statement, and underwriters of the security.  Id.  To

9  plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an

10  omission or misrepresentation, and that the omission or misrepresentation was material –

11  that is, that it would have misled a reasonable investor about the nature of his or her

12  investment.  In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1403-04 (9th Cir. 1996).

13              b.    whether plaintiffs' claims "sound in fraud"

14    Defendants argue that Rule 9(b) applies to plaintiffs' Section 11 claim because the

15  complaint's allegations are "predicated on fraud."  In support of its arguments regarding the

16  applicability of Rule 9(b), defendants note that plaintiffs' complaint utilizes the same alleged

17  misrepresentations and omissions in support of their section 11 claim as those used to

18  support their Section 10(b) claims – which do require heightened pleading.  Defendants

19  accordingly contend that all elements of the section 11 claim must be stated with

20  particularity, including the time, date, place, content of the alleged fraudulent

21  representation, and how and why the representation was false or misleading.

22    Plaintiffs counter that the heightened pleading standards of Rule 9(b) apply only if

23  the plaintiff alleges a "unified course of fraudulent conduct."  See In re Daou Sys., Inc., 411

24  F.3d 1006, 1027 (9th Cir. 2005).  Here, however, they assert that they describe only a

25  unified course of self-cannibalizing sales operations, premium product image dilution

26  through sales to big-box discounters, failing efforts to revitalize the infomercial sales and to

27  cross-sell, and heavy reliance on the negative option club program.  Plaintiffs contend that

28

18

United States District Court

For the Northern District of California

1   these are not fraudulent practices in and of themselves, and to the extent the plaintiffs seek

2   to hold defendants responsible for statements related to these practices, plaintiffs expressly

3   disclaim fraud, and insist that they claim only that defendants were negligent in failing to

4   adhere to their duties to "speak the whole truth," once they had undertaken to speak some

5   truth.  Accordingly, conclude plaintiffs, Rule 9(b) standards do not apply.

6           To ascertain whether a complaint "sounds in fraud," the court must normally

7   determine, after a close examination of the language and structure of the complaint,

8   whether the complaint "allege[s] a unified course of fraudulent conduct" and "rel[ies] entirely

9   on that course of conduct as the basis of a claim." See Vess v. Ciba-Geigy Corp. USA, 317

10  F.3d 1097, 1103-04 (9th Cir.2003).  Where, however, a complaint employs the exact same

11  factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct

12  under section 10(b) of the Exchange Act, the court "can assume that it sounds in fraud."

13  See Daou, 411 F.3d at 1028; see also Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161

14  (9th Cir. 2009).

15          This case presents an instance of the latter.  As defendants point out, there is a

16  remarkable similarity between the conduct forming the basis for plaintiffs' section 11 claims,

17  and the conduct forming a basis for plaintiffs' section 10(b) claims.  For example, the court

18  sees an obvious overlap between paragraphs 59, 62-63, 66-67, 73-74, and 80 (i.e., Section

19  11 allegations), and paragraphs 105-06, 108, 115, 117, 128 (section 10(b) allegations).

20  The principal difference between the former and the latter is that plaintiffs expressly state

21  that the former allegations disclaim fraud as a basis, and the latter allegations reflect the

22  use of terminology that is more consistent with so-called 'fraudulent' behavior – i.e., include

23  stronger references to defendants' 'concealment' in connection with the latter allegations.

24          As defendants correctly note, however, it is the conduct pled that matters – not

25  necessarily the words with which plaintiffs artfully seek to allege their claims.  And since the

26  course of conduct pled in connection with plaintiffs' section 11 claim is so substantively

27  similar to the conduct pled in connection with plaintiffs' section 10(b) claim – at least with

28

United States District Court

For the Northern District of California

1   respect to all statements contained within the IPO and March 2007 Registration statements

2   – the court concludes that plaintiffs' section 11 claims do, in fact, "sound in fraud."

3        As such, the heightened pleading requirements of Rule 9(b) apply, and to survive

4   dismissal, the court must conclude that plaintiffs have demonstrated *with particularity* in

5   accordance with Rule 9(b) that: (1) the registration statements contained an omission or

6   misrepresentation; and (2) and that the omission or misrepresentation was material – that

7   is, that it would have misled a reasonable investor about the nature of his or her

8   investment.  In re Stac Electronics, 89 F.3d at 1403-04.

9                    c.    material misstatements in connection with the IPO and March 2007

10                         Registration Statements

11       With this understanding in mind, the court turns to the heart of plaintiffs' section 11

12  claim – whether plaintiffs have adequately alleged a material misstatement in connection

13  with the IPO and/or March 2007 registration statements.  The parties focus on the following

14  alleged material misstatements: (i) those concerning Bare's adherence to "premium" sales

15  restrictions; (ii) those concerning the success of Bare's "club" program (i.e., negative option

16  sales program); (iii) those concerning Bare's efforts to cross-sell its non-foundation

17  products; and (iv) those concerning Bare's store expansion, and the resulting alleged

18  "cannibalization" of sales caused by the expansion.

19                         i.    Bare's adherence to "premium" sales restrictions

20       Plaintiffs allege that Bare's IPO and March 2007 statements/prospectuses misstated

21  Bare's adherence to its "premium sales" restrictions.  Specifically, plaintiffs allege: that the

22  statements/prospectuses stated that Bare's "multi-channel distribution strategy" provided

23  for "greater consumer diversity, reach and convenience while reinforcing the authenticity

24  and premium image of the Company's brands;" but that in reality, the company was selling

25  its product to foreign distributors that had begun reselling Bare products to mass

26  discounters like Costco and Target, thereby undermining the company's reputation as a

27  "premium" product seller; that the statements/prospectuses also stated that the company

28

United States District Court

For the Northern District of California

1   was in compliance with an exclusive rights agreement with QVC, whereby QVC had the

2   exclusive right to promote, market and sell Bare products in all distribution channels, but

3   only in "premium" channels; and that notwithstanding this assertion, Bare was not in

4   compliance with the agreement with QVC at the time these statements were made, since it

5   was redistributing its products to Costco and Target.  See CCC, ¶¶ 63, 65-67, 74, 79-80.

6       Ultimately, the court finds that these allegations fail to meet Rule 8's pleading

7   requirements, let alone Rule 9(b)'s.  When viewed as a whole, the allegations do not

8   exceed Twombly's 'plausibility' threshold.  The gist of plaintiffs' allegations, for example, are

9   premised on Bare's sale of products to big-box discounters Target and Costco.  Yet, in their

10  complaint, plaintiffs simultaneously allege that Bare filed litigation in federal court *against*

11  Costco, on grounds that Costco was harming Bare with Costco's "unauthorized" actions

12  and sales.  See CCC, ¶ 12.  It is strains credulity to infer that Bare would have been selling

13  its products to Costco, in violation of the Company's existing agreement with QVC, while

14  also prosecuting litigation against Costco for its unauthorized sale of Bare goods.

15      Similarly, plaintiffs allege that defendants "knew" at some point before the Fall of

16  2007 that its products were being sold on Target's website, but plaintiffs do not actually

17  allege – though they want the court to infer as much – that Bare was the entity doing the

18  selling to Target.  Plaintiffs seek to overcome this hurdle by alleging that the former Director

19  of Production during the February/March 2007 and February/March 2008 periods recalled

20  working on fulfilling a large special order, and that he "believed" this order ended up on

21  Target's shelves.  But this allegations is far too vague to meet Rule 9(b)'s heightened

22  pleading requirements.

23      In short, plaintiffs' allegations fail to establish, consistent with both Rule 8 and Rule

24  9(b) pleading standards, that defendants' IPO and March 2007 statements/prospectuses

25  materially misstated Bare's adherence to "premium sales" restrictions.

26              ii.    Bare's "club" program statements

27      Plaintiffs also allege that Bare's IPO and March 2007 statements/prospectuses

28

21

United States District Court

For the Northern District of California

1    concealed Bare's reliance on its "club" (i.e., negative option sales) program.  Specifically,

2    plaintiffs allege: that Bare utilized its club program to capture, obtain, and report several

3    years' worth of phenomenal premium sales" leading up to the September 2006 IPO; that

4    these club sales would grow lean in the period following the IPO and the follow-on

5    offerings; that the company would be forced to refund previously recognized sales, and

6    many direct to consumer sales customers became brick and mortar shoppers instead; that

7    in the two years following the IPO, the company's direct to consumer sales plummeted; and

8    that the registration statements and prospectuses not only failed to disclose the impact the

9    club practices were having on sales, but also falsely described Bare's infomercial program

10   as offering "competitive" strengths that generated "brand loyalty and enthusiasm" for Bare's

11   products.  See CCC, ¶¶ 59, 62, 73.

12        These allegations too are insufficient to satisfy the heightened pleading

13   requirements of Rule 9(b).  Plaintiffs do not adequately support with any detailed factual

14   allegations their claim that Bare's statements regarding the "competitive strength" of its

15   programs or the "brand loyalty and enthusiasm" generated for Bare products, were actual

16   misstatements.  For example, plaintiffs do not allege how many customers were members

17   of the club program, nor do they allege any facts objectively supporting the allegation that

18   the club program was actually performing poorly.  While plaintiffs do offer two confidential

19   witnesses who purportedly testify as to customer dissatisfaction with the club program, see

20   CCC ¶ 18, these witnesses confirm only the fact of certain ongoing customer complaints,

21   without any specifics that would enable the court to ascertain whether the club's

22   performance as a whole was so unsuccessful as to support plaintiffs' claim of

23   misrepresentation.  Plaintiffs do allege that in the two years following Bare's IPO, "the

24   Company's so-called direct-to-consumer sales plummeted from $179 million in FY 2006,

25   representing 45.6% of all sales, to $170 million in FY 2008, representing just 30.6% of all

26   sales." Id., ¶¶ 18-19.  However, this alleged decline is not sufficient, on its own, to support

27   plaintiffs' claim that Bare's sales were lost as a consequence of the poor performance of

28

United States District Court

For the Northern District of California

1    the club program.

2         To the extent, moreover, that plaintiffs, in their opposition brief and at the hearing on

3    this matter, urged the court to discern the failing nature of Bare's club sales from an

4    unrelated case filing in the Northern District between Bare and a third party named

5    Intelligent Beauty, the court declines to do so.  The court may not take judicial notice of the

6    substance of that unrelated complaint, for the truth of any matter asserted within that

7    complaint.

8         In sum, the court agrees with defendants that plaintiffs' allegations fail to adequately

9    establish that Bare's IPO and March 2007 statements/prospectuses improperly concealed

10   Bare's reliance on its "club" program, as well as the negative effect of the club program on

11   Bare's sales.

12                  iii.      Bare's efforts to "cross-sell" its non-foundation products

13        Next, plaintiffs allege that Bare's IPO and March 2007 statements/prospectuses

14   included the following representation: that the company planned to "leverage its strong

15   market position in foundation to cross-sell its other products," and that "to date, the

16   company had demonstrated success in cross-selling its non-foundation products."  These

17   representations were misstatements, say plaintiffs, because in reality, Bare's cross-selling

18   efforts had failed, as shown by the allegation that Bare's President of Retail stated on

19   October 30, 2008, that the company had previously "tried and failed" to cross-sell its

20   products and "broaden its offerings into related cosmetic categories."  See CCC, ¶¶ 68, 76,

21   197.

22        These allegations do not suffice to state with particularity a material misstatement by

23   defendants.  While the time, date, place and content of the affirmative representation may

24   be inferred from the allegation that the misstatements were contained within Bare's IPO

25   and March 2007 registration statements/prospectuses, plaintiffs do not allege how or why

26   the statements were wrong, and/or material, as conveyed at the time of the IPO and March

27   2007 registration statements/prospectuses.  In particular, plaintiffs rely on an October 30,

28

United States District Court

For the Northern District of California

1    2008 concession conveyed by a Bare executive in a third party analyst report stating the

2    Company had previously "tried and failed" with respect to strategies "similar" to the

3    Company's attempt to broaden its offerings into related cosmetics categories, in order to

4    demonstrate that the company's statements on its *September 2006* and *March 2007*

5    statements/prospectuses were misstatements.  See CCC, ¶ 179.  Without more – and in

6    view of the fact that the actual IPO and March 2007 registration statements themselves

7    actually state that the Company had experienced success in cross-selling blush, eye

8    makeup and lip products in boutiques and on home shopping television – plaintiffs have

9    failed to plausibly allege that the company's representation about its cross-selling success

10   in 2006 and 2007 was a misrepresentation, let alone a material one.  See, e.g., Declaration

11   of Molly Arico ISP Mot. to Dismiss ("Arico Decl."), Ex. 11 at 3.

12         And since there are no other allegations to demonstrate the falsity of the purported

13   misrepresentation, the allegations plainly fail.

14                    iv.    Bare's cannibalization of sales caused by its store expansion

15         Plaintiffs allege that Bare's IPO and March 2007 Registration

16   Statements/Prospectuses contained the following material misstatements: that defendants

17   planned to "further penetrate each of their multiple distribution channels" through a

18   "wholesale" and "retail" approach; and that with respect to the retail approach, defendants

19   believed "substantial opportunity exists to open additional domestic Boutiques."  See CCC,

20   ¶¶ 59-61, 75, 77-78.  According to plaintiffs, these were misstatements because

21   defendants were engaged in a "rampant expansion effort to chase immediate sales at all

22   costs," and that this resulted in Bare opening "over 750" brick and mortar sales channels,

23   without any efforts being made "to coordinate the multiple competing sales spots that were

24   popping up."  See id., ¶ 61.  According to plaintiffs, this resulted in the cannibalization,

25   rather than the growing, of "infomercial sales."  Id.

26         These allegations are not sufficient to plead a material misstatement with

27   particularity.  Again, while the time, date, place and content of the affirmative

28

                                              24

United States District Court

For the Northern District of California

1   representation may be inferred from the allegation that the misstatements were contained

2   within Bare's IPO and March 2007 registration statements/prospectuses, plaintiffs fail to

3   allege how the purported misstatements were misleading.  Plaintiffs only conclusorily

4   allege, for example, that Bare's so-called expansion efforts led to the cannibalization of

5   Bare's infomercial sales.  They provide no supporting facts that lead concrete credence to

6   the conclusion that unexpected "cannibalization" of Bare's infomercial sales channels

7   resulted from Bare's expansion of boutiques.  Moreover, as defendants counter, plaintiffs'

8   allegations with respect to the cannibalization caused by Bare's purportedly too-quick

9   expansion test the plausibility threshold.  Bare reported sales growth for 2006, 2007 and

10  the first half of 2008.  See CCC, ¶¶ 135, 157, 173; Arico Decl., Exs. 4, 6 at 67, 13.  Indeed,

11  Bare's so-called "rampant expansion" of brick and mortar stores is itself an indication of

12  successful growth and the truth of Bare's representation that it sought to further penetrate a

13  distribution channel that would encompass the growth of additional domestic Boutiques.

14       In sum, plaintiffs' allegations belie their claim that defendants' expressed desire to

15  increase growth through wholesale and retail approaches – including the creation of

16  additional domestic boutiques – was demonstrably wrong when expressed.  Plaintiffs base

17  defendants' alleged misrepresentations to this effect on the fact that Bare was actually

18  increasing its brick and mortar expansion at the expense of its infomercial sales, but

19  provide no logical link as to why this would be the case, let alone any supporting allegations

20  that would detail how this is the case.

21       Thus, the requisite degree of particularity is lacking.

22                                           * * *

23       In sum, defendants' motion to dismiss plaintiffs' Section 11 claim, based on the

24  foregoing grounds, is GRANTED.

25            d.    loss causation

26       Finally, defendants contend that plaintiffs fail to allege adequate loss causation.  The

27  Ninth Circuit has held, with respect to loss causation, that "plaintiff must demonstrate a

28

                                            25

United States District Court

For the Northern District of California

causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  In re Dauo, 411 F.3d at 1025.  However, as defendants concede, loss causation is not an element of a section 11 claim; rather, it is an affirmative defense.  Moreover, a "plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation."  Id.  "As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages."  *Id.*

Defendants argue that dismissal is warranted, notwithstanding that loss causation is an affirmative defense, because the face of the complaint is so lacking in any connection whatsoever between the alleged misrepresentation and plaintiffs' losses.  The court, however, finds that plaintiffs have generally alleged that they suffered injury from the hit their stock took once it was understood that defendants' myriad misrepresentations had contributed to an over-inflation of stock.  At this stage, this allegation is sufficient to pass muster.

The court accordingly DENIES defendants' motion to dismiss on this alternative and additional ground.

2.      Section 12(a)(2) of the Securities Act

Defendants contend that plaintiffs' complaint fails to state a claim under Section 12(a)(2) of the Securities Act, given their failure to satisfactorily allege a section 11 claim. Defendants also contend that plaintiffs' Section 12(a)(2) claim fails because neither Bare nor the individual defendants who sold stock during the offerings were "sellers" of securities under the statute, since the IPO and March 2007 offerings were "firm commitment" underwritten offerings.  Plaintiffs, by contrast, respond that the court should reject defendants' argument that they are not § 12(a)(2) "sellers," because defendants' combined actions clearly establish "solicitor seller" status.  Specifically, plaintiffs point to their allegations that the individual defendants actively met with potential investors to present

United States District Court

For the Northern District of California

1   highly favorable information about the company and its sales model; that the defendants

2   were motivated to solicit purchasers; and that they reaped millions of dollars from the

3   company's offerings.

4        Section 12(a)(2) of the 1933 Securities Act imposes civil liability on any person for

5   use of any instrumentality of interstate commerce to offer or sell securities by means of a

6   prospectus or oral communication that includes "an untrue statement of a material fact or

7   omits to state a material fact necessary in order to make the statements, in the light of the

8   circumstances under which they were made, not misleading ....".  See 15 U.S.C. § 77

9   l(a)(2).  To establish liability under section 12(a)(2), a plaintiff must prove that the

10   defendants did more than simply urge another to purchase a security; rather, the plaintiff

11   must show that the defendants solicited purchase of the securities for their own financial

12   gain.  See In re Daou Systems, Inc., 411 F.3d at 1029.  A person is a statutory seller, or

13   sells securities, if he or she either passes title of the security to the purchaser, *or* solicits

14   the sale of the security.  See Pinter v. Dahl, 486 U.S. 622, 646-648 (1988).

15        Defendants are correct that plaintiffs' claim fails in the first instance, because – as

16   already discussed in the preceding sections – they have failed to allege, as a predicate, the

17   existence of material misstatements and/or omissions in connection with the IPO and

18   March 2007 registration statements/prospectuses.  For this reason, therefore, dismissal of

19   plaintiffs' section 12(a)(2) claim is warranted.

20        Defendants are also ultimately correct that the claim must be dismissed for plaintiffs'

21   failure to satisfactorily plead that either Bare or the individual defendants who sold in the

22   offerings were "sellers" of securities, as contemplated by Section 12(a)(2).  To be sure,

23   defendants' argument that the IPO and March 2007 offerings' status as "firm commitment"

24   underwritten offerings prohibits defendants from qualifying as statutory "sellers," is not

25   wholly convincing.  As at least one district court has persuasively noted, "a firm

26   commitment offering does not mean that only the underwriters selling the security may be

27   sued, and that those involved in preparing the registration statement cannot be liable.  In a

28

United States District Court

For the Northern District of California

1    firm commitment offering, officers of the company issuing the registration statement may

2    not be held liable as "sellers" under section 12(2) "unless they actively 'solicited' the

3    Plaintiffs' purchase of securities to further their own financial motives ...". <u>See In re</u>

4    <u>Stratosphere Corp. Securities Litig.</u>, 1 F.Supp.2d 1096, 1120 (D. Nev. 1998).  Thus, the

5    court's inquiry must center on whether plaintiffs have adequately alleged active solicitation

6    on defendants' part.

7           However, a "mere assertion that defendants are solicitors or sellers is a legal

8    conclusion and therefore insufficient to withstand a motion to dismiss." <u>See, e g, Shaw v.</u>

9    <u>Digital Equipment Corp</u>., 82 F.3d 1194, 1216 (1st Cir1996) (superceded in part by PSLRA);

10   <u>In re Westinghouse Securities Litig.</u>, 90 F.3d 696, 717 (3d Cir. 1996).  Something more is

11   needed.  And it is this something more that plaintiffs have not provided.  In support of their

12   conclusion that defendants qualify as "sellers," plaintiffs rely on paragraphs 38-47, 56, 29,

13   71, 72, and 81.  These paragraphs, however, fail to set forth with any degree of detail the

14   means by which defendants actively solicited plaintiffs' purchase of securities.  Rather, they

15   allege via conclusory statements what defendants stood to gain, and what defendants

16   reaped as a consequence of the sale.  They do not set forth the actual efforts made to seek

17   or solicit a purchase of securities.

18          In sum, defendants' motion to dismiss plaintiffs' claim pursuant to Section 12(a)(2) of

19   the Securities Act is GRANTED.

20          3.      <u>Section 10(b) of the Securities Exchange Act</u>

21          Defendants also contend that plaintiffs' complaint fails to state a valid claim under

22   Section 10(b) of the Securities Exchange Act.  Plaintiffs' claim is premised on the fraudulent

23   statements purportedly made by defendants in connection with the IPO and March 2007

24   registration statements, as well as numerous other public statements made during the class

25   period.  Defendants generally assert that plaintiffs have failed to plead facts sufficient to

26   establish either of the requisite elements of falsity, or scienter.  At any rate, defendants

27   argue, the Company's forward-looking statements are protected by the safe harbor and the

28

28

**United States District Court**
For the Northern District of California

1   'bespeaks caution' doctrine.  Plaintiffs, naturally, respond that the allegations of their

2   complaint are more than adequate to establish falsity, and to raise a strong inference of

3   scienter.  Furthermore, plaintiffs counter that defendants cannot escape liability for their

4   false and misleading statements by invoking any safe harbor provision or "bespeaks

5   caution" doctrine.

6        As with plaintiffs' Section 11 claim, the arguments raised by the parties in connection

7   with plaintiffs' Section 10(b) claim require a straightforward analysis.  In short, the court's

8   analysis depends upon discussion and resolution of the following issues: (a) the standards

9   applicable to section 10(b) claims; (b) whether plaintiffs plead claims satisfying the 'falsity'

10  element; (c) whether plaintiffs plead facts satisfying the 'scienter' element; and (d) whether

11  defendants' forward-looking statements are protected by the safe harbor/'bespeaks caution'

12  doctrine.

13              a.      standards applicable to section 10(b) claims

14       To plead securities fraud under Section 10(b) of the 1934 Act or Rule 10b-5,

15  plaintiffs must allege (1) a misstatement or omission; (2) of material fact; (3) made with

16  scienter; (4) on which plaintiffs relied; (5) which proximately caused the plaintiffs' injury.

17  DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002).  A

18  presumption of reliance is available to plaintiffs alleging violations of § 10(b) based primarily

19  on omissions of material fact, but not in cases alleging significant misrepresentations in

20  addition to omissions, or alleging only misrepresentations.  Id. at 1063-64.  A presumption

21  of reliance is also available in a "fraud on the market" case, where the plaintiff alleges that

22  a defendant made material representations or omissions concerning a security that is

23  actively traded in an "efficient market."  Id. at 1064 (citing Basic, Inc. v. Levinson, 485 U.S.

24  224, 247 (1988)).

25       The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in

26  1995 to establish uniform and stringent pleading requirements for securities fraud actions,

27  and "to put an end to the practice of pleading 'fraud by hindsight.'"  In re Silicon Graphics,

28

United States District Court

For the Northern District of California

1   183 F.3d 970, 958 (9th Cir.1999). The PSLRA heightened the pleading requirements in

2   private securities fraud litigation by requiring that the complaint plead both falsity and

3   scienter with particularity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir.

4   2002).  If the complaint does not satisfy these pleading requirements, the court, upon

5   motion of the defendant, must dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

6       Under the PSLRA – whether alleging that a defendant "made an untrue statement of

7   a material fact" or alleging that a defendant "omitted to state a material fact necessary in

8   order to make the statements made, in the light of the circumstances in which they were

9   made, not misleading" – the complaint must now specify each statement alleged to have

10  been false or misleading, specify the reason or reasons why each such statement is

11  misleading, and, if an allegation regarding the statement or omission is made on

12  information and belief, state with particularity all facts on which that belief is formed. 15

13  U.S.C. § 78u-4(b)(1).[3]  If the challenged statement is not false or misleading, it does not

14  become actionable merely because it is incomplete.  In re Vantive, 283 F.3d at 1085; Brody

15  v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

16      In addition – whether alleging that a defendant "made an untrue statement of

17  material fact" or alleging that a defendant "omitted to state a material fact" – the complaint

18  must now, with respect to each alleged act or omission, "state with particularity facts giving

19  rise to a strong inference that the defendant acted with the required state of mind."  15

20  U.S.C. § 78u-4(b)(2); see also In re Vantive, 283 F.3d at 1084.  By requiring particularized,

21  detailed allegations showing a strong inference of scienter, the PSLRA was intended to

22  "eliminate abusive and opportunistic securities litigation."  Gompper v. VISX, Inc., 298 F.3d

23  893, 897 (9th Cir. 2002).

24      In the Ninth Circuit, the required state of mind is "deliberate or conscious

25  recklessness."  In re Silicon Graphics, 183 F.3d at 979.  If the challenged act is a

26  _____

27       [3]  Matters that are not alleged on personal knowledge are considered to be
    alleged on information and belief.  See In re Vantive, 283 F.3d at 1085 n. 3.

28

**United States District Court**
For the Northern District of California

1   forward-looking statement, the required state of mind is "actual knowledge . . . that the

2   statement was false or misleading."  15 U.S.C. § 78u-5(c)(1); see No. 84

3   Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co., 320

4   F.3d 920, 931 (9th Cir. 2003).  Because falsity and scienter in securities fraud cases are

5   generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the

6   falsity and scienter requirements into a single inquiry.  Id. at 932.  While the court must take

7   the totality of the allegations into account when considering whether the heightened

8   pleading standard has been met, see America West, 320 F.3d at 945, the complaint must

9   continue to comply with the Silicon Graphics standards in order to state a claim.  In re

10  Read-Rite, 335 F.3d at 846.

11      On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when

12  considering whether plaintiffs have shown a strong inference of scienter, "the district court

13  must consider all reasonable inferences to be drawn from the allegations, including

14  inferences unfavorable to the plaintiffs."  Gompper, 298 F.3d at 897 (noting the "inevitable

15  tension . . . between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to

16  dismiss . . . and the heightened pleading standard set forth under the PSLRA). In other

17  words, the court must consider all the allegations in their entirety in concluding whether, on

18  balance, the complaint gives rise to the requisite inference of scienter.  Id.

19          b.    the 'falsity' element

20      Defendants substantively challenge plaintiffs' ability to adequately allege falsity.

21  Plaintiffs allege numerous material misrepresentations and omissions by defendants,

22  based on defendants' purported statements made in connection with various conference

23  calls, financial press releases, and SEC statements from September 2006 through October

24  2008.[4]  Plaintiffs base their claim of falsity on allegations that defendants group into the

25

26          [4]    To the extent plaintiffs seek to allege falsity in connection with Bare's statements
    regarding its multi-channel distribution model and growth strategy (i.e., cross-selling and
27  cannibalization of sales via rapid expansion), brand loyalty and club sales program, and
    premium image dilution, defendants contend – and are correct – that the same reasons for
28  dismissing plaintiffs' Section 11 claim, also apply here, and warrant dismissal of plaintiffs'

United States District Court

For the Northern District of California

1  following categories:  (1) Bare's business model was not performing well, rendering Bare's

2  financial guidance "meaningless;" (2) Bare's infomercials were "not performing" and new

3  infomercials had caused declines in sales; (3) Bare's wholesale channels had problems;

4  and (4) the international markets were failing.  See, e.g., CCC, ¶¶ 112, 134 (a)-(k).

5      Defendants assert that plaintiffs' allegations fall short of Rule 9(b)'s heightened

6  pleading requirements.  First, defendants argue that a review of the financial reports cited

7  by plaintiffs discloses that Bare actually exceeded its financial guidance numerous times,

8  and only reduced its guidance in July and October 2008 in response to the deepening

9  recession – thus giving the lie to plaintiffs' allegation that Bare's business model was not

10  performing well and that its stated financial guidance was "meaningless" .  See CCC, ¶¶

11  129, 135-36, 140-41, 155, 173, 195; see Arico Decl., Exs. 3-5, 7-8.  Second, defendants

12  note plaintiffs' failure to plead facts that actually show that Bare knew the performance of

13  its infomercials would be disappointing, and that to the extent defendant Blodgett said she

14  was "excited" about an upcoming infomercial in May 2007, this was non-actionable puffery.

15  See In re Foundry Networks, Inc. Sec. Litig., 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003).

16   Third, defendants contend that Bare's wholesale channels were actually doing well, based

17  on the performance reflected in the financial reports cited by plaintiffs in their complaint,

18  and also that plaintiffs fail to plead facts showing that Bare somehow knew that its premium

19  wholesale partners would reduce inventory levels while claiming the opposite.  Finally,

20  defendants argue that Bare's international expansion efforts actually proved successful, as

21  demonstrated by the performance records contained within the financial reports cited by

22  plaintiffs in their complaint.  See Mot. Dismiss at 19:3-23:11.

23      In opposition, however, plaintiffs do not substantively respond to the majority of

24  defendants' arguments.  Rather, plaintiffs merely counter that it would be "impossible to

25  meaningfully summarize the 100+ page complaint here in order to outline every class

26  ────────────────

27  Section 10(b) claim on falsity grounds.  Thus, the court as a preliminary matter GRANTS
    defendants' motion to dismiss plaintiffs' 10(b) claim, to the extent premised on these same
28  allegations.

United States District Court

For the Northern District of California

1  period misstatement." See Op. Br. at 10-16.  By failing to at least meaningfully summarize

2  and combat the various categories of statements highlighted by defendants, however,

3  plaintiffs have essentially abdicated their responsibility to rebut defendants' dismissal

4  arguments, and conceded the point.

5       Plaintiffs do counter defendants' arguments with respect to the performance of

6  Bare's "infomercials" specifically, relying on paragraphs 60, 75, 77, and 86 and 90, for the

7  proposition that Bare believed in the growth continuity of the infomercial sales channel –

8  thereby purportedly demonstrating the falsity of such statements in light of the infomercials'

9  declining performance and declining sales.  See Opp. Br. at 34:23-35:6.  Critically,

10  however, plaintiffs completely fail to set forth any particularized allegations that would

11  demonstrate 'how' or 'why' defendants' alleged statements relating to Bare's infomercial

12  program were false when made.  Plaintiffs have essentially alleged that, while defendants

13  stated their "belief" in the growth of Bare's infomercial and online shopping sales, the reality

14  reflected something different, since infomercial sales were actually diminishing as a result,

15  for example, of defendants' rapid expansion into brick and mortar sales channels.  See,

16  e.g., ¶ 75, 77-78.  These allegations do nothing to establish that defendants' statements

17  regarding the growth of its infomercial programs were false *when made*, however.  In short,

18  plaintiffs fail to plead the falsity of Bare's statements in connection with its infomercial

19  program, with sufficient particularity.

20       Moreover, because plaintiffs do not bother to address any of the other three

21  categories of allegedly material misstatements and/or omissions highlighted by defendants,

22  plaintiffs have also failed to discharge their burden to successfully rebut defendants' well-

23  supported arguments.

24       All of which warrants DISMISSAL of plaintiffs' section 10(b) claim, for failure to

25  allege defendants' purported misstatements with particularity.

26            c.    the 'scienter' element

27       Even if failure to plead falsity did not provide a basis for dismissal, plaintiffs' failure to

28

United States District Court

For the Northern District of California

1   allege scienter ultimately would.  "In considering whether a private securities fraud

2   complaint can survive dismissal under Rule 12(b)(6), [the court] must determine whether

3   particular facts in the complaint, taken as a whole, raise a strong inference that defendants

4   intentionally or with deliberate recklessness made false or misleading statements."

5   America West, 320 F.3d at 932.  To determine whether a plaintiff has alleged facts that

6   give rise to the requisite "strong inference" of scienter, a court must consider plausible

7   nonculpable explanations for the defendant's conduct, as well as inferences favoring the

8   plaintiff.  See Tellabs, Inc., 551 U.S. at 323.

9        Plaintiffs generally contend that they adequately allege scienter by virtue of: (i) core

10  operation allegations; (ii) unusual stock sales; and (iii) corroboration of confidential

11  witnesses.  Ultimately, however, none of these are sufficient.

12                          i.     core operation allegations

13       Plaintiffs argue that each individual defendant's role as a "key player" in Bare's

14  internal operations helps satisfy the scienter requirement with respect to

15  misrepresentations regarding Bare's infomercial business.  Specifically, plaintiffs allege that

16  each defendant knew of the performance of various sales channels and was intimately

17  involved in and fully aware of actual reports regarding sales through all channels."  See,

18  e.g., CCC, ¶¶ 38-45.  This is proof of scienter, argue plaintiffs, with respect to the

19  company's misrepresentations regarding the "infomercial" sales channel as an avenue of

20  growth for the company.

21       As defendants point out, however, plaintiffs rely too broadly on a very narrow

22  exception to the scienter requirement.  As a general rule, complaints alleging that "facts

23  critical to a business's core operations or an important transaction generally are so

24  apparent that their knowledge may be attributed to the company and its key officers" are

25  found inadequate.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000 (9th Cir.

26  2009).  However, a narrow exception exists when (a) falsity is combined with "allegations

27  regarding a management's role in the company" that are "particular and suggest that the

28

34

United States District Court
For the Northern District of California

defendant had actual access to the disputed information," and where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter;" and (b) where the information misrepresented is readily apparent to the defendant corporation's senior management. See id. at 1000-01. Here, plaintiffs appear to be relying on the latter category of exemption.  But, as defendants point out, under this exemption, "reporting false information will only be indicative of scienter where the falsity is patently obvious"- i.e., where the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them." Id.  And here, plaintiffs fail to allege especially prominent facts.  Rather, they charge that Bare misstated its belief that it could "further penetrate" its multiple distribution channels, including growing infomercial sales." See CCC, ¶ ¶ 38-39, 41-45, 60, 75-77.  But as noted previously, there are insufficient facts to detail the falsity of this claim with particularity – let alone to establish that the falsity was "patently obvious."

Thus, plaintiffs cannot utilize the 'core operations' exemption here to show scienter with respect to purported misrepresentations surrounding Bare's infomercial program. Plaintiffs have not attempted to utilize the exemption to show scienter in connection with other categories of misrepresentations.

ii.    unusual stock sales

Plaintiffs argue that stock sales by several defendants are indicative of scienter.  As defendants note, however, the only defendants who really sold stock were Bare officers Blodgett and McCormick, and Bare directors John and Ottinger.  Blodgett sold stock in the March/June 2007 offerings, and sold 18.9% and 8.21% respectively; McCormick sold stock in the June 2007 offering, and sold 6.66% of his stock; John sold 14.5% of his holdings in February 2008, pursuant to a 10b-5 trading plan; and Ottinger sold stock in the March/June 2007 offerings, and sold 17.0% and 8.14%, respectively.  See CCC, ¶¶ 38-39, 44-45, 72, 82, 248.

Generally, the PSLRA "neither prohibits nor endorses the pleading of insider trading

United States District Court

For the Northern District of California

as evidence of scienter, but requires that the evidence meet the 'strong inference'

standard." In re Daou Sys., 411 F.3d at 1022 (citation and quotation omitted).  Stock

trades are only suspicious when "dramatically out of line with prior trading practices at

times calculated to maximize the personal benefit from undisclosed inside information."  In

re Silicon Graphics, 183 F.3d at 986. To evaluate suspiciousness of stock sales, the court

should consider the amount and percentage of shares sold, the timing of the sales, and

whether the sales were consistent with prior trading history.  Nursing Home, 380 F.3d at

1232.

Here, only 4 of the 10 individual defendants sold stock during the class period.  And

not all of these 4 defendants are alleged to have made false and or misleading statements.

Moreover, no defendant sold more than 20% of their stock at any given time.  Furthermore,

while plaintiffs are correct that the amounts of stock sold are alleged to have generated

extraordinarily large sums for the defendants – e.g., $58 million for Blodgett and $700

million for McCormick – they do not suggest that there was anything especially problematic

with the timing of the sales, since the stock was sold before final and favorable results for

2007 were reported.

In short, the court does not find the stock sales, without more, by several of the

Individual defendants to be probative of scienter.

iii.     corroboration of confidential witnesses

Plaintiffs also point to the testimony of confidential witnesses in order to establish

scienter.  See CCC, ¶¶ 13-14, 15, 17, 114.  Confidential witnesses whose statements are

introduced to establish scienter must be described with sufficient particularity to establish

their reliability and personal knowledge.  In re Daou, 411 F.3d at 1015-16.  In addition,

those statements which are reported by confidential witnesses with sufficient reliability and

personal knowledge must themselves be indicative of scienter.  See id. at 1022. 1022.

Here, plaintiffs' confidential witness testimony, as alleged in the complaint, falls short

of the standard needed to raise an inference of scienter.  First, as defendants contend,

36

United States District Court

For the Northern District of California

1   plaintiffs have failed to offer any confidential witness information concerning six of the eight

2   Individual defendants – defendants Blodgett, Ottinger, Jones, Bloom, Hansen, and John.

3   Since there is no allegation that any confidential witness "had any interaction or

4   communication with any of the defendants, or to have provided any defendant with

5   information, or to have heard or read any statement by any defendant, that contradicted or

6   even cast doubt on a public statement made during the class period," there is simply no

7   basis from which to infer scienter with respect to these six defendants.

8        Second, with respect to the remaining two witnesses – defendants McCormick and

9   Miles – plaintiffs' confidential witness testimony consists of the following: testimony by a

10  former Director of Retail Boutiques, to the effect that approximately 30 executives attended

11  monthly meetings conducted by defendant McCormick, and sometimes defendant Miles, at

12  which the issue of sales at Target and Costco was common knowledge and raised

13  regularly.  See CCC, ¶¶ 17, 114.  There is no allegation that either defendant Miles or

14  McCormick raised the issue themselves, nor is there any indication that either defendant in

15  any way knew, as plaintiffs charge, that Bare was intentionally shipping company goods to

16  big-box discounters while deliberately disclaiming any involvement in such sales.  To the

17  contrary, plaintiffs have alleged that "McCormick assured the sales Directors the Company

18  "was looking into" the situation – an allegation that could just as easily support defendants'

19  innocence, as their culpability.  Id., ¶ 114.

20       In sum, plaintiffs' isolated confidential witness statements fail to create an inference

21  of scienter more cogent or compelling than an alternative innocent inference.

22                                          * * *

23       The court therefore GRANTS defendants' motion to dismiss, for failure to adequately

24  allege scienter.

25            d.      safe harbor/'bespeaks caution' doctrine

26       Finally, defendants assert that many of the alleged misstatements pled by plaintiffs

27  during the class period are non-actionable, pursuant to the 'bespeaks caution' doctrine.  In

28

United States District Court

For the Northern District of California

essence, defendants argue that the alleged misstatements were accompanied by meaningful cautionary language, such as to render any claim of fraudulent misstatement not actionable.  Plaintiffs, in response, contend that rote cautionary language such as that contained in the statements highlighted by defendants, cannot counter the alleged misstatements made by defendants at the dismissal stage.[5]

Defendants have specifically and adequately highlighted the following instances of defendants' alleged forward-looking statements: defendants' press releases and/or conference statements dated November 7, 2006, February 28, 2007, May 2, 2007, June 5, 2007, August 1, 2007, September 26, 2007, October 31, 2007, November 29, 2007, February 26, 2008, March 1, 2008, and July 30 2008.  See CCC, ¶¶ 129, 131-32, 135-36, 140-42, 145, 148, 151-52, 155, 157-58, 167, and 173.  As alleged by plaintiffs, on each of these instances, defendants provided future projections with regard to the Company's financial guidance and/or general future expenditures.  As such, defendants' projections easily meet the definition of a forward-looking statement.  See 15 U.S.C. § 78-u5i(i)(1)(A).

Defendants' projections and forward-looking statements are inactionable under the PSLRA's safe harbor and the 'bespeaks caution' doctrine, provided they are accompanied by meaningful cautionary language.  See, e.g., Employers Teamseters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1133-34 (9th Cir. 2004).  This is so here, with respect to at least some of defendants' forward-looking statements.

Specifically, defendants have established that meaningful cautionary language accompanied defendants' forward-looking statements in connection with the Company's releases and/or conferences dated November 7, 2006; February 28, 2007; May 2, 2007; June 5, 2007; August 1, 2007; October 31, 2007; November 29, 2007; and February 26, 2008.  See CCC, ¶¶ 131-32, 180-82, 184, 188; see also Arico Decl., Exs. 3-5, 13-14, 27,

---

[5]      While the court would not normally find it necessary to reach this ground in view of plaintiffs' difficulties in establishing both falsity and scienter, the court nonetheless addresses defendants' arguments here in order to provide the parties with a thorough analysis of all arguments made.

1   29-30, 37-39, 40-41.  Moreover, defendants have also correctly noted that defendants'

2   Form 10-Ks – which investors were also directed to in connection with the foregoing

3   instances of cautionary language – additionally included meaningful cautionary language.

4   See, e.g., Arico Decl., Exs. 1-2, 6.

5       All of which renders defendants' forward-looking statements inactionable.  Plaintiffs

6   oppose such a finding on grounds that the cautionary language relied on by defendants is

7   too "generic" to support invocation of the 'bespeaks caution' doctrine at the pleading stage.

8   However, the court is unpersuaded, and finds that defendants' cautionary language is

9   sufficiently specific so as to support application of the doctrine in the foregoing instances.

10  Furthermore, even if unaccompanied by cautionary language, forward-looking statements

11  cannot support liability unless they are made with actual knowledge of their falsity.  See 15

12  U.S.C. § 78u-5(c)(1)(A)(i).  And as already explained, plaintiffs have not plead with

13  particularity Defendants' actual knowledge of falsity in any event.

14      Thus, defendants' motion to dismiss is GRANTED, with respect to the forward-

15  looking statements accompanied by meaningful cautionary language, as highlighted herein.

16      4.   Whether Plaintiffs' Claims are Time-Barred

17      The Bare defendants also argue that plaintiffs' claims under both the Securities Act

18  and the Exchange Act are untimely, and barred by the relevant statute of limitations.

19  Defendants' arguments, which are sparse, contend that paragraphs 203 and 205-06 of the

20  complaint disclose that "the nature and extent of the defendants' fraud" was "revealed to

21  investors and the market" on June 5, 2007, and again on August 1, October 31, and

22  November 26, 2007.  Thus, the one year limitations period that applies to Securities Act

23  claims expired on June 5, 2008, and the two-year limitations period that applies to

24  Exchange Act claims expired on June 5, 2009 – well before the July 2009 filing of plaintiffs'

25  complaint.  At a minimum, defendants contend that the limitations period began to run on

26  February 26, 2008, when Bare publicly disclosed the existence of the Target/Costco sales.

27  Plaintiffs, in response, contend that it was not until the final eventful disclosure that

28

39

1    occurred on October 30, 2008 – via the Company's 3rd quarter earnings release statement

2    – that the statute of limitations began to run.

3        The court declines to dismiss plaintiffs' claims as time-barred.  The determination of

4    inquiry notice is fact-intensive.  See, e.g., La Grasta v. First Union Sec., Inc., 358 F.3d 840,

5    847, 850 (11th Cir. 2004) (holding that a decline in stock price alone is not enough to put

6    investors on inquiry notice when stock had history of volatility); Caprin v. Simon Transp.

7    Serv., Inc., 99 Fed. Appx. 150,156-57 (10th Cir. 2004) (stating that plaintiff was on inquiry

8    notice of the company's fraudulent activity in light of the dramatic decline in stock price and

9    press release projecting loss); Benak v. Alliance Capital Management, LP, 435 F.3d 396

10   (3d Cir. 2006) (mutual fund investors are held to a lower standard of inquiry notice because

11   they may be unaware of where their investments are placed); Swack v. Credit Suisse First

12   Boston, 383 F. Supp. 2d 223, 234-236 (D. Mass. 2004) (finding that extensive reports

13   about conflicts of interest were not significant enough to trigger the limitations period until

14   the facts were revealed in a government investigation); Menowitz v. Brown, 991 F.2d 36,

15   41-42 (2d Cir. 1993) (holding that inquiry notice was provided by SEC filings); In re Dynegy,

16   Inc. Sec. Litig., 339 F. Supp. 2d 804 (S.D. Tex., Oct. 7, 2004).  But see Newman v.

17   Warnaco Group, Inc., 335 F.3d 187 (2d Cir. 2003) (holding that SEC filing of restated

18   earnings did not put the plaintiffs on inquiry notice because the report attributed the

19   restatement to a "benign" accounting change and failed to disclose the presence of serious

20   inventory problems); Shah v. Stanley, No. 03 CIV. 8761 (RJH), 2004 WL 2346716, at *9-13

21   (S.D.N.Y. Oct. 19, 2004), aff'd, 435 F.3d 244 (2d Cir. 2006) (finding that suit was time

22   barred because an investor in a security firm had inquiry notice about conflicts of interest

23   when articles critical of the security firm's practices were published); In re WorldCom, Inc.

24   Sec. Litig., 294 F.Supp. 2d 431 (S.D.N.Y. 2003) (finding that SEC subpoena by itself does

25   not trigger inquiry notice).

26       Here, in light of the various purported disclosures and relevant dates that plaintiffs

27   allege, stemming throughout the class period – the last of which allegedly occurred in the

28

40

United States District Court

For the Northern District of California

1   October 30, 2008 earnings release statement – the court finds that resolution of the

2   limitations issue is not appropriate at the pleading stage, but must be determined once an

3   evidentiary record has been developed.  Moreover, while defendants are correct that

4   plaintiffs allege multiple disclosures beginning as early as June 5, 2007 regarding the

5   exposure of defendants' fraud, plaintiffs are also entitled to the reasonable inference that it

6   is the course of all disclosures collectively that ultimately placed plaintiffs on notice of the

7   need to investigate for fraud – i.e., that it was no single disclosure that was dispositive, but

8   rather all the disclosures collectively.

9        The court accordingly DENIES defendants' motion to dismiss plaintiffs' claims on

10  statute of limitations grounds.

11        5.      Whether Plaintiffs State 'Control Person' Claims or 'Insider Trading' Claims

12                Under the Securities Laws

13        Defendants point out that, to state a claim for control person liability under section 15

14  of the Securities Act or section 20(a) of the Exchange Act, or for insider trading under

15  Section 20A of the Exchange Act, plaintiffs must plead a predicate violation of section 11 or

16  10(b).  Since they have failed to do so here, therefore, plaintiffs' claims must fail as to

17  section 15 and 20(a), too.  To the extent, moreover, that plaintiffs also seek to bring control

18  person claims against the outside directors of Bare, these claims also fail because plaintiffs

19  fail to plead specific facts establishing that these persons exercised a "significant degree of

20  day to day operational control" over the company, as the law requires.  In response,

21  plaintiffs do not specifically rebut or challenge defendants' argument on this point, except

22  with a brief argument included as part of plaintiffs' section 10(b) arguments.  Namely,

23  plaintiffs state that their allegations generally demonstrate that each Bare defendant was a

24  key player in the day to day operations of the company.

25        Adequate pleading of a primary violation of sections 11 and 10(b) is required for a

26  plaintiff to adequately plead control liability under § 20(a) of the Exchange Act and § 15 of

27  the Securities Act.  See, e.g., 15 U.S.C. § 78t.  Accordingly, because the complaint fails to

28

United States District Court

For the Northern District of California

1    state a claim for primary liability under the Securities Act or the Exchange Act, it follows that

2    the court must therefore GRANT defendants' motion to dismiss plaintiffs' claim for control

3    person liability.

4    C.       Underwriters' Motion to Dismiss

5            Separately, the Underwriter defendants contend that dismissal of plaintiffs' Section

6    11 and Section 12(a)(2) claims against the underwriters are time-barred.  Defendants make

7    two general arguments in support of dismissal:  first, that plaintiffs have failed to sufficiently

8    plead compliance with the statute of limitations; and second, that plaintiffs could not satisfy

9    their pleading burden with respect to the statute of limitations at any rate, given the

10   substantive allegations of the complaint.  Plaintiffs contest defendants' assertions, arguing

11   that the defendants are incorrect as to the time frame in which plaintiffs' causes of action

12   accrued, and that the statute of limitations issue is not appropriate for resolution at the

13   pleading stage in this instance.

14          As a general matter, the controlling standard for accrual of plaintiffs' claims is not in

15   dispute: plaintiffs must have filed suit within one year of the date they discovered or should

16   have discovered that the alleged statements or representations were untrue.  See 15

17   U.S.C. § 77m.  As the Supreme Court recently recognized, "discovery of the facts

18   constituting the violation" occurs not only once a plaintiff actually discovers the facts, but

19   also when a hypothetical reasonably diligent plaintiff would have discovered them.  See

20   Merck & Co., Inc. v. Reynolds, 130 S.Ct. 1784, 1795 (2010)("discovery" as [applied to

21   Exchange Act limitations period] encompasses not only those facts the plaintiff actually

22   knew, but also those facts a reasonably diligent plaintiff would have known.");  see also

23   Gray v. First Winthrop Corp., 82 F.3d 877, 881 (9th Cir.1996); Volk v. D.A. Davidson & Co.,

24   816 F.2d 1406, 1412 (9th Cir.1987).[6]

25          In contending that plaintiffs have fallen short of their duty to adequately plead

26   _____

27          [6]      While Merck applied this rule to a 10(b) violation, it is the same rule applicable

28   to section 11 Securities Act claims such as those asserted against the underwriters here.

42

United States District Court

For the Northern District of California

1    compliance with the statute of limitations, defendants rely on <u>Toombs v. Leone</u>, 777 F.2d

2    465 (9th Cir. 1985).  As a general matter, defendants are correct that <u>Toombs</u> holds that

3    plaintiffs are required to plead sufficient facts to demonstrate conformity with the statute of

4    limitations.  However, <u>Toombs</u> does not detail the kind of facts that are required in order for

5    a plaintiff to adequately allege conformity with the statute of limitations.  In the case before

6    it, the <u>Toombs</u> court merely held that plaintiff's failure to allege the date upon which his

7    securities were delivered, or any dates upon which securities were sold to other investors,

8    ultimately rendered plaintiff's claim time-barred.  <u>See id</u>. at 468.  Here, by contrast, the

9    court finds that plaintiffs have generally alleged, at a minimum, the amounts of stock sold at

10   different points in time, the amount of proceeds as a result of the alleged sales, and the

11   amount of alleged fees received by the Underwriter defendants.  <u>See, e.g.</u>, CCC ¶¶  29,

12   71-72, 81; <u>see also id</u>., ¶ 230.  As such, the court declines defendants' invitation to dismiss

13   plaintiffs' claims for failure to appropriately plead compliance with the statute of limitations

14   under <u>Toombs</u>.

15          Defendants also focus on the substance of plaintiffs' allegations, contending that

16   plaintiffs' allegations regarding defendants' alleged misstatements make clear that the facts

17   concerning all purported misstatements were in the public domain in 2007 and the first part

18   of 2008 – a fact which makes plaintiff's August 2009 complaint as to the underwriters

19   untimely.  Defendants have broken the alleged misstatements down into the following three

20   now familiar categories: (1) the Company's statements that it was marketing and selling its

21   products through premium channels, when in reality its products were also available at

22   Costco and Target; (2) the Company's reliance on "club deals," in which customers found

23   themselves receiving products they had not ordered and/or did not want; and (3) the

24   Company's multi-channel distribution strategy, and/or the Company's infomercial program,

25   and/or the Company's expansion into brick and mortar sales venues, all of which were

26   failing or in jeopardy of failing.

27          On balance, the court is unpersuaded by defendants' arguments.  As was explained

28

United States District Court

For the Northern District of California

1  in connection with the Individual defendants' motion to dismiss on statute of limitations

2  grounds, the question of inquiry notice – and the commencement of the statute of

3  limitations on plaintiffs' claims – is fact-intensive.  As a result, and because the court does

4  not find plaintiffs' allegations so devoid of substance that they are completely lacking in

5  plausibility with respect to the running of the statute of limitations, plaintiffs are entitled to

6  develop a factual record prior to resolution of the issue.

7      Thus, the Underwriter defendants' motion to dismiss on statute of limitations

8  grounds, is accordingly DENIED without prejudice.

9  D.    Leave to Amend

10     Plaintiffs request that they be given leave to amend the complaint.  Federal Rule of

11  Civil Procedure 15(a) dictates that leave to amend be "freely given" when justice so

12  requires.  See Foman v. Davis, 371 U.S. 178, 182 (1962).   Accordingly, the court GRANTS

13  plaintiffs' request for leave to amend, so that plaintiffs may attempt to cure the deficiencies

14  noted herein.  Plaintiffs' amendments are limited to the grounds discussed herein; plaintiffs

15  may not attempt to broaden the scope of their claims against defendants beyond that which

16  has already been pled and discussed.

17  E.    Conclusion

18     For all the foregoing reasons, the court hereby GRANTS in part and DENIES in part

19  the Individual defendants' motion to dismiss; GRANTS in part and DENIES in part

20  defendants' request for judicial notice; GRANTS plaintiffs' request for judicial notice;

21  GRANTS in part and DENIES in part plaintiffs' motion to strike; and DENIES the

22  Underwriter defendants' motion to dismiss.  Leave to amend is also granted, and any

23  amended complaint shall be filed within 28 days of the filing of this order.

24  **IT IS SO ORDERED**.

25  Dated: September 30, 2010

26                                    _____
                                     PHYLLIS J. HAMILTON
27                                    United States District Judge

28

44